## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES INSTITUTE OF PEACE**, *et al.*, | |
| Plaintiffs, | |
| v. | **Case No. 1:25-cv-00804-BAH** |
| **KENNETH JACKSON**, *et al.*, | |
| Defendants. | |

## PLAINTIFFS' STATEMENT OF MATERIAL FACTS AS
## TO WHICH THERE IS NO GENUINE ISSUE

Pursuant to Local Civil Rule 7(h), Plaintiffs hereby provide the following statement of material facts as to which there is no genuine issue.

## CREATION OF UNITED STATES INSTITUTE OF PEACE

1.     In 1984, Congress established the United States Institute of Peace ("USIP" or "the Institute") as an independent nonprofit corporation pursuant to the United States Institute of Peace Act (the "USIP Act").  Pub. L. No. 98-525, tit. XVII, § 1701, 98 Stat. 2492, 2649 (1984), 22 U.S.C. §§ 4601-4611, as amended.

2.     The Institute's creation followed the 1980 formation of the Commission on Proposals for the National Academy of Peace and Conflict Resolution ("the Commission").  Pub. L. No. 95-561, 92 Stat. 2143, 2376 (1980).  The Commission published its final report on the creation of a United States Peace Academy in 1981.  *See* Commission on Proposals for the National Academy of Peace & Conflict Resolution, *To Establish the United States Academy of Peace: Report to the President and Congress* (1981) ("Matsunaga Commission Report").

3.      Congress found that "there is a need for Federal leadership to expand and support the existing international peace and conflict resolution efforts of the Nation and to develop new comprehensive peace education and training programs, basic and applied research projects, and programs providing peace information," and that the Institute represents "the most efficient and immediate means" and "an appropriate investment by" the United States to promote peace and the peaceful resolution of conflicts. 22 U.S.C. § 4601(a).

4.      Congress designed the Institute to "carry out its activities outside the day-to-day policymaking pressures and constraints which might impinge upon that freedom were [the Institute] to be part of an existing agency or department." S. REP. NO. 98-244, at 23 (1983) (favorably reporting S. 564 to establish the U.S. Academy of Peace) (Ex. 26). *See also* 130 CONG. REC. 17,504 (1984) (proposing S. 564 as Hatfield Amendment No. 3270 to the Department of Defense Authorization Act, 1985, H.R. 5167, 98th Cong. (1984)).

5.      Congress stressed the Institute's role as a resource for both the legislative and executive branches. *Id.* (stating importance of an entity "whose only role is to explore alternatives to international violence and to bring those alternatives to the attention of those in a position of trust, within both the legislative and executive branches.").

## USIP ASSETS: THE HEADQUARTERS BUILDING, ENDOWMENT MONIES, AND STORED COMPUTER INFORMATION

6.      The Institute's headquarters building is located at 2301 Constitution Avenue, NW, Washington, DC 20037.

7.      The land on which the USIP headquarters sits is owned by the United States; however, Congress authorized the transfer of administrative jurisdiction over that land from the U.S. Department of the Navy to the Institute pursuant to Section 2831 of the National Defense

10133397.1

Authorization Act for Fiscal Year 1997.  The U.S. Navy completed that transfer on November 21, 1996.  Amended Compl. Ex. B (ECF No. 12-2).

8.      Congress authorized the transfer of administrative jurisdiction over an adjacent parcel of land pursuant to Section 2842 of the John Warner National Defense Authorization Act for Fiscal Year 2007.  The U.S. Navy completed that transfer on August 29, 2012.  Amended Compl. Ex. C (ECF No. 12-3).

9.      The Institute constructed its headquarters building beginning in 2008.  The building was initially funded with about $70 million of private contributions and $99 million of funds specially appropriated by Congress.  *See* Pub. L. No. 108-447, div. J, §§ 118, 122, 118 Stat. 2809, 3347-48 (Dec. 8, 2004).  After an additional appropriation of $15 million and completion of the building, *see* Pub. L. No. 111-117, div. F, tit. I, 123 Stat. 3034, 3319 (Dec. 16, 2009), Congress prohibited further use of appropriated funds for construction.  *See*, *e.g.*, Pub. L. No. 112-10, § 2103, 125 Stat. 38, 177 (Apr. 15, 2011); Pub. L. No. 118-47, div. F, tit. I, 138 Stat. 460, 736 (Mar. 23, 2024).  USIP has used private funds for building maintenance and renovation. Ex. 3, Decl. of Allison Blotzer ¶ 5.

10.     Pursuant to Congressional authority, § 4603(c), in 1986 the Institute created a separate nonprofit legal entity, the "Endowment of the United States Institute of Peace," under District of Columbia law.  Ex. 17, Endowment of the US Institute of Peace Form 990 (2022).

11.     The Endowment has held significant assets for the Institute, including bank accounts holding yet-unexpended appropriated funds pursuant to § 4609(b), as well as contributions from private sources for the limited purposes permitted by § 4604(h)(3). As of March 14, 2025, the Endowment's accounts held approximately $15 million in private contributions for the limited purposes permitted by § 4604(h)(3), and approximately $10 million

10133397.1

in unexpended appropriated funds pursuant to § 4609(b).  Exhibit 3, Decl. of Allison Blotzer ¶¶ 3-4 X.

12.      USIP's computer systems contain sensitive, important, and legally necessary information. For example, this includes employee information, vendor information, all of USIP's research and educational materials, including those developed and used in USIP's online global academy, documentation for intellectual property purposes, and documentation to support Institutional Review Board standards for research using human subjects. Amended Compl. Ex. H Decl. of Shira Lowinger ¶ 10 (ECF No. 12-8).

