# Exhibit 7

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

UNITED STATES INSTITUTE OF PEACE, *et al.*,

    Plaintiffs,

v.

KENNETH JACKSON, *et al.*,

    Defendants.

Case No. 1:25-cv-00804-BAH

**DECLARATION OF GEORGE E. MOOSE**

I, George E. Moose, declare under penalty of perjury, under 28 U.S.C. § 1746, that the following is true and correct:

1. I was appointed as the Acting President and Chief Executive Officer of the United States Institute of Peace (USIP) by the USIP Board of Directors in April 2024. As Acting President, I am a nonvoting *ex officio* member of the USIP Board.

2. In my capacity in this position, I have overseen all of USIP's activities, including those with U.S. government entities, foreign government entities, and private entities.

3. At least until March 17, 2025, the Institute maintained commercial directors' and officers' insurance policies with total coverage limits of $30 million.

4. USIP employees receive health insurance through a private health insurance plan, not the government-sponsored plan for federal employees. USIP also maintains a private 403(b) retirement plan for its employees.

5. USIP regularly receives requests for collaboration and projects from the U.S. government (both the legislative and executive branches), foreign governments, and non-governmental organizations. These groups come to USIP when they are in need of our extensive on-the-ground and subject matter expertise, and our independent viewpoint.

6. When deciding whether to engage with these groups on particular projects, we evaluate them all under the same standards (no matter the type of group making the request). The factors USIP takes into account include staffing capacity, budgetary constraints, and whether the project is consistent with USIP's mission.

7. When we receive requests to partner with a U.S. government agency, we sometimes turn them down if we do not have the capacity or capability to undertake the project, or if the project is not consistent with our mission. It is my understanding that sometimes these requests will then go out to other non-profit organizations who may be able to undertake the project.

8. Requests from U.S. government entities include such activities as providing information, briefings, and analysis and conducting peace games. It is my understanding that Search for Common Ground and other peace groups also provide briefings in this manner to the U.S. government, and groups like Rockefeller Foundation and Foreign Policy also conduct peace games.

9. When foreign governments or other organizations contact USIP to work together on projects, we do not obtain U.S. government approval when agreeing to undertake these activities. Again, if they align with USIP's mission and we have the capacity to engage with these groups, we may do so.

10. Requests from foreign governments include such activities as hosting events and speeches from foreign officials, conducting conflict analysis or peacebuilding trainings for foreign

government entities, and providing USIP-developed policy options to consider to foreign governments within USIP's expertise. For example, USIP provided support for a peace summit in June 2024 with respect to the conflict between Russia and Ukraine and provided options for top Ukrainian leadership which were based solely on USIP's analysis of the issues, independent of and unconstrained by U.S. government foreign policy.

11. Requests from other private entities often include partnership opportunities. For example, USIP partnered with the Lockheed Martin Corporation for a number of years to sponsor a lecture series held at the USIP headquarters building.

12. Ultimately, USIP's engagement with any group, whether domestic or foreign, governmental or non-governmental, is based upon whether USIP believes that the activities or projects offered fall within its mission and are logistically feasible.

13. Actions taken since March 14, 2025 individually and together impair the Institute's ability to function and fulfill its mission as provided by Congress. Actions that I am aware of include:

   a. Removal of eleven duly-appointed Board members, many of whom have served the Institute for many years and are committed to the ideals, mission, and activities of the organization;

   b. Purported installation the ex officio Board members of acting presidents (Ken Jackson and Nate Cavanaugh) who were committed not to the mission and activities of the Institute but to halting and eliminating all USIP staff and programs;

   c. Firing all but a handful of the Institute's over 400 employees, many with extensive experience and expertise in all areas of the field of peaceful conflict resolution;

   d. Shutting down the Institute's administrative and communication systems, leaving employees without adequate resources to understand their employment status, access to personal records, or health insurance coverage status;

    e. Undertaking to close USIP's field offices and cancel contracts concerning ongoing projects;

    f. Instructing and taking actions to transfer of all of USIP's assets to GSA, including (i) the USIP-owned headquarters building, valued at $500 million, for zero dollars, and (ii) all USIP property in the building;

    g. Undertaking to lease USIP's headquarters building to the Department of Labor; and

    h. Terminating all of the USIP Endowment's officers, appointing a new president of the Endowment, and instructing him to transfer all of the Endowment's assets, including bank accounts holding at least $25 million, to USIP.

14. The eleven USIP Board members who were duly appointed under 22 U.S.C. § 4605(b)(4) and who were purportedly removed by President Trump via email on March 14, 2025, were not notified about or given the opportunity to participate in board actions or decision-making concerning events on and after March 14, including: whether to remove me as Acting President and appoint Defendant Jackson as Acting President; whether to respond to Defendant Jackson's firing of employees on March 21; whether to participate in board action that concerned whether it was in USIP's best interests to terminate virtually all of USIP's employees on March 28, including the Institute's CFO and COO; whether to replace Defendant Jackson with Defendant Cavanaugh as Acting President; whether to transfer the USIP headquarters building and all property in it to GSA for zero dollars; and whether to replace all officers of the USIP Endowment and transfer all Endowment assets to USIP.

15. USIP's employees, individually and collectively, have deep institutional knowledge and expertise in a broad range of conflict resolution-related programs, activities, curriculum development, research, and training in which they have been engaged, both in the U.S. and around the world.

16. Recent events have adversely impacted the commitment of USIP's donor base to the Institute. Many donors who donated funds for the construction and/or maintenance of the USIP

headquarters building have contacted me concerning the status of their contributions. These donors include individuals who have pledged millions of dollars to support the Institute.

17. USIP's ability to fulfill its mission—including to engage in conflict resolution training, to be a trusted information resource for congressional and governmental bodies, and to convene and facilitate dialogue between groups in conflict—depends on its long-earned reputation as a nonpartisan, expert organization. It further depends on it not being part of, and being recognized as independent of, the Executive Branch. Defendants' actions toward USIP since issuance of EO 14217 adversely affect the Institute's standing and reputation as an "honest, good faith broker" in the field.

18. The sudden termination of USIP employees and contractor staff risks significant harm to both USIP and these personnel. Many of these personnel work in insecure areas of the world. Some are third-country nationals who were asked to leave their country of residence and relocate to a new country to perform work for USIP. If their contracts are canceled without proper notice or assistance, these staff could be stranded and trapped in that insecure country or kicked out or prosecuted for lack of proper work documentation.

I declare under penalty of perjury under the laws of the District of Columbia that the foregoing declaration is true and correct.

Dated this 4th of April, 2025, and executed in Washington, D.C.

Signed: /s/ George E. Moose

Print Name: George E. Moose