Exhibit 26

# Calendar No. 409

| 98TH CONGRESS | SENATE | REPORT |
|---|---|---|
| *1st Session* | | No. 98-244 |

## ESTABLISHING THE U.S. ACADEMY OF PEACE, AND FOR OTHER PURPOSES

SEPTEMBER 27 (legislative day, SEPTEMBER 26), 1983.—Ordered to be printed

Mr. HATCH, from the Committee on Labor and Human Resources, submitted the following

## REPORT

together with

### ADDITIONAL AND MINORITY VIEWS

[To accompany S. 564]

The Committee on Labor and Human Resources, to which was referred the bill (S. 564) to establish the U.S. Academy of Peace, and for other purposes, having considered the same, reports favorably thereon with an amendment and recommends that the bill as amended do pass.

### CONTENTS

|  |  | Page |
|---|---|---|
| I. | Background and need for legislation | 1 |
| II. | Legislative history | 3 |
| III. | Committee views/explanation of bill as amended | 15 |
| IV. | Section-by-section analysis | 26 |
| V. | Cost estimate | 31 |
| VI. | Regulatory impact statement | 32 |
| VII. | Additional views of Messrs. Randolph and Matsunaga | 34 |
| VIII. | Minority views of Messrs. Quayle, Nickles, Denton, Grassley, East, and Mrs. Hawkins | 39 |
| IX. | Minority views of Mr. Humphrey | 47 |

## I. BACKGROUND AND NEED FOR LEGISLATION

The Committee believes that the need for this legislation is evidenced both by the findings of the United States Study Commisson

11-010 O

2

and by its own hearing record indicating that "a focused federal investment in international peace is in the national interest."

This legislation is not an entirely new concept. Its roots can be traced back to the Presidency of George Washington (1783) and to the writings, 10 years later, of Dr. Benjamin Rush (1793), one of the signers of the Declaration of Independence. Mr. Rush pointed out that the Federal Constitution was ". . . totally silent upon the subject of an office of the utmost importance to the welfare of the United States, that is, an office for promoting and preserving perpetual peace in our country." Dr. Rush's original "Plan for a Peace Office" appeared in "Banneker's Almanac", published by Benjamin Banneker, a black mathematician, shortly after Rush proposed it, assuring that the idea reached a broad segment of the American public due to the popularity of the Almanac.

Legislative activity in the area of peace and conflict resolution during the 20th century has been extensive, beginning in 1935 when United States Senator Matthew Neeley of West Virginia introduced a Department of Peace bill. Other Members of Congress continued to press for the establishment of a peace-keeping body. In 1945, United States Senator Alexander Wiley of Wisconsin once again proposed the creation of a Department of Peace. In that same year while serving as a member of the United States House of Representatives, Jennings Randolph also introduced a bill to create a Department of Peace. Since that time, Jennings Randolph as a United States Senator has continued to press for this goal.

Between 1935 and 1976 more than 140 bills to establish a Department of Peace, a National Peace Agency or standing Congressional Peace Committees were introduced in the Senate or the House of Representatives. Sponsorship of such legislation has not been limited by political party or perspective.

The most recent Senate action has centered around three pieces of legislation. S. 1976, a Peace Academy bill principally sponsored by United States Senators Vance Hartke of Indiana and Mark Hatfield of Oregon, was introduced in 1976. Hearings were held on the bill by the Senate Labor and Public Welfare Subcommittee on Education chaired by Senator Claiborne Pell of Rhode Island. The Committee took no further action on S. 1976.

In 1978, the Senate amended the House-passed Elementary and Secondary Education bill with the provision to establish a Commission on Proposals for the National Academy of Peace and Conflict Resolution. The amendment was accepted in conference, President Jimmy Carter signed the legislation in November 1978, and appropriations were made available in 1979.

This Commission, chaired by Senator Spark Matsunaga, carried out its mandate to investigate existing peace programs in higher education institutions as well as its mandate to consider the feasibility, practicality and possible structure of a Peace Academy. Twelve public hearings were conducted across the United States to assist the Commission in this endeavor. Over 300 witnesses provided testimony for the Study Commission, the majority of whom supported establishing a National Academy of Peace.

After the Commission completed its work, it recommended to President Reagan and the Congress the establishment of a United States Academy of Peace.

3

The Commission recommended a federally funded, non-profit, independent corporation to assist in the attainment of the nation's goal of promoting international peace by developing knowledge of the processes and elements of peace among nations; educating and training people in the problem-solving skills of conflict resolution as they pertain to international peace; informing citizens and non-citizens, including government decision-makers at all levels, of peaceful methods of international conflict resolution; and advancing cooperation among peoples. The Commission found, among other things:

> The danger to national and international peace and security from violent escalation of political, economic, and cultural conflicts could be reduced by rigorous development of a range of effective conflict response options, in addition to military capacity; and
> The worldwide activities of Americans and the nation's rich peace heritage provide an important foundation for international peacemaking and understanding.

On two separate occasions in 1982 and 1983, the Labor and Human Resources Committee's Subcommittee on Education, Arts and Humanities held public hearings to consider creation of a National Academy of Peace. Witnesses representing a wide range of perspectives appeared at the hearings, carrying forward a very clear message: There is much that the nation could do to enhance the conflict resolution and peace research efforts currently occurring in our schools, public institutions and in government.

Many of the witnesses testifying suggested that the creation of a National Academy of Peace would serve as a catalyst for the establishment of computerized data banks and innovative thinking, congressional and governmental agency seminars in peacemaking, training techniques in conflict resolution and conflict dynamics, and increased financial and other assistance to doctoral and other post-graduate scholars in these areas. There was strong sentiment that the creation of a National Academy of Peace should in no way compete with the efforts of existing institutions with programs related to conflict resolution, diplomacy and peace research. Specifically, some representatives of existing educational institutions having relevant programs suggested that one of the goals in the creation of the Academy should be to fund and coordinate existing programs in these areas.

## II. LEGISLATIVE HISTORY

On November 24, 1981, Senator Matsunaga introduced the United States Academy of Peace Act (S. 1889) for himself and 51 other Senators. The bill was referred to the Committee on Labor and Human Resources. The purpose of the Act was to establish an independent, nonprofit, national institution to serve the people and government through education and training, basic and applied research, and information services on the means to promote international peace and conflict resolution.

On December 7, 1981, the bill was referred to the Subcommittee on Education, Arts and Humanities, which scheduled hearings on the proposed legislation for April 21, 1982. Six hours of hearings

4

were held during which 25 witnesses from Congress, academia, business, professional and religious organizations testified on the bill. At the hearing, Senator Stafford, the Subcommittee Chairman, scheduled a Subcommittee meeting for April 28, 1982 to consider S. 1889, the United States Academy of Peace Act.

After amendment, the Subcommittee on Education, Arts and Humanities favorably reported out of the Subcommittee the proposed legislation on April 28, 1982. The Committee favorably reported S. 1889 as amended, on June 22, 1982, by a roll call vote of 10 to 6.

Due to the adjournment of the 97th Congress before S. 1889 could be considered by the full Senate, Senator Matsunaga reintroduced the United States Peace Academy Act (S. 564), a bill identical to S. 1889 as earlier reported by the Committee. On March 16, 1983, the Subcommittee on Education, Arts and Humanities held an additional hearing to receive testimony from witnesses currently associated with institutions having programs in the areas of diplomacy, conflict resolution and peace studies. On April 14, 1983, the Education Subcommittee convened to consider S. 564, reporting it out favorably for consideration by the full Labor and Human Resources Committee. The full Labor and Human Resources Committee met on June 15, 1983, and considered amendments offered by Senators Denton, Stafford, Randolph and Humphrey. The Committee was not able to complete consideration of a set of amendments offered by Senator Hatch before being forced to adjourn under the rules of the Senate. Subsequently, the Committee reconvened on July 20, 1983, and considered amendments offered by Senators Humphrey, Grassley and Hatch. After 17 separate roll call votes, the Committee reported S. 564 by a roll call vote of 11 to 6.

### VOTES IN COMMITTEE

Pursuant to Section 133(b) of the Legislative Reorganization Act of 1946, the following is a tabulation of votes cast in both the Subcommittee on Education, Arts and Humanities, and the Committee on Labor and Human Resources.

The Subcommittee on Education, Arts and Humanities passed the United States Academy of Peace Act by a voice vote on April 14, 1983. The bill was next considered by the full Labor and Human Resources Committee on June 15, 1983.

*Senator Denton's substitute*

Senator Denton offered an amendment in the nature of a substitute to the Peace Academy Act which would have created an act entitled "The Education for Peace, Arms Control and Conflict Resolution Act." This substitute would have authorized the Director of the Arms Control and Disarmament Agency (ACDA) to assist institutions of higher education and other public and nonprofit agencies in order to provide training and research in peace, arms control and conflict resolution. The Director of ACDA would have been authorized to conduct training, symposia, continuing education, research and information dissemination services to promote educational efforts in conflict resolution. An advisory board—composed of members of ACDA; the Departments of Defense, State, Commerce, Education and Energy; the United States Information

5

Agency; the United States Senate and House of Representatives; institutions of higher education; and the general public—would have overseen the activities of the programs under ACDA. Funds for the operation of these programs would have come from appropriations under Title VI of the Higher Education Act of 1965 with authorization for fiscal year 1984 at $3 million and for fiscal year 1985 at $5 million. The substitute was defeated 10 to 8 as follows:

| YEAS | NAYS |
|------|------|
| Hatch | Stafford |
| Quayle | Weicker* |
| Nickles* | Kennedy* |
| Humphrey | Randolph |
| Denton | Pell |
| Grassley | Eagleton |
| East | Riegle* |
| Hawkins | Metzenbaum* |
|  | Matsunaga |
|  | Dodd* |

* By proxy.

### Degree-granting authority

Senator Stafford, for himself and for Senator Randolph, offered to S. 564 an amendment striking language authorizing the Academy to grant degrees. The amendment also changed a portion of the findings section of the bill to indicate that existing institutions in international affairs, diplomacy, conflict resolution and peace studies are essential to further development of techniques to promote peaceful resolution of international conflict. The Stafford/Randolph amendment passed as follows by a vote of 17 to 1:

| YEAS | NAYS |
|------|------|
| Hatch | Humphrey |
| Stafford |  |
| Quayle |  |
| Nickles* |  |
| Denton |  |
| Weicker* |  |
| Grassley* |  |
| East |  |
| Hawkins |  |
| Kennedy* |  |
| Randolph |  |
| Pell* |  |
| Eagleton |  |
| Riegle |  |
| Metzenbaum* |  |
| Matsunaga |  |
| Dodd* |  |

*By proxy.

### Private funding

The final amendment voted on during the June 15 markup was offered by Senator Humphrey. This amendment would have prohibited the United States Academy of Peace from accepting any grant,

6

contract, gift or contribution from private sources of funding. The amendment failed by a vote of 11 to 7 as follows:

| YEAS | NAYS |
|------|------|
| Hatch | Stafford |
| Nickles* | Quayle |
| Humphrey | Weicker* |
| Denton | Kennedy |
| Grassley | Randolph |
| East | Pell* |
| Hawkins | Eagleton |
| | Riegle |
| | Metzenbaum |
| | Matsunaga |
| | Dodd* |

*By proxy.

