# Exhibit 35

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES INSTITUTE OF PEACE, et al.,

*Plaintiffs,*

v.

KENNETH JACKSON, et al.,

*Defendants.*

Civil Action No. 25-0804-BAH

**DECLARATION OF TEGAN BLAINE**

I, Tegan Blaine, declare as follows:

1. I am offering this declaration in support of the motion for summary judgment filed by Plaintiffs in the above matter.

2. I worked at the U.S. Institute of Peace from October 2020 until March 2025. I was the director of the program on climate, environment, and conflict, where I oversaw four employees. As part of this job, my team and I worked closely with the U.S. Africa Command on climate security issues, as well as with the U.S. IndoPacific Command's Center for Excellence on Disaster Management. Prior to joining USIP, I spent over ten years working at USAID's Bureau of Africa, where I oversaw all of USAID's investments in climate programming in the Africa region.

3. The U.S. Africa Command reached out to USIP in fall of 2021 to ask whether USIP had expertise that could help advise them on issues related to climate security risks in Africa. In particular, they sought expertise to advise them on how climate security might lead to increased demand for U.S. presence or U.S. military engagement in Africa. These requests led to a long-term relationship, where USIP, as an expert institution with deep insights into climate security as

1

well as conflict and security issues more widely, was asked to provide information to U.S. military institutions to assist their consideration of issues with strategic and planning implications. USIP served solely as source of technical input based on its expertise, providing case studies, training, and convening on climate security issues, and never weighing in directly on specific strategic decisions made by USG military partners.

4.  Initially, USIP provided case studies on climate security in countries of interest to AFRICOM – Somalia, Ethiopia, Ghana, and Tunisia – as well as on specific issues related to security threats emerging from a transition towards cleaner energy sources, including extraction of green minerals and applications of renewable energy in Africa. USIP relied on expert knowledge and deep relationships with partners both within the U.S. (such as the Environmental Law Institute) and in the field (such as the International Crisis Group) to provide analysis rooted in on-the-ground experience and extensive analysis normally not accessible to or available within USG agencies. In Somalia, for example, researchers were able to have extensive, sensitive discussions with communities in territories under questionable control and with individuals who had escaped living in areas under the control of Al Shabaab, in areas where USG officials are unable to travel. In Ethiopia, USIP was able to work with a local university which built on long-term, trusting relationships with local communities to provide insights not available to international partners. These case studies provided deep understanding in the intersection of climate, security, and other conflict drivers – in other words, deep research and analysis – as input to and to inform decision-making within AFRICOM; however, USIP was never privy to how this information was used in practice in internal conversations around strategic terrain decisions. At USAID, such external input would have been used to guide decisions on budgets and programming in specific countries; in contrast, at USIP, we were not privy to the strategic priorities of many of

our partners or to their budget and implementation decisions but instead primarily provided analysis that USG employees could use, along with other information gathered from a range of sources (including other nonprofits also engaged on these issues in a variety of ways), to guide their decisions.

5. In addition, the U.S. Africa Command requested that USIP develop and support the implementation of two meetings with U.S. security partners in Africa related to climate security, including training around these issues. USIP developed agendas including sessions meant to elicit participant observations and concerns around climate security impacts in their own countries, including developing common concerns across regions; provided opportunities for AFRICOM participants and African security partners to share experiences and approaches in tackling and mitigating climate security risks; identified sector experts and prepared them to speak at these meetings; and developed case studies to allow participants to explore and test approaches to address climate security issues. In some cases, participants were well-versed in climate security issues; in other cases, this was the first time that they had actively discussed these issues with peers and were developing basic knowledge and understanding of the security implications of climate impacts. These meetings, held in the summers of 2022 and 2023, were primarily trainings and exchanges of information, developed using USIP's internal expertise and that of its partners. While these meetings provided a venue for USG military personnel to build mil-to-mil relationships and partnerships, USIP did not participate in diplomatic meetings on the side of these events, nor did USIP participate in development of AFRICOM's security partnerships with the countries attending these trainings.

6. Lastly, USIP was requested by the U.S. Africa Command to develop a publicly-available tool that would assist USG partners as well as African security partners to better

understand climate security risks and their interrelationships across Africa. Beginning in autumn 2022, together with partner CNA, USIP undertook a massive development process that included identifying experts from around the world, developing an original analytical framework of climate security risks in Africa, and identifying publicly-available data sources and inputs to guide assessment of risks. With the release of a prototype tool in 2023, the Center for Excellence on Disaster Management, associated with the U.S. IndoPacific Command, asked for these efforts to be extended to their own area of responsibility. These efforts were expected to wrap up with a release of a publicly available tool in summer 2025. The work was heavily reliant on USIP's expertise and partnerships on climate security issues, and the tool contained no access to classified information. The tool was expected to complement analysis available in the U.S. intelligence community, that is, not to be specific to USG interests and to be fully transparent on its data and methodologies, with the possibility of continued development based on feedback from users around the world, similar to other publicly-available tools developed in academic environments. It was also expected to be publicly accessible to partners both within and outside the U.S. government. When I worked at USAID, I would have used such a tool as one source of information in budget negotiations around climate priorities in my region of interest or would have used it as input into decisions around programming priorities; however, USIP was never privy to those types of decisions. USIP served solely to provide deep analysis and expertise as input into USG decisions, but never presumed to be part of those internal decisions.

      I declare under penalty of perjury that the foregoing is true and correct.

Date: _____4/4/2025_____         _____/s/Tegan Blaine_____
                                                                                Tegan W. Blaine