**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| UNITED STATES INSTITUTE OF PEACE, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> KENNETH JACKSON, *et al.*, <br><br> Defendants. | Case No. 1:25-cv-00804-BAH |

# PLAINTIFFS' CORRECTED MOTION FOR SUMMARY JUDGMENT AND INCORPORATED MEMORANDUM IN SUPPORT

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................. iii

INTRODUCTION ........................................................................................................... 1

FACTUAL BACKGROUND ............................................................................................ 2

I.    The United States Institute of Peace: A Non-Executive Nonprofit Corporation ................... 2

    A.    Non-Executive, Independent Corporate Form ............................................ 2

        1.    Independent Corporate Form .......................................................... 2

        2.    Independent Corporate Governance ............................................... 3

    B.    Non-Executive Function ............................................................................ 5

II.    Defendants' Takeover of the Institute ......................................................................... 8

    A.    An Executive Order Warning Shot ............................................................ 8

    B.    The Institute Attempts Peaceful Conflict Resolution ................................. 9

    C.    The White House and DOGE Respond with Unlawful Terminations ........... 10

    D.    DOGE Enlists Law Enforcement to Escalate the Takeover ......................... 11

    E.    Plaintiffs File Suit, But Defendants Rush to Dismantle the Institute ........... 12

ARGUMENT ................................................................................................................. 13

I.    Article II does not invalidate the Board removal provisions of the USIP Act. ..................... 14

    A.    The Institute is a nonprofit corporation that Congress structured to sit outside the Executive Branch ................................................................... 15

    B.    Article II does not apply to the Institute Board members because they do not wield executive power. .................................................................. 24

        1.    The Institute does not carry out the President's foreign affairs duties. ............... 25

        2.    The Institute does not execute the law. ........................................... 27

II.    The Removal Provisions are constitutional even if USIP is an agency within the Executive Branch because the Institute is a multimember expert board that exercises at most *de minimis* executive power. ............................................. 29

    A.    The Institute is a multimember, partisan-balanced board of information-gathering experts. .......................................................................................... 30

    B.    The Institute exercises far less executive power than the FTC in *Humphrey's*. ............ 31

i

C.   *Humphrey's* applies with full force to multimember boards in the foreign affairs space. .................................................................................................... 33

D.   The President retains greater control-through-removal than in *Humphrey's*. .............. 33

III.  Plaintiffs are entitled to summary judgment on all claims. .................................................. 36

A.   Because the statutory removal protections are constitutional and create the exclusive means for presidential removal of Board members, Plaintiffs prevail on all claims. ................................................................................................... 36

B.   Plaintiffs prevail on Counts I and V for the independent reason that Defendants have unlawfully ceased the Institute's corporate activities, in contravention of the USIP Act. ................................................................................ 38

IV.  Plaintiffs are entitled to declaratory and injunctive relief. .................................................. 39

A.   Declaratory and injunctive relief is appropriate. ............................................................ 39

1.   Harms to the Institute ............................................................................................. 39

2.   Harms to the Board Member Plaintiffs and Ambassador Moose.......................... 42

B.   The balance of hardships and public interest favor Plaintiffs....................................... 44

CONCLUSION.................................................................................................................................. 45

## TABLE OF AUTHORITIES

**CASES**

*Am. Ins. Ass'n v. Garamendi*,
    539 U.S. 396 (2003)..................................................................................................... 33

*Ameron, Inc. v. U.S. Army Corps of Eng'rs*, 7
    87 F.2d 875 (3d Cir. 1986) ........................................................................................ 17

*Arlington v. FCC*, 569 U.S. 290 (2013).............................................................................. 24, 28

*Armstrong v. Exceptional Child Ctr., Inc.*,
    575 U.S. 320 (2015)..................................................................................................... 43

*Aviel v. Gor*,
    No. 25-cv-778 (D.D.C. April 4, 2025).......................................................................... 42

*Beacon Assocs., Inc. v. Apprio, Inc.*,
    308 F. Supp. 3d 277 (D.D.C. 2018) ....................................................................... 40, 41

*Berry v. Reagan*,
    No. 83-cv-3182, 1983 WL 538 (D.D.C. Nov. 14, 1983)............................................. 42

*Bowsher v. Synar*,
    478 U.S. 714 (1986)........................................................................................... 16, 17, 18

*Buckley v. Valeo*,
    424 U.S. 1 (1976)............................................................................................. 26, 27, 28

*Collins v. Yellen*,
    594 U.S. 220 (2020)..................................................................................................... 29

*Dong. v. Smithsonian Inst.*,
    125 F.3d 877 (D.C. Cir. 1997) ............................................... 16, 20, 23, 24, 27, 29

*Earth Island Inst. v. Christopher*,
    6 F.3d 648 (9th Cir. 1993) ......................................................................................... 27

*eBay Inc. v. MercExchange LLC*,
    547 U.S. 388 (2006)..................................................................................................... 39

*Est. of Ellis by Clark v. Hoes*,
    677 A.2d 50 (D.C. 1996) ............................................................................................ 38

*Gonzales & Gonzales Bonds & Ins. Agency, Inc. v. DHS*,
    107 F.4th 1064 (9th Cir. 2024) ................................................................................. 17

*Grundmann v. Trump*,
   No. CV 25-425, 2025 WL 782665 (D.D.C. Mar. 12, 2025) ................................................... 32

*Hamdan v. Rumsfeld*,
   548 U.S. 557 (2006) ............................................................................................................. 43

*Harris v. Bessent*,
   2025 U.S. App. LEXIS 7301 (D.C. Cir. Mar. 28, 2025) ............................................ 30, 35, 39

*Harris v. Bessent*,
   No. CV 25-412, 2025 WL 679303 (D.D.C. Mar. 4, 2025) ................................................ 32, 45

*Humphrey's Ex'r v. United States*,*
   295 U.S. 602 (1935) ....................................... 1, 13, 14, 29, 30, 31, 32, 33, 34, 35, 36

*In re Grant*,
   635 F.3d 1227 (D.C. Cir. 2011) ........................................................................................... 30

*Larson v. Domestic & Foreign Com. Corp.*,
   337 U.S. 682 (1949) ............................................................................................................. 43

*Lebron v. Nat'l R.R. Passenger Corp.*,
   513 U.S. 374 (1995) ............................................................................................................. 16

*Make The Rd. New York v. Wolf*,
   962 F.3d 612 (D.C. Cir. 2020) ............................................................................................. 18

*Malone v. Bowdoin*,
   369 U.S. 643 ......................................................................................................................... 38

*Meridian Invs., Inc. v. Fed. Home Loan Mortg. Corp.*,
   855 F.3d 573 (4th Cir. 2017) ............................................................................................... 15

*Morrison v. Olson*,
   487 U.S. 654 (1988) ................................................................................................. 24, 33, 36

*Nken v. Holder*,
   556 U.S. 418 (2009) ............................................................................................................. 44

*Osborn v. Bank of U.S.*,
   22 U.S. 738 (1824) ............................................................................................................... 18

*PHH Corp. v. CFPB*,
   881 F.3d 75 (D.C. Cir. 2018) ............................................................................................... 35

*Seila L. LLC v. CFPB*,
   591 U.S. 197 (2020) ............................................... 1, 13, 14, 25, 29, 30, 31, 32, 35, 36

*Severino v. Biden*,
   71 F.4th 1028 (D.C. Cir. 2023) ............................................................................ 42, 43

*Sundance Land Corp. v. Cmty. First Fed. Sav. & Loan Ass'n*,
   840 F.2d 653 (9th Cir. 1988) ...................................................................................... 41

*Swan v. Clinton*,
   100 F.3d 973 (D.C. Cir. 1996) ............................................................................... 43, 44

*United States v. Fifty Acres of Land*,
   469 U.S. 24 (1984) ........................................................................................................ 41

*United States v. Menendez*,
   440 F. App'x 906 (11th Cir. 2011) ............................................................................... 18

*Washington Metro. Area Transit Comm'n v. Holiday Tours, Inc.*,
   559 F.2d 841 (D.C. Cir. 1977) ..................................................................................... 39

*Wiener v. United States*,
   357 U.S. 349 (1958) ............................................................................................... 29, 33

*Wilcox v. Trump*,*
   No. CV 25-334 (BAH), 2025 WL 720914
   (D.D.C. Mar. 6, 2025) ........................................... 13, 30, 31, 32, 33, 34, 37, 42, 43, 44

*Wisconsin Gas Co. v. FERC*,
   758 F. 2d 669 (D.C. Cir. 1985) ..................................................................................... 39

*Yorktown Systems Grp. Inc. v. Threat Tec LLC*,
   108 F. 4th 1287 (11th Cir. 2024) ................................................................................... 40

*Youngstown Sheet & Tube Co. v. Sawyer*,
   343 U.S. 579 (1952) ................................................................................................ 26, 43

*Zivotofsky ex rel. Zivotofsky v. Kerry*,
   576 U.S. 1 (2015) ............................................................................................... 24, 25, 26

**STATUTES**

14 Stat. L. 438 (1867) ........................................................................................................ 15

2 U.S.C.
   § 136-1 ........................................................................................................................... 18
   § 1801a .......................................................................................................................... 18

5 U.S.C.
   § 103 .................................................................................................................. 18, 19, 23
   § 104 ...................................................................................................................... 18, 23

§ 105 .................................................................................................. 18, 19
§ 551 .................................................................................................. 37
§ 552 .................................................................................................. 21
§ 706 .................................................................................................. 37, 39

7 U.S.C.
§ 1503 ................................................................................................. 19

12 U.S.C.
§ 1441 ................................................................................................. 20

15 U.S.C.
§ 714 .................................................................................................. 19

20 U.S.C.
§ 2004 ................................................................................................. 19
§ 3411 ................................................................................................. 19
§ 4703 ................................................................................................. 19

22 U.S.C.
§ 2501-1 .............................................................................................. 19
§ 3305 ................................................................................................. 26, 27
§ 3306 ................................................................................................. 27
§ 3307 ................................................................................................. 26
§ 3611 ................................................................................................. 20
§ 4601 ................................................................................................. 2
§ 4603 ................................................................................. 2, 3, 17, 19, 21, 22
§ 4604 ........................................................ 2, 3, 6, 7, 9, 17, 21, 22, 28, 38
§ 4605 .......................................... 3, 4, 5, 10, 13, 23, 30, 31, 34, 35, 37, 40, 44
§ 4606 ................................................................................................. 4, 5, 10, 17
§ 4607 ................................................................................................. 5, 21, 22
§ 4608 ................................................................................................. 5, 21
§ 4609 ................................................................................................. 3
§ 6563 ................................................................................................. 19
§ 7703 ................................................................................................. 19
§ 9612 ................................................................................................. 20

28 U.S.C.
§ 601 .................................................................................................. 16

29 U.S.C.
§ 153 .................................................................................................. 34

31 U.S.C.
§ 702 .................................................................................................. 16
§ 703 .................................................................................................. 17
§ 9101 ................................................................................................. 20

33 U.S.C.
§ 981 ............................................................................................................ 19
§ 1281 .......................................................................................................... 20

36 U.S.C.
§ 80301 ........................................................................................................ 15
§ 300102 ...................................................................................................... 27

39 U.S.C.
§ 201 ............................................................................................................ 19

42 U.S.C.
§ 2996 .......................................................................................................... 23
§ 10702 ........................................................................................................ 23
§ 12651 ........................................................................................................ 20
§ 17352 ........................................................................................................ 19

44 U.S.C.
§ 301 ............................................................................................................ 18

46 U.S.C.
§ 46101 ........................................................................................................ 19

49 U.S.C.
§ 1301 .......................................................................................................... 19
§ 24301 ........................................................................................................ 15

D.C. Code
§ 16-1101 ..................................................................................................... 38
§ 29-406.30 .................................................................................................. 17

**OTHER AUTHORITIES**

Commission on Proposals for the National Academy of Peace & Conflict Resolution,
*To Establish the United States Academy of Peace: Report to the President and Congress* (1981) .................................................................................................... 17

Kirti Datla & Richard L. Revesz,
*Deconstructing Independent Agencies (and Executive Agencies),* 98 Cornell L. Rev. 769 (2013) .................................................................................................... 15, 20

*Proposed Comm'n on Deregulation of Int'l Ocean Shipping,*
7 Op. O.L.C. 202 (1983) ............................................................................... 25

Pub. L. 110-315, Title IX, § 921(b)(1) Aug. 14, 2008 ...................................... 36

Pub. L. 92-500, § 12, Oct. 18, 1972, 86 Stat. 899 ........................................... 20

Pub. L. No. 108-57, 117 Stat. 859 (2003) ........................................................................ 28

Pub. L. No. 87-569, 17 Stat. 265, 268 (Aug. 6, 1962) ............................................. 2, 38

Pub. L. No. No. 98-525 ...................................................................................................... 2

*Statement on Signing the Dep't of Def. Authorization Act*,
    Ronald Reagan Pres. Lib. & Mus. (Oct. 19, 1984) ................................................ 36

Subaward or Contract:
    Which Should you Use? Thompson Grants (2017) .................................................. 28

U.S. Const. art. II, § 3. ..................................................................................... 24, 26, 38

United States Institute of Peace,
    NARA ............................................................................................................................ 22

Who We Are,
    The Carnegie Endowment for International Peace .................................................... 6

## INTRODUCTION

All of the harm to the United States Institute of Peace ("USIP" or "The Institute") since late February—including the forcible entry into and defacement of USIP's building, the seizure of its offices and data, the firing of nearly all of USIP's employees, and the transfer of USIP's $500 million building and financial assets to the General Services Administration ("GSA") for zero dollars—flows from the President's purported removal of USIP's board members in violation of the USIP Act. Based on those removals, the remaining *ex officio* board members first fired USIP's Acting President and appointed Defendant Kenneth Jackson in his stead, and then replaced Defendant Jackson with Defendant Nate Cavanaugh. These actions have stripped USIP of the resources needed to carry out the mission Congress chartered it to perform.

