# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES INSTITUTE OF PEACE, *et al.,*<br><br>Plaintiffs,<br><br>   v.<br><br>KENNETH JACKSON, in his official capacity as Assistant to the Administrator for Management and Resources for USAID and in his purported capacity as acting president of the United Sates Institute of Peace, *et al*.<br><br>Defendants. | Civil Action No. 25-804 (BAH) |

**BRIEF OF *AMICI* 128 EMPLOYEES OF THE UNITED STATES INSTITUTE OF PEACE PURPORTEDLY TERMINATED ON MARCH 28, 2025, IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND FOR DECLARATORY RELIEF AND PERMANENT INJUNCTION**

**CORPORATE DISCLOSURE STATEMENT**

*Amici curiae* are individual persons.  They have no parent corporations and do not issue

stock.

INTEREST OF *AMICI CURIAE*[1]

This *amicus* brief is filed on behalf of 128 employees of the United States Institute of Peace ("USIP" or the "Institute") purportedly terminated on March 28, 2025.[2]  (ECF No. 20-4 ¶¶ 4–5). Collectively representing more than 800 years of service to the Institute's noble purposes, *amici* have understood themselves to be employed by a federally funded but independent, nonprofit, national institute to promote international peace and the resolution of conflicts.  (ECF No. 20-20 ¶ 3).  That understanding was well founded, given that it is just what Congress said it was doing by statute when it created the Institute.  *See* 22 U.S.C. § 4601(b) (stating congressional purpose to "establish an independent, nonprofit, national institute . . . to promote international peace and the resolution of conflicts."); 22 U.S.C. § 4603(b) (stating that "[t]he Institute is an independent nonprofit corporation").

It was thus of great surprise to *amici* when the President of the United States purported to subsume the Institute into the Executive Branch and seek to disembowel it.  More specifically, on February 19, 2025, President Donald J. Trump issued an Executive Order entitled "Commencing the Reduction of the Federal Bureaucracy."  Exec. Order No. 14,217, 90 F.R. 10447 (2025).  *Amici* were particularly surprised to find their employer, the Institute, listed as a target in a section entitled "Reducing the Scope of the Federal Bureaucracy," *see id.* § 2.  They knew they were not part of the so-called "Federal Bureaucracy."  Yet, they watched as members of the Institute's board of directors were purportedly removed contrary to statutory procedure set forth in 22 U.S.C. §

---

[1] In accordance with Local Civil Rule 7(o)(5) and Federal Rule of Appellate Procedure 29(a)(4)(E), *amici* certify that (1) this brief was authored entirely by counsel for *amici curiae* and not by counsel for any party, in whole or part; (2) no party or counsel for any party contributed money to fund preparing or submitting this brief; and (3) apart from counsel for *amici curiae*, no other person contributed money to fund preparing or submitting this brief.

[2] The individual *amici* are described in the Appendix.  In addition to employees, *amici* include personal service contractors.

4605(f).  They watched as the rump board of *ex officio* appointees purported to replace the Institute's acting president.[3]

And then, on Friday evening, March 28, 2025, *amici* were among approximately 236 Institute employees who received letters purporting to terminate them as of that date.

## ARGUMENT

Individual Plaintiffs' purported removals—and *amici's* purported employment terminations—were improper because the Institute is not a part of the Executive Branch.  Given the unusual characteristics of the Institute's establishment, *amici* submit relevant extracts of their experience to assist the Court in understanding the Institute's unique operations.[4]

### A.  The Institute Serves a Non-Executive Purpose

The Institute of Peace is not a micro-State Department.  Rather, it was created by legislation as a manifestation of the practical reality that the United States has interests in international activities and capacities apart from its official organ of statecraft.  (ECF No. 20-31 ¶ 3).

As but one example of this dynamic: In the years after the Supreme Court announced *Brown v. Board of Education*, 347 U.S. 483 (1954), the great school desegregation case, Presidents

---

[3] By law, the Board of Directors consists of fifteen voting members.  22 U.S.C. § 4605. Twelve are presidential appointments subject to Senate confirmation and three are *ex officio* (the Secretary of State, the Secretary of Defense, and the president of the National Defense University, or their qualified designees).  *Id.*  As described in the Amended Complaint, the Board had 13 members (and two vacancies) on or about March 14, 2025.  (ECF No. 12 ¶ 49).  In addition to the three *ex officio* members, there were ten serving directors who had been appointed by various presidents following Senate confirmation.  (*Id.*).  Of the ten term directors, five were Republicans and five were Democrats (*id.*), consistent with the statutory requirement of bipartisanship, *see* 22 U.S.C. § 4605(c) (providing that not more than eight voting members of the Board may be members of the same political party).  The purported removals of term directors at the heart of this case left only the three *ex officio* members serving on the board, and those three members purported to act by unanimous consent—as a rump board—to remove Plaintiff Ambassador Moose as Institute Director and replace him with Defendant Jackson.  (ECF No. 12 ¶¶ 52-53).