13.      USIP's computer systems contain decades of research and educational materials which are USIP's intellectual property and documentation supporting this claim of intellectual property, such as author agreements. This includes but is not limited to educational courses and other materials used in USIP's online global academy, and student lists. The loss of control of intellectual property documentation renders USIP unable to use, distribute, or sell these texts in the future, which would harm USIP's ability to carry out a core part of its mission, which is education and training. *Id.* ¶ 13.

14.      USIP electronically maintains documentation regarding its operations and use of funds in its computer systems, which are required for audits, tax reporting obligations, and its statutorily mandated requirement to report its annual audits to Congress and the President of the United States. *Id.* ¶ 16.

**USIP BOARD OF DIRECTORS AND ACTING PRESIDENT GEORGE MOOSE**

15.      As provided in the USIP Act, 22 U.S.C. § 4605(b), the Institute's Board of Directors (the "USIP Board"), consists of three *ex officio* members (the Secretary of State, the Secretary of Defense, and the president of the National Defense University) and twelve members

10133397.1

appointed by the President with the advice and consent of the Senate. *See also* Ex. 37, USIP Bylaws.

16.     As of March 13, 2014, the USIP Board had 14 members: the three *ex officio* members plus 11 individuals duly appointed pursuant to § 4605(b)(4). One of the (b)(4) Board members resigned on March 14, leaving 10 (b)(4) Board members.

17.     *Ex officio* member Secretary of State Marco Rubio was confirmed by the U.S. Senate as the Secretary of State on January 20, 2025.  171 CONG. REC. S259 (daily ed. Jan. 20, 2025) (confirmation).

18.     *Ex officio* member Secretary of State Pete Hegseth was confirmed by the U.S. Senate as the Secretary of Defense on January 24, 2025.  171 CONG. REC. S374 (daily ed. Jan. 24, 2025) (confirmation).

19.     *Ex officio* member Vice Admiral Garvin assumed command as the president of the National Defense University on October 11, 2024.  Ex. 18, National Defense University, "VADM Peter A. Garvin, USN," (*available at* https://www.ndu.edu/About/Leadership/Article-View/Article/2492624/vadm-peter-a-garvin-usn/).

20.     Ambassador John Sullivan was confirmed by the U.S. Senate as a member of the USIP Board on May 2, 2024.  170 CONG. REC. S3369 (daily ed. May 2, 2024) (confirmations). His term began on July 20, 2024.[1]  He fills one of the Republican slots.  Ex. 19, Sullivan Appointment Affidavit (2024).

21.     Nancy Zirkin was confirmed by the U.S. Senate as a member of the USIP Board on June 4, 2008. 154 CONG. REC. S5124 (daily ed. June 4, 2008) (confirmations).  Her term

---

[1]  *See* 22 U.S.C. § 4605(e)(5).

10133397.1

began on October 16, 2008. She fills one of the Democratic slots.  Ex. 20, USIP, "New Board Members Begin Tenure at U.S. Institute of Peace," (Oct. 16, 2008).

22.     Judy Ansley was simultaneously nominated to complete a prior USIP Board member's term and for reappointment as a member of the USIP Board.  157 CONG. REC. S293 (daily ed. Jan. 26, 2011).  She was confirmed by the U.S. Senate for both terms on May 26, 2011.  157 CONG. REC. S3468 (daily ed. May 26, 2011) (confirmations).  She was sworn in on June 6, 2011.  She fills one of the Republican slots.  Ex. 21, USIP, "New Members for USIP Board of Directors Sworn In," (June 7, 2011).

23.     Joseph Falk was confirmed by the U.S. Senate as a member of the USIP Board on February 2, 2023.  169 CONG. REC. S242 (daily ed. Feb. 2, 2023) (confirmations).  His term began on April 29, 2023. He fills one of the Democratic slots.  Ex. 6, Decl. of Joseph Falk, ¶ 3 (Apr. 3, 2025).

24.     Kerry Kennedy was confirmed by the U.S. Senate as a member of the USIP Board on June 4, 2008.  154 CONG. REC. S5124 (daily ed. June 4, 2008) (confirmations).  Her term began on October 16, 2008. She fills one of the Democratic slots.  Ex. 20, USIP, "New Board Members Begin Tenure at U.S. Institute of Peace," (Oct. 16, 2008).

25.     Mary Swig was confirmed by the U.S. Senate as a member of the USIP Board on August 4, 2022.  168 CONG. REC. S4048 (daily ed. Aug. 4, 2022) (confirmations).  Her term began on October 19, 2022. She fills one of the Democratic slots.  Ex. 5, Decl. of Mary Swig, ¶ 3 (Apr. 3, 2025).

26.     Jonathan Burks was confirmed by the U.S. Senate as a member of the USIP Board on August 4, 2022.  168 CONG. REC. S4049 (daily ed. Aug. 4, 2022) (confirmations). His term began on October 19, 2022. He fills one of the Republican slots.  Ex. 5, Decl. of Mary Swig, ¶ 3.

10133397.1

27.     Edward M. Gabriel was confirmed by the U.S. Senate as a member of the USIP Board on August 4, 2022.  168 CONG. REC. S4048 (daily ed. Aug. 4, 2022) (confirmations). His term began on October 19, 2022. He fills one of the Democratic slots.  Ex. 5, Decl. of Mary Swig, ¶ 3.

28.     Michael Singh was confirmed by the U.S. Senate as a member of the USIP Board on August 4, 2022.  168 CONG. REC. S4049 (daily ed. Aug. 4, 2022) (confirmations). His term began on October 19, 2022. He fills one of the Republican slots.  Ex. 5, Decl. of Mary Swig, ¶ 3.

29.     Roger Zakheim was confirmed by the U.S. Senate as a member of the USIP Board on January 30, 2023.  169 CONG. REC. S152 (daily ed. Jan. 30, 2023) (confirmation). His term began on April 29, 2023. He fills one of the Republican slots. Ex. 6, Decl. of Joseph Falk, ¶ 3 (Apr. 3, 2025).