### Foreign funding

On July 20, 1983, the Labor and Human Resources Committee reconvened. After dispensing with a Matsunaga technical amendment, the Committee turned to the consideration of an amendment offered by Senator Humphrey on behalf of Senator Grassley. This amendment prohibits the Academy from receiving any gift, contribution or grant from any instrumentality of a foreign government, international organization or foreign national, except that the Academy could receive the payment of tuition by foreign nationals for instruction provided by the Academy. The amendment carried by a vote of 15 to 0 as follows:

| YEAS | NAYS | ABSTAIN | ABSENT/NOT VOTING |
|------|------|---------|-------------------|
| Hatch | | Quayle | Denton |
| Stafford | | | Metzenbaum |
| Nickles* | | | |
| Humphrey | | | |
| Weicker* | | | |
| Grassley* | | | |
| East* | | | |
| Hawkins* | | | |
| Kennedy | | | |
| Randolph | | | |
| Pell* | | | |
| Eagleton | | | |
| Riegle | | | |
| Matsunaga | | | |
| Dodd* | | | |

*By proxy

### Board approval of certain expenditures

Senator Humphrey then introduced an amendment to require the Board of the Academy to approve any obligation or expenditure of funds which are held by the Academy but which are not appro-

7

priated to the Academy by Congress. The amendment carried, as follows, by a vote of 16 to 0:

| YEAS | NAYS | ABSTAIN | ABSENT/NOT VOTING |
|---|---|---|---|
| Hatch | | Quayle | Metzenbaum |
| Stafford | | | |
| Nickles* | | | |
| Humphrey | | | |
| Denton | | | |
| Weicker* | | | |
| Grassley* | | | |
| East* | | | |
| Hawkins* | | | |
| Kennedy | | | |
| Randolph | | | |
| Pell* | | | |
| Eagleton | | | |
| Riegle | | | |
| Matsunaga | | | |
| Dodd* | | | |

*By proxy.

The Committee next turned to the consideration of a series of amendments offered by Senator Hatch. Roll call votes were ordered on 15 individual amendments of this package after which the Committee voted on the Hatch package as amended.

### Capitalization fund

The first component of the Hatch package dealt with the issue of the Academy's capitalization fund. The first amendment would have deleted the $15 million capitalization fund from the bill and would have required that the Peace Academy be located on federal property at no additional cost to the United States. The amendment failed 9 to 7, the votes recorded as follows:

| YEAS | NAYS | ABSTAIN | ABSENT/NOT VOTING |
|---|---|---|---|
| Hatch | Stafford | Quayle | Metzenbaum |
| Nickles* | Weicker* | | |
| Humphrey | Kennedy | | |
| Denton* | Randolph | | |
| Grassley | Pell* | | |
| East* | Eagleton | | |
| Hawkins* | Riegle | | |
| | Matsunaga | | |
| | Dodd* | | |

* By proxy.

An amendment to reduce the authorization for the capitalization fund to $7.5 million was offered and was accepted unanimously as

8

was a related amendment prohibiting the use of the capitalization fund for new construction for the Peace Academy. Both amendments passed as follows:

| YEAS | NAYS | ABSTAIN | ABSENT/NOT VOTING |
| --- | --- | --- | --- |
| Hatch | | Quayle | Metzenbaum |
| Stafford | | | |
| Nickles* | | | |
| Humphrey | | | |
| Denton* | | | |
| Weicker* | | | |
| Grassley* | | | |
| East* | | | |
| Hawkins* | | | |
| Kennedy | | | |
| Randolph | | | |
| Pell* | | | |
| Eagleton | | | |
| Riegle | | | |
| Matsunaga | | | |
| Dodd* | | | |

*By proxy.

*Principal office:*

The next amendments in this series offered by Senator Hatch dealt with the question of locating the principal office of the Peace Academy. The first roll call vote was on the question of locating the principal office of the Peace Academy on property pertaining to the National Defense University or on any other property or facility owned by the Department of Defense. The amendment failed, as follows, on a tie 8 to 8 vote:

| YEAS | NAYS | ABSTAIN | ABSENT/NOT VOTING |
| --- | --- | --- | --- |
| Hatch | Weicker* | Quayle | Metzenbaum |
| Stafford | Kennedy | | |
| Nickles* | Randolph | | |
| Humphrey | Pell | | |
| Denton* | Eagleton | | |
| Grassley* | Riegle | | |
| East* | Matsunaga | | |
| Hawkins* | Dodd* | | |

*By proxy.

The second roll call vote determined that the Board of the Peace Academy must give preference first to federally-owned facilities and then to university-owned and privately-owned facilities in selecting the principal office of the Academy. The Board must also base its decision on the need for a setting to encourage the pursuit

9

of scholarly research and educational activities and must bear in mind that the purpose of the Academy is not to serve as a base for public political activity of any kind against United States foreign policy or United States peacemaking efforts. The site selection decision should also, according to this amendment, be as cost-effective as possible. The amendment passed unanimously, as follows:

| YEAS | NAYS | ABSTAIN | ABSENT/NOT VOTING |
|---|---|---|---|
| Hatch | | Quayle | Metzenbaum |
| Stafford | | | |
| Nickles* | | | |
| Humphrey | | | |
| Denton* | | | |
| Weicker* | | | |
| Grassley* | | | |
| East* | | | |
| Hawkins* | | | |
| Kennedy | | | |
| Randolph | | | |
| Pell | | | |
| Eagleton | | | |
| Riegle | | | |
| Matsunaga | | | |
| Dodd | | | |

*By proxy.

The final amendment in this series would have required that every effort be made to minimize any use of the capitalization fund in securing a principal office of the Academy. The amendment failed 9 to 7:

| YEAS | NAYS | ABSTAIN | ABSENT/NOT VOTING |
|---|---|---|---|
| Hatch | Stafford | Quayle | Metzenbaum |
| Nickles* | Weicker* | | |
| Humphrey | Kennedy | | |
| Denton* | Randolph | | |
| Grassley* | Pell | | |
| East* | Eagleton | | |
| Hawkins* | Riegle | | |
| | Matsunaga | | |
| | Dodd | | |

* By proxy.

### Board composition/quorum of meetings

The third series of amendments affects the composition of the Board which would direct the activities of the United States Academy of Peace. An amendment increasing the number of Board members to 19 by requiring the participation of the Secretary of State,

10

the Secretary of Defense, the Director of the Arms Control Agency, and the Commandant of the National Defense University or their designees was accepted by a 9 to 7 vote as follows:

| YEAS | NAYS | ABSTAIN | ABSENT/NOT VOTING |
|---|---|---|---|
| Hatch | Kennedy | Quayle | Metzenbaum |
| Stafford | Randolph | | |
| Nickles* | Pell | | |
| Humphrey | Eagleton | | |
| Denton* | Riegle | | |
| Weicker* | Matsunaga | | |
| Grassley | Dodd | | |
| East* | | | |
| Hawkins | | | |

*By proxy.

The next roll call vote in this series was on an amendment to require the presence of three of the four members of the Board appointed by Congress for the purpose of establishing a quorum at the twice-a-year meeting of the Academy Board. The amendment failed 9 to 7, as follows:

| YEAS | NAYS | ABSTAIN | ABSENT/NOT VOTING |
|---|---|---|---|
| Hatch | Stafford | Quayle | Metzenbaum |
| Nickles* | Weicker* | | |
| Humphrey | Kennedy | | |
| Denton* | Randolph | | |
| Grassley* | Pell | | |
| East* | Eagleton | | |
| Hawkins* | Riegle | | |
| | Matsunaga | | |
| | Dodd | | |

*By proxy.

A vote was next taken on an amendment to require *one* congressionally appointed member to be present for purposes of establishing a quorum at the meeting of the Academy's Board. The motion passed 15 to 1:

| YEAS | NAYS | ABSTAIN | ABSENT/NOT VOTING |
|---|---|---|---|
| Hatch | Denton* | Quayle | Metzenbaum |
| Stafford | | | |
| Nickles* | | | |
| Humphrey* | | | |
| Weicker* | | | |
| Grassley* | | | |
| East* | | | |
| Hawkins* | | | |

| YEAS | NAYS | ABSTAIN | ABSENT/NOT VOTING |
|------|------|---------|-------------------|
| Kennedy | | | |
| Randolph | | | |
| Pell | | | |
| Eagleton | | | |
| Riegle | | | |
| Matsunaga | | | |
| Dodd | | | |

\* By proxy.

### *Academy funds transferred to other institutions*

An amendment to require that at least one-fourth of the Academy's annual appropriations be paid to nonprofit and official institutions to which the Academy may provide grants and with which the Academy may enter into contracts under its extension and outreach functions passed by the following vote of 15 to 1:

| YEAS | NAYS | ABSTAIN | ABSENT/NOT VOTING |
|------|------|---------|-------------------|
| Hatch | Denton | Quayle | Metzenbaum |
| Stafford | | | |
| Nickles\* | | | |
| Humphrey | | | |
| Weicker\* | | | |
| Grassley\* | | | |
| East\* | | | |
| Hawkins\* | | | |
| Kennedy | | | |
| Randolph | | | |
| Pell | | | |
| Eagleton | | | |
| Reigle | | | |
| Matsunaga | | | |
| Dodd | | | |

\*By proxy.

### *Role of Federal agencies*

The next amendment offered attempts to involve employees of federal agencies in the activities of the Academy by mandating the Secretary of State, the Secretary of Defense, the Director of the Arms Control and Disarmament Agency and the Director of the Central Intelligence Agency to assign officers and employees of his respective department or agency. The amendment was amended by Senator Randolph to make the assignment permissive rather than mandatory and they passed unanimously as follows:

12

| YEAS | NAYS | ABSTAIN | ABSENT/NOT VOTING |
|------|------|---------|-------------------|
| Hatch | | Quayle | Metzenbaum |
| Stafford | | | |
| Nickles* | | | |
| Humphrey | | | |
| Denton* | | | |
| Weicker* | | | |
| Grassley* | | | |
| East* | | | |
| Hawkins* | | | |
| Kennedy | | | |
| Randolph | | | |
| Pell | | | |
| Eagleton | | | |
| Riegle | | | |
| Matsunaga | | | |
| Dodd | | | |

*By proxy.

### Private finding

The next two amendments were offered to address further the question of the Academy's use of private sources of funding. The first amendment, requiring that the Academy lose its right to be designated the "United States Academy of Peace" in any year during which the Academy accepted any private contributions or funds not appropriated by the Congress was defeated 9 to 7. The second amendment, requiring the Academy to restrict the acceptance of private contributions and funds to not more than one-half its annually appropriated congressional funding failed by the same margin of 9 to 7. Both of these amendments were decided as follows:

| YEAS | NAYS | ABSTAIN | ABSENT/NOT VOTING |
|------|------|---------|-------------------|
| Hatch | Stafford | Quayle | Metzenbaum |
| Nickles* | Weicker* | | |
| Humphrey** | Kennedy* | | |
| Denton* | Randolph | | |
| Grassley* | Pell | | |
| East* | Eagleton | | |
| Hawkins* | Riegle | | |
| | Matsunaga | | |
| | Dodd* | | |

*By proxy
**Humphrey was present for the second vote.

### Additional amendments

The next four amendments, offered individually, passed unanimously, and in each case, the same Senators were present to vote.

13

. The first amendment struck out the words "without reimburse-
ment" from Section 5(b)(11) of the bill and added the requirement
that any information request by the President of the Academy to
the head of any federal department or agency be governed by the
' Freedom of Information Act. The second amendment requires the
Academy to treat all employees as federal employees for the pur-
pose of determining compensation and all other fringe benefits,
except that no federal funds could be used to pay for private fringe
benefit programs; the Academy is also precluded from granting
long-term commitments (such as tenure) to employees if such long-
term arrangements are inconsistent with the rules and regulations
applicable to federal employees. The third amendment deleted a
portion of Section 5(b)(10) in order to render ineligible for the
Peace Academy Medal anyone associated with the Academy. The
fourth amendment considered in this series was an amendment to
delete all language concerning the Peace Academy Medal from the
bill and substitute language allowing the Academy to recommend
to Congress the establishment of a Medal of Peace to be awarded
under such procedures as the Congress may determine. The four
amendments were in each roll call vote adopted by votes recorded
as follows:

| YEAS | NAYS | ABSTAIN | ABSENT/NOT VOTING |
|------|------|---------|-------------------|
| Hatch | | Quayle | Metzenbaum |
| Stafford | | | |
| Nickles* | | | |
| Humphrey | | | |
| Denton* | | | |
| Weicker* | | | |
| Grassley* | | | |
| East* | | | |
| Hawkins* | | | |
| Kennedy* | | | |
| Randolph | | | |
| Pell | | | |
| Eagleton | | | |
| Riegle | | | |
| Matsunaga | | | |
| Dodd | | | |

*By proxy.