Defendants do not contend that the President complied with the USIP Act's preconditions for removing Board members. Instead, they seek a ruling that Article II allows the President to ignore the statute and remove the Board members of a nonprofit corporation at will. But no court has held that a congressionally established, free-standing nonprofit with no regulatory or enforcement power is part of the Executive Branch such that its board members are officers of the United States. And even if the courts treated nonprofit corporations as part of the Executive Branch, USIP's Board is a multi-member politically-balanced body that does not exercise any executive power, much less "*significant* executive power"—so the USIP Act's removal restrictions are constitutional under Supreme Court precedent. *Seila L. LLC v. CFPB*, 591 U.S. 197, 218 (2020) (emphasis added); *Humphrey's Ex'r v. United States*, 295 U.S. 602, 632 (1935). Plaintiffs respectfully request that the Court grant summary judgment in their favor on all claims, issue them declaratory relief, and issue a permanent injunction restoring USIP to its lawful leadership.

**FACTUAL BACKGROUND**

I.    **The United States Institute of Peace: A Non-Executive Nonprofit Corporation**

    A.    **Non-Executive, Independent Corporate Form**

        1.    *Independent Corporate Form*

Congress established USIP in 1984 when it passed the United States Institute of Peace Act, Pub. L. No. No. 98-525, codified at 22 U.S.C. § 4601, et seq. (the "USIP Act"). Under the USIP Act, USIP is an "independent nonprofit corporation" with authority to exercise the powers conferred upon a nonprofit corporation by the District of Columbia Nonprofit Corporation Act"[1] except that USIP does not have the power to "cease its corporate activities" or dissolve itself. 22 U.S. C. § 4603(b); *id.* § 4604(a) (all powers except section 5(o) of the District of Columbia Nonprofit Corporation Act); Pub. L. No. 87-569, 17 Stat. 265, 268 (Aug. 6, 1962).

Congress found that "there is a need for Federal leadership to expand and support the existing international peace and conflict resolution efforts of the Nation and to develop new comprehensive peace education and training programs, basic and applied research projects, and programs providing peace information," and that the Institute represents "the most efficient and immediate means" and "an appropriate investment by" the United States to promote peace and the peaceful resolution of conflicts. 22 U.S.C. § 4601(a).

Congress designed the Institute to "carry out its activities outside the day-to-day policymaking pressures and constraints which might impinge upon that freedom were [the Institute] to be part of an existing agency or department." Congress stressed the Institute's role as a resource for both the legislative and executive branches. Statement of Undisputed Material Facts

---

[1]    Pub. L. No. 87-569 (1962).

("SUMF") ¶¶ 4; 5. Consistent with these goals, Congress created the Institute as an independent entity outside the Executive Branch, both in form and function.

USIP solely owns the USIP headquarters building on Constitution Avenue, and is responsible for its security and upkeep. 22 U.S.C. § 4604(h)(3)(A). USIP constructed its headquarters building with the help of millions in privately raised funds pursuant to § 4604(h)(3)(A), as well as specially appropriated funds from Congress. USIP owns the building, and controls the parcel of land on which it sits. SUMF ¶¶ 7; 8. In contrast to its general role as landlord to much of the federal government, prior to the events of the last few days (discussed below), GSA played no role in the control or administration of the building.

Congress authorized the Institute to create another legal entity, the "Endowment of the United States Institute of Peace" under District of Columbia law. 22 U.S.C. § 4603(c). The Endowment holds significant assets for the benefit of the Institute, including bank accounts holding contributions from private sources for the purposes permitted by § 4604(h)(3), as well as unexpended appropriated funds transferred to the Endowment pursuant to § 4609(b). The Endowment holds $15 million in privately sourced funds and $10 million in funds sourced from rolled-over appropriations. SUMF ¶ 11.

Unlike Executive Branch agencies, the Institute is a juridical person that may sue and be sued. *Id.* at § 4604(k). And unlike those agencies, USIP is not covered by sovereign immunity, *see* 22 U.S.C. § 4603(d), and is not represented in litigation by the Department of Justice. SUMF ¶ 32. It "is liable for the acts of its directors, officers, employees, and agents when acting within the scope of their authority." 22 U.S.C. § 4603(d).

### 2.    *Independent Corporate Governance*

The "powers of the Institute" are vested in the Institute's Board. § 4605(a). Of the fifteen Board positions, three are filled by *ex officio* members: the Secretaries of State and Defense (or

their Senate-confirmed designees) and the president or vice-president of the National Defense University. § 4605(b)(1)–(3). The other twelve board members are "individuals appointed by the President, by and with the advice and consent of the Senate." 22 U.S.C. § 4605(b)(4) (the "(b)(4) Board members").[2] The USIP Act requires partisan balance on the Board: "Not more than eight voting members of the Board . . . may be members of the same political party." *Id.* at § 4605(c). The (b)(4) Board members must have appropriate experience "in peace and conflict resolution efforts of the United States." *Id.* at § 4605(d)(1). And importantly, "*Officers and employees of the United States Government may not be appointed to the Board under subsection (b)(4)." Id.* at § 4605(d)(2) (emphasis added). The USIP Act provides four-year staggered terms for (b)(4) Board members. *Id.* at § 4605(e).

The three *ex officio* members serve at the pleasure of the President. However, the President may remove (b)(4) Board members only under three specific circumstances:

(1)    in consultation with the Board, for conviction of a felony, malfeasance in office, persistent neglect of duties, or inability to discharge duties;

(2)    upon the recommendation of eight voting members of the Board; or

(3)    upon the recommendation of a majority of the members of the Committee on Foreign Affairs and the Committee on Education and Labor of the House of Representatives and a majority of the members of the Committee on Foreign Relations and the Committee on Labor and Human Resources of the Senate.

22 U.S.C. § 4605(f).

The USIP president is appointed by the Board. The Institute's president has the power to hire, fix the compensation of, and remove employees. *Id.* at § 4606(c). "Officers and employees of the Institute shall not be considered officers and employees of the Federal Government" except

---

[2] By using the term "individual" to refer to the (b)(4) Board members while referring to "officers" in several provisions to refer to federal government personnel, Congress made clear that these Board members are not federal "officers." *E.g.*, 22 U.S.C. §§ 4605(d)(2), (g); *id.* § 4606(d).

for specified, limited purposes. *Id.* at § 4606(f)(1). Rather, as indicated by § 4606(c), USIP employees are at-will employees—as Defendant Jackson emphasized when he fired six USIP employees on March 21. *See* SUMF ¶ 53. The USIP president may request the secondment of both congressional and Executive Branch staff to the Institute. *Id.* at § 4606(d)(1).[3]

USIP also has significant budgetary and fiscal independence from the Executive Branch. It is authorized to seek appropriations directly from Congress. That is, unlike Executive Branch agencies, the Office of Management and Budget ("OMB") does not establish USIP's budget; OMB is limited to submitting comments when USIP makes its requests to Congress. The only Executive oversight authorized by Congress with respect to the Institute's financial activities is "the authority of the [OMB] to review and submit comments on the Institute's budget request at the time it is transmitted to Congress." 22 U.S.C. § 4608(a). Thus, as the Institute stated in its recent response to an OMB inquiry, USIP is "directly responsible to Congress for all of its work." SUMF ¶ 4. Unlike Executive Branch agencies, USIP retains a private-sector accountants (KPMG) to audit its books. 22 U.S.C. § 4607(g); SUMF ¶ 33.

### B.    Non-Executive Function

Under the USIP Act, the principal activities of the Institute are to establish a fellowship program for domestic and global peace scholars; establish a scholarship program for high school and college students; establish a multidisciplinary research program on peace and conflict; develop programs to make peace education, research, and training "useful" to government, private

---

[3] In their opposition to Plaintiffs' application for a TRO, Defendants stated that USIP may include employees "specifically appointed by the President." ECF 9 at 1 (citing 22 U.S.C. § 4606(d)(1)). But § 4606 concerns officers and employees of the Institute, and the reference in § 4606(d)(1) is plainly to the power of the *Institute's* (small-p) president to appoint employees, not the (large-P) President of the United States. *E.g.*, § 4606(a) ("The Board shall appoint the president of the Institute . . ."). Where the USIP Act refers to the President of the United States, it capitalizes the term. *E.g.*, §§ 4605(b)(4).

enterprise, and voluntary associations"; support post-graduate peace research; conduct trainings "for practitioners, policymakers, policy implementers, and citizens and noncitizens" in the field of international peace and conflict resolution; and publish analyses and information gleaned from fieldwork to the public and the government.[4] 22 U.S.C. § 4604(b). In other words, USIP is a charitable think tank focused on research into international methods of peaceful conflict resolution.[5] To engage in its "extension and outreach activities," USIP may make grants to and contract with educational and research institutions, as well as with state and federal government agencies. *Id.* § 4604(d). It may also obtain grants from federal agencies. *Id.* § 4604(h)(1).

Moreover, the Institute serves as a factfinder and analyst for Congress in support of the Legislative Branch's conflict resolution work. USIP regularly briefs members of Congress and their staff upon request and has long facilitated congressionally-coordinated expert working groups. SUMF ¶ 60. For example:

- At the request of a bipartisan group of members of Congress in 2006, USIP served as the facilitator for the Iraq Study Group, which was set up to provide a "fresh eyes" assessment of the situation in Iraq. The Institute, with support from the Center for the Study of the Presidency, the Center for Strategic and International Studies (CSIS), and the James A. Baker III Institute for Public Policy at Rice University, convened expert working groups, wrote briefing papers, provided analysis, and coordinated meetings. *Id.*

- USIP similarly supported of the Afghan Study Group, established by Congress in December 2019 to consider issues related to a possible peace settlement in Afghanistan. *Id.*

---

[4] Like other think tanks, the Institute may request information from federal agencies pursuant to the Freedom of Information Act ("FOIA"). 22 U.S.C. § 4604(b)(9).

[5] Compare, for example, The Carnegie Endowment for International Peace, which "generates strategic ideas and independent analysis, supports diplomacy, and trains the next generation of scholar-practitioners to help countries and institutions take on the most difficult global problems and advance peace." Who We Are, The Carnegie Endowment for International Peace, https://perma.cc/3XQX-BCC7 (last visited Apr. 4, 2025).

- In 2020, Congress directed the Institute to create the Gandhi-King Global Academy, a professional development training initiative to develop and make publicly available a curriculum on conflict resolution tools based on the principles of nonviolence. *Id.*

Consistent with its mission of "develop[ing] programs to make international peace and conflict resolution research, education, and training more available and useful to persons in government, private enterprise, and voluntary associations," the Institute maintains a global applied research presence. 22 U.S.C. § 4604(b)(4). It has field offices, staff, and/or contractors in twenty-six countries around the world, including Nigeria, Libya, Thailand, El Salvador, Pakistan, Tunisia, and Colombia. SUMF ¶ 59.