[4] This brief uses the present tense in describing the operations of the Institute on the basis that seizure and purported operational changes were invalid, but *amici*'s personal knowledge does not extend past their purported terminations.

and Secretaries of State routinely asked Chief Justice Earl Warren to foster friendships with other countries that Cold War politics precluded the Executive Branch from so engaging directly. In 1956, for example, President Dwight D. Eisenhower and Secretary of State John Foster Dulles determined to ask Chief Justice Warren to visit India. *See* T. Vestal, *Public Diplomacy in the Supreme Court: The Warren Years—Part I*, 33 J. S. Ct. Hist. 371, 374 (2008). Warren was "regarded as an ideal envoy for a friendship mission to India at a time when confusing and frequently harsh Washington criticism of unaligned nations and neutralism had put fresh strains on relations with New Delhi." *Id*. It marked the beginning of an era in which Warren was "a practitioner *par excellence* of public diplomacy." T. Vestal, *Public Diplomacy in the Supreme Court: The Warren Years—Part II*, 34 J. S. Ct. Hist. 99, 118 (2009).[5] These visits did not turn the Chief Justice of the United States into a member of the Executive Branch.

The Institute likewise serves an important complement to formal diplomacy: The foundational concept for the Institute's work is Track II diplomacy. (ECF No. 20-10 ¶¶ 5–6). An Institute publication explains the concept:

---

[5] The public diplomacy work of the Judicial Branch continues today. The International Judicial Relations Committee of the Judicial Conference of the United States is one important organ. *See generally* S. Halabi & Hon. N. Laughrey, *Understanding the Judicial Conference Committee on International Judicial Relations*, 99 MARQUETTE L. REV. 239 (2015) (describing history of the Committee); *see also* Hon. D. O'Scannlain, *The Rule of Law and the Judicial Function in the World Today*, 89 NOTRE DAME L. REV. 1383, 1399 (2015) (noting at the conclusion of the author's term as chairman of the International Judicial Relations Committee that the fundamental purpose of a judiciary in upholding the rule of law is to "step[] in and declare[] the trespassory act to be what it is: a nullity" when the "very government actors" brought into being by a constitution "perform acts forbidden by it"). The international subject matter of this work—entailing appropriate coordination with the State Department—surely does not convert the Judicial Conference or participating judges into parts of the Executive Branch entailing supervision by the President under the Take Care clause, notwithstanding that the Article III judges have been nominated by the President and confirmed by the Senate, nor that their salaries are paid by federal funds. Same for the Congressional Office of International Liaison (COIL) and its Open World Program in the Legislative Branch, which operates administratively in the Library of Congress. *See* 2 U.S.C. § 1151(a)(1) & (e)(2).

In the conflict resolution realm, "track II" peacemaking or diplomacy has become increasingly common, complementing official "track I" peacemaking efforts in myriad ways and at various points throughout a peace process. As defined in the United States Institute of Peace's glossary, Peace Terms, track I diplomacy consists of "formal discussions typically involving high-level political and military leaders and focusing on cease-fires, peace talks, and treaties and other agreements. Third-party interveners are almost always official—a government or international organization, for example." They can also be private citizens who are appointed by a governmental entity to undertake mediation or other diplomatic activities on behalf of the government. (Former [P]resident Carter has acted in such a capacity, for instance.)

By contrast, track II diplomacy involves "unofficial dialogue and problem-solving activities aimed at building relationships and encouraging new thinking that can inform the formal process. Track II activities typically involve influential academic, religious, and NGO leaders and other civil society actors who can interact more freely than high-ranking officials." Track II practitioners bring parties together across conflict lines to talk, build relationships, engage in joint civic projects, or even develop new ideas about potential political solutions to the conflict.