30.     The remaining two appointed positions on the Board are vacant.

31.     The USIP Board appointed Ambassador George E. Moose as the Acting President of the Institute in April 2024. Ambassador Moose served on the USIP Board from 2007 to 2023, first as a member, then as Vice Chair and from October 2022 until a few months before his appointment to Acting President, as Chair. Amended Compl. Ex. A, Amended Decl. of George Moose ¶ 3 (ECF No. 12-1). Prior to joining the USIP Board, Ambassador Moose served in many governmental roles, including as Ambassador to the Republics of Benin and Senegal in the 1980s and 1990s and Assistant Secretary of State for African Affairs from 1993 to 1997.

32.     Pursuant to its status as an independent nonprofit, USIP may sue and be sued in its own name. *Id*. at § 4604(k). Accordingly, USIP is not represented in litigation by the Department of Justice. Indeed, USIP must, and does, hire private counsel for legal representation. For example, in 2022 USIP hired a private firm in in Omaha, Nebraska to pursue

payment recovery from a defaulting contractor. *See United States Institute of Peace v. Safiullah Rauf et. al.*, No. CI-1023 (Douglas County Ct. NEB); *see also* Amended Compl. Ex. D, Decl. of George Foote ¶ 3 (ECF No. 12-4) (declarant stating that he has served as USIP outside counsel since 1987).

33.     Pursuant to the USIP Act's requirement that USIP accounts be audited annually by an accredited, certified public accounting firm according to generally accepted auditing standards, § 4607(g), USIP has retained KPMG to conduct the annual audits.  Ex. 3, Decl. of Allison Blotzer ¶¶ 6-7.

**DEFENDANTS' ACTIONS PURSUANT TO EXECUTIVE ORDER 14217**

34.     On February 19, 2025, President Trump signed Executive Order 14217, entitled "Commencing the Reduction of the Federal Bureaucracy." Exec. Order No. 14217, 90 Fed. Reg. 10,577 (Feb. 25, 2025) ("EO 14217").  EO 14217 directs USIP to eliminate its "non-statutory components and functions . . . to the maximum extent consistent with applicable law" and to "reduce the performance of [its] statutory functions and associated personnel to the minimum presence and function required by law."  *Id*.

35.     EO 14217 further directed any official review of budget requests be rejected "to the extent consistent with applicable law and except insofar as necessary to effectuate an expected termination." EO 14217 required that it be implemented "consistent with applicable law and subject to the availability of appropriations." *Id*.

36.     On February 20, the day after issuance of EO 14217, a representative of the DOGE Service contacted the Institute. On February 24, Ambassador Moose and USIP's outside counsel met virtually with DOGE representatives Defendants Nate Cavanaugh, James Burnham, and Jacob Altik. Ambassador Moose and USIP counsel explained the Institute's legal status as

10133397.1

an independent nonprofit corporation outside of the Executive branch of the Federal government. The DOGE representatives asserted that the only statutory requirements of the Institute are the existence of its Board, the appointment of a president, the payment of incidental expenses for the Board, and the submission of certain reports to Congress and the Executive branch. Amended Compl. Ex. D, Decl. of George Foote ¶ 5 (ECF No. 12-4).

37.     On March 9, 2025, after the Institute received word that DOGE staff was making inquiries into the status of the Institute's security operations, George Foote emailed DOGE representatives James Burnham, Jacob Altik, and Nate Cavanaugh with information about the nature of the Institute's privately contracted security firm, and the Institute's ownership of its headquarters building.  Mr. Foote reiterated the Institute's status as an independent nonprofit organization and stated that uninvited persons would only be admitted to the property with a valid warrant issued by a court.  Mr. Foote did not receive a response from Mr. Burnham. *Id. ¶ 6*.

38.     On March 14, 2025, Trent Morse of the White House Presidential Personnel Office emailed certain members of the USIP Board "on behalf of" President Trump.  Ex. 12 (compilation of termination notices).  The email stated that the Board members' "position on the United States Institute of Peace {*sic*} is hereby terminated, effective immediately."  *Id.*

39.     By such emails President Trump purported to remove all 11 USIP Board members duly appointed pursuant to 22 USC § 4605(b)(4).

40.     The email did not identify a conviction of a felony, malfeasance in office, persistent neglect of duties, or inability to discharge duties on the part of any of the USIP Board members.  Ex. 12 (compilation of termination notices).

10133397.1

41.    The email did not indicate or claim that President Trump removed any of the USIP Board members pursuant to the recommendation of eight voting members of the USIP Board. *Id.*

42.    The email did not indicate or claim that President Trump removed any of the USIP Board members pursuant to the recommendation of a majority of the members of the Committee on Foreign Affairs and the Committee on Education and Labor of the House of Representatives and a majority of the members of the Committee on Foreign Relations and the HELP Committee of the Senate.  *Id.*

43.    On March 14, 2025, USIP's outside counsel was presented with a document labeled "Resolution of the Board of Directors" stating that "as of March 14, 2025, Mr. George E. Moose is removed from his position as USIP's president and Mr. Kenneth Jackson is designated as USIP's acting president with all the powers delegated by the Board of Directors to that role." Amended Compl. Ex. F (ECF No. 12-6).  The document did not reflect the agreement or participation of any Board member other than the three *ex officio* members.

44.    On March 14, a majority of the Board members duly appointed under 22 U.S.C. § 4605(b)(4) plus Ambassador Moose as an *ex officio* Board member convened a call with the Institute's outside counsel to discuss the termination notices. Counsel communicated his view that the notices have no legal effect because they do not comply with the for-cause termination clause of the USIP Act.  Amended Compl. Ex. D, Decl. of George Foote ¶¶ 7-8 (ECF No. 12-4).