The final vote before the vote to report the bill was to accept the
Hatch amendment as amended by the series of individual amend-
ments. The unamended portions of Senator Hatch's package in-
clude the following provisions:
1. A requirement that the Academy's exercise of powers and
duties be carried out "Acting through the Board" (of Directors).
2. A requirement that in conducting research and making studies
the Academy place particular emphasis on realistic approaches to
past successes and failures in the quest for peace and arms control
. and utilize to the maximum extent possible United States govern-

14

ment documents and classified materials from the State Department, the Department of Defense, the Arms Control and Disarmament Agency and the intelligence community.

3. The application of the words "carefully selected" to those products which the Academy could develop for publication and dissemination.

4. The inclusion of "classified information that is properly safeguarded" as part of the information to be disseminated by the Academy's clearinghouse, provided that those receiving such information have appropriate security clearances.

5. The addition of classified information as part of that group of information which the Academy may secure, upon request of the President of the Academy, from any federal department or agency, provided that Academy staff and board members with access to this information obtain appropriate security clearances from the Department of Defense and Department of State.

6. The inclusion of the American Federation of Labor—the Congress of Industrial Organizations as an organization to which the Academy may make grants and with which the Academy may enter contracts in carrying out its extension and outreach duties.

7. A section allowing the Academy to provide assistance to promote the study of conflict resolution between free trade unions and Communist dominated organizations in the context of the global struggle for the protection of human rights.

8. The removal of the portion of Section 5(d) which emphasizes that the Academy may refuse a research request from a federal department or agency for reasons of cost or inappropriateness and the addition of language emphasizing that the study of past negotiating histories and the use of classified materials be included in the group of activities which a federal department or agency can request the Academy to investigate.

9. The addition of language requiring the presidentially-appointed members of the Academy's board to have appropriate practical or academic experience in peace and conflict resolution efforts of the United States.

The Hatch amemdment, as amended, was adopted unanimously by the following roll call vote:

| YEAS | NAYS | ABSTAIN | ABSENT/NOT VOTING |
|---|---|---|---|
| Hatch | | Quayle | Metzenbaum |
| Stafford | | | |
| Nickles* | | | |
| Humphrey | | | |
| Denton* | | | |
| Weicker* | | | |
| Grassley* | | | |
| East* | | | |
| Hawkins* | | | |
| Kennedy | | | |
| Randolph | | | |
| Pell | | | |
| Eagleton | | | |

15

| YEAS | NAYS | ABSTAIN | ABSENT/NOT VOTING |
|------|------|---------|-------------------|
| Riegle | | | |
| Matsunaga | | | |
| Dodd | | | |

*By proxy

S. 564, as amended by Senators Stafford, Humphrey, Grassley, Randolph, Matsunaga and Hatch, was favorably reported from the Committee on Labor and Human Resources by a vote of 11 to 6 as follows:

| YEAS | NAYS | ABSTAIN | ABSENT/NOT VOTING |
|------|------|---------|-------------------|
| Hatch | Nickles* | Quayle | |
| Stafford | Humphrey | | |
| Weicker* | Denton* | | |
| Kennedy | Grassley* | | |
| Randolph | East* | | |
| Pell | Hawkins* | | |
| Eagleton | | | |
| Riegle | | | |
| Metzenbaum | | | |
| Matsunaga | | | |
| Dodd | | | |

*By proxy

### III. COMMITTEE VIEWS/EXPLANATION OF THE BILL AS AMENDED

#### SUMMARY

The United States Academy of Peace Act creates a national, independent, nonprofit corporation providing endowment and operational services to enhance current research and training efforts in the fields of conflict resolution, diplomacy, international affairs and peace studies. The Academy's primary function is to provide and finance research, education, training and information dissemination in effective and appropriate techniques and theories promoting international peace and the resolution of conflict without recourse to violence.

The Peace Academy, under this Act, may create an endowment to which both public and private contributions may be made and from which research, education, training and information dissemination projects may be funded. The Academy and associated satellite institutions may be created to provide non-degree, graduate and post-graduate research and training programs to further the conflict resolution skills and knowledge of participants. Products of the Academy's research and data collection efforts are to be disseminated to appropriate individuals and institutions.

A capitalization fund of $7.5 million is authorized to provide funding for the establishment of the Academy's principal adminis-

16

trative office and educational facilities. In fiscal years 1984 and 1985 $6 million and $10 million is authorized, respectively, to carry out the program and administrative costs of the Academy. The principal office, the endowment, and the Center for International Peace, must be located in or near Washington, D.C.

A Board of Directors, composed of 19 members, oversees the operation of the Academy. At least one quarter of the Academy's annual congressional appropriation must be used to fund projects in peace and conflict resolution conducted at existing educational institutions. This requirement reinforces this Committee's expectation that the Academy's primary role is to coordinate its own programs with and enhance the efforts of existing institutions with programs in peace studies and conflict resolution.

### ESTABLISHMENT

As provided in Section 4, the United States Peace Academy is assigned the same rights and privileges accorded non-profit institutions under the Internal Revenue Act of 1954. The Academy, however, has no authority to issue shares of stock or to pay or declare dividends. The Committee intends that the Academy invest its unobligated funds.

The principal office of the Academy, the Committee believes, should serve as the administrative, financial and planning center for the Academy. The Committee also anticipates that the principal office serve as the office for the President of the Academy and other administrative officers in carrying out their responsibilities outlined in Section 7 of this bill. As Section 8 requires, the principal office must also serve as the repository for the Academy's necessary administrative information, including the names and addresses of Board members, laws relating to the Academy, bylaws, rules, regulations, minutes of proceedings, applications, proposals, grants and other administrative and financial information.

Requiring the location of the Academy's principal office in Washington, D.C. area underlines the Committee's belief in the Academy's need to have access to the resources only the nation's capital can provide. The Committee also feels that locating the principal office in Washington enhances the Academy's ability to offer its resources to this nation's policymakers.

As emphasized in Section 4(h), the Committee expects the Board of Directors to make every effort to minimize the cost of locating and administering the principal office by giving selection preference to federally owned facilities which might be easily converted or modified into the administrative center for the Academy. Control over such a facility would rest with the Peace Academy and not with the federal department from whom the property had been acquired, rented or leased.

The Committee is mindful of the quasi-federal nature of the Peace Academy and wants to emphasize further that the Academy must perform as an institution whose primary pursuit is academic and scholarly research, education, training and the attendant dissemination of information. The Academy should not perform a policy implementation role except to the extent that it provides information, insight or training to those charged with formulating

17

policy in conflict resolution and international affairs. At the same time, because of its financial and authorizing obligation to the United States, the Academy must not serve as a base for public political activity of any kind against United States foreign policy or United States peacemaking efforts (Section 4(h)). To this end, the Committee recommends that the Board give some consideration to Department of Defense property (such as excess property) to serve as the site for the principal office of the Academy. Should the Board make a decision to pursue this suggestion, the Committee would certainly expect that the Department of Defense would have no administrative, planning or other control over the operation of the United States Peace Academy, other than by way, for example, of normal lessor's rights retained in the event of a lease.

As required by Section 4(f), the Academy, consistent with most legislation governing corporations, is liable for the acts of its directors, officers, employees and agents when acting within the scope of their authority as associates of the Academy. The Act further authorizes exclusive right to the use of the terms "United States Academy of Peace", "Center for International Peace" and "Endowment of the United States Academy of Peace" except that any reference to "United States" is prohibited in any year in which the Congress does not provide authorization of appropriations for the Academy.

### ACTIVITIES OF THE PEACE ACADEMY

The primary purpose of the United States Academy of Peace is to provide research and training opportunities in the areas of mediation, conflict resolution, diplomacy and peace studies. Three primary avenue are open to the Academy to carry out these goals: The operation of the Academy's own programs, symposia, conferences and public activities; grants to existing institutions to carry out their own programs in these areas; and, cooperative arrangements between the Academy, existing institutions or consortia of such institutions.

The Committee believes very strongly that the Academy should develop its own programs, courses, publications and other activities to carry out the purposes of this bill. Section 4(d) specifically authorizes the Academy to establish appropriate offices, schools and other training facilities which may be necessary to further efforts of the Academy. Such facilities, at the discretion of the Board, may be located outside the District of Columbia or the surrounding area. The Committee envisions, for example, a series of satellite branches—preferably operating under joint contract between the Academy and an existing institution (including institutions of higher education, non-profit groups and libraries)—to provide educational services consistent with the provisions of the bill. The Committee, however, does not anticipate that satellite branches be limited to such contractual arrangements, though it enjoins the Board in the establishment of such branches to pursue the most cost-effective and fiscally responsible approaches consistent with its mission.

In addition to the research, education, training and information dissemination services described above, the Academy may also es-

18

tablish a Center for International Peace. The Academy's Board
may appoint to the Center for periods of up to two years scholars
and leaders in peace and conflict resolution from the United States
and abroad. The Academy is authorized to award scholarships, fel-
lowships, grants or other remuneration to Center participants. The
Committee is mindful of the success of the Woodrow Wilson Center
in bringing together renowned scholars from around the world and
commends to the Board this successful model.

The Committee envisions the Center and the Academy as inter-
national centers attracting outstanding members in the field of
peace and conflict resolution and offering long-term course offer-
ings, extended periods of cooperative research, symposia, confer-
ences, lectures, continuing education programs, libraries services
and other educational programs. The Committee believes that the
Academy, the Center and satellites should serve as a readily avail-
able resource for government policymakers, private sector officials
and others actively involved in arms control, international conflict
resolution and diplomacy. In addition, many of these services
should be provided through grants to or contracts with existing in-
stitutions of higher education with programs in international af-
fairs, diplomacy and conflict resolution research.

The Committee strongly recommends that the Board seriously
consider locating the Center at an existing educational institution,
abandoned school or other appropriate facility in the Washington,
D.C. area to minimize costs.

The Academy, the Center for International Peace and associated
programs are expected to provide interdisciplinary and multidisci-
plinary examinations of the causes of war and other international
conflicts and the elements of peace among the nations and peoples
of the world. The programs will be offered at the graduate, post-
graduate and mid-career levels but will not, in their own right,
lead to formal degrees. The Committee strongly believes that the
Academy's primary focus is to enhance the efforts of existing insti-
tutions by offering programs which would periodically bring togeth-
er experts in the field. The Committee does, however, anticipate
the awarding of credit by institutions of higher education granting
leave to students or instructors desiring to participate in the pro-
grams of the Academy if the parent institution determines that
such credit, certificate or other symbol of participation is appropri-
ate.

The Academy is also charged with the task of developing for pub-
lication and other public communication the products of the Acade-
my. Section 5(b)(10), for example, specifically authorizes the Acade-
my to establish a clearinghouse or other appropriate institution to
perform this function. The Board bears the ultimate responsibility
for determining what should be published and should bear in mind
in creating bylaws governing the publication and distribution of in-
formation the Committee's expectation that the products distribut-
ed be carefully selected to ensure cost-effective distribution of rele-
vant and innovative advances in the fields of peace studies and con-
flict resolution. In no way should the Academy's publication serve
as a forum or platform for eliciting public support for positions in
policy debates in any level of government. Such an interventionist,
proponent role would be inconsistent with the Academy's charter.

19

However, neither does the Committee believe it would be proper to restrict the publication of research simply because its findings could be used to support one alternative or another in such decision processes. This, after all, is one of the intended purposes of the Academy.

### FUNDING

Under Section 4(e) of the Act, the Academy may establish a legal entity (the "Endowment of the United States Academy of Peace") to receive, hold and invest public and private funds to further the purposes of this bill. The Committee feels that a primary function of the Academy must be to stimulate the devotion of additional private, as well as public, resources to peace studies and conflict resolution efforts. To this end, the Academy may accept gifts, contributions, grants and contracts from government, private organizations, institutions and individuals. In addition, the Academy is authorized to collect compensation for subscriptions, publications and other activities sponsored by the Academy.