USIP facilitates conflict resolution discussions, or what is known in the peace studies field as Track 1.5"and "Track 2" diplomacy. SUMF ¶¶ 65, 66. The term "diplomacy" is something of a misnomer: the defining feature of Track 1.5 and Track 2 talks is that non-governmental experts drive informal dialogue.[6] *Id.*[7] Examples of Track 1.5 talks (not involving USIP) include the Carter Center's mediation of the conflict between Uganda and Sudan and the China-U.S. Strategic Nuclear Dynamics Dialogue, which was convened and run by the nonprofit, private think tanks CSIS and the Pacific Forum. SUMF ¶¶ 61, 65.

When USIP participates in these conflict resolution efforts, it plays the role of neutral, expert, non-governmental convener—just like the Carter Center or CSIS. SUMF ¶ 65. Parties on all sides understand USIP to be independent from, and not to speak for, the United States government. SUMF ¶¶ 63, 67, 68. Indeed, that is precisely why USIP is well-positioned to

---

[6] In Track 2, no governmental representatives participate; in Track 1.5, governmental representatives may also participate while a non-governmental expert serves as a neutral convener. SUMF ¶¶ 65, 66.

[7] USIP does not engage or participate in "Track 1" diplomacy, which is reserved for official governmental representatives. SUMF ¶ 64.

contribute to these discussions: as an independent nonprofit, USIP can speak with independent

credibility in ways government representatives cannot. SUMF ¶¶ 62, 63, 65, 68. Some of USIP's

conflict resolution efforts include:

- In connection with a border dispute between Kyrgyzstan and Tajikistan, USIP sponsored a Track 2 between an influential group of former advisors and policy experts to discuss initiatives to reconcile the divided and hostile communities. The dialogue thawed relations and paved the way for a historic official border demarcation deal. SUMF ¶ 64.

- Ahead of local elections in the autonomous Bangsamoro region in the southern Philippines in October 2023, USIP was asked by both the Philippines government and the Moro Islamic Liberation Front—not by the U.S. government—to discreetly facilitate successful ceasefire efforts between the two sides. USIP's independent status made it possible to engage both sides directly as a third party. *Id.*

- USIP facilitated informal conversations with the Azerbaijani and Armenian Embassies about what would be needed by both sides to reach a peace agreement ending their 30-plus year war.  The talks created the opportunity for both parties to float ideas and talk about concerns they did not want to provide in official channels. These conversations helped narrow the gap between their war aims and concerns, leading to a peace agreement in mid-March 2025. SUMF ¶ 68.

USIP further leverages its on-the-ground conflict resolution work to provide services like

briefing, analysis, and conflict training to a variety of different partners: educational institutions,

foreign governments, other nonprofit think tanks, and agencies within the United States Executive

Branch. SUMF ¶¶ 63; 68 (describing instances in which USIP facilitated conflict resolutions

between Iraqi tribes and between Israeli and Palestinian stakeholders, and then shared objective

research findings with the U.S. government). The U.S. government has no say over what projects

USIP undertakes in coordination with foreign and NGO groups. SUMF ¶ 63.

## II.    Defendants' Takeover of the Institute

### A.    An Executive Order Warning Shot

On February 19, 2025, President Trump issued Executive Order No. 14217: "Commencing

the Reduction of the Federal Bureaucracy" ("EO 14217"). SUMF ¶ 34. EO 14217 labeled the

Institute a part of the "Federal bureaucracy." The President declared the Institute and three other

entities "unnecessary"; directed that their "non-statutory components and functions . . . be eliminated to the maximum extent consistent with applicable law"; and directed that they "reduce the performance of their statutory functions and associated personnel to the minimum presence and function required by law." *Id.* By so doing, the President ordered USIP to cease its activities and effectively dissolve—something Congress expressly provided that USIP cannot do. 22 U.S.C. § 4604(a) (granting to the Institute all powers of a D.C. nonprofit corporation other than the powers to cease activities and dissolve). One day after President Trump signed EO 14217, a representative of the U.S. DOGE Service, contacted the Institute. SUMF ¶ 36.

### B.    The Institute Attempts Peaceful Conflict Resolution

On February 24, Ambassador Moose and USIP's outside counsel met virtually with DOGE representatives Defendants Nate Cavanaugh, James Burnham, and Jacob Altik. Ambassador Moose and USIP counsel explained the Institute's legal status as an independent nonprofit corporation outside of the Executive Branch. The DOGE representatives asserted that the only statutory requisites for the Institute were to maintain the existence of its Board, to appoint a president, to pay incidental expenses for the Board, and to submit certain reports to Congress and the Executive Branch. *Id.*

On March 5, 2025, the Institute submitted a letter to OMB "in a spirit of cooperation and comity." The letter reiterated that while the Institute is independent from the Executive Branch, it remained willing to maintain its longstanding cooperation with the Executive Branch. Am. Compl. Ex. E. Afterwards, on March 9, USIP's longstanding outside counsel, George Foote, emailed the DOGE representatives information about the nature of the Institute's privately contracted security and the Institute's ownership of its headquarters building. Mr. Foote again emphasized the Institute's status as an independent nonprofit corporation and stated that unauthorized persons would only be admitted to the property with a valid warrant.  DOGE did not respond. SUMF ¶ 37.

### C.    The White House and DOGE Respond with Unlawful Terminations

As of March 13, 2025, the Institute had 14 duly appointed Board members. SUMF ¶ 16. Eleven of them were appointed by former Presidents and confirmed by the Senate, pursuant to 22 U.S.C. § 4605(b)(4) (the "(b)(4) Board members"). The eleven (b)(4) members included the six Republican and Democratic Board members who are Plaintiffs here—Ambassador John J. Sullivan; Nancy Zirkin; Judy Ansley, Former Chair; Kerry Kennedy; Mary Swig; and Joseph L. Falk. SUMF ¶ 20–25. As Acting President, Ambassador Moose was a nonvoting *ex officio* member of the Board. 22 U.S.C. § 4606(a). As of March 14, 2025, the Institute employed over 400 employees and personal services contractors to carry out its statutory mission. SUMF ¶ 52.

On March 14, Defendant Trent Morse, Deputy Director of Presidential Personnel at the White House, sent all of the (b)(4) Board members emails stating in full: "On behalf of President Donald J. Trump, I am writing to inform you that your position on the United States Institute of Peace [sic] is hereby terminated, effective immediately." The emails provided no factual or legal justification for these unlawful terminations.  SUMF ¶¶ 38–42.

After these emails went out, later on March 14, USIP's outside counsel was presented with a document labeled "Resolution of the Board of Directors" signed by the three *ex officio* Board members stating that "as of March 14, 2025, Mr. George E. Moose is removed from his position as USIP's president and Mr. Kenneth Jackson is designated as USIP's acting president with all the powers delegated by the Board of Directors to that role." SUMF ¶¶ 15; 43.[8] The (b)(4) Board members convened a call to discuss the termination notices that same day. The Institute's outside

---

[8] Neither this purported resolution, nor any of the purported resolutions described below, were valid or effective: the (b)(4) Board members were not lawfully removed, so they were still part of the Board. The Board may only act (1) when there is a quorum—a majority—of the Board present or (2) by unanimous written consent of all Board members. 22 U.S.C. § 4605(h)(2); SUMF ¶ 15.

counsel advised them that the notices had no legal effect because they violated the termination provisions of the USIP Act.  SUMF ¶ 44.

### D.    DOGE Enlists Law Enforcement to Escalate the Takeover

At two different points in time on March 14, Defendant Jackson and representatives from DOGE, including Defendants Burnham, Mr. Altik, and Mr. Cavanaugh, entered the USIP parcel of land accompanied by FBI agents and requested access to the USIP headquarters building. They were denied entry. SUMF ¶ 45.

On March 16, while a senior USIP security employee enjoying a Sunday at home, two FBI agents showed up unannounced and pressed for information about how to gain access to the USIP building. Meanwhile, the Institute's outside counsel received multiple calls from Jonathan Hornok, Chief of the Criminal Division of the U.S. Attorney's Office for the District of Columbia. Mr. Hornok sought access to the USIP building for unnamed individuals and stated that he suspected that USIP may be engaging in criminal behavior. He told USIP counsel that he would criminally investigate USIP and anyone who "obstructed" DOGE's access to USIP's computer systems. SUMF ¶ 47.

On March 16, the Institute learned that its security firm, Inter-Con Security Systems Inc. ("Inter-Con"), was coordinating with the DOGE Defendants and Defendant Jackson to facilitate their unlawful access to USIP headquarters. So USIP suspended Inter-Con's contracts. SUMF ¶ 48. The following day at approximately 2:30 p.m., four Inter-Con employees arrived at USIP headquarters. Initially, they were unable to enter—the suspension of Inter-Con's contract deactivated their badges. But another Inter-Con employee arrived with a physical key, which he used to gain entrance to the building and let in other Inter-Con employees. SUMF ¶ 49.

Institute counsel called the Washington, D.C. Metropolitan Police Department ("the MPD") to report Inter-Con's entry without consent. SUMF ¶ 50. But when MPD officers arrived,

they helped DOGE, who had arrived on the premises, enter the building, and outside counsel from the building, leaving the DOGE Defendants and Defendant Jackson in physical possession and control of USIP's headquarters. SUMF ¶ 51.

### E.    Plaintiffs File Suit, But Defendants Rush to Dismantle the Institute

Late on the following day, March 18, Plaintiffs filed the instant action. Upon learning that a senior USIP computer security employee was en route from Georgia by car to help DOGE gain access to the Institute's computer systems that very evening; that DOGE representatives were actively damaging the Institute's headquarters, including ripping the USIP seal off the wall; and that DOGE staff were shredding USIP financial records, Plaintiffs sought temporary relief. ECF 2. By minute orders on March 19 and 20, the Court first denied Plaintiffs' request for a temporary restraining order, and then entered a schedule for expedited summary judgment briefing.

Wasting no time, on March 21, 2025, Defendant Jackson sent termination notices to six employees, citing their "at-will-employment status." SUMF ¶ 53. On the night of March 28, 2025, one or more Defendants caused termination notices to be sent to virtually all of the Institute's employees. SUMF ¶ 54. On March 31, Plaintiffs learned of an undated document titled "Resolution of the Board of Directors" signed by two of the *ex officio* directors (Defendants Hegseth and Rubio). The document purported, as of March 25, 2025, to end Defendant Jackson's short-lived tenure as purported Acting President of the Institute and to appoint Defendant Cavanaugh in his stead. The two *ex officio* Board members separately fired the Endowment's officers, replaced them with Adam Amar, and instructed him to transfer all the Endowment's assets to USIP.  SUMF ¶ 57. The resolution also purported to fire USIP's Chief Financial Officer and Chief Operating Officer, and went on to direct Defendant Cavanaugh "to transfer USIP's assets, including USIP's real property and rights thereof, including all assets recently received from the Endowment, to the General Services Administration (GSA)." SUMF ¶ 56. Defendant Cavanaugh

sent a form and a letter to the GSA requesting transfer of USIP's headquarters building—valued at $500 million, and constructed largely with privately donated funds—without reimbursement, as well as a transfer request form. *Id.* GSA issued a letter approving the transfer on March 29, 2024. *Id.* As of this submission, it is unknown if the transfer has occurred, or where the Endowment's funds are.

## ARGUMENT

Plaintiffs are entitled to summary judgment on all claims because the President's purported terminations of the Board members were *ultra vires*—all of Defendants' actions flow from that unlawful, void *ab initio* action. "Summary judgment shall be granted if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. A fact is only material if a dispute over it might affect the outcome of a suit under the governing law; factual disputes that are irrelevant or unnecessary do not affect the summary judgment determination. The dispute is only genuine if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Wilcox v. Trump*, No. CV 25-334 (BAH), 2025 WL 720914, at *5 (D.D.C. Mar. 6, 2025) (citations omitted and cleaned up).

There is no dispute that the President did not comply with the USIP Act's limitation on Board member removal to three specific circumstances. 22 U.S.C. § 4605(f) (the "Removal Provisions"). Like other statutes limiting presidential removal, these provisions set forth the exclusive circumstances under which the President may remove individuals whose appointments were confirmed by the Senate. *See Seila Law,* 591 U.S. at 20 (treating similarly worded statute as exclusive); *Humphrey's*, 295 U.S. at 626 (same).

Defendants argue that the removal provisions interfere with the President's "Article II Powers to remove Executive Branch officers and employees performing executive actions." *See* Defs.' Response to TRO Mot. at 2, ECF 9. This constitutional challenge to the USIP Act depends

on (1) treating the board of a non-profit corporation as officers of the United States who wield executive power on behalf of the President and as to whom presidential authority to appoint with Senate advice and consent implies a textually unstated power of removal; and (2) treating the Institute as outside the *Humphrey's Executor* exception to the President's Article II powers of removal, even though it is a politically balanced multi-member, expert board with staggered terms. That argument falters at each step.