H. Burgess & G. Burgess, CONDUCTING TRACK II PEACEMAKING 5–6 (2010) (footnotes omitted).[6]

The Institute "provides analysis, training, and tools to help prevent, manage, and end violent international conflicts, promote stability, and professionalize the field of peacebuilding." *Id.* at 81. Given that Track II diplomacy definitionally entails 'unofficial dialogue and problem-solving activities' by 'civil society actors' outside of government, it cannot be performed without separation from the Executive Branch.[7] As such, it makes perfect sense that Congress established the Institute as an entity independent from the Executive Branch.

---

[6] The cited volume was published by the Institute as part of a series entitled "The Peacemaker's Toolkit." Until the events at the heart of this case, it was available on the Institute's website. The copyright is held by the Endowment of the United States Institute of Peace, and modest revenues from this type of publication are earned by the Endowment for use in supporting the Institute's programs, all consistent with the corporate structure and powers Congress provided for by law as discussed below.

[7] Courts have inherent familiarity with the litigation analog of alternative dispute resolution, which requires participation of a neutral who (even when paid for by one, some, or all parties) does not take a side.

**B. Consistent with its Purpose, the Institute's Structure Is Distinct from Entities Within the Executive Branch**

Reflecting its non-executive purpose, the Institute is an "independent nonprofit corporation" created by law.  22 U.S.C. § 4603.  It has all of the powers conferred upon a nonprofit corporation by the District of Columbia Nonprofit Corporation Act (other than "to cease its corporate activities and surrender its corporate franchise.").  *See* 22 U.S.C. § 4604(a).[8]  As John Norton Moore, the Institute's inaugural chairman, reported back to Congress at the first oversight hearing for the Institute:

> The legislative history of our enabling statute, and indeed the statutory text itself, makes clear that the United States Institute of Peace was not designed to become part of the Executive Branch.  We believe that one of the great accomplishments of our early months in existence was the establishment of this independence.

S. Hrg. 100-432 at 6 (Nov. 10, 1987) (remarks of Hon. John Norton Moore).[9]  Consistent with the Institute's status, its website, usip.org, was established with the .org top-level domain and not .gov.

---

[8] The relevant subsection provides in full: "The Institute may exercise the powers conferred upon a nonprofit corporation by the District of Columbia Nonprofit Corporation Act consistent with this chapter, except for section 5(o) of the District of Columbia Nonprofit Corporation Act."  22 U.S.C. § 4604(a).  The reference is to the District of Columbia Nonprofit Corporation Act of 1962, as amended, prior to its replacement by the Nonprofit Corporation Act of 2010, D.C. Law 18-378, § 2.

[9] The Reagan Administration evidently would have preferred a different design for the Institute, one that was integrated into the Executive Branch.  *See* Joel M. Woldman, *The United States Institute for Peace*, Rep. No. 86-15F at 9–11, Cong. Rsch. Serv. (Jan. 23, 1986).  In April 1985, the State Department proposed an amendment to the Institute of Peace Act of 1984, but Congress did not take up the proposal.  *Id.* at 9.  The President proposed to defer the initial appropriation for the Institute, but Congress disapproved the deferral by law.  *See* Pub L. No. 98-88, 99 Stat. 347 (1985).  President Reagan also delayed nomination of the initial directors well beyond the statutory deadline of April 1985.  *See* Woldman, *supra*, at 6–9; *see also* 22 U.S.C. § 4605(e)(3) (providing for initial nomination timing).  The White House Counsel's Office advised that the Administration needed to go about following the law as enacted.  *See* John G. Roberts, Jr., "Memorandum for Fred Fielding re U.S. Institute of Peace," May 8, 1985, available at https://www.reaganlibrary.gov/public/digitallibrary/smof/counsel/roberts/box-036/40-485-6908381-036-003-2017.pdf#page=6 ("Since we are already violating the law by not having submitted nominations by April 20, I think we must form the Board under existing law and not delay any further in the hope that new legislation will pass.").  The board ultimately held its first

The Institute is authorized to establish a separate D.C. nonprofit corporation as an "Endowment of the United States Institute for Peace," (the "Endowment") that will be "capable of receiving, holding, and investing public funds for purposes in furtherance of the Institute."  22 U.S.C. § 4604(c).  The Endowment has its own board meetings, bylaws, and bank accounts.  It has a separate Employer Identification Number (EIN) from the Institute, and it files a Form 990 (Return of Organization Exempt from Income Tax) with the IRS annually.  (ECF No. 20-17).

The Institute "may" (not *shall*) "respond to the request of a department or agency of the United States Government to investigate, examine, study, and report on any issue within the Institute's competence, including the study of past negotiating histories and the use of classified material."  22 U.S.C. § 4604(e).  (ECF No. 20-7 ¶¶ 5–7).