45.    On March 14, at two different points in time, Defendant Jackson and representatives from DOGE, including Defendants Altik and Cavanaugh, entered onto the USIP parcel of land accompanied by FBI agents and requested access to the USIP headquarters

10133397.1

building. They presented no warrant and were denied entry to the USIP headquarters building.
*Id.* ¶¶ 8-9.

46.     On Sunday, March 16, two FBI agents visited a senior USIP security official at
his home unannounced for the purposes of gaining information on how to gain entrance to the
USIP building. *Id.* ¶ 10.

47.     That same Sunday, the Institute's outside counsel received multiple calls from
Jonathan Hornok, Chief of the Criminal Division of the U.S. Attorney's Office for the District of
Columbia. Hornok sought access to the USIP building for unnamed individuals and stated that he
had suspicion that USIP may be engaging in criminal behavior. In one call, Hornok sought
access to USIP records for *ex officio* Board member Hegseth as provided in 22 U.S.C. § 4607(f).
Hornok demanded access to the building and USIP computer systems for an unnamed
representative of Defendant Hegseth at 2:00 p.m. the following day. USIP counsel offered to
arrange access as provided in the statute but refused Hornok's demand as outside the statutory
requirements of reasonableness. Hornok told USIP counsel that he would criminally investigate
USIP and anyone who "obstructed" access to USIP's computer systems. *Id.* ¶¶ 12-15.

48.     On March 16, the Institute suspended its contract with its security firm, Inter-Con
Security Systems Inc. ("Inter-Con"), based on Inter-Con's efforts to coordinate with Defendants
and facilitate access to the USIP headquarters building by the DOGE Defendants and Defendant
Jackson. USIP cancelled the Inter-Con contract on March 17.  Amended Compl. Ex. G, Decl. of
Colin O'Brien ¶¶ 4, 9 (ECF No. 12-7).

49.     The following day, March 17, four employees of Inter-Con arrived at USIP
headquarters at approximately 2:30 p.m. After they were initially unable to enter the building
because their badges had been deactivated upon the suspension of Inter-Con's contract, another

10133397.1

Inter-Con employee, Kevin Simpson, arrived with a physical key that USIP had not yet recovered from Inter-Con. Simpson used the key to gain entrance into the USIP headquarters building and let in the other Inter-Con employees. *Id.* ¶¶ 5-6.

50.    In response, Institute counsel called the Washington, D.C. Metropolitan Police Department ("MPD") to report Inter-Con's entry without consent to the Institute's land and headquarters building. *Id.* ¶ 7.

51.    When MPD officers arrived to receive the report, they assisted DOGE personnel, who were present outside the building, to gain physical entry to the Institute's building. MPD officers escorted Ambassador Moose, other USIP personnel, and outside counsel from the building, leaving the DOGE Defendants and Defendant Jackson in physical possession and control of USIP's headquarters. *Id.* ¶¶ 14-17, 20, 24.

52.    As of March 14, 2025, the Institute employed over 400 employees and personal services contractors to carry out its statutory mandate. Ex. 4, Decl. of Terry Jones ¶ 3.

53.    On March 21, 2025, Defendant Jackson fired six USIP employees. The termination letters referred to the employees' "at-will-employment-status." *See, e.g.*, Ex. 13 ("Termination of Colin O'Brien's At-Will Employment with USIP").

54.    On March 28, 2025, one or more Defendants caused termination notices to be sent to virtually all of the Institute's employees. Ex. 4, Decl. of Terry Jones ¶ 5; *See* Abigail Hauslohner & Derek Hawkins, *DOGE Fires Nearly All Staff at U.S. Institute of Peace Headquarters*, Washington Post (Mar. 29, 2025), https://www.washingtonpost.com/—national-security/2025/03/29/doge-usip-peace-institute-fired/.

55.    On March 31, 2025, Plaintiffs learned of an undated document titled "Resolution of the Board of Directors" signed by two of the *ex officio* directors (Defendants Hegseth and

Rubio). The document purports, as of March 25, 2025, to remove Defendant Jackson as Acting President of the Institute and appoint Defendant Cavanaugh in his stead. The resolution also purports to fire USIP's Chief Financial Officer and Chief Operating Officer. The document further directs Cavanaugh "to transfer USIP's assets, including USIP's real property and rights thereof, including all assets recently received from the Endowment, to the General Services Administration (GSA)." Ex. 2 to Defs' Opp. To Motion pursuant to the All Writs Act (ECF No. 15-2).

56.     On March 31, 2025, Plaintiffs learned of additional documents that purported to execute the transfer of USIP's headquarters building to GSA on Saturday, March 29, 2025. Exs. 1, 3, 4 to Defs' Opp. to Motion pursuant to the All Writs Act (ECF No. 15-1, 15-3, 15-4).

57.     On March 31, 2025, Plaintiffs learned of a purported board resolution by two e*x officio* board members (Secretaries Rubio and Hegseth) firing all officers of the USIP Endowment, appointing Adam Amar as new president of the Endowment, and directing Amar to transfer all of the Endowment's assets to USIP. Ex. 2 to Defs' Opp. to Motion pursuant to the All Writs Act (ECF No. 15-2).

58.     On April 1, 2025, Defendants' counsel informed this Court that GSA had leased, or was in the process of leasing, the USIP building to the Department of Labor.