The Committee however, is concerned that the Academy not be subject to financial influences which might compromise its independence or objective pursuit of research in peace. Therefore, except for receipt of payment for tuition and related expenses for participation in the programs of the Academy, the Academy is prohibited from receiving gifts, contributions and contracts from foreign governments or instrumentalities thereof, foreign citizens and corporations or similar entities in which foreign citizens own more than 50 percent of the outstanding capital stock or other beneficial interest. This provision is in no way designed to preclude contributions from United States-based institutions with substantial interests or activities in foreign countries.

S. 564 authorizes a one-time appropriation of $7.5 million to purchase, lease, rent or otherwise improve a site for the principal office of the Academy, the Center for International Peace and the endowment. This sum shall remain available to the Academy without regard to fiscal year except that none of the funds can be used for any new construction of any building or facility for the Academy. The Committee, however, does not feel that the construction prohibition should in any way preclude the Academy from making the necessary structural modifications of facilities the Academy is renting or otherwise acquiring.

S. 564 authorizes $6 million in operating funds for fiscal year 1984 and $10 million for fiscal year 1985 for establishing programs and administering the affairs of the Academy. At least one quarter of these funds must be distributed to nonprofit and other public institutions to which the Academy provides grants under its outreach and extension functions. The Committee does not intend that this restriction apply to the capitalization fund. In addition, any funds appropriated in fiscal year 1984 for administrative and program costs but not obligated shall remain available through the end of 1985.

20

RELATIONS WITH GOVERNMENT INSTITUTIONS/INDEPENDENCE

The Academy is not an intervention agency. The Committee clearly expects the Academy to study ongoing crises and disputes yet does not feel that the Academy or its personnel should intervene directly in such conflicts. The Academy is not a national policy-setting agency, nor should it participate in the policy decisions of any federal or non-federal body. The Committee, however, wishes to encourage the participation of policymakers in the research, education and training programs of the Academy. The Committee believes that the Academy should not act as an institution with either the role or the authority to undermine the ability of the Congress, President, Secretary of State, Secretary of Defense or other policy-setting officials to develop and implement foreign policy.

Specific provisions of S. 564 reinforce these limitations. Section 9(a) prohibits the designation of the Academy as a department, agency or other instrumentality of the federal government, except to the extent that the Office of Management and Budget is charged with reviewing the Academy's budget requests. Section 5(n) makes it clear that the Academy shall not undertake to influence the passage or defeat of any legislation by the Congress, local and state legislative bodies or the United Nations, except that personnel of the Academy may testify or submit comments upon request of the appropriate legislative body. The Committee expects that this limitation would also apply to the rulemaking procedures of federal, state, local and international agencies.

No political test or qualification may be used in determining the status of personnel, contracts, grants or other Academy awards. The Committee expects that the Academy would select personnel and program participants based on an applicant's expertise, experience and interest in the fields of diplomacy, international affairs, conflict resolution and peace research and not on the applicant's political perspective. Grants, contracts and other awards should be judged on their quality and not on the political or ideological perspective of the proposed project's sponsor. However, the Committee does recommend that, for purposes of balance, a wide variety of viewpoints in relevant areas be represented among those individuals and entities receiving assistance from the Academy, consistent with its purposes. The Committee also desires the Academy to become respected as a scholarly institution which in its own in-house education, research and training activities maintains a healthy balance and diversity of responsible approaches and viewpoints.

In addition, Section 7(e) prohibits officers and employees of the Academy from receiving a salary or other compensation for services from any outside source during employment by the Academy, except as the Board may authorize. The Committee expects that such exceptional authorization by the Board occur in cases where the receipt of compensation would not compromise the independence or academic integrity of the Academy or of the employee or officer. For example, the Committee anticipates that reimbursement of expenses for participation in external symposia, conferences or speaking engagements would be permitted by the Board.

21

The Committee also believes that officers and employees of the Academy should not be considered employees of the federal government except for salary or compensation determination, liability, compensation for work injuries, civil service retirement, life insurance and health insurance. Additionally, no federal funds should be used to pay private fringe benefit programs such as university-based insurance, retirement or health plans although the Committee expects tht such programs could be funded from the Academy's private financial sources. Finally, the Academy is not permitted to grant academic tenure or make long-term commitments that are inconsistent with the rules and regulations applicable to federal employees.

Although concerned that the Academy not involve itself directly in the policy decisions of government at any level, the Committee does not wish to restrict the Academy to policy irrelevance. To restrict the Academy's research and training expertise to an "ivory tower" contributes little to furthering the cause of peace in the world. For these reasons, the Committee expects the Academy to make every effort to (1) use relevant information in research and training efforts; (2) construct training programs for use by those who are responsible for contributing to the nation's foreign and domestic policy (such as symposia and classes for current policy-makers or people destined to enter the fields of international affairs, conflict resolution and mediation); and (3) make conclusions and findings available to people who might use such information to effect a policy change conducive to peaceful resolution of conflict.

The Committee anticipates that its dissemination products will receive broad exposure among both laymen and experts, and it is thus concerned that these products reflect the highest standards of objective scholarship. In all materials, care should be taken to make the information accessible without oversimplifying; to acknowledge factors weighing against the conclusion reached, to identify assumptions which are crucial to the course of reasoning and to fairly discuss weakness in statistics or other data. Too often in both government and academia those whose work has policy implications neglect these principles of scholarship with the result that experts lose respect for the researcher and the sponsoring institution, and laymen are misled or confused when they fail to approach the material with requisite caution. The Committee is confident that the Academy will be able to avoid these pitfalls, but feels it important to initially set forth proper standards.

Section 5(c) requires the Academy in exercising its outreach and extension functions to devote at least one-quarter of the annual congressional appropriations to existing educational institutions, nonprofit research organizations and public departments or agencies. These grants should be made to strengthen basic and applied research in international peace and conflict resolution, promote such study by educational, training, research and other institutions, assist the Academy in its information dissemination function, and assist the Academy in the study of conflict resolution between free trade unions and communist-dominated organizations in the context of the global struggle for human rights. To emphasize this last goal, the Committee believes the American Federation of Labor—the Congress of Industrial Organizations should be eligible

22

for assistance to carry out its international conflict resolution functions.

The Committee also expects the one-quarter setaside to constitute a floor for the amount of resources devoted to programs at existing academic institutions. The strength of the nation's educational and research community lies in its diversity, and the Committee expects the Academy to take advantage of this resource and to eventually allocate funds from public and private sources at levels substantially above the one-quarter requirement.

The Committee also encourages, to the extent possible, participation in the Academy's programs by individuals and groups having policy-making functions. Specific sections of S. 564 reinforce this expectation.

Section 5(d) authorizes the Academy to respond, at its discretion, to the research requests of a department or agency of the United States government for the investigation of issues within the Academy's competence, including the study of past negotiation histories and the use of classified documents. The Committee strongly believes that insightful work in the successes and failures of past efforts to resolve conflict must include access to classified information and negotiating histories necessary to provide an accurate historical picture. Of course, access to this information should be given only to those employees, participants and subcontractors of the Academy who have received the appropriate security clearances for the Department of State or the Department of Defense, as necessary. However, the Committee does not expect that all employees, officials, board members and participants will require security clearances.

Section 5(b)(11) also authorizes the Academy to request, in accordance with the Freedom of Information Act, information necessary to enable the Academy to carry out its purposes if the release does not interfere with the proper functioning of the department or agency. The Committee believes that undue interference does not include normal requests for documents—and if classified, properly safeguarded documents—and the Committee further expects that the appropriate federal department or agency would make every effort to respond to the request in a fashion consistent with the usual response to requests from other federal entities. Moreover, under the information dissemination functions authorized in Section 5(b)(9), the Academy may release properly safeguarded classified reports and other Academy publications to government personnel with appropriate security clearances.

Each of these provisions reinforces the Committee's intent, stated explicitly in Section 5(b)(4), that the Academy's research and study efforts place particular emphasis on realistic approaches to past successes and failures in the quest for peace and arms control, utilizing to the maximum extent possible United States government documents and classified materials from the Department of State, the Department of Defense, the Arms Control and Disarmament Agency (ACDA) and the intelligence community. Valid suggestions on how best to resolve peacefully an international conflict undoubtedly depend on intelligence and other classified data pertaining to the conflict. Section 5(h)(1), for example, specifically authorizes the Academy to accept contracts for classified research from the De-

23

partments of State and Defense, ACDA and the intelligence community. Conversely an analyst with any of these agencies or departments might gain new insight into the possibility of peaceful resolution of a conflict through access to Peace Academy publications or through participation in an Academy sponsored forum or symposium.

To further promote program participation by government policy-makers, the Academy's president may request the participation of federal employees—including members of departments and agencies, congressional officials and members of Congress—in the programs of the Academy if such instruction does not obstruct opportunities in that employee's current job. Furthermore, the Secretary of Defense, the Secretary of State, the Director of ACDA and the Director of Central Intelligence are authorized to assign officers, on a rotating basis to be determined by the Academy's Board, to the programs of the Academy. The Committee expects the Board to oversee such assignment to ensure that the Academy's independence is not compromised and to promote the exchange of information regarding peaceful resolution of conflict. The Board should also ensure that such assignment is not used as a springboard for covert intelligence actions.

The Committee is mindful of concerns expressed about establishing a new layer of bureaucracy by creating this Academy outside of existing federal departments or agencies. However, it became clear to the Committee after extensive hearings and debate, that an independent and free-standing institution was advisable in this case. In an effort to increase cooperation with existing federal peace-making agencies, the Committee has, among other things, added four new members to the governing board of the Academy, representing the Departments of Defense and State, as well as the Arms Control and Disarmament Agency and the National Defense University, housing our war colleges.

Thus, the Committee feels that in order to ensure the Academy's ability to pursue scholarly work in the tradition of academic freedom and non-bias, the Academy must be able to carry out its activities outside the day-to-day policy-making pressures and constraints which might impinge upon that freedom were the Academy to be part of an existing agency or department. Moreover, it is clear to the Committee that the issues the Academy will be dealing with are of vital importance and favor the creation of a separate institution whose purpose is to explore new areas of international peace-making. To relegate this function to an existing agency—to make it merely one more responsibility among many others—might well limit the time, energy and resources that must be directed toward the Academy's crucial education, research and training efforts. The Committee feels our national security deserves an entity whose only role is to explore alternatives to the international violence and to bring those alternatives to the attention of those in a position of trust, within both the legislative and executive branches.

## BOARD OF DIRECTORS

Under Section 6, all the powers of the Academy are vested in a 19 member Board of Directors responsible for creating the struc-

24

ture and overseeing the operation of the United States Academy of
Peace.

Two Members of the Senate, one from each political party, are to
be appointed by the President pro tempore of the Senate. Two
Members of the House of Representatives, again one from each po-
litical party, must be selected by the Speaker of the House. Eleven
other persons, no more than six of whom may be from the same
political party, must be appointed by the President of the United
States subject to Senate confirmation. Finally, four ex officio mem-
bers of the United States government, the Secretary of State, the
Secretary of Defense, the Director of the Arms Control and Disar-
mament Agency and the Commandant of the National Defense
University, or their designees, shall serve as voting members of the
Peace Academy's Board of Directors.

The Committee is mindful of the need to provide a balance of po-
litical perspectives to the body charged with the primary responsi-
bility for creating the structure of the Academy. To this end, a po-
litical test is applied to those candidates selected by the Congress
and the President. However, the Committee is also concerned that
the Academy serve as an important resource for those primarily re-
sponsible for implementing the day-to-day decisions that affect the
involvement of the United States in the resolution of international
conflict. For this reason, the input of the Secretary of State, the
Secretary of Defense, the Director of ACDA and the Commandant
of the National Defense University is expected to enhance the
Academy's role in providing relevant information to policymakers.
The participation of these members in no way makes the Academy
an intervention agency, and in no way compromises the Academy's
independence, but instead provides the Academy's Board with indi-
viduals whose positions guarantee a high level of credibility.