First, Article II has nothing to say about the removal of USIP Board members because USIP is an independent nonprofit corporation that sits outside the Executive Branch and it does not exercise *any* executive authority. Second, even if USIP can be said to exercise some modicum of executive authority, the Removal Provisions are consistent with Article II because USIP does not wield "*substantial* executive power" and is a multimember, partisan-balanced expert board. *Seila Law*, 591 U.S. at 128; *Humphrey's*, 295 U.S. at 632. The inclusion of three *ex officio* board members who serve at the pleasure of the President gives the President more control over USIP than over independent agencies with for cause removal protections for board members that the Supreme Court and lower courts (including this Court) have held to be constitutional under *Humphrey's*. Plaintiffs have suffered irreparable harm; they are entitled to a declaration that their removal was unlawful and to injunctive relief restoring the lawful leadership to USIP.

## I.    Article II does not invalidate the Board removal provisions of the USIP Act.

The Institute's Board members are not executive officers who "wield" *the President's* "authority" and must therefore "remain accountable to him" through removal. *Seila Law*, 591 U.S. at 213–14 (emphasis added). First, Congress chose to structure the Institute as a nonprofit corporation that sits outside the Executive Branch, with a statutory structure that would be anomalous if applied to an Executive Branch agency—all indicators that the Institute is not executive in nature. Moreover, the Institute does not perform any executive functions; it does not

14

enforce the laws, regulate the public, make foreign policy, or conduct foreign relations on behalf of the United States. Instead, it is a think tank that engages in research for the benefit of the public and provides applied-research conflict resolution advisory services to non-governmental and governmental groups worldwide. Article II has nothing to say about the removal of the Board of a standalone nonprofit corporation with no regulatory power.

### A.    The Institute is a nonprofit corporation that Congress structured to sit outside the Executive Branch.

The Institute is just one of many entities that Congress has created throughout our history in various non-agency and non-executive-department forms since 1791 (when it created the first Bank of the United States) to perform functions that promote the nation's interests in all sorts of ways. *E.g.*, Kirti Datla & Richard L. Revesz, *Deconstructing Independent Agencies (and Executive Agencies),* 98 Cornell L. Rev. 769, 776–77 (2013). Congress has used a range of different organizational structures for these entities—including District of Columbia nonprofit corporations like USIP; for-profit corporations like Amtrak; and congressional charters for nonprofit organizations like the Girl Scouts. 49 U.S.C. § 24301; 36 U.S.C. § 80301(a). These bodies are not automatically "executive" in either structure or function.

Corporations established by Congress are not even always part of the government, much less the Executive Branch. Some have no governmental character at all. *See*, e.g., 14 Stat. L. 438 (1867) (incorporating Howard University); *Meridian Invs., Inc. v. Fed. Home Loan Mortg. Corp.*, 855 F.3d 573, 579 (4th Cir. 2017) (Freddie Mac, which Congress "created as . . . a private corporation," was not a "government instrumentality"). Others share characteristics that arguably

give them some governmental features. But the question at hand is not whether USIP might for certain purposes properly be considered part of the government writ large. [9]

Instead, the question relevant to answering Defendants' Article II contention is whether Congress designed the Institute to stand apart from the President and the Executive Branch he oversees. There is no neat list or statutory definition that yields a quick answer. Nor do funding and links to the government place all congressionally-established entities in the Executive Branch; certainly not for a nonprofit corporation that also receives private funds like USIP. Rather, the court must analyze the Institute's structure, the USIP Act, and USIP's interaction with other statutes. *Cf. Dong. v. Smithsonian Inst.*, 125 F.3d 877, 879–80 (D.C. Cir. 1997) (looking to the Smithsonian Institution's structure, its degree of independence from the President, and whether it "engages in any . . . typically executive activity" to conclude that the Smithsonian Institution is not an "establishment in the executive branch" or "Government controlled corporation" within the

---

[9] For example, the Supreme Court's framework for assessing whether a government-chartered corporation should be considered "part of the Government for purposes of the First Amendment" does not resolve governmental status for purposes of structural provisions like Article II. *Lebron v. Nat'l R.R. Passenger Corp.*, 513 U.S. 374, 399 (1995) (Amtrak was subject to the First Amendment). The First Amendment applies not just to the Executive Branch but to the whole government. Even "actions of private entities"—entities no one would contend are executive and subject to presidential control—"can sometimes be regarded as governmental" when it comes to the protection of fundamental individual rights. *Id.* at 378. Similarly, Congress has established multiple entities to assist all branches of the federal government—institutions like the Government Accountability Office ("GAO") and the Architect of the Capitol are plainly part of the federal government, but they sit outside the Executive Branch and do not (indeed cannot) wield executive power. *Bowsher v. Synar*, 478 U.S. 714, 731 (1986); *see, e.g.*, 28 U.S.C. §§ 601, *et seq.* (creating the Administrative Office of the United States Courts, run by personnel appointed and subject to removal by the Chief Justice of the United States, to assist the efficient functioning of the federal court system); 31 U.S.C. § 702, *et seq.* (creating what is now called the GAO as a legislative-branch agency "independent of the executive departments" to assist Congress in ensuring that public monies are expended economically and efficiently). The Court in *Lebron* did not decide whether to disregard Amtrak's corporate structure for all constitutional purposes; did not decide whether Amtrak was part of the Executive Branch; and did not decide whether Amtrak's directors wielded executive power.

meaning of the Privacy Act—even though it "receives extensive federal funding," and maintains "an impressive array of links" with "the federal government"). In this case, these factors all lead to the conclusion that Congress did not locate USIP within the Executive Branch.

Start with text and history. Congress in the past considered bills to create an executive Department of Peace or a Peace Division in the State Department. Commission on Proposals for the National Academy of Peace & Conflict Resolution, *To Establish the United States Academy of Peace: Report to the President and Congress* at 45 (1981). Congress rejected these Executive Branch options and instead created an independent body outside the Executive Branch. Congress structured USIP as an "independent nonprofit corporation"; provided that USIP shall be a charitable organization under the tax code; provided that it shall have all powers of a nonprofit corporation (save cessation of activity and dissolution); provided that it is a distinct legal entity that may sue and be sued; and provided that officers and employees are not federal officers or employees except for limited purposes. 22 U.S.C. §§ 4603(b); 4604(a); 4604(k); 4606(f)(1).

The Board members' duties are fiduciary and run to the Institute, not the United States. *See* D.C. Code § 29-406.30. Put another way, Congress did not make USIP board members "officers of the United States" for purposes of appointment and removal, even though it used the same presidential appointment and Senate confirmation process used for executive officers—as it has also done for other non-executive positions like the Comptroller General.[10] *Cf. Osborn v. Bank of*

---

[10] While a principal officer who exercises executive power must be presidentially appointed and Senate confirmed, the "obverse" is not true—one who is appointed in this manner is not "necessarily" a "member[] of the executive branch." *Ameron, Inc. v. U.S. Army Corps of Eng'rs*, 787 F.2d 875, 893 n.2 (3d Cir. 1986) (Becker, J., concurring), *on reh'g*, 809 F.2d 979 (3d Cir. 1986). The paradigmatic example is the Comptroller General, the head of the GAO. Although the Comptroller General is presidentially appointed and Senate confirmed, 31 U.S.C. § 703, the Comptroller "is an officer of the legislative branch." *See Gonzales & Gonzales Bonds & Ins. Agency, Inc. v. DHS*, 107 F.4th 1064, 1085 (9th Cir. 2024) (Johnstone, J., concurring); *Bowsher v. Synar*, 478 U.S. 714, 731–36 (1986) (as a legislative-branch officer removable by Congress, the

*U.S.*, 22 U.S. 738, 866–67 (1824) (Marshall, C.J.) (dictum) ("It will not be contended, that the directors, or other officers of the [second] Bank [of the United States], are officers of government").

The *USIP Act's* text and structure are dispositive in placing USIP outside the Executive Branch. The Court should decline Defendants' invitation to rely on definitions "for the purpose of" Title 5's government housekeeping provisions or other statutory titles to which defendants have pointed. 5 U.S. Code §§ 103, 104, 105. These ad hoc definitions, each for the purpose of its own title,[11] do not establish the constitutional status or character of USIP. The terms of Chapter 5 of Title 22—the USIP Act—do. And general statutes cannot override Congress's express decisions in the USIP Act to make USIP an "independent nonprofit corporation." *Cf. Make The Rd. New York v. Wolf*, 962 F.3d 612, 631 n.13 (D.C. Cir. 2020) ("It is well established 'that the specific governs the general'" in statutory interpretation." (citation omitted)). More fundamentally, these definitions do not purport to draw (or redraw) constitutional boundaries between branches of government.[12]

---

Comptroller could not constitutionally perform the executive function of determining which budget cuts to make and "command[ing]" the President to make the cuts). Other non-executive officers, such as the Librarian of Congress and the Director of the Government Publishing Office, are also appointed by the President with Senate advice and consent. 2 U.S.C. § 136-1(a); 44 U.S.C. § 301(a). To put this another way, the President's statutory authority to appoint Institute Board members is a privilege Congress elected to grant by statute because it saw fit to give the President some input into the Institute—not because it sought to make them officers of the Executive Branch. Congress could have specified any other method of appointment because the Institute Board members do not carry out executive functions. *See, e.g.*, 2 U.S.C. § 1801a (the Architect of the Capitol is appointed by a majority vote of a congressional commission).

[11] *Cf. United States v. Menendez*, 440 F. App'x 906, 909–10 (11th Cir. 2011) (the definition of "independent establishment" found in Title 5 did not control the meaning of the same term in Title 18).

[12] Thus, the 5 U.S.C. § 105 definition of "Executive agency" *includes* the GAO, a legislative-branch agency, 5 U.S.C. § 104(2), *Bowsher*, 478 U.S. at 731–36, yet *excludes* the Postal Service, 5 U.S.C. § 104(1), even though the Postal Service's organic statute describes the Postal Service as

Returning to the *USIP Act*, 22 U.S.C. § 4603, Congress pointedly did not specify that USIP would sit in the "Executive Branch." When it wishes to do that, Congress expressly describes the entity as a department or agency,[13] expressly provides that the entity shall be "within the Executive Branch" (or a similar phrase), or expressly references statutory definitions of executive agencies.[14] Especially when Congress wants to create a hybrid entity that is both a corporation *and* an Executive Branch agency (or part of one), it says so clearly in the organic statute.[15] The same is true when Congress wishes an entity to be a "Government corporation" within the meaning of various statutes, including 5 U.S.C. §§ 103–105.[16] By using none of this language, and instead

---

part "of the executive branch," 39 U.S. Code § 201, and the Postal Service's predecessor agency was until 1971 led by a member of the Cabinet.

[13] *E.g.*, 20 U.S.C. § 3411 ("There is established an executive department to be known as the Department of Education.").

[14] *E.g.*, 22 U.S.C. § 6563 (setting up USAID "within the Executive branch" and "as an entity described in 5 U.S.C. § 104, which defines "independent establishment," which is in turn a subcomponent of the definition of "Executive agency" under 5 U.S. Code § 105); 20 U.S.C. § 2004(a) (Harry S. Truman Scholarship Foundation "is established, as an independent establishment of the executive branch of the United States Government"); 20 U.S.C. § 4703(a) (Barry Goldwater Scholarship and Excellence in Education Foundation "is established, as an independent establishment of the executive branch of the United States Government"); 39 U.S.C. § 201 ("There is established, as an independent establishment of the executive branch of the Government of the United States, the United States Postal Service"); 46 U.S.C. § 46101(a) ("The Federal Maritime Commission is an independent establishment of the United States Government."); 49 U.S.C. § 1301(a) ("The Surface Transportation Board is an independent establishment of the United States Government."); *cf.* 22 U.S.C. § 2501-1 (the "Peace Corps shall be an independent agency within the executive branch").

[15] 15 U.S.C. § 714 ("there is created a body corporate to be known as Commodity Credit Corporation . . . which shall be an agency and instrumentality of the United States, within the Department of Agriculture, subject to the general supervision and direction of the Secretary of Agriculture"); 7 U.S.C. § 1503 ("To carry out the purposes of this subchapter, there is hereby created as an agency of and within the Department [of Agriculture] a body corporate with the name 'Federal Crop Insurance Corporation'"); 33 U.S.C. § 981 ("There is hereby created, subject to the direction and supervision of the Secretary of Transportation, a body corporate to be known as the Great Lakes St. Lawrence Seaway Development Corporation.").