The Institute may enter personal services and other contracts.  22 U.S.C. § 4604(f).  Its president may hire, fix the pay of, and remove employees of the institute.  22 U.S.C. § 4604(c).  And those employees "shall not be considered officers and employees of the Federal Government" except for federal tort claims and very limited other purposes.  22 U.S.C. § 4604(f).  The Institute is not obligated to shut down in case of lapse of appropriations, and it has drawn on funds in its commercial bank accounts to cover salaries and other expenses during lapses of appropriations.

The Institute may sweep unobligated appropriated funds into the Endowment account and spend them "without regard to fiscal year limitations."  22 U.S.C. § 4609(b).

The Institute is required to have its own outside auditor, and it has for many years contracted with KPMG, a private firm, for audits.  22 U.S.C. § 4607(g).  (ECF No. 20-3 ¶¶ 6–7).

---

meeting to constitute the Institute at the White House in February 1986.  *See* Ronald Reagan, *Remarks at a White House Meeting of the Board of Directors of the United States Institute of Peace* (Feb. 26, 1986).  And the board has since furthered the vision for an entity independent of the Executive Branch that Congress provided for by law.

The Institute has the authority to sue and to be sued.  22 U.S.C. § 4604(k).

The Institute has power over its land.  *See* Pub. L. No. 104-201 § 2831 (giving the Institute administrative jurisdiction—effectively a permanent rent-free tenancy—over three acres); *see also* Pub. L. No. 109-364 § 2842 (giving the Institute administrative jurisdiction over an additional acre, including two buildings that were subsequently renovated and renamed the Bush and Clinton Buildings).

The Institute was given authority to use limited public appropriations supplemented by privately raised funds to construct and own its landmark building.  *See* 22 U.S.C. § 4604(h)(3)(A); Pub. L. No. 108-447, div. J, §§ 118, 122, 118 Stat. 2809, 3347–48; *see also* Pub. L. No. 111-117, div. F, tit. I, 123 Stat. 3034, 3319.

At the public groundbreaking for that building, President George W. Bush said:

> The work of democratic development is the work of non-governmental organizations, like the U.S. Institute of Peace.  Obviously these organizations can go into countries where it's harder for governments to operate.  So it's very important for this government and future governments to always be a strong and steady partner to non-governmental organizations and groups like the U.S. Institute of Peace.

The White House Office of the Press Secretary, *President Bush Attends Ceremonial Groundbreaking of United States Institute of Peace*, June 5, 2008.[10]

### C.  Institute Employment Does Not Entail Hallmarks of Federal Service

The Institute's purpose gives it a rationale to exist outside the Executive Branch.  The law created it outside the Executive Branch.  But the D.C. Circuit also has a history of applying the celebrated "duck" test: "WHEREAS it looks like a duck, and WHEREAS it walks like a duck, and WHEREAS it quacks like a duck, WE THEREFORE HOLD that it is a duck."  *See Dole v.*

---

[10] Available at
https://georgewbush-whitehouse.archives.gov/news/releases/2008/06/20080605-2.html and
http://www.presidentialrhetoric.com/speeches/06.05.08.html.

*Williams Enters., Inc.*, 876 F.2d 186, 188 n.2 (D.C. Cir. 1989).  Anyone who has ever been a federal employee will recognize that the experiences of *amici* as Institute employees demonstrate facts on the ground that the Institute is a nonprofit corporation outside the Executive Branch (and indeed, outside the Federal Government).

The Institute does not issue SF-50 forms to mark personnel actions.  *See* Standard Form 50, U.S. Office of Personnel Management (Rev. 7/91) ("This is your copy of the official notice of personnel action.").  The Institute does not participate in government-wide recordkeeping in the form of Official Personnel Folders.  The Institute's employees are not required to execute appointment affidavits such as an SF-61, entailing an oath of office and commitments regarding loyalty and striking against the government required of federal employees by 5 U.S.C. §§ 3331 and 3333.

The Institute's employees receive their salary direct deposits from a private payroll provider.  To effect this, the Institute's financial management staff transfers funds for payroll to the provider through a commercial bank account held in the Institute's name.  The payroll provider withholds employment taxes and remits them to the federal treasury.