**USIP ACTIVITIES**

59.     The Institute has field offices, staff, and/or contractors in 26 countries around the world, including seven field offices in Nigeria, Libya, Thailand, El Salvador, Pakistan, Tunisia, and Colombia. Amended Compl. Ex. H, Decl. of Shira Lowinger ¶ 8 (ECF No. 12-8). These offices have maintained computer systems with sensitive information about USIP workers and operations. *Id.*

10133397.1

60.     USIP frequently serves as a resource to Congress. It regularly briefs Members and their staffs upon request and holds briefings on Capitol Hill. Such briefings have concerned transnational criminal networks with links to China, crime and mass migration in Central America, and critical minerals in Africa. The Institute has long facilitated congressionally mandated commissions and regularly convenes senior expert groups to analyze pressing issues. For example:

> a.  Iraq Study Group. In 2006, a bipartisan group of Members of Congress requested USIP to act as the facilitator for the Iraq Study Group (ISG), which was set up to provide a "'fresh eyes' assessment of the situation in Iraq." Ex. 2 (Iraq Study Group Fact Sheet).[2] The members of the ISG hailed from all parts of the federal government: former Secretary of State James A. Baker, III; Congressman Lee Hamilton; Lawrence S. Eagleburger, former Secretary of State; Vernon E. Jordan, Jr., Senior Managing Director, Lazard, Freres & Co. LLC; Edwin Meese, III, former U.S. Attorney General; Sandra Day O'Connor, former U.S. Supreme Court Associate Justice; Leon E. Panetta, former White House Chief of Staff; William J. Perry, former U.S. Secretary of Defense; Charles S. Robb, former U.S. Senator; and Alan K. Simpson, former U.S. Senator. Ex. 1, Decl. of Paul Hughes ¶¶ 5-7.
>
> The Institute, with support from the Center for the Study of the Presidency, the Center for Strategic and International Studies, and the James A. Baker III Institute for Public Policy at Rice University, served the ISG by convening expert working groups, writing briefing papers, providing analysis, and coordinating meetings. Ex. 1, Decl. of Paul Hughes ¶ 8.
>
> b.  Afghanistan Study Group. The Afghan Study Group (ASG) was established by Congress in December 2019. S. Rept. No. 116-126, at 43 (2019). Congress tasked the ASG to "consider the implications of a peace settlement or the failure to reach a settlement on U.S. policy, resources, and commitments in Afghanistan." Id. The group was co-chaired by former Senator Kelly Ayotte, former Chairman of the Joint Chiefs of Staff, General Joe Dunford, USMC, as

---

[2] USIP's role in the ISG was funded by specific Congressional appropriations to facilitate and support the ISG. See Emergency Supplemental Appropriations Act for Defense, the Global War on Terror, and Hurricane Recovery, 2006, Pub. L. No. 109-234, 120 STAT. 418, 439 (2006); Conference Report on H.R. 4939, Emergency Supplemental Appropriations Act for Defense, the Global War on Terror, and Hurricane Recovery, 2006, 109 CONG. REC. H3614-15 (Oct. 8, 2004) (stating that $1 million dollars were provided for USIP for activities related to the ISG).

10133397.1

well as Nancy Lindborg, former Assistant Administrator for the Bureau for Democracy, Conflict, and Humanitarian Assistance at USAID. Ex. 14, Decl. of Michael Phelan ¶ 3.

USIP served the ASG by providing administrative and logistical support, convening working groups and stakeholder meetings, writing briefing papers, providing analysis, and coordinating ASG meetings. Ex. 14, Decl. of Michael Phelan ¶ 4.

c. Gandhi-King Global Academy. In 2020, Congress directed the Institute to create the "Gandhi-King Global Academy," a professional development training initiative to develop and make publicly available a curriculum on conflict resolution tools based on the principles of nonviolence. Pub. L. No. 116-260, div. FF, § 334, 134 Stat. 1182, 3115 (Dec. 27, 2020). Congress directed the Institute to report every six months to four congressional committees (two House, two Senate) on its progress on the initiative. *Id.* § 336(a)(2). *See* Ex. 31, Decl. of Alli Aloudes Phillips (describing role in the Gandhi-King Global Academy's conflict resolution education and training programs); Ex. 32, Decl. of Maria Antonia Montes (describing work as Senior Program Officer for Gandhi-King Global Academy).

61.    Other nonprofit organizations and think tanks perform the same type of research, education, training, and dialogue facilitation activities as USIP in communities around the world. *See, e.g.*, Ex. 27, Decl. of Andrew Wells-Dang (explaining the similarity between USIP and other international nonprofits he has worked with); Ex. 29, Decl. of Mary Glantz (describing other nonprofits and think tanks that broadly offer expert advice and analysis, including to Congress and government agencies); Ex. 30, Decl. of Nicole Cochran (describing research and training efforts, as well as work convening expert study groups similar to how the Stimson Center and Center for Strategic and International Studies function);

62.    USIP's research, training, and conflict resolution efforts often occurs "on the ground" in communities in conflict and involves a wide range of partners and stakeholders to which USIP is able to gain access and trust because of its independence from official U.S. Government institutions. The substance, approach, and type of work is very different from that undertaken by Executive branch agencies. Ex. 29, Decl. of Mary Glantz (contrasting USIP work