The Committee also expects that the remaining members bring
credibility to the Board by having sufficient eminence in the issues
of peace and conflict resolution throughout the world. To further
emphasize this, Section 6(b)(3) specifically requires that presiden-
tially-appointed members of the Board have appropriate practical
or academic experience in the peace and conflict resolution efforts
of the United States. This provision in no way limits Board mem-
bers to those who have participated in the government of the
United States, but instead suggests to the President the selection of
eminent academicians, lawyers, corporate figures, labor leaders
and others who have contributed to the resolution of conflict
throughout the world. The Committee also recommends that the
congressionally appointed members of the Board have substantial
interest or experience in conflict resolution and concern for the
goals and objectives of the Academy.

The Vice President of the United States administers the oath of
office to Board Directors two weeks after appointment if a Member
of Congress, or two weeks after Senate confirmation if a presiden-
tial nominee. Congressionally appointed members serve for a single
term of six years and only while a Member of Congress. The initial
submission of a nomination by the President must include four Di-
rectors who would serve for five-year terms, four Directors who
would serve four-year terms and three Directors who would serve
three-year terms. Except for a Director appointed to fill an unex-

pired term, all presidential appointees must thereafter serve for terms of five years. No presidential appointee may serve on the Board for more than ten years, and no person may be appointed to less than a full term unless appointed to fill an unexpired term.

Board vacancies created by the departure of a congressionally-appointed Director before the end of term must be filled within 30 days through the same procedure used to select congressionally-appointed Directors at the inception of the Academy. When a presidential appointee leaves before the end of term, the Board must submit to the President three to five recommendations for replacement. The President must within 30 days submit one of these names to the Senate for confirmation. The same procedure is used to fill a vacancy created by the expiration of a Director's term except that the Board must submit the list of recommendations to the President 120 days before expiration of the term, and the President must submit his choice to the Senate 45 days before the expiration of the term.

Congressionally-appointed members of the Board may be removed by the appointing authority for malfeasance in office, persistent neglect of duties or inability to discharge responsibilities. The Committee believes that persistent failure to attend meetings of the Board clearly evidences neglect of duties.

Presidentially-nominated Board members may be removed by the President, in consultation with the Board, for conviction of a felony or neglect of or inability to carry out the responsibilities of Board members. This power of removal may also be exercised upon the recommendation to ten members of the Board or upon the recommendation of a majority of the Members of the Committee on Foreign Affairs in the House of Representatives, the majority of Members on the Committee of Education in the House of Representatives and the majority of Members on the Senate's Committee on Labor and Human Resources.

The President of the United States shall select the first Chairman of the Board, who shall serve a term of three years. The Board is responsible at the expiration of that term for electing the subsequent Chairman from the presidentially-appointed Directors. The Board is responsible for adopting bylaws necessary for the proper functioning of the Academy and may elect to include in these bylaws the designation of procedures to elect a Vice Chairman.

The Board must meet at least semiannually, at any time the Chairman requests a meeting, by virtue of a written request submitted to the Chairman by at least five Board members, or as required by the bylaws of the Academy. While a majority of the Board Directors constitutes a quorum, at least one congressionally appointed member must be present before the Board may transact business. Consistent failure to attend such meetings subjects congressionally appointed Directors to the removal requirements of this Act.

Meetings of the Academy's Board of Directors shall be open to the public except in circumstances where a majority of Board members determine that an open meeting would disclose information jeopardizing ongoing peace proceedings or compromising national security. Additionally, on a biennial basis the Chairman of the

26

Board is required to prepare and transmit to the Congress and the President a report detailing the Academy's progress implementing the purposes of this Act. The same Congressional committees with jurisdiction over Board member removal are required to hold hearings to evaluate the report and the recommendations of the President of the United States.

## IV. SECTION-BY-SECTION ANALYSIS

### PREAMBLE. SHORT TITLE

The Preamble specifies that the Act may be cited as the "United States Academy of Peace Act."

### SECTION 2. DECLARATION OF FINDINGS AND PURPOSES

Sec. 2(a)(1)–(9) outlines 9 Congressional findings suggesting the need for establishing an Academy of Peace. Sec. 2(b) declares that the purpose of the Academy is to serve the people and the government as an independent, nonprofit, national institution offering programs in peace research, education, training and information services.

### SECTION 3. DEFINITIONS

Sec. 3 defines the term "Academy" as the United States Academy of Peace established under the Act; the term "Board" means the Board of Directors of the Academy; and, the term "Center" means the Center for International Peace of the Academy.

### SECTION 4. ESTABLISHMENT

Sec. 4(a) establishes the United States Academy of Peace. The term "United States" in the Academy's title emphasizes the official, national stature of the institution. The term "Academy" refers to the educational mission of the new entity. The term "Peace" is used to suggest that the primary focus of the Academy is to promote the attainment of peaceful resolution of conflict through research, training and information dissemination.

Sec. 4(b) establishes the United States Peace Academy as an independent, nonprofit corporation without the power to issue any share of stock or to declare or pay dividends. Persons in any way associated with the Academy cannot receive personally the benefit of any of the Academy's resources or assets except as reasonable compensation for services rendered.

Sec. 4(c) designates the District of Columbia as the location for the central facilities and administrative offices of the Academy. Other sites and facilities for the Academy may be located outside of the Washington, D.C. area as provided in Sec. 4(d).

Sec. 4(e) provides for the establishment of a legal entity known as the "Endowment of the United States Academy of Peace" as an endowment fund. Sec. 4(f) confirms the liability of the Academy for the acts of its officers and employees.

Sec. 4(g)(1) reserves the right of the Academy to exclusive use of the terms "United States Academy of Peace", "Center for International Peace" and "Endowment of the United States Academy of

27

Peace" as well as the Academy's use of associated emblems, badges and seals. Sec. 4(g)(2) specifies that the use of the designation "United States", "U.S." or any other reference to the United States government in its corporate seal, emblem, badge or the like must be contingent upon an authorization of appropriations for the Academy during the fiscal year of use.

### SECTION 5. POWERS AND DUTIES

Sec. 5(a) confers general authority upon the Academy to exercise the powers of a nonprofit corporation as defined in the District of Columbia Nonprofit Corporation Act.

Sec. 5(b)(1) authorizes the establishment of a Center for International Peace where leaders and scholars in the field of international peace could reside for up to two years with Academy support. Sec. 5(b)(2) empowers the Academy to establish programs, schools and offices as appropriate in implementing its functions. Sec. 5(b)(3) permits the Academy to enter into both formal and informal relationships with other institutions.

Sec. 5(b)(4) empowers the Academy to conduct research of a multidisciplinary nature into the causes of international conflict and the elements of international conflict resolution. The development of associated programs and materials for the practical implementation of this research is provided for under Sec. 5(b)(5). The development of peace education and research programs at both graduate and post-graduate levels is provided for under Sec. 5(b)(6), and short-term training in peace and conflict resolution is empowered under Sec. 5(b)(7).

Sec. 5(b) (8) and (9) authorizes the Academy to provide information services through developing its own publications and establishing a clearinghouse for the dissemination of peace information to the public and to government personnel.

Sec. 5(b)(10) permits the Academy to recommend to the Congress the establishment of a United States Medal of Peace, except that no person associated with the Academy may receive the medal.

Sec. 5(b)(11) authorizes the Academy's right to secure information, in accordance with the Freedom of Information Act, from any federal department or agency necessary to carry out its purposes so long as the release of the information does not unduly interfere with the proper functioning of the agency.

Sec. 5(c) (1)–(6) permits the Academy to engage in extension and outreach activities through grants to and contracts with public and private educational, training and research institutions as well as with appropriate state and territorial departments and agencies. Grants may be made only to nonprofit or official public institutions. Grants and contracts are authorized on behalf of basic and applied research concerning international peace studies, for the purpose of education and training in the theories and techniques of peaceful conflict resolution, to assist the Academy in its information dissemination functions and to promote other purposes of the Act. In addition at least 25 percent of the Academy's annual appropriations must be paid to such nonprofit and official public institutions.

28

Sec. 5(d) sanctions Academy studies and investigations in response to requests from federal agencies and departments, including requests to study past negotiating histories through the use of classified materials.

The Academy is further empowered to enter into contracts for the operation of the Academy (Sec. 5(e)), to appoint and compensate Academy officers and employees (Sec. 5(f)), to adopt and amend bylaws (Sec. 5(g)), to obtain grants and contracts and receive gifts and contributions except from foreign governments and organizations (Sec. 5(h)) and to impose fees on publications and activities associated with the Academy (Sec. 5 (i) and (j)).

Sec. 5(k) defines the Academy's legal status; Sec. 5(l) authorizes the Academy to adopt and use a corporate seal; and Sec. 5(m) generally empowers the Academy to engage in all lawful acts consistent with the Academy's purposes. Sec. 5(n) stipulates that the Academy may not lobby on behalf of or against any legislation at local, state, federal and international levels (including the United Nations). Formal requests by a legislative body for testimony by a member of the Academy are exempt from this provision.

### SECTION 6. BOARD OF DIRECTORS

A Board of Directors of the Academy is established under Sec. 6(a). Sec. 6(b)(1)–(4) specifies the composition of the 19 Board members. Two Members of the Senate, one from each of the major political parties, must be appointed by the President pro tempore of the Senate; two Members of the House of Representatives, one from each of the major political parties, are to be appointed by the Speaker of the House; eleven other persons (no more than six of whom are members of the same political party and who are not employees of the federal government) are to be appointed by the President of the United States with the advice and consent of the Senate. In addition, the Secretary of Defense, the Secretary of State, the Director of the Arms Control and Disarmament Agency and the Commandant of the National Defense University or their designees must serve as ex officio members of the board. This section further specifies that each Director takes an oath of office administered by the Vice President of the United States (Sec. 6(c)) and that members of the Board shall serve limited terms (Sec. 6(d)). In the case of congressional members of the Board, the bill provides for a single term of six years but only while the Member continues to serve in Congress. For the remaining members of the Board, the bill requires staggered terms of service varying from three to five years for initial Board appointees; therefore, each presidential appointee is to serve a five-year term unless appointed to fill an unexpired term. Presidential appointees are prohibited from serving on the Board for more than ten years (Sec. 6(d) (1) and (2)).

Whenever a vacancy occurs on the Board before the expiration of a Congressional director's term of office, the vacancy must be filled in accordance with an appointment by the President pro tempore of the Senate or the Speaker of the House, as appropriate. If the vacancy is that of the unexpired term of a Presidential appointee, then the President must select a nominee for the Senate confirmation from a list of nominees furnished by the Board (Sec. 6(e) (1)

29

and (2)). Similarly, the Board must provide the President a list of nominees at a specified time interval prior to the normal expiration of a Presidential appointee's term of office. Subsequently, the President shall select a nominee from the Board's list and submit the nominee's name to the Senate for confirmation in accordance with specified time requirements (Sec. 6(f)).

Sec. 6(g) authorizes the removal of members of the Board of Directors. Congressional directors may be removed from the Board by either the President pro tempore of the Senate or the Speaker of the House, as appropriate, for malfeasance in office, persistent neglect of duties or inability to discharge duties. Board members appointed by the President may be removed by the President for these same reasons except that the President may also remove a member of a felony conviction; where the Board has recommended removal by a vote of ten members; or upon the recommendation of a majority of the members of the Committees on Foreign Affairs and Education and Labor in the House of Representatives or a majority of the members of the Committees on Labor and Human Resources and Foreign Relations of the Senate.

Sec. 6(h) prohibits Board members from participating in any official action associated with an organization—public, private or nonprofit—with which the member is currently affiliated or with which the member has been formally associated during the past two years.

Meetings of the Board of Directors are governed by Sec. 6(i)(1)–(4); the first Chairman of the Board must be named by the President and must serve a three-year term. Subsequently, the Board shall elect a Chairman every three years from among the Directors appointed by the President. The Board may elect a Vice Chairman if its bylaws so provide.