[16] 42 U.S.C. § 17352(a)(1) ("There is established in the executive branch a foundation to be known as the 'International Clean Energy Foundation' . . . . The Foundation shall be a government corporation, as defined in section 103 of Title 5.") 22 U.S.C. § 7703(a) ("There is established *in*

using the phrase "independent nonprofit corporation" and incorporating D.C. nonprofit corporation law, Congress made clear its intent to locate USIP outside the Executive Branch.

Moreover, Congress purposefully designed USIP to be independent from the President. *Cf. Dong*, 125 F.3d at 879 (Congress did not structure the Smithsonian's leadership to "answer[] to the President"). When Congress has determined that a congressionally created entity could better accomplish its purposes if shielded (in whole or part) from political or partisan influence, it has legislated mechanisms intended to provide a measure of independence from the President—to varying degrees. Such mechanisms include: assigning the entity's power to a multi-member board instead of a single leader; requiring the board to have relevant substantive expertise; placing limits on the removal of board members; requiring partisan balance for the composition of the board; and providing staggered terms for board members. *See* Datla & Revesz, *Deconstructing Independent*

---

*the executive branch* a corporation to be known as the "Millennium Challenge Corporation" that shall be responsible for carrying out this chapter. The Corporation shall be a government corporation, as defined in section 103 of Title 5." (emphasis added)); 42 U.S.C. § 12651 (The Corporation for National and Community Service "shall be a Government corporation, as defined in section 103 of Title 5."); 22 U.S.C. § 9612 ("There is established *in the executive branch the United States* International Development Finance Corporation . . . which shall be a wholly owned Government corporation for purposes of chapter 91 of Title 31 under the foreign policy guidance of the Secretary of State." (emphasis added)); 22 U.S.C. § 3611(a) ("[T]he Panama Canal Commission . . . is established as a wholly owned government corporation (as that term is used in chapter 91 of Title 31) within the executive branch of the Government of the United States. The authority of the President with respect to the Commission shall be exercised through the Secretary of Defense."); 12 U.S.C. § 1441(h)(3) ("[T]he Financing Corporation shall be treated, for purposes of sections 9105, 9107, and 9108 of Title 31, as a mixed-ownership Government corporation which has capital of the Government."); *id.* § 1441b(h)(3) (same for the Resolution Funding Corporation); 33 U.S.C. § 1281, statutory note (noting that the Environmental Financing Act of 1972 "created a body corporate to be known as the Environmental Financing Authority . . . The Authority shall be subject to the general supervision and direction of the Secretary of the Treasury. The Authority shall be an instrumentality of the United States Government" (quoting Pub. L. 92-500, § 12, Oct. 18, 1972, 86 Stat. 899, as amended by Pub. L. 97-258, § 4(b), Sept. 13, 1982, 96 Stat. 1067)); 31 U.S.C. § 9101(3) (expressly listing entities that are "wholly owned Government corporation[s]" for the purpose of Title 31).

*Agencies (and Executive Agencies), supra*, at 770–71 (2013). As described above, Congress gave the USIP Board these features in spades, plus many other features to ensure its independence.

Further, the USIP Act includes provisions that would be anomalous if Congress had intended to structure USIP as a part of the Executive Branch. The USIP Act goes out of its way to apply selected aspects of the federal government apparatus to USIP, including (i) the enumeration of just a few specific items from the array of federal protections available to federal employees (compensation rates, federal tort claims protection, healthcare and insurance benefits)), § 4608(f)(1); (ii) making USIP subject to FOIA, § 4607(i),[17] and (iii) allowing USIP to purchase services from GSA, § 4604(o). If USIP were part of the Executive Branch, as Defendants contend, all of these aspects of federal agency status would apply automatically and the USIP Act provisions would not serve any purpose. Indeed, other standard components of the United States Code that apply to Executive Branch agencies, like Title 5's civil service, Inspector General, and Administrative Procedure Act adjudication provisions, plainly have no application to USIP.[18]

---

[17] FOIA applies to every "agency," defined as "any executive department, military department, Government corporation, Government controlled corporation, or other establishment in the executive branch of the Government (including the Executive Office of the President), or any independent regulatory agency." 5 U.S.C. 552(f)(1). Congress's decision explicitly to apply FOIA to the Institute indicates that Congress did not believe USIP to be either within the Executive Branch—not even an "other establishment in the executive branch"—nor a "Government controlled corporation, or an "independent regulatory agency." Otherwise, the USIP Act's express FOIA reference would be superfluous. And of course, § 4607(i) is not the only FOIA reference in the USIP Act. 22 U.S.C. § 4604(b)(9) provides that the Institute may *request* information from a "Federal Department or agency" under FOIA, including subject to FOIA exemptions—the same limited channels of information available to the public.

[18] Additionally, the USIP Act differentiates between the Institute's exclusive right to use the name "United States Institute of Peace" and its right to use "United States" or "U.S." in its emblem and public-facing materials—the Institute's right to the latter designations depends on express annual congressional authorization. A department or agency of the Executive Branch would not need such permission to use the term "United States." 22 U.S.C. § 4603(e) (1), (2).

Likewise, the Institute is not subject to the Federal Records Act: the U.S. National Archives and Records Administration ("NARA") has concluded that "[r]ecords schedules approved by [NARA] are nonbinding on USIP." United States Institute of Peace, NARA, https://perma.cc/5XF8-UUF6 (last visited Apr. 4, 2025) NARA's legal conclusion is that any USIP records accepted by the National Archives are pursuant to "a deed of gift." *Id.* Unlike executive agencies, USIP retains a private auditor and private legal counsel. 22 U.S.C. § 4607(g); SUMF ¶¶ 32, 33. And unlike an agency, the Institute may establish a separate entity, an Endowment, capable of holding private donations for certain purposes. 22 U.S.C. § 4603(c); 4604(h)(3).

Tellingly, before the Executive Order and March 14 takeover attempt, the Executive Branch itself treated the Institute as outside the Executive Branch. The United States Government Manual, a publication of the Office of the Federal Register within NARA, is the "official handbook of the Federal Government." SUMF ¶ 69. Its most recent organizational chart of federal government entities does not include USIP at all. SUMF ¶ 70. Within the Executive Branch, the Manual lists 15 agencies and 58 "independent establishments and government corporations." *Id.* Again, USIP is not listed among them. The Manual also classifies entities within the Executive Branch (in addition to the White House) as "Executive Branch: Departments" and "Executive Branch: Independent Agencies and Government Corporations." Again, USIP is not listed. *Id.* Rather, since it first listed USIP in 1988, the Manual has classified USIP along with the Legal Services Corporation ("LSC"), Smithsonian Institution, State Justice Institute, and United States Holocaust Memorial Museum as a "Quasi-Official Agency." SUMF ¶ 71. The Executive Branch (NARA) has defined these as entities that are "**not executive agencies under the definition of 5**

**U.S.C. 105** but are required by statute to publish certain information on their programs and activities in the Federal Register."[19] SUMF ¶ 72 (emphasis added).

Even compared to other entities the Manual places alongside USIP in the non-executive "Quasi-Official Agency" category, USIP's non-executive features stand out. For example, the LSC at first blush might seem similar to USIP. Congress established LSC in 1974 as a "private nonmembership nonprofit corporation" in the District of Columbia for the purpose of "providing financial support for legal assistance in noncriminal proceedings or matters to persons financially unable to afford legal assistance." 42 U.S.C. § 2996b(a). Like USIP, LSC has a board whose members are appointed by the President and confirmed by the Senate, and which requires partisan balance. *Id.* at § 2996c(a). But unlike USIP, Congress directed LSC to issue rules and regulations through public notice-and-comment procedures. *Id.* at §§ 2996e(b)(1)(A), 2996g(e); *see also* 42 U.S.C. § 10702 (establishing the State Justice Institute as a "private nonprofit corporation" "to further the development and adoption of improved judicial administration in State courts in the United States" with authority to issue regulations via notice-and-comment procedures); *Dong*, 125

---

[19] As the discussion so far has shown, NARA is right about this. USIP is not an independent establishment because Congress established it as an nonprofit corporation, not "an establishment in the executive branch," 5 U.S.C. § 104(1), and because Congress did not use the "independent establishment" or "of the executive branch" language it uses to denote this type of entity. *See supra* note 14. Nor is it a "Government corporation, 5 U.S.C. § 103, because Congress did not use the specific "Government corporation" language it uses to denote *that* type of entity. *See supra* note 16. Instead, it used a distinct phrase: "independent nonprofit corporation." Moreover, USIP is neither "owned" or "controlled" by the government. *Id.* District of Columbia nonprofits do not have owners. D.C. Department of Licensing and Consumer Protection, Domestic Nonprofit Corporation, https://perma.cc/XGD7-JFUE (last visited April 4, 2025). As to control, Congress specified that USIP would be "*independent*" and the vast majority directors are private individuals protected from presidential removal. 22 U.S.C. §§ 4605(b), (d)(2). Finally, even when something is an "independent establishment" for some purposes, it is not an executive agency for all purposes. *Dong*, 125 F.3d at 881 (Smithsonian qualified as "independent establishment of the United States" for purposes of the Federal Tort Claims Act but not an "establishment in the executive branch" or "Government controlled corporation" for purposes of the Privacy Act).

F.3d at 879 (Smithsonian is not an establishment of the Executive Branch because there is "no evidence that the institution administers federal statutes, prosecutes offenses, promulgates rules and regulations (other than with respect to its own buildings and grounds), or engages in any other typically executive activity"). USIP's charitable, public-education orientation—including its capacity to receive private, tax-exempt donations—is another indicator of non-executive status. As the Smithsonian example demonstrates, Congress has used non-executive forms to further such educational purposes at least since 1846, when Congress established the Smithsonian pursuant to a trust bequest. *Dong*, 125 F.2d at 882.

In short, the text of the USIP Act and related federal statutes, USIP's form as a D.C. nonprofit corporation, USIP's independent structure, and the Executive Branch's own determinations all make clear that USIP is situated firmly outside the Executive Branch.

### B. Article II does not apply to the Institute Board members because they do not wield executive power.

USIP Board members do not exercise any of the President's executive authority. The President must take care that the laws Congress passes be faithfully executed. U.S. Const. art. II, § 3. Thus, in addition to enforcement of federal law, the President's power includes oversight of administrative agencies as they apply the law to private parties through rulemaking and adjudications. *Arlington v. FCC*, 569 U.S. 290, 304 n.4 (2013); *Morrison v. Olson*, 487 U.S. 654, 695 1988). Other presidential powers include granting pardons and nominating Supreme Court Justices and principal Officers of the United States. U.S. Const, art. II, § 2, cl. 2. Beyond the domestic sphere, the Constitution makes the President the Commander in Chief of the armed forces, and reserves for him (with Senate advice and consent) the power to make treaties, appoint ambassadors and other diplomats, and recognize foreign states. U.S. Const. art. II, § 2, cl. 1, 2; *Zivotofsky ex rel. Zivotofsky v. Kerry*, 576 U.S. 1, 28 (2015).

The Institute, a research think tank, does not carry out any of these functions, "on behalf" of the President or anyone else. It does not make or enforce "policy" for the President. *See Seila Law*, 591 U.S. at 225.  Research is not an exercise of executive power. *See Proposed Comm'n on Deregulation of Int'l Ocean Shipping*, 7 Op. O.L.C. 202, 202–03 (1983) (concluding that members of the Commission on Deregulation of International Ocean Shipping did not need to be Officers of the United States, and members of Congress could serve on the Commission without running afoul of the Incompatibility Clause, because the statute tasked them with the "purely advisory" function of undertaking a "comprehensive study" and submitting a report with recommendations both to Congress *and* the President, and the statute did not vest them with any "enforcement authority or power to bind the government"). Article II therefore does not require Institute directors to "remain accountable" to the President through the threat of removal. *See Seila Law*, 591 U.S. at 204, 213.

1.     *The Institute does not carry out the President's foreign affairs duties.*

To contend that the USIP exercises executive power, Defendants vaguely suggest that USIP participates in foreign affairs. But engagement in international activity does not constitute governmental foreign affairs; private think tanks and civil-society groups play a prominent role. *See* SUMF ¶¶ 61, 65, 66. And not all governmental foreign affairs activity is executive. The Supreme Court has rejected the proposition that only the President plays a role in foreign relations, even though he has sole authority over specific constitutionally-assigned roles, like the power to recognize foreign governments. *Zivotofsky*, 576 U.S. at 19–21, 28.