The Institute's employees are not provided with typical federal employee benefits such as health insurance (Federal Employee Health Benefits), defined-benefit retirement (Federal Employee Retirement System), defined-contribution retirement (Thrift Savings Program). Instead, health and retirement benefits are made available through commercial providers befitting the Institute's status as an independent nonprofit corporation.  (ECF No. 20-7 ¶ 4, ECF No. 2-34 ¶ 4).  This was, in fact, a subsequent change to the Institute's organic provision for employee benefits, *see* 22 U.S.C. § 4606(f), because Congress decided in January 1988 that federal benefits

should no longer be provided to individuals "employed by an entity *other than the Government*," Pub. L. 100-238 § 108 (codified at 5 U.S.C. § 8914) (emphasis added).[11]

When Institute employees travel abroad for work, they do not use diplomatic passports and do not invoke consular protections beyond what is available to any citizen. They are not subject to Chief of Mission authority, such that they may travel to locations in other countries that an Executive Branch employee may not. *Cf.* 22 U.S.C. § 3927(b) (making employees of any "executive branch agency" subject to Chief of Mission authority). They must arrange their own accommodations and generally do not have the protections of an embassy compound. As a result, the Institute's employees—including *amici*—take on risk to life and liberty in discharge of their work of teaching, training, research, and facilitation that is different in character from those of diplomatic and military officials who are part of the Government of the United States. (ECF No. 20-8 ¶ 57, ECF No. 20-32 ¶¶ 4–5). Evidencing the significance of this risk, the Institute's headquarters building—purportedly now seized by the Executive Branch—at last sight maintained a display of five carved doves in the foyer, each bearing the name of a staff member who was lost in a conflict zone.

Financial management of the Institute also is qualitatively different from an Executive Branch entity. The Institute has "bypass" authority in the budgeting process such that it is entitled to present its budget requests to Congress independent of the Office of Management and Budget

_____

[11] Also in 1988, Congress struck a provision of the original statute that prohibited the use of funding provided by appropriation to procure fringe benefits for Institute employees. *See* Pub. L. No. 100-569 § 301. Had *amici* been federal employees with access to the Federal Employee Health Benefit program in March 2025, they would have been eligible for an automatic 31-day extension of coverage following their purported terminations. *See* Office of Personnel Mgmt., *31-Day Extension of Coverage and Conversion*, at https://www.opm.gov/healthcare-insurance/healthcare/reference-materials/reference/termination-conversion-and-temporary-continuation-of-coverage/#extensioncov (last visited Apr. 8, 2025).

in the Executive Office of the President, and the Institute has utilized that bypass authority on numerous occasions. *See* 22 U.S.C. § 4608(a); E. Pasachoff, *The President's Budget as a Source of Agency Policy Control*, 125 YALE L. J. 2182, 2221–22, n. 162 (2016) (describing "budget bypass authority").[12]  The Endowment's commercial bank accounts hold millions of dollars of funds, including unobligated expired appropriated funds, transferred pursuant to law, and restricted and unrestricted private contributions used for limited purposes specified by law.  (ECF No. 20-3 ¶¶ 3–4). The Institute is not covered by the Government-wide policy of self-insurance, and so the Institute, via the Endowment, procures and pays for commercial insurance for directors' and officers' liability, (ECF No. 20-7 ¶ 3), property, automobile coverage, employment practices, cyber risk, crime, international travel, and other purposes.

The Institute follows its own procurement, grant, and contracting policies rather than uniform federal policies applicable to the Executive Branch.  Although the Institute often draws as a guide on Federal Acquisition Regulations for procurement and the Uniform Administrative Requirements for Federal Awards for grantmaking, it has different competition rules, thresholds, and terms and conditions that reflect its unique status and non-profit best practices.

Employees of the Institute generate revenue for its own operations (and those funds have never been treated as federal miscellaneous receipts pursuant to 31 U.S.C. § 3302 because of the Institute's nonprofit corporate status).  Most significantly, the Institute rents out space in the building it owns for public and private events.  It has income from services, including training courses for which it may charge tuition.  And it has income from publication sales and other uses

---

[12] *See also* Memorandum from Jim Jukes, Assistant Dir. for Legislative Reference, Office of Mgmt. & Budget, Exec. Office of the President, to OMB Policy Officers & DADs, Agencies with Legislative & Budget "Bypass" Authorities 7, 9-14 (Feb. 20, 2001), available at *http://www.citizen.org/documents/OMBDocument1.pdf [http://perma.cc/8GM6-GE3Z]*.

of its intellectual property.  These receipts are placed in the Endowment and used for purposes including technology investment, facilities management, insurance, and security.