10133397.1

with her prior work as a Foreign Service Officer); Ex. 32, Decl. of Maria Antonia Montes (describing ability to travel to areas where U.S. Government personnel were not authorized to go, and to meet with grassroots civil society members to gather information, and describing her lack of access to official files or discussions around State Department's Executive or Foreign Policy Objectives); Ex. 36, Decl. of Frank Aum (explaining differences between nature and substance of work at USIP compared to the Office of the Secretary of Defense at the Pentagon, where he previously worked); Ex. 34, Decl. of Scott Worden (explaining how work for USIP is "fundamentally different" from his work at a federal agency (USAID) and for the Special Inspector General for Afghanistan Reconstruction); Ex. 28, Decl. of Christopher Bosley (former U.S. Navy intelligence officer contrasting work on USIP's Countering Violent Extremism team, which involved engaging "local, on-the-ground partners and communities dealing with violent extremism issues and root causes," conducting "immediate-term piloting of programs to stop violent extremism," and "longitudinal convening and scholarship to study and address these issues over time" with "the workstreams in which agencies of the official U.S. government operate"); Ex. 33, Decl. of Mary Speck (describing how her work in Guatemala on USIP's Latin America Program is "unlike that of any Executive Branch entity" and how USIP's "status as an independent non-profit entity was crucial to [its] work. Our goal is to build trust between authorities -- especially police -- and local citizen groups, including businesspeople, indigenous authorities, activists, and religious leaders. These partners trust us because we do not represent the U.S. government or any ideological group that is advocating for specific policies. We can be honest interlocutors, able to reach out to Evangelical leaders, human rights activists and business owners alike."

     63.    USIP is able to perform conflict-resolution research and conduct trainings, convene and facilitate communications and dialogue between groups in conflict because it assiduously

10133397.1

maintains its independence from official U.S. Government diplomatic and policymaking activities, and because its partners recognize (and rely upon) that independence. Indeed, USIP provides research briefing analysis, and conflict-resolution training services, training, and advisory services to a variety of different partners: educational institutions, foreign governments, other nonprofit think tanks, and agencies within the United States Executive Branch. The United States government has no say over what projects USIP undertakes for foreign and NGO groups. *See* Ex. 31, Decl. of Alli Aloudes Phillips (describing importance of USIP's independence from the Executive Branch to the nongovernmental peacebuilding organizations with which USIP works in Africa, Latin America, and Asia); Ex. 34, Decl. of Scott Worden ("USIP was able to convene a variety of Afghan and international stakeholders at USIP's [private office space in Kabul] because we were viewed as non-governmental and created a neutral space for peacebuilders to engage in open dialogue that would not have been possible at a U.S. government facility."); Ex. 35, Decl. of Tegan Blaine (former USAID official explaining work on USIP's "climate, environment, and conflict" project in Africa performing "deep research and analysis" of information derived from "on-the-ground" dialogue with communities inaccessible to US Government, and describing clear lines between USIP and involvement or awareness of decisionmaking or strategic priorities of U.S. Africa Command); Ex. 11, Decl. of Samantha Robinson (describing USIP's ability to perform humanitarian peacebuilding work in the Middle East and other places because it operates independently from U.S. government agencies and is not subject to work free of governmental restrictions and protocols).

64.      USIP does not engage or participate in "Track 1" diplomacy, which is reserved for official governmental representatives. *See* Ex. 16, Lisa Sokol, "Multi-Track Diplomacy Explained," Nuclear Threat Initiative, at https://www.nti.org/risky-business/multi-track-

diplomacy-explained/ ("Track 1 Diplomacy refers to official diplomacy, where communication is directly between or among governments. These formal discussions are conducted by diplomats, heads of state, and other official authorities.").

65.    USIP engages in "Track 1.5" diplomacy. *E.g.*, Ex. 30, Decl. of Nicole Cochran (USIP implemented and supported Track 1.5 dialogues as a "neutral and credible convener"). The distinctive feature of Track 1.5 diplomacy is that it involves the participation of "nongovernmental experts." Ex. 16. *See* Jeffrey Mapendere et al., *Track One and a Half Diplomacy and the Complementarity of Tracks*, 2 Culture of Peace Online J. 66, 69 (2006) (Ex. 15).  Independent nongovernmental entities similarly convene Track 1.5 meetings. One example is the Carter Center's involvement in mediating the conflict between Uganda and Sudan. "By operating at a Track One and a Half level, The Carter Center has the advantage of applying an eclectic approach to international and ethnic conflict, such as the use of high-level diplomacy, private problemsolving workshops, direct mediation, interactive conflict resolution, and other confidencebuilding interventions."  Ex. 15 at 70.  Another example was the China-U.S. Strategic Nuclear Dynamics Dialogue, which was convened and run by the nonprofit, private think tanks Center for Strategic and International Studies and Pacific Forum.  Ex 16.

66.    USIP also engages in "Track 2" diplomacy, which denotes "a purely unofficial channel for dialogue between *non-governmental experts*, without direct governmental involvement." *Id.* (emphasis added). Scholars have defined it as "unofficial, informal interaction between members of adversary groups or nations that aim to develop strategies, to influence public opinion, organize human and material resources in ways that might help resolve their conflict." Ex. 15 at 68.

10133397.1

67.    When USIP engages on these fronts, parties on all sides understand it to be an independent forum, and not to speak for the United States (just like the Center for Strategic and International Studies in the China-U.S. Strategic Nuclear Dynamics Dialogue or the Carter Center when mediating the conflict between Uganda and Sudan in the late 1990s). *See* Exs. 15, 16.    In the example of the Center for Strategic and International Studies, the dialogue "provided an avenue for what officials often describe as 'frank and candid' discussions with Chinese counterparts on nuclear issues. By bringing together think tank experts, retired officials, and active government and military officials, the dialogue led to a unique series of conversations where both sides could exchange views and build trust, even in the face of broader tensions." Ex. 16; Ex. 36, Decl. of Frank Aum (describing research on the Korean Peninsula and efforts "convening and moderating dozens of Track 2 (nongovernmental) dialogues, seminars, and roundtables").