The Board must meet at least semiannually but may meet more often at the request of the Chairman, through the written request of five Board members or as provided in the bylaws. A majority of the members of the Board, including one member appointed from the Congress, shall constitute a quorum for any Board meeting. Adoption and amendment of bylaws may occur upon a majority vote of Board members. Meetings of the Board shall be open to the public unless exceptional circumstances arise where the national security of the United States or any ongoing peace proceeding might be jeopardized through the disclosure of information or unless matters are exempt from public disclosure pursuant to law.

Sec. 6(j) and 6(k) provide for the salaries of directors appointed by the President and authorize travel expenses and per diem allowances for directors in connection with the performance of their duties for the Academy.

### SECTION 7. OFFICERS AND EMPLOYEES OF THE ACADEMY

Sec. 7(a) of the bill requires the Board to appoint the president and other officers of the Academy. Sec. 7(b) authorizes the president to receive and disburse money, to obtain and make grants, to enter into contracts and to undertake all other activities necessary for the efficient and proper functioning of the Academy. Moreover, Sec. 7(c) permits the president, within the framework of Academy

bylaws and Board policy, to appoint and remove Academy employees. The president may also request the assignment of federal officials to the Academy in accordance with an agreement with the relevant federal agency (Sec. 7(d)(1)).

Furthermore, the Secretary of State, the Secretary of Defense, the Director of the Arms Control and Disarmament Agency and the Director of the Central Intelligence Agency each may assign officers and employees, subject to the Board's approval, to the Academy (Sec. 7(d)(2)).

In order to guarantee the Academy's independence, employees and officers of the Academy cannot receive salary or compensation from sources outside the Academy (Sec. 7(e)), are exempt from federal employee status except in certain situations (such as the determination of wages and other compensation) (Sec. 7(f)(A–B)), cannot receive the income or assets (exclusive of salary) of the Academy (Sec. 7(g)) and cannot receive loans through the Academy (Sec. 7(h)).

### SECTION 8. PROCEDURES AND RECORDS

Sec. 8(a) requires the Academy to monitor and evaluate its programs to ensure compatibility with the Act. Procedures must be prescribed (Sec. 8(b)) whereby persons and entities affected by the suspension of Academy grants or contracts have sufficient notice of such actions and are given the opportunity to object to the suspension. Under Sec. 8(c), the Academy is required to consider the peace-keeping background and experience of candidates when selecting participants for Academy activities.

Sec. 8(d) specifies that the Academy must maintain a complete and accurate financial record, including separate accounting for the receipt and disbursement of federal and non-federal funds. Minutes of all Board meetings and associated committee proceedings are required under Sec. 8(e), and Sec. 8(f) requires specific records to be maintained at the principal Academy office in Washington, D.C. An annual independent audit of the Academy's accounts is required under Sec. 8(g), and the submission of that audit to the President of the United States and to the Senate and House of Representatives is stipulated under Sec. 8(h). Sec. 8(i) provides that the Academy, its officers and its employees are subject to the requirements of the Freedom of Information Act.

### SECTION 9. INDEPENDENCE AND LIMITATIONS

Sec. 9(a) clarifies that the Academy is an independent entity, not to be considered an agency, department or instrumentality of the federal government.

Sec. 9(b) further emphasizes that no political test or qualification may be employed in connection with the Academy's personnel or funding activities.

### SECTION 10. FUNDING

Sec. 10(a) authorizes a capitalization fund of $7.5 million for the purpose of purchasing, leasing, renting or otherwise acquiring and improving a site for the principal office of the Academy and the

31

Center for International Peace in or within easy reach of the District of Columbia. The Academy may not, however, use the capitalization fund for the construction of any new facilities.

Sec. 10(b) authorizes, for the purpose of establishing programs and administering the affairs of the Academy, $6 million for fiscal year 1984 and $10 million for fiscal year 1985.

Sec. 10(c) permits the transfer of federal funds which remain unexpended during the fiscal year to the endowment fund established by Sec. 4(e) of this Act without regard to fiscal year limitations. Contract authority is effective for a fiscal year only in the amount provided in appropriation acts under Sec. 10(d).

Sec. 10(e) requires the Board to approve the obligation or expenditure of any of the Academy's funds not appropriated by the Congress.

### SECTION 11. DISSOLUTION OR LIQUIDATION

This section provides that upon dissolution or final liquidation of the Academy, the income and assets of the corporation are to revert to the Treasury of the United States.

### SECTION 12. REPORTING REQUIREMENT AND REQUIREMENT TO HOLD HEARINGS

This section requires the Board Chairman of the Peace Academy to prepare and transmit to the Congress and the President a progress report on implementing the purposes of the Act every two years. Hearings must be held by Congress after the President has submitted comments on possible legislative changes.

### V. Cost Estimate

U.S. Congress,
Congressional Budget Office,
*Washington, D.C., August 1, 1983.*

Hon. Orrin G. Hatch,
*Chairman, Committee on Labor and Human Resources,*
*U.S. Senate, Washington, D.C.*

Dear Mr. Chairman: Pursuant to Section 403 of the Congressional Budget Act of 1974, the Congressioanl Budget Office has prepared the attached cost estimate for S. 564, the United States Academy of Peace Act, as ordered reported by the Senate Committee on Labor and Human Resources, July 20, 1983.

Should the Committee so desire, we would be pleased to provide further details on this estimate.

Sincerely,

Nancy M. Gordon
(For Alice M. Rivlin, Director).

### CONGRESSIONAL BUDGET OFFICE COST ESTIMATE

1. Bill number: S. 564.
2. Bill title: United States Academy of Peace Act.
3. Bill status: As ordered reported by the Senate Committee on Labor and Human Resources, July 20, 1983.

32

4. Bill purpose: The purpose of this bill is to establish the United States Academy of Peace. This bill is subject to subsequent appropriations action.

5. Estimate cost to the Federal Government:

[By fiscal year, in millions of dollars]

|  | 1984 | 1985 | 1986 | 1987 | 1988 |
|---|---|---|---|---|---|
| Authorization level |  |  |  |  |  |
| Office space | 7 5 |  |  |  |  |
| Administration | 6 0 | 10 0 |  |  |  |
| Total authorization level | 13 5 | 10 0 |  |  |  |
| Estimated total outlays | 8 3 | 12 2 | 2 3 | 0 7 |  |

The cost of this bill falls in Function 500.

*Basis of estimate:* The authorization levels are those specifically stated in the bill. The authorization level for office space does not have a fiscal year limitation. For the purposes of this estimate it was assumed to be appropriated in 1984. The estimated outlays assume full appropriation of authorized levels. The outlays for office space acquisition are assumed to occur over a two-year period. The administration outlays are assumed to reflect other education research organization spending patterns for research grants and salaries and expenses.

6. Estimated cost to State and local governments: The Congressional Budget Office has determined that the budgets of the state and local governments would not be affected directly by the enactment of this bill.

7. Estimate comparison: None.

8. Previous CBO estimate: None.

9. Estimate prepared by: Deborah Kalcevic.

10. Estimate approved by: James L. Blum, Assistant Director for Budget Analysis.

## VI. REGULATORY IMPACT STATEMENT

In accordance with paragraph 5(a) of rule XXIX of the Standing Rules of the Senate concerning the regulatory impact of proposed legislation, the Committee provided the following evaluation of the anticipated additional paperwork and other regulatory impact that would result from the implementation of S. 564, which established the United States Academy of Peace:

*A. Estimated number of individuals and businesses regulated and their group or classifications.*—No new classification of individuals or businesses in the private sector would become subject to regulation as a result of this legislation.

*B. Impact of the act on personal privacy.*—This legislation has no impact on personal privacy.

*C. Additional paperwork, time and costs.*—It is not anticipated that implementation of this legislation will impose any additional paperwork, time or cost upon the private sector. S. 564 requires a bienniel report filed by the Chairman of the Board of the Peace Academy to the Congress and the President of the United States

33

outlining the progress of the Academy in implementing the purposes of the Act.

   D. *Economic impact of such regulation on individuals or businesses.*—Federally appropriated funds for the Peace Academy will be used to employ leaders in the field of conflict resolution to teach at the Academy. Grants will also be issued to individuals and groups to conduct research in peace and conflict resolution.

## VII. ADDITIONAL VIEWS OF MESSRS. RANDOLPH AND MATSUNAGA

In favorably reporting S. 564, the U.S. Academy of Peace Act, the Senate Committee on Labor and Human Resources has again taken a significant step toward the establishment of a federal institution devoted to the peace education and peacemaking capabilities of the American people. We are pleased to note, as well, that this legislation has gained widespread support since its original introduction in 1981. Over 50 national organizations and associations have endorsed the peace academy concept, along with several state legislatures, and the bill is currently cosponsored by 54 senators.

America's heritage, power and prestige make the United States a major force for world peace. The concept of a national institution devoted to peace research and education originated during the American Revolutionary War era. The 20th Century saw the United States joining other nations in a pact to "outlaw war." This solemn pledge was contained in the Pact of Paris of 1928, more popularly known as the Kellog-Briand Treaty. Sixty-two nations signed the pact, which was ratified in the United States Senate by a vote of 82–1. Simply stated, the Pact of Paris renounced war as a means for settlement of international disputes and as an instrument of national policy. All disputes were to be settled by "pacific means."

Since 1928, the United States has fought in World War II, the Korean Conflict, and the war in Vietnam. Moreover, a recent survey by the Associated Press revealed that there are at least 15 "small wars" underway today in various parts of the world. Public opinion polls show that the fear of a nuclear holocaust is greater today than at any time since the Cuban Missile Crisis of the early 1960's. In a more skeptical age, most people would reject the idea that war can be ended by a solemn declaration alone.

Yet, the majority of Americans refuse to accept the idea that war is inevitable, and we believe that they are ready for the establishment of a practical institution such as the proposed United States Academy of Peace, which potentially could reduce the likelihood of war and increase our national security.

The U.S. Academy of Peace would have three major functions: research, education and training, and information services. Its doors would be open to students from institutions of higher education, organizations and individuals in the private sector, and government officials. Through its Center for International Peace, it would also be able to train leaders and prospective leaders from other nations. Because the Academy would be an independent, semi-autonomous institution, segregated from the day-to-day imperatives of national policy making, it would be able to focus on the comprehensive and long term study of alternatives to war and the various new techniques for resolving conflicts without violence

(34)

35

which have been developed in this country during the last 25 years. Sponsors of S. 564 believe that the Academy's activities will help insure that the world evolves in a way that will maximize the chances for peaceful cooperation, freedom, enhancement of human rights and economic development.

S. 564, and its predecessor bill, S. 1889, are based on the findings of the U.S. Commission on Proposals for the United States Academy of Peace and Conflict Resolution. Through its study of existing literature on conflict resolution and its public hearings, the Commission answered many questions surrounding this plan for a Peace Academy. The proposal was further illuminated during the public hearings held in 1982 and 1983 by the Subcommittee on Education, Arts and Humanities of the Labor and Human Resources Committee. In these additional views, we will briefly discuss some of the major questions which have arisen about the Peace Academy.

### WILL THE ACADEMY BE DUPLICATIVE?

In reporting S. 564, the Committee found that the U.S. Academy of Peace would enhance, not duplicate, the ongoing efforts of the U.S. government and existing institutions of higher education. Sponsors of the bill believe that the Academy will be a new and unique entity. Its primary focus will be on the study of the causes of international conflict and alternatives to war, and not on the day-to-day protection and preservation of U.S. interests abroad. In fact, the provisions of S. 564 specifically prohibit the Peace Academy from intervening in international disputes and in the routine policy-making processes of the federal government. However, the fruits of the Academy's research, education and training activities will undoubtedly will be helpful to those federal agencies and international organizations which are charged with the conduct of foreign affairs, foreign trade and commerce, military affairs, and intelligence operations. As originally drafted, S. 564 permits the Academy to request the cooperation and services of federal agencies and officials. The Committee on Labor and Human Resources strengthened this provision by specifically authorizing certain departments and agencies of the federal government to assign employees to the Academy temporarily as students or faculty members. Further amendments were adopted to make it easier for the Academy to obtain classified government documents for use in its research, and to add to the Academy's Board of Directors as ex officio members the Secretary of State, the Secretary of Defense, the Director of the Arms Control Agency, and the Commandant of the National Defense University.