The Institute's research, training, and conflict resolution activities around the world are not executive in nature. They are largely in aid of Congress's own constitutionally-assigned role in foreign affairs. *Id.* ("[I]t is essential the congressional role in foreign affairs be . . . respected. . . . It is not for the President alone to determine the whole content of the Nation's foreign policy.").

Congress designed the Institute in substantial part to be a factfinder in aid of its foreign affairs initiatives and legislation. Thus, when USIP performs functions like briefing members of Congress and convening the Iraq and Afghan Study Groups, it acts in service of the Legislative Branch. SUMF ¶ 60; *see Buckley v. Valeo*, 424 U.S. 1, 139–41 (1976) (the Federal Election Commission's functions that were "essentially of an investigative and informative nature" in aid of Congress were not executive). The President has no Article II right to ignore Congress's decision to legislate removal protections for its research aid just because the statute touches on foreign affairs. *See, e.g.*, *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 637, (1952) (Jackson, J., concurring) ("When the President takes measures incompatible with the expressed or implied will of Congress, his power is at its lowest ebb."); *Zivotofsky* 576 U.S. at 62 (Roberts, C.J., dissenting) ("For our first 225 years, no President prevailed when contradicting a statute in the field of foreign affairs.").

Even when the Institute works with Executive Branch agencies, it does so as a partner—just as it works as a consultant and advisor to foreign governments and NGOs, SUMF ¶ 63—not as a department or agency that is executing the President's policies with respect to foreign affairs; *see* U.S. Const. art. II, § 2; *Zivotofsky*, 576 U.S. at 13,  20–21, 28. Thus, the Institute does *not* direct the military or represent the United States in dealings with foreign governments. When Congress wants to take the extraordinary step of assigning one of those core executive functions to be carried out by an entity other than an executive department, it does so expressly. There are examples of this, and they do not at all resemble the role of USIP. The American Institute in Taiwan ("AIT"), a tax-exempt "nonprofit corporation incorporated under the laws of the District of Columbia," literally "conduct[s] and carrie[s] out" "relations" "by the President" with respect to Taiwan, "in the manner and to the extent directed by the President." 22 U.S.C. § 3305(a); 22 U.S.C. § 3307. When the President so directs, AIT enters into agreements related to Taiwan on his

behalf of the Executive Branch. *Id.* § 3305(b). AIT may, when the President directs, perform consular activities. *Id.* § 3306(a)(3).[20]

In stark contrast, USIP does not "direct the actual conduct of foreign relations": the terms of the USIP Act do not permit it and it does not happen in practice. *See Earth Island Inst. v. Christopher*, 6 F.3d 648, 653 (9th Cir. 1993); SUMF ¶¶ 63–68. USIP's Track 1.5 and Track 2 efforts, though called "diplomacy" in the academic field of peace studies, do not involve representation of the United States. *Id.* (collecting examples, such as USIP's participation in dialogues between the Philippines government and the Moro Islamic Liberation front at the request of those parties). Rather, USIP—just like the Carter Center and CSIS—is a valuable player in these efforts precisely because it brings to bear the credibility and flexibility of an independent nonprofit. When the United States participates in these exercises, it does so as a distinct party from USIP. No participant in or observer of these talks—not USIP, not foreign governmental or nongovernmental participants, and not the United States Executive Branch—understands USIP to be representing the interests of the United States in any way. SUMF ¶¶ 62, 63, 65, 68.

2. *The Institute does not execute the law.*

The Institute is not charged with enforcing any laws. Nor does the Institute issue any rules, regulations, or advisory opinions "fleshing out" any statute regulating the public. *See Buckley*, 424 U.S. at 691; *Dong*, 125 F.3d at 879 (Smithsonian Institution is not an "establishment in the executive branch" under the Privacy Act in part because it does not "administer[] federal statutes, prosecute[] offenses, promulgate[] rules and regulations (other than with respect to its own

---

[20] Unlike, for example, the American National Red Cross, Congress did not assign USIP any role in executing treaty obligations on behalf of the United States. 36 U.S.C. § 300102.

buildings and grounds), or engage[] in any other typically executive activity"). Nor may the Institute apply the law to private parties through adjudication. *Arlington*, 569 U.S. at 304 n.4.

Defendants have pointed to the Institute's grantmaking activities, but these are not executive in nature. Private nonprofit (and even for-profit) as well as state-government entities routinely receive federal funds and then dole them out to other private or non-federal organizations. Subaward or Contract: Which Should you Use? at 2, Thompson Grants (2017), https://perma.cc/JH4L-G5VV ("As much as 75 percent of federal funding in grants and cooperative agreements—or $480 billion out of $600 billion—awarded to primary recipients each year are passed through to lower-tier organizations . . . . In many instances, these awards are issued to states, or other prime recipients such as universities and national nonprofits, who pass the funds through to local agencies and other organizations as subawards or contracts."); *see, e.g.*, Pub. L. No. 108-57, 117 Stat. 859 (2003) (directing that appropriated funds "be made available" to a private nonprofit, the Congressional Hunger Center, which would then distribute them as fellowships). Like these entities, the Institute not only makes grants but also receives grants from federal agencies. 22 U.S.C. § 4604(h)(1).

Moreover, when the Institute does make grants, it is not administering any federal statute directing how and where funds should be distributed or adjudicating statutory eligibility criteria for grantees. *Cf. Buckley*, 424 U.S. at 140–41 (FEC Commissioners' "determinations of eligibility for" public campaign funds via interpretation and application of a detailed statutory regime constituted "administration and enforcement of the public law" such that it was an executive function). The USIP Act provides only general guidance on the purposes for which the Institute may make grants, namely in support of its peace studies mission. 22 U.S.C. § 4604(d). In these ways, the Institute's grantmaking process is just like that of a wholly private nonprofit foundation

or university. *See Dong*, 125 F.3d at 882 ("To the extent that the Smithsonian devotes part of its own budget to funding grants and fellowships, it appears to be no different from any private research university which receives federal funds and enjoys some control over their use.").

\*\*\*

The Institute does not exercise any executive power; nor does it exercise discretion to make or enforce presidential policy, in the field of foreign affairs or otherwise. Therefore, the President retains no Article II removal interest on which the Removal Provisions enacted by Congress might intrude. Accordingly, the Removal Provisions bind the President. His purported removal of the Institute Board members without complying with the statute was *ultra vires*.

## II.    The Removal Provisions are constitutional even if USIP is an agency within the Executive Branch because the Institute is a multimember expert board that exercises at most *de minimis* executive power.

The Removal Provisions would be constitutional even if the Court were to disagree and conclude that the Institute is part of the Executive Branch. The USIP Act does not concentrate any executive authority in the hands of a single, removal-protected director. *Seila Law*, 591 U.S. at 223–26; *Collins v. Yellen*, 594 U.S. 220, 251-56 (2020). Instead, the Act disperses any modicum of executive authority the Institute may exercise among multiple expert members of a bipartisan board, some of whom the President *may* lawfully remove at will and others of whom he may remove under certain circumstances. *Humphrey's*, 295 U.S. at 602. *Humphrey's* applies with just as much force when the board in question operates in the sphere of foreign affairs. *Wiener v. United States* 357 U.S. 349 (1958). Moreover, to the extent the Board members may be thought to exercise any executive power at all, they do not wield "*significant* executive power" such that the Removal Provisions prevent the President from doing his job. *Seila Law*, 591 U.S. at 220 (emphasis added).

Even if the Institute were an agency of the Executive Branch, it would fit neatly into a well-established history of Congress establishing "boards . . . with elements of independence from the

President." *Wilcox*, 2025 WL 720914, at *14. The Supreme Court has repeatedly held that such arrangements—in particular, the vesting of leadership of a federal entity in "a multimember group of experts," *id.* at *6, removable by the President only for cause—are consistent with Article II. *Humphrey's* 295 U.S. at 620, 632 (upholding this structure in the context of the Federal Trade Commission); *Wilcox*, 2025 WL 720914, at *18 (applying *Humphrey*'s to uphold a similar structure for the National Labor Relations Board). The two judges of the D.C. Circuit who recently voted to grant an emergency stay of this Court's decision in *Wilcox* agreed that *Humphrey's* is binding insofar as it upholds the constitutionality of removal restrictions as applied to "partisan-balanced 'multimember expert agencies that do not wield substantial executive power.'"[21] *Harris v. Bessent*, 2025 U.S. App. LEXIS 7301, *30 (D.C. Cir. Mar. 28, 2025) (hereinafter "*Harris/Wilcox* Stay Order") (Walker, J., concurring) (quoting *Seila Law*, 591 U.S. at 218); *see id.* at *50 (Henderson, J., concurring in the grants of stay).[22]

Assuming the Institute is subject to Article II at all, *Humphrey's* mandates the conclusion that the Removal Provisions are constitutional.

### A. The Institute is a multimember, partisan-balanced board of information-gathering experts.

The USIP Act vests control of the Institute in "a Board of Directors" consisting of fifteen voting members. 22 U.S.C. § 4605 (a), (b). Three of these members are the Secretary of State, the Secretary of Defense, and the president of the National Defense University (the "*ex officio*"

---

[21] Judge Walker would start with a "default" presumption that "*[e]xecutive* agencies *exercise* executive power." *Harris/Wilcox* Stay Order at 29 (Walker, J., concurring) (emphasis in original). Were this default ever to become controlling law, it would not apply to the Institute, because Congress structured the Institute not as an agency within the Executive Branch but as an independent nonprofit corporation.

[22] This unpublished per curiam emergency stay disposition is not precedential in the D.C. Circuit, and neither are the single-judge concurrences. *See In re Grant*, 635 F.3d 1227, 1232 (D.C. Cir. 2011).

members); the remaining twelve seats are for individuals the President selects (and the Senate confirms) who (1) are not officers or employees of the federal government' (2) have "practical or academic experience in peace or conflict resolution efforts . . . ."; and (3) are removable by the President only in specified circumstances. *Id.* § 4605(b)(4), (d)(1), (2), (f). Just like the FTC Act, the USIP Act mandates partisan balance among Board members in the interest of impartial judgment: no more than eight voting members of the Board may be members of the same party. *Id.* § 4605(c). And like NLRB and FTC members, the Institute Board members serve staggered terms. *Id.* § 4605(e); *Wilcox*, 2025 WL 720914, at *7. The terms last four years. 22 U.S.C. § 4605(e)(1). The Institute's primary function is to perform research for the benefit of the public and the government, including Congress. *Seila Law*, 591 U.S. at 215 (*Humphrey's* turned on the fact that one of the 1935 FTC's primary functions, in addition to engaging in adjudications, was to "'mak[e] investigations and reports' to Congress" (quoting *Humphrey'*s, 295 U.S. at 628)).

### B.     The Institute exercises far less executive power than the FTC in *Humphrey's*.

The Institute does not exercise "substantial executive power," *id.* at 218; it certainly exercises far less executive authority than the FTC or NLRB. First, unlike those agencies, the Institute does not have any compulsory investigative powers or authority to adjudicate the rights of private parties. *Wilcox*, 2025 WL 720914, at *8 (The FTC in 1935 "had broad powers of investigation and could issue a complaint and hold a hearing for potential unfair methods of competition" and could issue subpoenas; both the FTC and NLRB could issue cease-and-desist orders enforceable in court). As this Court aptly explained in *Wilcox*, removal protection for NLRB Board members did not unduly interfere with the President's oversight of Article II executive powers even though the NLRB engaged in adjudications. *Id.* at *9.

And *Humphrey's* is not limited to adjudication-focused agencies. Equally important in *Humphrey*'s was the FTC's function of "making investigations and reports" in aid of the

Legislative Branch. *See Humphrey's*, 295 U.S. at 624, 628. *Seila Law*, 591 U.S. at 204 (describing *Humphrey's* as holding that "Congress could create expert agencies led by a *group* of principal officers removable by the President only for good cause," not just that it could create adjudicative agencies with these features). No less than in the context of adjudication, Congress's choice to ensure nonpartisan impartiality for the expert factfinder organization it created in the Institute deserves weight.