Employees of the Institute manage the Institute's own information security.  The Institute has agreed with the Cybersecurity & Infrastructure Security Agency (CISA) that the Institute is beyond CISA's remit in light of the Institute's corporate status; and the Institute has determined to invest in its own cybersecurity defense system in light of the sensitive information it manages.

These features will be familiar to managers and employees of non-profit entities, not government instrumentalities.  Applying the duck test, the Institute is not part of the Executive Branch, and the President cannot claim a removal power over its directors beyond what Congress has authorized by law.

## CONCLUSION

For the foregoing reasons, *amici* urge this Court to grant summary judgment to Plaintiffs, restoring control of the Institute, its operations, and its property to the duly appointed board, and thereby determining that the purported dismissals of *amici* as employees of the Institute were invalid.


[signatures on next page]

11

Date:   April 8, 2025                               Respectfully submitted,

Washington, DC


                                                    **BAILEY & GLASSER, LLP**

                                                    */s/ Michael L. Shenkman*

                                                    Brian A. Glasser (D.C. Bar No. 1024003)
                                                    Michael L. Shenkman (D.C. Bar No. 1029094)
                                                    Cary Joshi (D.C. Bar No. 1028594)
                                                    1055 Thomas Jefferson St., NW, Ste. 540
                                                    Washington, DC  20007
                                                    Tel: 202-463-2101
                                                    bglasser@baileyglasser.com
                                                    mshenkman@baileyglasser.com
                                                    cjoshi@baileyglasser.com

                                                    *Counsel for* Amici Curiae

**Certificate of Compliance**

I hereby certify that the foregoing complies with Local Civil Rule 7(o)(4) and does not exceed 25 pages. I further certify that the *amicus* brief complies with the typeface and type style requirements of Local Rule 5.1(d) because it has been prepared in a proportionally spaced typeface using Microsoft Word and 12-pont Times New Roman font.

April 8, 2025                            */s/ Michael L. Shenkman*
                                         Michael L. Shenkman

# APPENDIX

List of *Amici Curiae*

| Name | Years of Service | USIP Title as of March 29, 2025 |
| --- | --- | --- |
| Pamela Aall | 1992–2025 | Senior Advisor for Conflict Prevention and Management |
| Camille Akinnusotu | 2022–2025 | Procurement and Contracts Assistant for Grants and Contracts Administration |
| April Alley | 2024–2025 | Senior Expert for the Gulf and Yemen |
| Sayed Habib Ameri | 2023–2025 | International Finance Manager |
| Kateira Aryaeinejad | 2017–2025 | Senior Program Officer, RESOLVE/Program on Violent Extremism |
| Lauren Baillie | 2020–2025 | Senior Program Officer, Atrocity Prevention |
| Nicoletta Barbera | 2012–2025 | Acting Director for West Africa, the Sahel and Central Africa |
| Robert Barron | 2018–2025 | Senior Program Officer, Israel, the Palestinian Territories, Egypt and the Levant |
| Jon F. Bishop | 2024–2025 | Program Assistant for Political Transitions, Africa Center |
| Tegan Blaine | 2020–2025 | Director, Program on Climate, Environment and Conflict |
| Kent Brokenshire | 2023–2025 | Senior Advisor, Africa Center |
| Cassandra Burns | 2024–2025 | Senior Program Manager - Climate, Environment, and Conflict |
| Elizabeth (Liz) Callihan | 2012–2025 | Senior Advisor, Strategic Engagement |
| Katia Cavigelli | 2020–2025 | Senior Program Specialist, Africa Center |
| Aaron Chapman | 2014–2025 | Senior Event Manager |
| Alejandro Chile | 2022–2025 | Senior Administrative Assistant, Asia Center |
| Ben Clarick | 2023–2025 | Senior Program Assistant |
| Nicole Cochran | 2020–2025 | Program Officer, Burma |
| Brittany Croll | 2024–2025 | Senior Program Officer, Environment/Conflict |
| Margo Cunniffe | 2023–2025 | Program Officer, Grants and Fellows |
| Wapoenje Dacruz Evora | 2022–2025 | Program Officer, Africa Center |
| Catherine Dale | 1993–1994 & 2024–2025 | Acting Vice President, Center for Russia and Europe |
| Anna Daley Laursen | 2022–2025 | Program Specialist for Women, Peace and Security |
| Michael Darden | 2018–2025 | Program Officer, Program of Violence and Extremism |
| Caroline Dibble | 2022–2025 | Senior Program Assistant, Israel, the Palestinian Territories, Egypt and the Levant |
| Ena Dion | 2013–2025 | Police Reform Advisor |
| Shauna Eisenberg | 2016–2025 | Senior Manager, Grants and Contracts Administration |
| Kamel Fakhry | 2022–2025 | Program Specialist, Africa Center |
| Georges Fauriol | 2023–2025 | Senior Advisor, Latin America Program |