68.    When USIP participates in conflict resolution initiatives, it draws on developed regional expertise to give it credibility among the parties to the dialogue. At times, USIP's independence facilitates access to certain communities, networks, or stakeholders that federal officers with formal governmental or diplomatic status channels lack. USIP's experience, expertise and long-term relationships of trust with key stakeholders help it craft effective agendas, convene the right participants, and facilitate discussion that can generate new insights to inform congressional and Executive branch policy evaluation and development efforts. For example:

- In connection with a border dispute between Kyrgyzstan and Tajikistan, USIP sponsored a Track 2 dialogue between an influential group of former advisors and policy experts to discuss initiatives to reconcile the divided and hostile communities. The governments' representatives focused on difficult border demarcation and access issues. The USIP-related dialogue worked on initiatives that more broadly addressed how to reestablish normal interaction between communities on both sides of the border.  The dialogue thawed relations and paved the way for a historic official border demarcation deal. Ex. 10, Decl. of Gavin Helf ¶ 5.

10133397.1

- In 2003 and 2004, USIP members in Iraq worked outside the official U.S. security bubble, known as the Green Zone, to facilitate reconciliation between Iraqi tribes. USIP's independence allowed it to conduct objective research, which it shared with US officials to consider as part of their policy and programming activities, to engage parties in training and problem-solving dialogue, and to engage with diverse stakeholders necessary for preventing and resolving conflict. Ex. 1, Decl. of Paul Hughes ¶¶ 17-18, 23.

- In the Middle East, USIP has leveraged its independent status and its peacebuilding tools, including its Peace Game strategic exercise tool, and its deep networks of trusted local contacts, to bring together trusted Palestinian, Israeli, and regional interlocutors to work together on problem-solving related to post-conflict recovery and stabilization in Gaza. The work yielded valuable information, which USIP shared at the request of U.S. government representatives. Ex. 11, Decl. of Samantha Robinson ¶ 6.

- Ahead of local elections in the autonomous Bangsamoro region in the southern Philippines in October 2023, USIP was asked by both the Philippines government and the Moro Islamic Liberation Front—not by the US government—to discreetly facilitate ceasefire efforts between the two sides. USIP's independent status made it possible to engage both sides directly as a third party and create joint Quick Response Teams of Philippine Army, National Police, and Moro Islamic Liberation Front former combatants. The ceasefire did not break down and the peace process remained intact. Ex. 8, Decl. of Brian Harding ¶ 6.

- USIP facilitated informal conversations with the Azerbaijani and Armenian Embassies about what would be needed by both sides to reach a peace agreement ending their 30-plus year war. The talks created the opportunity for both parties to float ideas and talk about concerns they did not want to provide in official channels. These conversations helped narrow the gap between their war aims and concerns, leading to a peace agreement in mid-March 2025. Ex. 9, Decl. of Catherine Dale ¶ 6.

**The United States Government Manual**

69.     The United States Government Manual (the "Manual") is a publication of the Office of the Federal Register of the National Archives and Records Administration ("NARA") within the Executive branch. It is published by the Government Publishing Office, an office within the Legislative branch. *See* Ex. 22, Manual, "About Us" (available at https://www.usgovernmentmanual.gov/About). *See also* Ex. 23, U.S. Government Manual (published Jan 13, 2025) (available at

10133397.1

https://www.govinfo.gov/app/collection/govman/2025/03executive_United%20States%20Government%20Manual) (excerpted). The Manual is the "official handbook of the Federal Government." *See id.*

70. The current organizational chart of the federal government in the Government Manual does not include USIP at all. *See* Ex. 23. Under the Executive Branch, the Manual identifies 15 agencies and 58 "independent establishments and government corporations." *Id.* USIP is not listed among them. *See id.* The Manual also classifies entities within the Executive Branch (in addition to the White House) as "Executive Branch: Departments" and "Executive Branch: Independent Agencies and Government Corporations." Again, USIP is not listed. *Id.*

71. The Manual lists USIP as a "Quasi-Official Agency," along with Legal Services Corporation ("LSC"), Smithsonian Institution, State Justice Institute, and the United States Holocaust Memorial Museum. *Id.*

72. Since USIP first appeared in the Manual in 1988, the Manual has listed it as a "Quasi-Official Agency." Ex. Ex. 24, U.S. Office of the Federal Register, NARA, *United States Government Manual, 1988/89*, p. 767 (Rev. June 1, 1988) (excerpted). NARA defines "quasi-official agencies" as "***organizations that are not agencies under the definition of 5 U.S.C. 105*** but that are required by statute to publish certain information on their programs and activities in the Federal Register." *Id.* at 747 (emphasis added); *see also* Ex. 25, U.S. Office of the Federal Register, NARA, *United States Government Manual, 2009-2010*, p. 543 (Washington: GPO, 2010) (excerpted) (defining quasi-official agencies as ***organizations that are not executive agencies under the definition in 5 U.S.C. 105***…") (emphasis added).

**ADDITIONAL FACTS BEARING ON IRREPARABLE HARM TO THE INSTITUTE**

10133397.1

73.    Actions taken to date since March 14, 2025 that individually and collectively impair the Institute's ability to function and fulfill its mission as provided by Congress include:

    a.  Removal of eleven duly-appointed Board members;

    b.  Purported installation by the ex officio Board members of acting presidents (Ken Jackson and Nate Cavanaugh) who were committed not to the mission and activities of the Institute but to halting and eliminating all USIP staff and programs;

    c.  Firing all but a handful of the Institute's over 400 employees, many with extensive experience and expertise in all areas of the field of peaceful conflict resolution;

    d.  Shutting down the Institute's administrative and communication systems, leaving employees without adequate resources to understand their employment status, access to personnel records, or health insurance coverage status;

    e.  Undertaking to close USIP's field offices and cancel contracts concerning ongoing projects;

    f.  Instructing and taking actions to transfer of all of USIP's assets to GSA, including (i) the USIP-owned headquarters building, valued at $500 million, for zero dollars, and (ii) all USIP property in the building;

    g.  Undertaking to lease USIP's headquarters building to the Department of Labor;

    h.  Terminating all of the USIP Endowment's officers, appointing a new president of the Endowment, and instructing him to transfer all of the Endowment's assets, including bank accounts holding at least $25 million, to USIP.