Witnesses during the Subcommittee's hearings on S. 564 and S. 1889 testified to the need to maintain adequate support for existing international studies programs, and also noted that the proposed Peace Academy would fill a gap which exists within higher education. First, the Peace Academy would strengthen existing programs by providing additional funds (a full 25 percent of the Peace Academy's appropriations would be used for the purpose of establishing peace studies programs at exising institutions through grants and contracts awarded and entered into as provided in S. 564), as well

as to provide additional opportunities for study and research. Secondly, the Academy would provide opportunities for graduate-level research and training in peace studies and conflict resolution—a field that is not quite the same as international affairs or diplomacy. While several universities and colleges have established courses in peace studies at the undergraduate level, there are very few opportunities for advanced study and research in this area. We believe that the Academy will serve as a catalyst in bringing the field of peace studies to as many people as possible and in stimulating the development of graduate level programs in this field at other institutions. In short, as the Commission on Proposals for the National Academy of Peace and Conflict Resolution found, the Academy would "activate the field of peace learning." The Commission found that "to date the peace learning field as suffered from both inadequate investment and unfocused public sanction, especially in the United States . . ."

### WHY A SEPARATE, INDEPENDENT ENTITY?

The Peace Academy, in the view of the Committee, should be an independent, semi-autonomous agency and not just an adjunct to an existing federal department or agency. S. 564 specifically removes the U.S. Academy of Peace from the day-to-day policy making processes of the federal government and from direct intervention in disputes, and it also attempts to insulate the Academy from direct partisan political influence. This will enhance the Academy's credibility both at home and abroad, and will enhance the Academy's status as a symbol of the United States' dedication to world peace. During its consideration of S. 564, the Committee on Labor and Human Resources rejected an amendment in the nature of a substitute which would have provided for a research and training program, funded under Title VI of the Higher Education Act, to be conducted by the Arms Control and Disarmament Agency.

The U.S. Commission on Proposals for the National Academy of Peace and Conflict Resolution seriously examined various proposals that would have established a simple Endowment for Peace only, or would have created a peace studies agency within an existing federal department, rather than a free-standing, independent Academy of Peace. The Commission rejected both such proposals, preferring the creation of an Academy, but with authority contained in the bill to establish an endowment as an integral part of that Academy. This is in keeping with the Committee's findings that even if its principal offices are located on federal property as a cost-saving measure, the Academy should be an independent entity, as reiterated in the main body of the report of the Committee on Labor and Human Resources.

### WHY FEDERAL FUNDS? WHY PRIVATE FUNDS?

In its proposal for a United States Academy of Peace, the U.S. Commission on Proposals for the National Academy of Peace and Conflict Resolution found that to be effective, the Peace Academy should receive its core funding from the federal government and supplemental funding from the private sector. The mix of public

37

and private funding will further assure the Academy's independence, and will enable the Academy to conduct research, education and training activities in a broader range of fields than would be possible otherwise.

S. 564 authorizes the establishment, within the U.S. Academy of Peace, of an Endowment to accept private funds and gifts. During its consideration of the bill, the Committee rejected a proposed amendment which would have prohibited the Peace Academy from accepting private funds. Several committee members expressed concern that the Academy might eventually be controlled by its major private sector contributors. We wish to point out that this has not happened in the case of the military service academies and the National Defense University, all of which are permitted to accept private contributions and gifts.

For example, the Naval Academy receives funds through a private independent, tax exempt organization called the "Department of Planned Giving." Although independent of the Naval Academy, it exists only to raise funds for the Academy. Funds may be contributed to the "Department of Planned Giving" on a "restricted" or "non-restricted" basis, and for academic chairs at the Naval Academy.

At the U.S. Military Academy at West Point, the Association of Graduates accepts contributions on behalf of the Military Academy. The Association establishes charitable trusts and pooled income trusts to achieve maximum tax deductibility, and the funds can be used for current operating costs and a variety of other purposes. As of July 1, 1983, the Association had raised $1 million this year.

The NDU Foundation, established one year ago, is a tax-exempt organization which accepts contributions of money, books, and other items for the National Defense University. To date, approximately $1 million has been contributed to the NDU Foundation, which is similar to the Military Academy's Association of Graduates.

### WILL THE PEACE ACADEMY BE COST-EFFECTIVE?

Efforts to reduce federal budget deficits have put the squeeze on all existing federal spending programs. But most supporters of S. 564, both on the Committee on Labor and Human Resources and in the Senate believe that if we can and should support the largest increase in defense spending in our history, then we can and should spend additional funds to prepare for peace. Some calculations indicate that the $23.5 million cost of operating the U.S. Academy of Peace for two years would cost each individual U.S. taxpayer five cents per year. By comparison, each American pays about $1,100 in taxes annually to support our defense budget. We believe the Peace Academy to be a sound, though comparatively modest, investment, which could pay great returns.

### CONCLUSION

As sponsors and supporters of the proposed U.S. Academy of Peace, we have been greatly impressed by the fact that even opponents of the Academy acknowledge that there is a need for federal

38

support of peace learning and conflict resolution, and for increased federal support of existing international studies programs. We believe that this reflects the strong public belief that these areas have heretofore been neglected by our federal government. As reported by the Committee on Labor and Human Resources, S. 564 is a bipartisan bill which reflects neither a totally "liberal" nor a totally "conservative" point of view. It is the product of some nine hours of public hearings at the subcommittee level and hours of consideration by the full Committee during the last two years.

We believe that the Senate is ready—and the American people are ready—for this focused federal investment in world peace, and we urge the adoption of S. 564 by the Senate.

JENNINGS RANDOLPH.
SPARK M. MATSUNAGA.

## VIII. MINORITY VIEWS OF MESSRS. QUAYLE, NICKLES, DENTON, GRASSLEY, EAST, AND MRS. HAWKINS

Although we share the desire for peace that motivates the supporters of this bill in its several forms, and although we agree that the Congress and our country should bend every reasonable and responsible effort to increase the prospects for maintaining peace, we cannot support S. 564.

We find the bill flawed in concept and in execution, lacking in definition, entailing large expenditures for few benefits, duplicative of activities already underway in our educational system, and reflective more of wishful thinking than of sound planning and analysis.

Because S. 564 seems to provide a simple solution to a complex problem, because it promises more than it can possibly deliver, it diverts attention and efforts from more important tasks both in government and in the private sector.

Last year, when the Committee reported an earlier version of the same bill, those of us in the minority expressed the view that the establishment of a Federal Government "Peace Academy" would be, in educational terms, nothing but a symbolic act. We pointed out that the structure the bill sought to erect for peace studies already exists in universities, foundations, and service academies, the so-called "war colleges," the National Defense University, and professional schools of international affairs. The bill that the Committee has reported this year is subject to the same criticism, but this year the symbolic nature of the proposal is even more apparent.

Many of the substantial and persuasive criticisms of the bill were aired in a joint hearing held in the House of Representatives last year. The Subcommittees on International Security and Scientific Affairs and on International Operations of the Committee on Foreign Affairs, and the Subcommittee on Postsecondary Education of the Committee on Education and Labor, published the hearing under the title "Proposals to Establish a U.S. Academy of Peace." We urge our colleagues to examine that volume, and particularly the testimony presented by Ambassador Theodore L. Eliot, Jr., Dean of The Fletcher School of Law and Diplomacy at Tufts University, and by Mr. John T. Sprott, the Deputy Director of the Foreign Service Institute, Department of State.

An additional Senate hearing, held by the Subcommittee on Education, Arts and Humanities on March 16, 1983, illustrated that the bill was vulnerable to many valid criticisms from the educational community. Moreover, even the witnesses called to support the bill had serious criticisms and reservations. We urge our colleagues to examine the printed record of the hearing. If they read nothing else, we commend to them the informed and perceptive written statement submitted by the Honorable David D. Newsom,

(39)

an experienced American diplomat who served as Under Secretary of State for Political Affairs during the previous administration.

In addition, several respected educators presented testimony in opposition to the bill, and for the most part in opposition to the establishment of a United States Academy of Peace in any form. We particularly call the attention of our colleagues to the testimony and statements presented by:

    Ambassador Stephen Low, Director of the Foreign Service Institute of the Department of State;

    Dr. Harvey Picker, Dean of the Columbia University School of International and Public Affairs;

    Professor Duncan L. Clarke, a member of the Faculty at the American University School of International Service;

    Dr. John Funari, Dean of the School of Public and International Affairs at the University of Pittsburgh;

    Professor I. William Zartman, of the Faculty of the Johns Hopkins University School of Advanced International Studies;

    Rear Admiral Edward F. Welch, USN (Ret.), former President of the Naval War College; and

    Admiral Thomas H. Moorer, USN (Ret.), former Chairman of the Joint Chiefs of Staff.

Moreover, we hope that each of our colleagues will take a moment to read the letters from Administration officials in opposition to establishment of a United States Academy of Peace. They are printed following the text of our Minority Report.

In an attempt to respond to the many sound criticisms of the bill made in the hearings and in Committee discussion, the proponents proposed or accepted changes that have the effect of weakening rather than strengthening the case for the legislation. In our mind, that speaks to the insufficiency of the idea and to the desire of some supporters of the legislation to get a "peace academy" of any kind at almost any price.

One such change was that the sponsors of the bill amended it to delete the degree-granting authority in order to respond to one major criticism of the original bill. Although that change apparently placated some segments of the educational community, since it eliminated the possibility that the Peace Academy would be a full-blown degree-granting school, at the same time it removed from the proposed Academy one major function envisaged for it, a function that some supporters had presented as a primary reason for creating it in the first place.

An Academy created under legislation that does not include authority for granting degrees would be precluded from operating accredited educational programs. The proponents both in and out of Congress have been asked how such an Academy would fulfill the purposes the legislation states for it, how it would be organized, what specific programs it would undertake. They have been able to say little more than that those matters would be determined by the Board after the Academy is established. We have great difficulty with legislation that would establish an institution whose operational programs will be determined only after the fact. We believe that the Congress should not approve legislation that is so unspecific in its content and implications.

41

It is clear that the United States Academy of Peace would be nothing other than a new governmental agency, with a Board appointed by the President with the advice and consent of the Senate and with an annual federal budget appropriated by the Congress. One cannot ignore that simple fact. The Administration is adamantly opposed to the legislation on that ground as well as on the ground that the need for the institution has by no means been demonstrated and that it would in fact duplicate existing efforts both in the Federal Government and in the private sector.

We must also take fiscal considerations into account. Although the funding requested is not large in comparison with many other federal programs ($13.5 million for Fiscal Year 1984, including facilities, and $10 million in Fiscal Year 1985), it is very substantial in comparison with the costs of operating private educational and research institutions and in comparison with federal programs supporting international affairs research and education. At a time of budget restraint in education, when the Congress and our citizens are deeply concerned about budget deficits and the wise expenditure of tax dollars, there is little or no justification for spending money on a new institution to perform functions that are performed well by our existing educational system.

If the Congress believes that federal dollars should be spent on the promotion of education in peace and conflict resolution, we believe that better ways can be found to do it. Rather than establish a new, high cost, federal institution, it would be more efficient, more practical and, above all, more beneficial to use the federal program already designed to assist the study of international affairs, Title VI of the Higher Education Act.

One appealing approach is found in S. 1466, a bill that was introduced by Senator Denton earlier this year and of which many of us are cosponsors. That bill would establish a new Section of Title VI and give the Director of the Arms Control and Disarmament Agency the responsibility and authority to conduct a program that would accomplish all of the worthwhile goals of S. 564 at considerably less cost and relying upon the existing resources of our educational system. That proposal has the support of the Administration, including of the requested funding of $3 million in fiscal year 1985 and $5 million in 1986. Adoption of that proposal instead of S. 564 would serve the citizens of this country by making it possible to encourage the study of peacemaking and conflict resolution at substantially less cost than S. 564 and without the many problems that S. 564 entails.