Moreover, the 1935 FTC "could issue rules and regulations regarding unfair practices and deceptive acts." *Wilcox*, 2025 WL 720914, at \*8. The NLRB presented an easier case than the FTC because it "hardly engaged in rulemaking." *Id.* at \*9. The Institute's structure imposes still less of a burden on the President's oversight of Article II executive power *because the Institute does not any regulation of the public whatsoever.*

In *Wilcox*, this Court reasoned that the NLRB's "collective authority" of the sort today's Supreme Court considers "executive" was, "if anything, less extensive than that of the FTC at issue in *Humphrey's*." 2025 WL 720914, at \*9. The Institute carries far less extensive executive authority than either the FTC or the NLRB, both of which are structured consistently with Article II. *Humphrey's*, 295 U.S. at 629; *Wilcox*, 2025 WL 720914, at \*8 (collecting authorities reaching similar conclusions with respect to the Consumer Product Safety Commission); *Harris v. Bessent*, No. CV 25-412 (RC), 2025 WL 679303, at \*7 (D.D.C. Mar. 4, 2025) (similar conclusion regarding Merit Systems Protection Board); *Grundmann v. Trump*, No. CV 25-425 (SLS), 2025 WL 782665, at \*10 (D.D.C. Mar. 12, 2025) (similar conclusion regarding Federal Labor Relations Authority). *Humphrey's* "dictates the same outcome" for the Institute. *Wilcox*, 2025 WL 720914, at \*8.

### C.    *Humphrey's* applies with full force to multimember boards in the foreign affairs space.

It is no answer for Defendants to point to the Institute's involvement in foreign affairs as an attempted escape from the binding precedent of *Humphrey's*. As explained above, the Institute does not make or carry out any foreign policy on behalf of the United States. Even if it did, Article II permits removal protections for multimember, impartial bodies in the fields of foreign and military affairs. In *Wiener v. United States*, the Supreme Court applied *Humphrey's* to uphold for-cause removal protections for members of the War Claims Commission, which assessed and paid out Americans' claims for "damage at the hands of the enemy in connection with World War II," including claims against Japan. 357 U.S. at 349, 350, 354. Settlement of claims against foreign states, perhaps especially "postwar settlements" against "formerly belligerent" states, is a core executive foreign-affairs function, yet *Humphrey's* still applied. *See Am. Ins. Ass'n v. Garamendi*, 539 U.S. 396, 415–16 (2003); *cf. Morrison*, 487 U.S. at 688–93 (rejecting argument that *Humphrey's* and *Wiener* did not apply to consideration of removal restrictions on an officer who exercised the core executive function of law enforcement). USIP's role as a think tank and as a consultant to non-governmental actors, foreign governments, and the United States government in the sphere of international conflict resolution, if executive in nature at all, is at the periphery of executive authority.  SUMF ¶ 60–68.

### D.    The President retains greater control-through-removal than in *Humphrey's*.

The Institute is distinct from the FTC and the NLRB in another way that makes any clash between Congress's chosen structure and Article II even less acute: the President retains more control over the Institute than he did over the FTC in *Humphrey's*, or over NLRB in *Wilcox*. To start, the President has at least the same level of authority to remove that the Supreme Court held constitutional in *Humphrey's* and this Court held constitutional in *Wilcox*. *Compare* 22 U.S.C. §

33

4605(f)(1) (the President may remove a non-ex-officio USIP Board member for "malfeasance in office, persistent neglect of duties, or inability to discharge duties," as well as for conviction of a felony), *with Humphrey's*, 295 U.S. at 620 (FTC Act provided for presidential removal "for inefficiency[,] neglect of duty[,] or malfeasance in office"), *and* 29 U.S.C. § 153(a) (the President may remove NLRB board members "upon notice and hearing, for neglect of duty or malfeasance in office"); *see Wilcox* 2025 WL 720914, at *10 (treating FTC provisions and NLRB provisions the same for constitutional purposes despite slight differences in wording). To be sure, the President must "consult[] with the Board" before removing a Board member for these reasons, 22 U.S.C. § 4605(f)(1), but that procedural requirement has no substantive bite and is far less significant a procedural hurdle than the "notice and a hearing" required to remove for cause under the NLRA, a requirement this Court held constitutional in *Wilcox*.

And Congress gave the President even more control over USIP than that. Unlike the FTC and NLRB, where the *entire* Board enjoyed removal protection, the President retains the unfettered right under the USIP Act to remove three members of the Institute Board for whatever reason he wishes (or for no reason at all)—the Secretary of State, the Secretary of Defense, and the president of the National Defense University. Should the President wish to remove additional members under 22 U.S.C. § 4605(f)(2), the President's control over these *ex officio* seats provides three of the eight votes necessary to do so. What is more, even if the Board's partisan balance happens to be as heavily weighted against the President as it possibly can be at any given time, adding the three *ex officio* members to the appointed Board members who will be members of the President's party puts the President in a strong position to garner a majority vote to remove.

In addition, the President retains yet another option for removing Institute Board members without cause. If the House Committees on Foreign Affairs and Education and Labor and the

Senate Committees on Foreign Relations and Health, Education, Labor, and Pensions (formerly known as Labor and Human Resources) make a recommendation, the President can remove any Board member he decides to replace. 22 U.S.C. § 4605(f)(3). If the comparatively limited presidential removal power in *Humphrey's* did not unduly impede the President's Article II functions, the Removal Provisions are also consistent with Article II.

Finally, the USIP Act's staggering of Board terms combined with its specification that terms shall last four years means that that every President will have the opportunity to fill Board vacancies, providing still another means of presidential control over the direction of the Institute. *See Seila Law*, 591 U.S. at 225 (finding it constitutionally significant that because of the CFPB director's five-year term, some Presidents may never have the opportunity to appoint a CFPB director, diminishing presidential influence over the CFPB).

***

*Humphrey's* and *Seila Law* draw a distinction between those agencies that must be directly responsive to the President through at-will removal and, by contrast, multimember expert boards "that do not wield substantial executive power" such that statutory removal protections are consistent with Article II. *Seila Law*, 591 U.S. at 218. Even more than the FTC and NLRB, the Institute falls into the second category. Plus, the USIP Act gives the President greater removal power over USIP than he has over the FTC, further mitigating any Article II concern. Even if Judge Walker's view ultimately carries the day—that courts should not "exten[d]" *Humphrey's*— the Removal Provisions are constitutional. *Harris/Wilcox* Stay Order at *32 (Walker, J., concurring) (quoting *PHH Corp. v. CFPB*, 881 F.3d 75, 156 (D.C. Cir. 2018) (Henderson, J., dissenting)). To uphold them does not require an extension of *Humphrey's*; it does not even require the Court to begin to approach that precedent's outer limits.

35

Even setting aside *Humphrey's* and considerations specific to multimember expert boards aside, the "ultimate question" in balancing the President's Article II interests against Congress's authority to structure positions with protection from presidential removal is whether the removal protections are "of 'such a nature that [they] impede[] the President's ability to perform his constitutional duty.'" *Seila Law*, 591 U.S. at 196 (quoting *Morrison*, 487 U.S. at 691). The USIP Act, which gives the President multiple pathways to remove the board members of an independent nonprofit think tank, plainly does not run afoul of *Seila Law*.[23]

## III.    Plaintiffs are entitled to summary judgment on all claims.

### A.    Because the statutory removal protections are constitutional and create the exclusive means for presidential removal of Board members, Plaintiffs prevail on all claims.

The USIP Act's provisions for removing Institute Board members are constitutional and bind the President. Because the President did not comply with them, Plaintiffs prevail on all claims. Counts I, II, III, and IV challenge as *ultra vires* Defendants' actions to remove Plaintiffs and other Institute Board members; to then purport to act as the full board and remove Ambassador Moose as Acting President and replace him with Defendant Jackson (and later Defendant Cavanaugh); and to use purported Board and Institute-presidential authorities to assert control over and dismantle the Institute. All of these actions—including the forcible entry into USIP's building, the

---

[23] When he signed the bill that included the USIP Act, President Reagan said that he had "been advised by the Attorney General" that the Removal Provisions were not "intended to, or ha[d] the effect of, restricting the President's constitutional power to remove those officers." *Statement on Signing the Dep't of Def. Authorization Act*, Ronald Reagan Pres. Lib. & Mus. (Oct. 19, 1984), https://perma.cc/6KAA-2UGH (last visited Apr. 4, 2025). As Plaintiffs have shown, the Attorney General was simply wrong that the President retained constitutional power to remove the Board members beyond the ample leeway the USIP Act provides. Nor was this signing statement the last presidential word on the subject. Congress amended the Act in 2008, including the section containing the removal restrictions (leaving the removal restrictions in place). Pub. L. 110-315, Title IX, § 921(b)(1), Aug. 14, 2008, 122 Stat. 3456. President Bush did not issue any signing statement questioning the constitutionality of the removal restrictions.

seizure of its offices and data, the firing of nearly all of USIP's employees, and the transfer of USIP's building to GSA—flow directly from the unlawful purported terminations of Board members, and are therefore *ultra vires* and void *ab initio*. *See Wilcox*, 2025 WL 720914, at *18.

That the terminations were unlawful, and the Defendant *ex officio* Board members therefore did not have the majority of lawful board members necessary for a quorum or effective board vote (or unanimous written consent of *all* lawful board members necessary to take any of the actions Plaintiffs challenge), means that Plaintiffs also prevail on their APA claims in Count V.[24] 22. U.S.C. § 4605(h)(2); SUMF ¶ 15. These actions were contrary to the USIP Act and in excess of these executive officers' constitutional authority, so they are "arbitrary, capricious, abus[es] of discretion, otherwise not in accordance with law,"; "contrary to constitutional right" and "power,; and "in excess of statutory jurisdiction, authority," and "limitations." 5 U.S.C. § 706(2)(A)–(C). Because these actions did not comply with the quorum requirements of 22 U.S.C. § 4605(h)(2), these Defendants acted "without observance of procedure required by law." 5 U.S.C. § 706(2)(D). Moreover, the actions are "short of" the Board member Plaintiffs' statutory right to their Board seats. Accordingly, the Court "shall" "hold" these Defendants' challenged actions "unlawful" and "set" them "aside." *Id.* § 706(2)(D). Moreover, the Court "shall" compel these Defendants to rescind their unlawful actions—Defendants are "unlawfully with[olding]" and "unreasonably delay[ing]" prompt rescissions of their purported terminations and actions to dismantle USIP. *Id.* § 706(1).

Finally, because Ambassador Moose's termination, and the appointment of Defendants Jackson and Cavanaugh as USIP president, were *ultra vires*, Defendants' forced entry onto USIP

---

[24] These *ex officio* Defendants act in their capacities as heads of agencies subject to the APA (the Department of Defense, the Department of State, and the National Defense University). *See* 5 U.S.C. § 551.

premises over the objection of Ambassador Moose and employees acting at his direction was a trespass. Defendants' continued occupancy of USIP property is unlawful. Plaintiffs thus prevail on their trespass and ejectment claims under both federal common law and D.C. law. *Est. of Ellis by Clark v. Hoes*, 677 A.2d 50, 51 (D.C. 1996), D.C. Code § 16-1101(a)(1); *id.* § 16-1104; *Malone v. Bowdoin*, 369 U.S. 643, 647–48, (1962) (common law ejectment action against federal officer unlawfully occupying federal property lies, and there is no sovereign immunity, "if the officer's action is not within the officer's statutory powers or, if within those powers, only if the powers, or their exercise in the particular case, are constitutionally void").

**B.      Plaintiffs prevail on Counts I and V for the independent reason that Defendants have unlawfully ceased the Institute's corporate activities, in contravention of the USIP Act.**

Congress conferred upon the Institute all of the powers of a District of Columbia Nonprofit Corporation under the District of Columbia Nonprofit Corporation Act except one: the power to "cease its corporate activities and surrender its corporate franchise." 22 U.S.C. § 4604(a) (all powers except section 5(o) of the District of Columbia Nonprofit Corporation Act); Pub. L. No. 87-569, 17 Stat. 265, 268 (Aug. 6, 1962) (Section 5(o) of the act that "shall be known" as the "District of Columbia Nonprofit Corporation Act" is the power to "cease [the nonprofit's] corporate activities and surrender its corporate franchise"). Defendants' actions to fire nearly all Institute employees, give away all of its property, and cancel its contracts, constitute an effective dissolution of the Institute. SUMF ¶¶ 54; 55–58; 73; 79–80. Defendants have certainly caused the Institute to cease all of the Institute's corporate activities. Defendants have not offered any argument that they have a constitutional privilege to ignore *this* express directive from Congress; and the President has violated his duty to take care that the laws be faithfully executed in so doing. U.S. Const. art. II, § 3. Accordingly, Defendants' actions on this point are *ultra vires* and must be halted and unwound. *See* Am. Compl. ¶ 77 (Count I).