| | | |
|---|---|---|
| Mark Feierstein | 2023–2025 | Expert for Latin America |
| Tracy Fleming | 2006–2025 | Sr. Accounting Tech, Finance |
| William Ford | 2019–2025 | Program Officer, Burma |
| Athena Mison Fulay | 2024–2025 | Senior Outreach Officer for Public Engagement |
| Mirna Galic | 2021–2025 | Senior Expert, East Asia |
| Adam Gallagher | 2018–2025 | Editor-in-Chief |
| Galen Gammino | 2020–2025 | Instructional Design Specialist |
| Asalou Givens | 2017–2025 | Senior Administrative Assistant |
| Mary Glantz | 2022–2025 | Senior Advisor for Russia and Europe |
| Corinne Graff | 2017–2025 | Chief of Strategy, Research and Learning |
| Anne-Marie Gwynn-Sackson | 2008–2015 & 2018–2025 | Senior Program Officer, Strategic Partnerships |
| Alean Haider Sayedzada | 2023–2025 | Senior Administrative Assistant |
| Madison Handy | 2022–2025 | Legislative Affairs Officer |
| Brian Harding | 2020–2025 | Senior Expert, Southeast Asia and the Pacific Islands |
| Sarah Harper-Johnston | 2023–2025 | Senior Program Specialist, Burma |
| Gavin Helf | 2019–2025 | Senior Expert on Central Asia |
| Mary Anne Holmcrans | 2022–2025 | Program Assistant, Africa Center |
| Katie Hortenstine | 2020–2025 | Program Officer, Learning, Evaluation and Research |
| Joshua Ivey | 2024–2025 | Talent Acquisition Coordinator |
| Ibanez Jacobs | 2022–2025 | Director of Global Human Resources |
| Kathryn (Katie) Jones | 2024–2025 | K-12 Outreach Officer, Public Engagement |
| Palwasha Kakar | 2014–2025 | Interim Director, Religion |
| Dominic Kiraly | 2008–2025 | Director, Online and Headquarters Training |
| Nicole Krakora | 2024–2025 | Director of Special Events and Protocol |
| Kathleen Kuehnast | 2008–2025 | Director of Women, Peace and Security |
| Lucy Kurtzer-Ellenbogen | 2010–2025 | Director, Israel, The Palestinian Territories, Egypt and the Levant Program |
| Illana Lancaster | 2015–2025 | Director, Higher Education Engagement |
| Allison Larmann | 2024–2025 | Program Specialist |
| Philippe Lerou-Martin | 2015–2025 | Director, Governance, Justice and Security |
| Megan Madeira | 2024–2025 | Program Specialist for Afghanistan |
| Bethesda Manrique | 2023–2025 | Senior Program Officer |
| Angelina Marioni | 2024–2025 | Senior Graphic Design Specialist |
| Daniel Markey | 2021–2025 | Senior Advisor for South Asia |
| Carol McKay | 2013–2025 | Administrative Specialist, Africa Center |
| Joia McManus | 2023–2025 | Program Specialist, Frontline Peacebuilder Training Team |
| Maria Antonia Montes | 2015–2025 | Senior Program Officer |
| Jeremy Moore | 2010–2025 | Interim Director, Grants and Fellowships |
| Elizabeth Murray | 2008–2025 | Senior Advisor, Disability and Peacebuilding |
| Garrett Nada | 2012–2025 | Program Officer for Iran |