Ex. 7, Moose Decl. ¶ 13.

74.    The eleven USIP Board members who were duly appointed under 22 U.S.C. § 4605(b)(4) and who were purportedly removed by President Trump via email on March 14, 2025 were not notified about and were not given the opportunity to participate in board actions or decisionmaking concerning: whether to terminate Ambassador Moose and replace him with Defendant Jackson as Acting President; whether to respond to Defendant Jackson's firing of employees on March 21; whether to participate in board action that concerned whether it was in USIP's best interests to terminate virtually all of USIP's employees on March 28, including the

10133397.1

Institute's CFO and COO; whether to replace Defendant Jackson with Defendant Cavanaugh as

Acting President; whether to transfer the USIP headquarters building and all property in it to

GSA for zero dollars; and whether to replace all officers of the USIP Endowment and transfer all

Endowment assets to USIP. *Id.* ¶ 14.

75.     USIP's employees, individually and collectively, have deep institutional

knowledge and expertise in a broad range of conflict resolution-related programs, activities,

curriculum development, research, and training in which they have been engaged, both in the

U.S. and around the world. *See Id.* ¶ 15; Exs. 8-11, 27-36 (declarations of former USIP Staff).

76.     Recent events have adversely impacted the commitment of USIP's donor base to

the Institute. Many donors who donated funds for the construction and/or maintenance of the

USIP headquarters building have contacted Ambassador Moose concerning the status of their

contributions. These donors include individuals who have pledged millions of dollars to support

the Institute. Ex. 7, Moose Decl. ¶ 16.

77.     The USIP building is unique—its design intended to reflect and functionally aid

the Institute's mission. *See* https://www.safdiearchitects.com/projects/united-states-institute-of-

peace; *At U.S. Institute of Peace, building's provocative design doesn't entirely succeed*,

Washington Post (Feb. 24, 2012) (available at https://www.washingtonpost.com/realestate/at-us-

institute-of-peace-buildings-provocative-design-doesnt-entirely-

succeed/2012/02/21/gIQADOxOYR_story.html).

78.     USIP's ability to fulfill its mission—including to engage in conflict resolution

training, to be a trusted information resource for congressional and governmental bodies, and to

convene and facilitate dialogue between groups in conflict—depends on its long-earned

reputation as a nonpartisan, expert organization. It further depends on it not being part of, and

10133397.1

being recognized as independent of the Executive Branch. Defendants' actions toward USIP since issuance of EO 14217 will adversely affect the Institute's standing and reputation as an "honest, good faith broker" in the field. Ex. 7, Moose Decl. ¶ 17.

79.    Actions to cancel contracts and grants, and deletion or alteration of information from USIP's computer system will cause severe and irreparable harm to USIP and its staff. Amended Compl. Ex. H, Decl. of Shira Lowinger ¶ 5 (ECF No. 12-8).

80.    USIP has contracts domestically with a variety of vendors. These include a facilities and engineering contract for building maintenance, catering contracts, and building security contracts. USIP is legally bound by these contracts, and the sudden cancellation of such contracts without cause will result in USIP breaching the contracts. Outside of the potential legal repercussions, USIP's relationship with these vendors will be harmed, rendering it difficult to reestablish such contracts in the future in order to restart work. Further, canceling the facilities and engineering contract will result in the loss of key personnel with pertinent and specialized knowledge about the USIP headquarters building and systems, rendering it difficult to safely maintain the building and restart work in the future. *Id.* ¶¶ 6-7.

81.    USIP's offices contain USIP assets, federal assets, and computers with sensitive information about USIP workers and operations. If such leases are terminated without guidance for how to shut down an office, especially in insecure areas, all of this information is at risk of being taken and used to harm USIP and its staff. *Id.* ¶¶ 8-9.

82.    USIP's computer systems contain sensitive, important, and legally necessary information. For example, this includes employee information, vendor information, all of USIP's research and educational materials, including those developed and used in USIP's online global academy, documentation for intellectual property purposes, and documentation to support

10133397.1

Institutional Review Board standards for research using human subjects. Any release of employee information, which includes names, personal information, and banking information, would harm and even endanger USIP's staff, especially those located abroad in insecure areas, who may be targeted by terrorist groups or other bad actors. *Id.* ¶ 11.

83.    Further, the deletion of current and historical employee and vendor information would render it extremely difficult to restart work in the future, as all records are kept electronically. *Id.* ¶ 12.

84.    USIP's computer system contains decades of research and educational materials which are USIP's intellectual property and documentation supporting this claim of intellectual property, such as author agreements. This includes but is not limited to educational courses and other materials used in USIP's online global academy, and student lists. The loss of this intellectual property documentation would render USIP unable to use, distribute, or sell these texts in the future, which would harm USIP's ability to carry out part of its core mission, which is education and training. *Id.* ¶ 13.

85.    USIP maintains documentation regarding its operations and use of funds in its computer systems, which are required for audits of the organization. Loss of access to these materials, which are only kept electronically, would prevent USIP from fulfilling its tax reporting obligations as well as its statutorily mandated requirement to report its annual audits to Congress and the President of the United States. *Id.* ¶ 15.

86.    The sudden termination of USIP employees and contractor staff risks significant harm to both USIP and these personnel. Many of these personnel work in insecure areas of the world. Some are third-country nationals who were asked to leave their country of residence and relocate to a new country to perform work for USIP. If their contracts are canceled without

10133397.1

proper notice or assistance, these staff could be stranded and trapped in that insecure country or kicked out or prosecuted for lack of proper work documentation. *Id.* ¶ 16.