We see no need to establish what the State Department has described as a "quasi-governmental institution and bureaucracy complete with 'buildings and grounds'" to refine and teach conflict resolution. It is difficult to see how it could be effective or perceived as impartial in the international arena when it would be funded by the United States government, would be governed by Presidential appointees confirmed by the Senate, and would bear the official title. "United States Academy of Peace."

We recognize that the Committee, during its extended and detailed consideration of the bill, made many changes to the legislation. Although many of those changes have improved the legislation, in our view the proposal was fatally flawed to begin with. We

42

fear, therefore, that the Committee changes are, on the whole, cosmetic rather than substantial.

DAN QUAYLE.
DON NICKLES.
JEREMIAH DENTON.
CHARLES E. GRASSLEY.
JOHN P. EAST.
PAULA HAWKINS.

U.S. DEPARTMENT OF STATE,
*Washington, D.C., May 24, 1983.*

Hon. JEREMIAH A. DENTON,
*U.S. Senate.*

DEAR SENATOR DENTON: Thank you for the opportunity to comment on your proposed amendment entitled "Peace, Arms Control, and Conflict Resolution Act," which, I understand, you intend to offer as a substitute to S. 564, a bill to establish the United States Academy of Peace. The Department of State opposes S. 564. As the Department has previously indicated, and, as the Director of the OMB wrote to you last year, we believe that the private sector has done a commendable job of promoting the study of negotiations, mediation arbitration, and conflict resolution. Establishing a new governmental entity such as the United States Academy of Peace to pursue such work is therefore unnecessary.

For the same reasons outlined in previous Administration correspondence with you, the Department of State is pleased to support your alternative legislative proposal which will reinforce the traditional role of programs under Title VI of the Higher Education Act and will make it a primary source of governmental assistance to studies in the area of international peace and understanding.

The Office of Management and Budget advises that from the standpoint of the Administration's program, there is no objection to the submission of this report.

With cordial regards,
    Sincerely,

POWELL A. MOORE,
*Assistant Secretary for Legislative and
Intergovernmental Affairs.*

———

EXECUTIVE OFFICE OF THE PRESIDENT,
OFFICE OF MANAGEMENT AND BUDGET,
*Washington, D.C., May 23, 1983.*

Hon. ORRIN G. HATCH,
*Chairman, Committee on Labor and Human Resources,
U.S. Senate, Washington, D.C.*

DEAR ORRIN: This is in reply to your request of March 2, 1983, for the views of the Office of Management and Budget on S. 564, the "United States Academy of Peace Act."

The Office of Management and Budget concurs in the views on S. 564 as expressed by the Department of State in testimony before your Committee on March 16, 1983. Establishing a new governmental entity is unnecessary and would duplicate and compete with ef-

43

forts already under way. Accordingly, you are advised that this Office remains opposed to enactment of S. 564.

The Administration does support, however, Senator Denton's proposed substitute for S. 564 which would authorize $3 million in fiscal year 1984 and $5 million in fiscal year 1985 under a new Part D of Title VI of the Higher Education Act. This authority, to be administered by the Arms Control and Disarmament Agency, would serve as the primary source of governmental assistance to studies in the area of international peace and understanding.

Sincerely,

DAVID A. STOCKMAN, *Director.*

———

DEPARTMENT OF EDUCATION,

THE SECRETARY,
*Washington, D.C., April 13, 1983.*

Hon. ROBERT T. STAFFORD,
*Chairman, Subcommittee on Education, Arts, and Humanities, Committee on Labor and Human Resources, U.S. Senate, Washington, D.C.*

DEAR MR. CHAIRMAN: Thank you for your recent letter requesting my comments on S. 564. a bill to establish a United States Academy of Peace. Specifically, you have asked me to comment on the need for a Federal institution designed to offer graduate and postgraduate programs, research opportunities, and information services in peace studies and conflict resolution.

Mr. Chairman, while I share the Committee's concerns about the importance of promoting peaceful resolution of international conflict, I continue to believe that creating an independent, federally-funded Academy of Peace is not the most appropriate or cost-effective way to encourage international understanding and to foster the study of conflict resolution.

As this Administration has stated previously and most recently reiterated by Stephen Low, Director of the Service Institute, Department of State before the Senate Subcommittee on Education, Arts, and Humanities on March 16, 1983, "In a time of severe budget stringencies . . . it [is] difficult to justify the expenditures of . . . federal funds over the next several years for research, educational and informational activities . . . where much work is already being done by private universities, institutes and foundations."

Therefore, Mr. Chairman, I must continue to oppose the creation of an unnecessary governmental entity which would duplicate activities and research already conducted by private organizations and institutions of higher education.

I am advised by the Office of Management and Budget that there is no objection to the submission of this letter from the standpoint of the Administration's program.

Sincerely,

T. H. BELL.

44

U.S. DEPARTMENT OF STATE,
*Washington, D.C., June 29, 1983.*

Hon. CLEMENT J. ZABLOCKI,
*Chairman, Committee on Foreign Affairs,*
*House of Representatives.*

DEAR MR. CHAIRMAN: This letter responds to yours of April 19 requesting comments from the Department of State on HR 1249, a bill to establish the United States Academy of Peace and Conflict Resolution.

For a number of reasons the Department of State maintains its opposition to this legislation expressed to you in my letter of May 11, 1982. In the Department's view facilities have already been established by the Congress for training government employees in the field which has been described as peace studies. So far as the general public is concerned, recent healthy growth of research and education in negotiation, mediation, and conflict management and related studies provides adequate study opportunity without the need of a Federal Government supported institution which would duplicate and compete with these promising new developments. I would like to elaborate on these points.

In the Foreign Service Acts of 1946 and 1980, the Congress established the Foreign Service Institute to provide training for government employees from all agencies in the field of foreign affairs. This includes study in conflict resolution, mediation, and negotiation. Other government training institutions, including the National Defense University, the Service colleges, and specialized training institutes also recognize such study as part of their appropriate curriculum. It seems to the Department, therefore, that so far as the training of government employees is concerned the Congress has already provided adequate facilities for the study of the kind envisioned in this legislation.

These institutions are in continuing close contact both with practitioners and academicians in the field and are incorporating the results of the new study and research in this field into the training programs they provide. The Foreign Service Institute has new courses in negotiation recently made part of its mid-career training which all officers now take. It has established a Center for the Study of Foreign Affairs which is supporting research and discussion in the form of conferences and collequia bringing together government practitioners and private academicians in the field. Except for a very few specialists, it is difficult to see what purpose a new government-supported institution could serve with regard to training of government employees.

As the Commission on Proposals for the National Academy of Peace has noted, there has been a considerable growth recently of research and education by academic institutions and centers in the field of negotiation, mediation, and conflict management. This growth has responded to new interest on the part of the academicians and demand for education by the general public. It has occurred without Federal Government involvement or support and there is every reason to believe that its growth will continue without such support.

In the 1940's and 1950's demand for interdisciplinary schools in foreign affairs produced a number of graduate schools in international relations like the Fletcher School, School of Advanced International Studies, and schools associated with prominent universities at Columbia, Princeton, Georgetown, Pittsburgh, Denver, and the University of California. These schools have provided an excellent education and have produced many of the most distinguished diplomats who today seek peaceful settlement of international disputes representing many countries of the world. There is every reason to believe that non-federally supported institutions will provide the same response to student demand in the new field of generic studies of mediation, arbitration, and conflict management which has appeared.

The Department of State does not believe it advisable for the United States Government for the first time to begin providing liberal arts educations to the general public even though it is limited to graduate education in international affairs. The Department believes that a Peace Academy would in fact compete with the duplicate work now going on and that both government and private institutions already have adequate facilities available for the pursuit of such studies.

One further point seems worth making. A great deal has been said about the symbolic value of the United States Government establishing an Academy of Peace and the impact of such a gesture abroad and within this country. It is the Department's view that the image of the United States as a government and nation genuinely concerned with the pursuit of peace will depend upon the degree to which the words and action of the President, the Secretary of State, and other members of the government can convince the world abroad and at home of their sincere dedication to the search for peace in places like small schools such as the proposed Academy already exist in a number of places. While they testify to the dedication towards peace of their founders and administrators, their symbolic impact has been limited.

For these reasons, therefore, the Department of State opposes H.R. 1249. The Administration does support, however, Senator Denton's proposal, S. 1466. S. 1466, the "Education for Peace, Arms Control, and Conflict Resolution Act," would authorize $3 million in fiscal year 1984 and $5 million in fiscal year 1985 under a new Part D of Title VI of the Higher Education Act. This authority, to be administered by the Arms Control and Disarmament Agency, would serve as a primary source of governmental assistance to studies in the area of international peace and understanding.

The Office of Management and Budget advises that from the standpoint of the Administration's program there is no objection to the submission of this report.

With cordial regards.
Sincerely,

POWELL A. MOORE,
*Assistant Secretary for Legislative and*
*Intergovernmental Affairs.*

46

U.S. ARMS CONTROL AND DISARMAMENT AGENCY,
*Washington, D.C., May 31, 1983.*

Hon. ORRIN G. HATCH,
*Chairman, Committee on Labor and Human Resources,*
*U.S. Senate.*

DEAR MR. CHAIRMAN: I would like to express my support for Senator Denton's proposed amendment entitled "Peace, Arms Control, and Conflict Resolution Act." I understand the Senator intends to offer this amendment as a substitute to S. 564, which would establish the United States Academy of Peace. I concur with the views of the Office of Management and Budget and the Department of State opposing the establishment of such a new governmental entity. The Arms Control and Disarmament Agency's statutory mandate, among other things, already covers "the conduct, support, and coordination of research for arms control and disarmament policy formulation." Also under Section 31 of the ACDA Act the Director is authorized "to make arrangements (including contracts, agreements and grants) for the conduct of research, development, and other studies in the field of arms control and disarmament by private or public institutions or persons."

Should Senator Denton's substitute legislation become law, as Director of the Arms Control and Disarmament Agency I would carry out the program as prescribed in the legislation, in keeping with the administration's programs under the guidelines of the Office of Management and Budget.

Sincerely,

KENNETH L. ADELMAN.

## IX. MINORITY VIEWS OF MR. HUMPHREY

The proponents of the Peace Academy point to our military service academies and say, "We also should have a Peace Academy." That's not a bad argument.

But the Peace Academy, as constituted by this bill is not a true counterpart to the service academies, because while the service academies are funded exclusively by the Congress [1] and therefore truly accountable to Congress, the Peace Academy contemplates receiving substantial private contributions and therefore will not be fully accountable to Congress in any practical sense. Accountability should be a principal criterion in the creation of any new agency which is likely to deal with controversial matters. We have had bitter experience in this area. The Legal Services Corporation is an example. A series of amendments to its authorization have not succeeded yet in fully curbing proscribed practices.

The United States Peace Academy will bear the imprimatur of the federal government and will be perceived here and abroad as an official agency of the United States. Yet the Academy, through the expenditure of private funds, will have a highly dangerous potential to become a sounding board for pacifists and Soviet apologists. Clearly, the Academy, as proposed in this bill is no counterpart to the military academies.

Leaving the Peace Academy open to the influence of private contributors, each with his own narrow agenda, while permitting the Academy to pose as an official agency of the government is unacceptable, and I urge my Colleagues to defeat the bill, unless by amendment the Academy is made wholly accountable to Congress through exclusive reliance on funds authorized and appropriated by Congress.

GORDON HUMPHREY.

O

---

[1] Very small amounts of additional funding are received by the military academies made up almost entirely of alumni gifts However, these funds, their uses, and the amounts are strictly controlled by statutes and Department of Defense regulations to preclude the funds from influencing the academies

(47)