In addition to contravening the USIP Act's prohibition against ceasing activities, the *ex officio* Defendants' actions are arbitrary and capricious abuses of discretion. 5 U.S.C. § 706(2)(A)–(C). These Defendants seized hundreds of millions of dollars in assets and real property of an independent nonprofit and gave them away for free or are in the process of so doing, all without any explanation, and without regard for the fact that these assets largely derive from the tax-exempt contributions of private donors. SUMF ¶¶ 10–11; 50–58.

## IV.    Plaintiffs are entitled to declaratory and injunctive relief.

USIP, the Plaintiff Board members, and Ambassador Moose have each suffered irreparable harm for which legal remedies are inadequate, and the balance of hardships and the public interest both strongly weigh in favor of a permanent injunction. *See, e.g.*, *eBay Inc. v. MercExchange LLC*, 547 U.S. 388, 391 (2006). Only an injunction restoring the unlawfully removed directors to their positions, reinstating Ambassador Moose as Acting President, and voiding the actions taken by the *ex officio* directors can begin the process of undoing the damage to the Institute, as requested in Plaintiffs' Proposed Order Granting Summary Judgment attached hereto. For the same reasons, the declaratory relief requested in Plaintiffs' proposed order is appropriate to clarify the substantial controversy over the legal relationships between with respect to these issues of "significant public importance." *See Harris*, 2025 WL 679303, at *8.

### A.    Declaratory and injunctive relief is appropriate.

#### 1.    *Harms to the Institute*

Non-economic harm that is "certain and great" is "irreparable." And even monetary loss can be irreparable where it threatens a plaintiff's existence. *Wisconsin Gas Co. v. FERC*, 758 F. 2d 669, 674 (D.C. Cir. 1985) (citing *Washington Metro. Area Transit Comm'n v. Holiday Tours, Inc.,* 559 F.2d 841, 843 n.2 (D.C. Cir. 1977)).

*Loss of expert leadership.* Here, the injuries Defendants have inflicted on the Institute easily qualify as irreparable. The unlawful Board terminations are irreparable even standing alone. Many of the Board members have long tenures of service and extensive experience as committed stewards of the Institute, and expertise on the issues on which the Institute works. SUMF ¶ 20–29. The loss to the Institute of the entire group of Board members duly appointed under 22 U.S.C. § 4605(b)(4) such leadership is irreparable.[25]

*Termination of employees.* Between March 21 and March 28, Defendants fired virtually all employees were fired. SUMF ¶ 53–54. *See Yorktown Systems Grp. Inc. v. Threat Tec LLC*, 108 F. 4th 1287, 1296–97 (11th Cir. 2024) (affirming district court finding of irreparable harm based on "the difficulty, if not impossibility, of quantifying in monetary terms the injury from losing highly skilled and experienced employees"); *Beacon Assocs., Inc. v. Apprio, Inc.*, 308 F. Supp. 3d 277, 288–89 (D.D.C. 2018) (finding loss of "incumbent employees, and their institutional knowledge and reputation," to cause irreparable harm to plaintiff's business).

*Sudden and total cessation of programmatic activity.* The ability of the organization to function has been irreparably impaired in other ways. With the firing of the employees, all of the Institute's activities immediately ceased. USIP's overseas offices have been or are in the process of being shuttered and abandoned. And the Institute's computer and communications systems have been shut down. SUMF ¶ 73.

*Loss of valuable real property.* In addition, Defendants have transferred USIP's headquarters building, valued at $500 million, to GSA. The USIP building is unique—with a bespoke design crafted to reflect and functionally aid the Institute's mission, SUMF ¶ 77—and

---

[25] It is an understatement to say that the three *ex officio* members have substantial other responsibilities and do not by themselves have the time, interest, or commitment to responsibly oversee the work of USIP.

thus its loss is irreparable. *E.g.*, *United States v. Fifty Acres of Land*, 469 U.S. 24 (1984) (noting that money damages for loss of property are inadequate "when its application would result in manifest injustice to owner"); *Sundance Land Corp. v. Cmty. First Fed. Sav. & Loan Ass'n*, 840 F.2d 653, 661 (9th Cir. 1988) (finding potential loss of "unique" property through foreclosure constituted irreparable harm).

*Loss of donor confidence.* Additionally, Defendants have irreparably injured the Institute's ability to solicit and raise private funds for statutorily permissible purposes. SUMF ¶ 76. Many donors have reached out to Ambassador Moose, expressing concerns about the status of the funds they donated for the construction and maintenance of USIP's unique building. Going forward, new and would-be-repeat donors will understandably be reluctant to contribute, given the uncertainty Defendants have inflicted upon USIP's future by rapidly dismantling it in manner that will be very difficult to unwind. That is particularly so given Defendants' demonstration that they will stop at nothing to accomplish the complete "termination" of the Institute, to use the words of EO 14217.

*Reputational damage.* Finally, Defendants have irreparably damaged the Institute's standing and reputation in the eyes of the communities in which it works. *See Beacon*, 308 F. Supp. 3d at 288 (finding irreparable harm where alleged termination for default injured plaintiff's reputation and diminished future contracting opportunities). USIP's ability to fulfill its mission— including to engage in conflict resolution training, to be a trusted information resource for congressional and governmental bodies, and to convene and facilitate dialogue between groups in conflict—fundamentally depends on its earned reputation as a nonpartisan, expert entity that is not part of the Executive Branch. SUMF ¶¶ 62–63; 78. The wrongful insistence by President Trump and other Defendants that the Institute is part of the Executive Branch and their actions to dismantle

USIP since issuance of EO 14217 will adversely affect the Institute's ability to position itself as an "honest, good faith" actor that operates outside the control of the Executive.

In short, having been stripped of all of its human capital, real property, and physical and monetary assets, USIP has in essence been involuntarily dissolved.  As the duly appointed stewards of the Institute, the Board member Plaintiffs and Ambassador Moose suffer these harms in their official capacities as well.  None of these irreparable harms can be adequately remedied by legal relief.

2.    *Harms to the Board Member Plaintiffs and Ambassador Moose*

As to the Board member Plaintiffs and Ambassador Moose, many of the harms the Court found to be irreparable in *Wilcox* exist with at least equal force for the Board members here. The wrongful removal from office "indisputabl[y]" constitutes "a cognizable injury[.]" *Severino v. Biden*, 71 F.4th 1028, 1032 (D.C. Cir. 2023). "Courts have recognized as irreparable harms the 'unlawful removal from office by the President' and 'the obviously disruptive effect' that such removal has on the organization's functioning." *Wilcox*, 2025 WL 720914, at *15 (quoting *Berry v. Reagan,* No. 83-cv-3182, 1983 WL 538, at *5 (D.D.C. Nov. 14, 1983), *vacated as moot,* 732 F.2d 949 (Mem.) (D.C. Cir. 1983)).[26]

Just like the plaintiff in *Wilcox*, the Board members "have been deprived of a presidentially appointed and congressionally confirmed position of high importance, and both [they] and, by consequence, the [Institute] have been deprived of the ability to carry out their congressional mandate" of conflict resolution research, training, and facilitation authorized by the USIP Act. *Id.*

---

[26] Indeed, in a case involving another organization targeted by the same Executive Order as in this case, arising from actions similar to those taken here by some of the very same parties, the court found irreparable harm to the Inter-American Foundation's president if left to lead an organization reduced to a "pile of rubble" by massive employee firings and cancellation of grants. *See* Mem. Op. at 19-21 (ECF NO. 22), *Aviel v. Gor*, No. 25-cv-778 (LAA) (D.D.C. April 4, 2025).

Further, during their period of removal, the USIP Board members and Ambassador Moose were deprived of the ability to fulfill their fiduciary obligations, imposed upon them as the leaders of a nonprofit corporation, to act in the best interest of the organization.

And because Defendants unlawfully divested them of control over USIP, Plaintiffs lost the opportunity to, in keeping with their fiduciary duties, try to protect the Institute from the dismantling activities that President Trump presaged in February 2025 in EO 14217, all of the injurious actions that occurred on and after March 14. SUMF ¶ 74.

These harms, as in *Wilcox*, "cannot be retroactively cured by monetary damages." *Id.* And federal courts possess the power in equity to grant equitable and injunctive relief "with respect to violations of federal law by federal officials." *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 326-27 (2015); *Larson v. Domestic & Foreign Com. Corp.*, 337 U.S. 682, 689 (1949) (equitable relief available against federal officials who act "beyond th[e] limitations" imposed by federal statute). Courts have a well-established authority to issue injunctions against subordinate executive officials to prevent illegal action by the Executive Branch. *See, e.g., Youngstown Sheet & Tube Co.*, 343 U.S. at 584; *Hamdan v. Rumsfeld,* 548 U.S. 557, 567 (2006); *Swan v. Clinton,* 100 F.3d 973, 980 (D.C. Cir. 1996).

Relatedly, the Court has the power to issue an injunction, or, alternatively, a writ of mandamus, compelling the reinstatement of a wrongly terminated member of a multimember board, "even without a formal presidential reappointment." *Severino,* 71 F.4th at 1042–1043 (citing *Swan,* 100 F.3d at 980); *see also Swan,* 100 F.3d at 977 (writ of mandamus is a traditional

remedy at law ordering an executive official to carry out a mandatory and legally ministerial duty, including redressing an unlawful removal from public office).[27]

### B.    The balance of hardships and public interest favor Plaintiffs.

When the government is a party, the balance of equities and public interest considerations merge. *Wilcox*, 2025 WL 720914, at * 15 (quoting *Nken v. Holder*, 556 U.S. 418, 435 (2009)). Here, the harm to USIP substantially outweighs the harm to Defendants. Compared to the injuries to the Institute, any harm to the Defendants is negligible. The requested declaratory and injunctive relief would simply require Defendants to comply with the duly enacted, constitutional USIP Act. A permanent injunction would not prevent President Trump from pursuing the removal of duly appointed Board members under the circumstances set out in 22 U.S.C. § 4605(f), so long as those preconditions are met. Nor would an injunction keep the President from seeking greater control over USIP by appointing Board members of his choosing under 22 U.S.C. § 4605(b)(4)—even if the Court reinstates the Board member plaintiffs, as it should, there are two vacancies on the Board, waiting for the President to fill them. Finally, the President could attempt to persuade Congress to change the USIP Act to give the President unfettered power to remove all USIP Board members, not just the three *ex officio* members.

Likewise, the public has a strong interest in ensuring that government officials comply with duly enacted, constitutional statutes—and an attendant interest in meaningfully remedying injuries to organizations and individuals who suffer lasting, irreparable harm when government officials

---

[27] Where the injunction is sought to compel federal officials to perform a statutorily required ministerial duty, a "request for an injunction based on the general federal question statute is essentially a request for a writ of mandamus." *Wilcox*, 2025 WL 720914, at *16 n.22 (quoting *Swan*, 100 F.3d at 976 n.1). A writ of mandamus requires that (1) the plaintiff has a clear right to relief; (2) the defendant has a clear duty to act; and (3) there is no other adequate remedy available to the plaintiff." *Id.* For the foregoing reasons, these circumstances exist here.

violate such laws. *See Harris*, 2025 WL 679303 at \*14. In addition, the public has an interest in

seeing USIP, an organization created by Congress to promote, study, and engage in training as to

the peaceful, nonviolent resolution of conflict, restored to its ability to able to fulfill a mission that

Congress found to be in the nation's interest.

## <u>CONCLUSION</u>

For the foregoing reasons, Plaintiffs respectfully request that the Court grant their motion

for summary judgment and order the declaratory and injunctive relief they request.

Dated: April 5, 2025                      Respectfully submitted,

                                          */s/ Andrew N. Goldfarb*
                                          Andrew N. Goldfarb (D.C. Bar No. 455751)
                                          J. Benjamin Jernigan (D.C. Bar No. 9000865)
                                          ZUCKERMAN SPAEDER LLP
                                          2100 L Street N.W.
                                          Suite 400
                                          Washington, D.C. 20037
                                          Tel: (202) 778-1800

                                          William J. Murphy (D.C. Bar No. 350371)
                                          ZUCKERMAN SPAEDER LLP
                                          100 East Pratt Street Suite 2440
                                          Baltimore, MD 21202-1031
                                          Tel: (410) 332-0444

                                          *Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on April 5th, 2025, I served a true and correct copy of the foregoing document via the Court's Electronic Filing System, which will electronically send notice to all counsel of record.

/s/ *Andrew N. Goldfarb*

Andrew N. Goldfarb