| | | |
|---|---|---|
| Anthony Navone | 2023–2025 | Senior Program Officer |
| Analise Obremskey | 2024–2025 | Program Specialist |
| Matthew Parkes | 2018–2025 | Program Officer, Afghanistan and Central Asia |
| Barmak Pazhwak | 2007–2025 | Senior Program Officer for Afghanistan and Central Asia |
| Michael Phelan | 2019–2025 | Vice President, Center of Thematic Excellence |
| Alli Phillips | 2011–2016 & 2018–2025 | Program Director for Curriculum and Training Design |
| Camilla Pohle | 2022–2025 | Senior Program Specialist on the Pacific Islands |
| Samuel Ponzar | 2023–2025 | Senior Audio Visual Manager of Systems and Services |
| Brielle Powers | 2019–2025 | Digital Communications Officer |
| Thea Price | 2016–2025 | Administrative Officer/Program Operations Officer for Asia Center |
| Miriam Psychas | 2022–2025 | Program Officer for Latin America |
| Julie Ramirez | 2015–2025 | Executive Assistant |
| Harriet Randolph | 2021–2025 | Program Officer |
| Paola Ricaurte | 2023–2025 | Senior Program Assistant for Strategic Partnerships |
| Steven M. Riskin | 1994–2025 | Senior Advisor |
| Victoria Rivera | 2012–2025 | Senior Program Officer, Gandhi-King Academy |
| Danielle Robertson | 2014–2025 | Senior Program Officer for Curriculum and Training Design, GKGA |
| Samantha Robinson | 2023–2025 | Program Specialist, Peace Processes |
| Steven Ruder | 2010–2025 | Senior Digital Communications Officer |
| Katie Ruppert | 2023–2025 | Senior Program Officer |
| Aaya Rustom | 2023–2025 | Senior Program Assistant, Africa Center |
| Julia Schiwal | 2022–2025 | Program Officer, Religion Program and Disruptive Technology Program |
| Brigitta Schuchert | 2022–2025 | Program Officer, South Asia |
| Tyler Scrimager | 2023–2025 | Senior Program Assistant - Iraq, Gulf, Yemen |
| Gabrielle Seamon | 2023–2025 | Senior Communications Assistant |
| Jayani Senanayake | 2023–2025 | Talent Acquisition Specialist |
| Christopher M. Sfetsios | 2007–2010 & 2021–2025 | Program Operations Officer, Center for Thematic Excellence |
| Karine Shalaby | 2016–2025 | Senior Program Operations Manager, Africa Center |
| Shafique Shalizi | 2011–2025 | Contracts Specialist |
| Kirtika Sharad | 2022–2025 | Senior Program Assistant, Center for Russia and Europe |
| Jamie Shillinger | 2010–2025 | Senior Manager, Event Production & Protocol |

3

| | | |
|---|---|---|
| Samantha Shimer | 2024–2025 | Program Officer for Learning, Evaluation and Research |
| Mariam Sidibe | 2024–2025 | Accounting Manager |
| Shadya Sims | 2023–2025 | Human Resources Assistant |
| Jaclyn Sirc | 2023–2025 | Program Officer, Strategic Partnerships |
| Tiffany (Daniella) Smith | 2021–2025 | Senior Program Assistant, Peace Processes |
| Mary Speck | 2021–2025 | Senior Advisor |
| Daniel Spinelli | 2024–2025 | Program Specialist, China |
| Jennifer Staats | 2016–2025 | Director, East Asia and Pacific Programs |
| Susan Stigant | 2013–2025 | Director, Africa Program |
| Allison Sturma | 2008–2025 | Director of Public Engagement |
| Hodie Sultan | 2009–2025 | Director of Program Operations, Asia Center |
| Yousof Sultan | 2015–2025 | Program Operations and External Agreement Officer for Expanded Executive Office and Grants and Contracts Administration |
| Manal Taha | 2020–2025 | Program Officer for Sudan |
| Alicia Talamas | 2023–2025 | Senior Program Assistant |
| James Tanton | 2024–2025 | Budget Director |
| Kiersten Terrell | 2021–2025 | Senior Operations Specialist |
| Anita Thompson | 2022–2025 | Senior Program Specialist |
| Denise Thrift | 2024–2025 | Administrative Assistant, Public Engagement |
| Calin Trenkov-Wermuth | 2019–2025 | Security Governance Advisor |
| Henry Tugendhat | 2021–2025 | Economist, China Team |
| Rachel Vandenbrink | 2016–2025 | Senior Program Officer for China |
| David Vega-Pulido | 2022–2025 | Senior Program Assistant |
| Jessica Vermooten | 2020–2024 | Publications Editor |
| Richard Walker | 2017–2025 | Managing Editor, Publications |
| Kristen Wall | 2023–2025 | Program Officer, LER |
| Katherine Waters | 2023–2025 | Senior Program Assistant, Climate |
| Andrew Wells-Dang | 2021–2025 | Senior Expert for Southeast Asia |
| Scott Worden | 2007–2011 & 2016–2025 | Director, Afghanistan and Central Asia Programs |
| Karen Zehr | 2018–2025 | Grants and Contracts Specialist |