UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES INSTITUTE FOR PEACE, et al., <br><br>            Plaintiffs, <br><br>     v. <br><br> KENNETH JACKSON, <br> Assistant to the Administrator for <br> Management and Resources for USAID, et al., <br><br>           Defendants. | Civil Action No. 25-0804 (BAH) |

**DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT,
MEMORANDUM IN SUPPORT THEREOF, AND
OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

Table of Contents ................................................................................................... i

Introduction ........................................................................................................... 1

Background .............................................................................................................. 2

    I.     The Institute is an Establishment of the United States and Exercises Executive Functions. ............................................................................................. 2

    II.    The President Lawfully Removed the Former Board Members, and the Remaining Board Members In Turn Properly Removed Moose. ........................... 4

Legal Standards ...................................................................................................... 5

Argument ................................................................................................................ 6

    I.     Plaintiffs' Claims On Behalf of the Institute, Those Brought In Their Official Capacities, and Those Against Jackson in His Role at USAID Fail at the Threshold. ............................................................................................... 7

    II.    The Institute is Part of the Executive Branch ........................................ 9

        A.    The Institute Is Part of the United States Government, Not a "Private" Entity. ......................................................................................... 10

        B.    The Characteristics of the Institute Plainly Reflect Those of an Executive Branch Agency. ....................................................................... 13

        C.    The Institute's Status as an Executive Branch Agency Is Confirmed By Federal Statutes and the Historic Way It Has Been Treated Under the Law. ................................................................................. 20

        D.    Plaintiffs' Comparisons of the Institute to Other Government-Chartered Organizations or Government-Created Entities Miss the Mark. ................................................................................................ 22

    III.   The Institute Exercises No Quasi-Judicial or Quasi-Legislative Functions, and Thus, Its Board Members Are Removal by the President in His Discretion. ............................................................................................. 23

        A.    *Myers*, *Seila Law*, and *Collins* Dictate the Result Here. ........................... 24

        B.    *Humphrey's Executor* and *Wiener* Are Inapposite. .................................. 25

        C.    Plaintiffs' Other Grounds for Permitting For-Cause Removal of Institute Board Members Fail. ................................................................ 26

IV.    Plaintiffs' Other Claims Rise and Fall With Their Removal Claims....................27

V.    Plaintiffs Are Not Entitled to Declaratory and Injunctive Relief. ........................30

Conclusion ...........................................................................................................................33

Defendants respectfully cross-move for summary judgment and oppose Plaintiffs' corrected motion for summary judgment (ECF No. 22). For the reasons set forth herein, the Court should enter summary judgment in Defendants' favor on Plaintiffs' claims in this suit and deny Plaintiffs' motion.

## INTRODUCTION

The United States Institute of Peace (the "Institute") receives millions of dollars of taxpayer appropriations each year to extend the United States' soft power internationally, enhancing U.S. diplomacy and foreign policy efforts in an attempt to obviate the need for military action. The Institute is led by a board selected by the President with the advice and consent of the Senate and whose constituency is guaranteed to always track the political party of the President. On these basic facts, any reasonable observer would easily recognize the Institute to be an Executive Branch component of the Nation's federal government exercising executive power through executive functions.

Plaintiffs, however, argue to the contrary. Attempting to insulate themselves from the President's Article II removal powers, Plaintiffs—including former board members—suggest that although the Institute is a part of the federal government, it sits outside of the Executive Branch and exercises no executive power whatsoever. This bizarre assertion flies in the face of the Institute's organic statute, the fundamental structure of the Constitution, and well-established law recognizing the President's authority to supervise the entire Executive Branch. Plaintiffs concede that the Institute is part of the federal government and engages in diplomatic endeavors. Those two facts alone establish the Institute to be a vehicle of executive powers and functions. Accordingly, because the Institute does not fall into the exception created by *Humphrey's Executor*, its leadership (the Institute's board) must be removable by the President at will.

Plaintiffs' other claims largely rise and fall with their untenable arguments that the former board members were improperly terminated by the President. To the extent they do not, they are also flawed for several legal reasons.

For these reasons, as discussed in detail below, the Court should grant Defendants summary judgment and deny Plaintiffs' motion for summary judgment.

## BACKGROUND

### I.    The Institute is an Establishment of the United States and Exercises Executive Functions.

In 1984, Congress established the Institute through the Department of Defense Authorization Act of 1985, Act. Pub. L. No. 98-525, tit. XVII, § 1701, 98 Stat. 2492, 2649 (1984). *See* 22 U.S.C. §§ 4601–4611. In the Institute's organic statute, Congress made several findings that prompted the Institute's creation, including the following:

> (1)    a living institution embodying the heritage, ideals, and concerns of the American people for peace would be a significant response to the deep public need for the Nation to develop fully a range of effective options, in addition to armed capacity, that can leash international violence and manage international conflict; . . .

> (4)    there is a national need to examine the disciplines in the social, behavioral, and physical sciences and the arts and humanities with regard to the history, nature, elements, and future of peace processes, and to bring together and develop new and tested techniques to promote peaceful economic, political, social, and cultural relations in the world; . . .

> (6)    there is a need for Federal leadership to expand and support the existing international peace and conflict resolution efforts of the Nation and to develop new comprehensive peace education and training programs, basic and applied research projects, and programs providing peace information;

> (7)    the Commission on Proposals for the National Academy of Peace and Conflict Resolution, created by the Education Amendments of 1978, recommended establishing an academy as a highly desirable investment to further the Nation's interest in promoting international peace;

> (8)    an institute strengthening and symbolizing the fruitful relation between the world of learning and the world of public affairs, would be the most efficient and

immediate means for the Nation to enlarge its capacity to promote the peaceful resolution of international conflicts; and

(9)    the establishment of such an institute is an appropriate investment by the people of this Nation to advance the history, science, art, and practice of international peace and the resolution of conflicts among nations without the use of violence.

22 U.S.C. § 4601(a).

To fulfill these needs, Congress created the Institute as an establishment of the United States. 22 U.S.C. § 4603(a). As to its form, the Institute is organized as a nonprofit corporation and prohibited from having any owner other than its incorporator, the United States. *Id.* § 4603(b) ("The Institute is an independent nonprofit corporation . . . The Institute does not have the power to issue any shares of stock[.]"). Authority to run the Institute is vested in its board of directors. *Id.* § 4605(a). The board consists of three voting ex officio members—the Secretary of State, the Secretary of Defense, and the president of the National Defense University—and twelve appointed members. *Id.* § 4605(b). The appointed members are "appointed by the President, by and with the advice and consent of the Senate." *Id.* § 4605(b)(4). No more than eight total members can be from one political party, but by virtue of the ex officio members, the Institute's board is designed to be dominated by the political party of the President. *Id.* § 4605(c).

The Institute's board has the power to select a president of the Institute. *Id.* § 4606(a). The president and other officers of the Institute "serve at the pleasure of the Board[,]" meaning they can be removed by the board at any time for any reason. *Id.* The Institute receives congressional appropriations and is prohibited from receiving non-governmental funds except for two highly specific activities—the construction and maintenance of a suitable headquarters and program-related hospitality. *Id.* § 4605(h)(3). The Institute, including through its president, is authorized to "receive and disburse public moneys, obtain and make grants, enter into contracts, [and] establish and collect fees," among other authorities. *Id.* § 4606(b).

The Institute's organic statute includes various other provisions, including:

(a)    it is authorized to use the name and seal of the United States, *id.* § 4603;

(b)    it is subject to the Freedom of Information Act, *id.* § 4607(i);

(c)    it is required to publish notices of board meetings in the Federal Register, *id.* § 4605(h)(3);

(d)    it can obtain services and support from the General Services Administration ("GSA"), *id.* § 4604(o);

(e)    the compensation of its board members, president, and employees are set by federal statute, *id.* §§ 4605(i), 4606(a), 4606(c);

(f)    reimbursement of its board's travel expenses is controlled by federal statute, *id.* § 4605(j);

(g)    the Federal Tort Claims Act applies to it and its officers and employees, *id.* § 4606(f)(1);

(h)    its employees receive federal government benefits (e.g., workers compensation, civil service retirement, federal life insurance, and federal health insurance), *id.* § 4606(f)(1); and

(i)    upon liquidation, its asserts revert to the United States Treasury, *id.* § 4610.

## II.    The President Lawfully Removed the Former Board Members, and the Remaining Board Members In Turn Properly Removed Moose.

On February 19, 2025, President Trump signed Executive Order 14,217.  Exec. Order 14,217, 90 Fed. Reg. 10577 (Feb. 19, 2025).  That Order described the policy of President Trump's administration "to dramatically reduce the size of the Federal Government, while increasing its accountability to the American people." *Id.* § 1.  To fulfill that objective, the President directed that "[t]he non-statutory components and functions of [certain identified] governmental entities shall be eliminated to the maximum extent consistent with applicable law, and such entities shall reduce the performance of their statutory functions and associated personnel to the minimum presence and function required by law[.]" *Id.* § 2(a).  The Institute was among the identified entities. *Id.* § 2(a)(iv).

To carry out that Executive Order, on or about March 14, 2025, the White House Presidential Personnel Office notified the Institute's board members, including the former board members who are Plaintiffs in this suit, that they had been terminated from their positions with the Institute. Am. Compl. (ECF No. 12) ¶ 50; Pls. Stmt. of Undisp. Facts (ECF No. 19-1, "Pls. Stmt.") ¶ 38; Termination Notices, ECF No. 24-1. Thereafter, the remaining Institute board members (i.e., the ex officio members) issued a resolution of the board removing the then-acting Institute president, George E. Moose, and designating a new president, Kenneth Jackson. Am. Compl. (ECF No. 12) ¶¶ 52–53; Pls. Stmt. (ECF No. 19-1) ¶ 43; Bd. Resolution, ECF No. 12-6.

In response, Moose barricaded the Institute's then-headquarters and only permitted Jackson to enter with the assistance of law enforcement. *See* Am. Compl. (ECF No. 12) ¶¶ 51–59; Pls. Stmt. (ECF No. 19-1) ¶¶ 45–51. After successfully gaining access to the Institute's headquarters, Jackson began efforts to implement the Executive Order. *See* Am. Compl. (ECF No. 12) ¶¶ 60–61; Pls. Stmt. (ECF No. 19-1) ¶¶ 53-54.

By resolution effective March 25, 2025, the Institute's board issued another resolution removing Jackson as the Institute's president and appointing Nate Cavanaugh as the Institute's acting president. Bd. Resolution, ECF No. 15-2. Thereafter, consistent with government property statutes and regulations, the Institute transferred title of its former headquarters to GSA. *See id.*; GSA Form 1334, ECF No. 15-1; Institute Request Letter, ECF No. 15-3; OMB Approval Letter, ECF No. 15-4.

## LEGAL STANDARDS

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is genuine if a reasonable factfinder could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is material

if it might affect the outcome of the suit under the governing law. *Id.* Although all inferences are taken in a light most favorable to the nonmoving party, a party opposing summary judgment may not rest on allegations or denials from its pleadings but "must set forth specific facts showing that there is a genuine issue for trial." *Id.* at 255-56. This includes "citing to particular parts of materials in the record . . . or showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1).

## ARGUMENT

The Institute is plainly an Executive Branch agency. First, the Institute is clearly part of the Government, not a private corporation sitting outside of it. Second, its place in the Government's tripartite is clear—the Institute exercises no judicial or legislative function, it exercises only executive duties. Third, Plaintiffs' comparisons to other Government chartered corporations and other entities with more complex and different organizational structures does nothing to place the Institute outside of the Executive Branch.

Because the Institute is part of the Executive Branch and exercises no quasi-judicial or quasi-legislative functions, the President's Article II powers allow him to remove its board members in his discretion. The Institute is far removed from the early-20th century Federal Trade Commission discussed in *Humphrey's Executor v. United States*, 295 U.S. 602 (1935), and even the current Merit Systems Protection Board and National Labor Relations Board pending at issue in *Harris v. Bessent*, No. 25-5055 (D.C. Cir.), and *Wilcox v. Trump*, No. 25-5057 (D.C. Cir.).[1] All of the functions exercised by the Institute are executive in nature. Thus, the Institute's board

---

[1]    The Supreme Court has now stayed the preliminary injunctions entered by the district court in those matters. *See Trump v. Wilcox*, No. 24A966 (U.S. Apr. 9, 2025).

members are removable by the President in his discretion. This dooms Plaintiffs' board-removal claims (Counts I, II).

As Plaintiffs appear to concede, their remaining claims rise and fall on the President's authority to remove the former board members. For example, if the former board members were properly removed, Moose's removal was similarly lawful (Count III) and the presence of the Institute's new leadership at its former headquarters can hardly be termed a trespass (Count VI). Moreover, Plaintiffs' claims of procedural irregularities regarding the appointment of Jackson as board president (Count IV) fail because Plaintiffs lack any injury from that appointment—they have no ongoing relationship with the Institute aside from this lawsuit. Lastly, Plaintiffs' other makeweight claims similarly lack merit: (1) the Institute's ex officio board members were plainly acting in their ex officio status as Institute board members, not in their roles as cabinet level officials, defeating the premise of Plaintiffs' Administrative Procedure Act ("APA") challenge to Moose's removal (Count V); and (2) the Declaratory Judgment Act is a remedial statute and provides no independent cause of action (Count VII). Lastly, even were Plaintiffs to prevail on their removal claims, the relief they seek (reinstatement) is improper as a matter of law.

## I.     Plaintiffs' Claims On Behalf of the Institute, Those Brought In Their Official Capacities, and Those Against Jackson in His Role at USAID Fail at the Threshold.

As an initial matter, in their Amended Complaint, Plaintiffs continue to purport to bring claims on behalf of the Institute and on behalf of the former board members in their official capacities. Plaintiffs also bring claims against Jackson in his official capacity at USAID. These claims are meritless at the threshold.

*First*, Plaintiffs' counsel does not represent the Institute. The Institute's authority is vested in its board of directors. 22 U.S.C. § 4605(a). That authority includes the power to direct the Institute to sue. 22 U.S.C. § 4604(k). The only current board members are the ex officio members:

the Secretary of State, the Secretary of Defense and the president of the National Defense University.  22 U.S.C. § 4605(b)(1), (2), (3).  The former board members who are among the Plaintiffs in this action are exactly that—*former* members of the Institute's board.  Pls. Stmt. (ECF No. 19-1) ¶ 39.  They have no authority to direct the activities of the Institute nor exercise the official-capacity authorities of their former offices.  Nor does Plaintiffs' counsel have any authority to file or maintain suit on behalf of the Institute—the Institute's current leadership has authorized no such actions.

While the former board members can challenge their terminations, they cannot ignore those terminations and their continuing effects.  Indeed, when President Reagan signed the Institute's organic statute into law, he issued a signing statement noting that the act was "neither intended to, nor has the effect of, restricting the President's constitutional power to remove" the Institute's board members.  Statement on Signing the Department of Defense Authorization Act, 1985 (Oct. 19, 1984), available at:  https://www.reaganlibrary.gov/archives/speech/statement-signing-department-defense-authorization-act-1985.  President Reagan's statement thus clearly implies an understanding, from the Institute's origins, that it is an executive entity, and its board members are principal officers.  Following that interpretation, President Trump's actions to remove the Institute's former board members here is lawful.  *In re Aiken County*, 725 F.3d 255, 261 (D.C. Cir. 2013) ("[U]nless and until a final Court decision in a justiciable case says that a statutory mandate or prohibition on the Executive Branch is constitutional, the President (and subordinate executive agencies supervised and directed by the President) may decline to follow that statutory mandate or prohibition if the President concludes that it is unconstitutional.  Presidents routinely exercise this power through Presidential directives, executive orders, signing statements, and other forms of Presidential decisions.").  At bottom, the former board members tried to be reinstated during the

pendency of this suit and failed.  Their continuing efforts to usurp the Institute's authority to sue is improper, and the claims that Plaintiffs' counsel purports to bring on behalf of the Institute should be dismissed.

*Second*, and similarly, the former board members have no authority to bring suit in their former official capacities as members of the board.  Once an individual ceases to hold an office, they cease to have authority to exercise the powers of that office.  *See, e.g.*, *Glob. NAPs, Inc. v. Verizon New England, Inc.*, 389 F. Supp. 3d 144, 146 (D. Mass. 2019) ("Once discharged, however, the receiver's duties and authority cease, and he may no longer act in an official capacity.").  The Federal Rules of Civil Procedure recognize as much, automatically substituting an official's successor as the party.  Fed. R. Civ. P. 25(d).  As such, the Court should dismiss the former board members official capacity claims as they lack any authority to bring them.

*Third*, Plaintiffs sue Jackson in his official capacity at USAID.  But Jackson has never asserted authority over the Institute in any USAID capacity.  Instead, he was appointed by the Institute's board to serve as its president, and that appointment has ceased.  *See* Bd. Resolution of Mar. 14, 2025, ECF No. 1-2; Bd. Resolution of Mar. 25, 2025, ECF No. 15-2.  As such, the claims against Jackson in his official capacity at USAID plainly fail.[2]

## II.    The Institute is Part of the Executive Branch

The Institute's duties, its structure, its authorities, and its leadership all point in one direction: it is part of the federal government and, among the three (and only three) branches, it falls within the Executive Branch.  Congressional enactments and the historical treatment of the Institute confirm this status.  Plaintiffs' suggestions to the contrary are ill conceived and misplaced.

---

[2]    Also, pursuant to Rule 25(d), Jackson in his official capacity as the Institute's president has been automatically substituted by his successor in office, Cavanaugh.

**A.      The Institute Is Part of the United States Government, Not a "Private" Entity.**

While Plaintiffs dispute where the Institute falls within the federal government, it appears that Plaintiffs now agree that the Institute is part of the federal government. Pls. Mot. (ECF No. 22) at 16 n.9. This is for a good reason. As noted above, the Institute was created by a federal statute. *See* Department of Defense Authorization Act of 1985, Pub. L. 98-525, 98 Stat. 2492 (Oct. 19, 1984). That statute makes clear that the Institute is an establishment of the United States. 22 U.S.C. § 4603(a) ("There is hereby established the United States Institute of Peace."). The Institute's organic statute includes various other hallmarks of being part of the federal government:

(j)      its board consists of cabinet officials and individuals appointed by the President with the advice and consent of the Senate, 22 U.S.C. § 4605(b);

(k)      it is authorized to use the name and seal of the United States, *id.* § 4603;

(l)      it is subject to the Freedom of Information Act, *id.* § 4607(i);

(m)      it is required to publish notices of board meetings in the Federal Register, *id.* § 4605(h)(3);

(n)      it is funded almost exclusively by appropriations, *id.* § 4604(h)(3);

(o)      it is prohibited from issuing stock, and thus, having private owners or members, *id.* § 4603(b);

(p)      it can obtain services and support from the General Services Administration, *id.* § 4604(o);

(q)      the compensation of its board members, president, and employees are set by federal statute, *id.* §§ 4605(i), 4606(a), 4606(c);

(r)      reimbursement of its board's travel expenses is controlled by federal statute, *id.* § 4605(j);

(s)      the Federal Tort Claims Act applies to it and its officers and employees, *id.* § 4606(f)(1);

(t)      its employees receive federal government benefits (e.g., workers compensation, civil service retirement, federal life insurance, and federal health insurance), *id.* § 4606(f)(1); and

(u)    upon liquidation, its asserts revert to the United States Treasury, *id.* § 4610.

Given these characteristics, it should come as no surprise that the Institute has long been considered part of the federal government.  For example, under the Inspector General Act of 1978, the Office of Management and Budget is required to publish a list of specifically identified "designated federal entities" and separately a list of other "federal entities."  5 U.S.C. § 415(h).  A "federal entity" as used under that statute means:

> any Government corporation (within the meaning of section 103(1) of this title), any Government controlled corporation (within the meaning of section 103(2) of this title), or any other entity in the executive branch of the Government, or any independent regulatory agency, but does not include—
>
> (A)    an establishment (as defined under section 401 of this title) or part of an establishment;
>
> (B)    a designated Federal entity (as defined under paragraph (1) of this subsection) or part of a designated Federal entity;
>
> (C)    the Executive Office of the President;
>
> (D)    the Central Intelligence Agency;
>
> (E)    the Government Accountability Office; or
>
> (F)    any entity in the judicial or legislative branches of the Government, including the Administrative Office of the United States Courts and the Architect of the Capitol and any activities under the direction of the Architect of the Capitol.

5 U.S.C. § 415(a)(2).  Like clockwork, for decades, each listing published in the Federal Register under the Inspector General Act lists the Institute as a "federal entity."  *See* List of Designated Federal Entities & Federal Entities, 59 Fed. Reg. 43598, 43599 (Aug. 24, 1994); 1995 List of Designated Federal Entities & Federal Entities, 60 Fed. Reg. 55742, 55743 (Nov. 2, 1995); 1996 List of Designated Federal Entities & Federal Entities, 61 Fed. Reg. 50514, 50516 (Sept. 26, 1996); 1997 List of Designated Federal Entities & Federal Entities, 62 Fed. Reg. 23505, 23507 (Apr. 30, 1997); 1998 List of Designated Federal Entities & Federal Entities, 63 Fed. Reg. 37421, 37422

(July 10, 1998); 1999 List of Designated Federal Entities & Federal Entities, 64 Fed. Reg. 45291,

45293 (Aug. 19, 1999); 2000 List of Designated Federal Entities & Federal Entities, 65 Fed. Reg.

38611, 38612 (June 21, 2000); 2001 List of Designated Federal Entities & Federal Entities, 66 Fed.

Reg. 20492, 20493 (Apr. 23, 2001); 2002 List of Designated Federal Entities & Federal Entities,

67 Fed. Reg. 46218, 46220 (July 12, 2002); 2003 List of Designated Federal Entities & Federal

Entities, 68 Fed. Reg. 35015, 35016 (June 11, 2003); 2004 List of Designated Federal Entities &

Federal Entities, 70 Fed. Reg. 4157, 4158 (Jan. 28, 2005); 2005 and 2006 List of Designated

Federal Entities & Federal Entities, 71 Fed. Reg. 24872, 24875 (Apr. 27, 2006); Revised 2006 List

of Designated Federal Entities & Federal Entities, 71 Fed. Reg. 39690, 39691 (July 13, 2006);

2007 List of Designated Federal Entities & Federal Entities, 72 Fed. Reg. 67985, 67987 (Dec. 3,

2007); 2008 and 2009 List of Designated Federal Entities & Federal Entities, 74 Fed. Reg. 3656,

3657 (Jan. 21, 2009); Fiscal Year (FY) 2013 and (FY) 2014 List of Designated Federal Entities &

Federal Entities, 79 Fed. Reg. 1896, 1897 (Jan. 10, 2014).

The Institute's status as a federal entity is also consistent with controlling law. For

example, in *Lebron v. National Railroad Passenger Corp.*, 513 U.S. 374, 399 (1995), the Supreme

Court considered whether Amtrak was part of the federal government for purposes of the First

Amendment. After a lengthy analysis, the Court concluded it was, summarizing its holding as:

> We hold that where, as here, the Government creates a corporation by special law,
> for the furtherance of governmental objectives, and retains for itself permanent
> authority to appoint a majority of the directors of that corporation, the corporation
> is part of the Government for purposes of the First Amendment.

*Id.* The Court reached this conclusion despite Amtrak's then-organic statute expressly disavowing

its government status, declaring it "will not be an agency or establishment of the United States

Government." 45 U.S.C. § 541 (1995). It also rejected the contention that because Amtrak was

created as a "corporation," it could not be part of the federal government. *Lebron*, 513 U.S. at 398

- 12 -

("Amtrak is not merely in the temporary control of the Government (as a private corporation whose stock comes into federal ownership might be); it is established and organized under federal law for the very purpose of pursuing federal governmental objectives, under the direction and control of federal governmental appointees.").  The Institute's structure and composition resembles that of Amtrak in *Lebron*—it is a corporation where the United States retains the authority to appoint a controlling share of its leadership.  As such, under Supreme Court precedent it is part of the federal government.

Also, while Plaintiffs cite the U.S. Government Manual to suggest the Institute falls outside of the Executive Branch, Pls. Mot. (ECF No. 22) at 22–23, the Institute's presence in the Manual likewise confirms that it is part of the federal government.  *See id.*  The same goes for USA.gov, a General Services Administration website that serves as "the official guide to government information and services."  USA.gov, https://www.usa.gov/.  It too lists the Institute under its index of "government departments and agencies."  USA.gov, USIP, https://www.usa.gov/agencies/united-states-institute-of-peace.  While Plaintiffs irrelevantly muse that some corporations established by Congress are not part of the federal government, Pls. Mot. (ECF No. 22) at 15, Plaintiffs make no attempt to suggest the Institute falls in that category.

### B.     The Characteristics of the Institute Plainly Reflect Those of an Executive Branch Agency.

While Plaintiffs appear to concede the Institute is part of the federal government, they persist that it is not part of the Executive Branch.  That is plainly wrong.

A component of the federal government must fall into one of three branches, the Legislative, the Executive, or the Judicial Branch.  U.S. Const. art. I, II, III.  The Institute falls within the Executive Branch.  First, it is not the Judicial Branch.  The Institute has no authority to conduct contested hearings or render or support administrative, quasi-judicial, or judicial decisions

of any sort. 22 U.S.C. §§ 4601–4611. Equally clear, it is not the Legislative Branch. The Institute has no rulemaking authority or other authority to promulgate regulations, rules, or quasi-legislative provisions; nor does it have the exclusive purpose of supporting Congress in its legislative functions. *Id.*; *see also, e.g.*, 42 U.S.C. § 12209(4) (identifying the "instrumentalities of Congress" to be "the Government Accountability Office, the Government Publishing Office, and the Library of Congress").

                1.      The Institute Exercises Executive Functions in Furtherance of Executive <u>Powers</u>

        The Institute's core mission falls squarely within the ambit of the Executive's foreign policy powers. That mission is best summarized as extending the United States' soft power to enhance its diplomacy and foreign relations and attempt to obviate the need for military action. *See* 22 U.S.C. § 4601. The Institute's organic statute identifies, among other rationales for its creation, "the deep public need for the Nation to develop fully a range of effective options, in addition to armed capacity, that can leash international violence and manage international conflict[,]" *id.* § 4601(a)(1), and "a need for Federal leadership to expand and support the existing international peace and conflict resolution efforts of the Nation and to develop new comprehensive peace education and training programs, basic and applied research projects, and programs providing peace information[,]" *id.* § 4601(a)(6). It concludes by highlighting "the establishment of such an institute is an appropriate investment by the people of this Nation to advance the history, science, art, and practice of international peace and the resolution of conflicts among nations without the use of violence." *Id.* § 4601(a)(9). Consistent with these underlying rationales, Congress identified the purpose of the organic statute "to establish an independent, nonprofit, national institute to serve the people and the Government through the widest possible range of education and training, basic and applied research opportunities, and peace information services

on the means to promote international peace and the resolution of conflicts among the nations and peoples of the world without recourse to violence." *Id.* § 4601(b).

Notably, Plaintiffs themselves admit that the Institute engages in diplomacy. Pls. Stmt. (ECF No. 19-1) ¶¶ 65–66. While Plaintiffs characterize their diplomacy as "Track 1.5" diplomacy, their own cited support for that term notes that its origins are "elusive and its operationalization confusing." Jeffrey Mapendere, *Track One and a Half Diplomacy and the Complementarity of Tracks*, Culture of Peace Online Journal, ECF No. 20-15. Moreover, their own cited materials would appear to disqualify the Institute from "Track 1.5" diplomacy because Plaintiffs concede the Institute is part of the federal government. *Id.* (noting that "Track 1.5" diplomacy "is facilitated or mediated by a third party not representing a political organization or institution").

In any event, negotiating for peace, international engagement, and diplomacy are quintessential executive functions. "[T]he Constitution vests the President with certain foreign-affairs powers including '[t]he executive Power,' which includes a residual authority over war, peace, and foreign interactions." *Haaland v. Brackeen*, 599 U.S. 255, 341 (2023) (Thomas, J., dissenting) (quoting U.S. Const. art. II). Indeed, "[t]he President is the sole organ of the nation in its external relations, and its sole representative with foreign nations." *United States v. Curtiss-Wright Exp. Corp.*, 299 U.S. 304, 319 (1936) (noting that external relations include the powers to "wage war, to conclude peace, to make treaties, to maintain diplomatic relations with other sovereignties"); *see also Zivotofsky ex rel. Zivotofsky v. Kerry*, 576 U.S. 1, 13–14 (2015) (recognizing that diplomacy is an executive function); *id.* at 36 (Thomas, J., concurring in part) ("The external executive power 'comprehends war, peace, the sending and receiving ambassadors, and whatever concerns the transactions of the state with any other independent state[.]'" (cleaned up)). While formal declarations of war and peace treaties require cooperation of the political

- 15 -

branches, *see* U.S. Const. art. I, § 8, cl. 11; *id.* § 10, cl. 3, the Constitution unquestionably vests the Executive with diplomatic and foreign affairs powers. *Muthana v. Pompeo*, 985 F.3d 893, 907 (D.C. Cir. 2021) (discussing President's diplomatic powers); *Holder v. Humanitarian L. Project*, 561 U.S. 1, 61 (2010) (Breyer, J., dissenting) ("the Constitution entrusts to the Executive and Legislative Branches the power to provide for the national defense, and that it grants particular authority to the President in matters of foreign affairs"); *Am. Ins. Ass'n v. Garamendi*, 539 U.S. 396, 414 (2003) ("Although the source of the President's power to act in foreign affairs does not enjoy any textual detail, the historical gloss on the 'executive Power' vested in Article II of the Constitution has recognized the President's 'vast share of responsibility for the conduct of our foreign relations.'" (quoting *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 610–611 (1952) (Frankfurter, J., concurring)). The Institute's work in those areas is, thus, substantially executive in nature.

### 2.    Plaintiffs' Arguments to the Contrary Miss the Mark

Plaintiffs' suggestion to the contrary, that the Institute does not engage in executive functions, is mistaken. Pls. Mot. (ECF No. 22) at 24-29. Indeed, Plaintiffs ignore the litany of controlling decisions that make clear that the executive power vested in the President includes the "vast share of responsibility for the conduct of our foreign relations." *Am. Ins. Ass'n*, 539 U.S. at 414 (quoting *Youngstown*, 343 U.S. at 610–611 (Frankfurter, J., concurring)). Instead, they myopically focus on the underlying work that the Institute's officers and employees perform—e.g., research, report writing, training, and conflict resolution activities—to suggest that their activities are not executive in nature. Pls. Mot. (ECF No. 22) at 25–26. But Plaintiffs' focus on the trees ignores the forest. For example, undersigned government counsel regularly conducts research, writes reports in the form of memoranda to his managers and other government audiences, conducts training of other governmental and non-governmental groups, and seeks to

resolve conflicts.  But obviously undersigned counsel, as an Assistant U.S. Attorney in the Justice Department, is an Executive Branch employee exercising executive functions (under the supervision of officers of the United States).

So too with the Institute.  The Institute's research, report writing, training, and conflict resolution activities are aimed at furthering the United States' efforts to promote peace and alternatives to war—i.e., core executive powers.  Moreover, several of the Institute's specific tasks are clear examples of executive functions.  For example, the Institute is compelled to issue grants to recipients in its discretion from federal appropriations to further certain federal objectives. 22 U.S.C. § 4604(d).

Next, Plaintiffs appear to suggest that the Institute is primarily a research arm for Congress. Not so.  Its organic statute specifically prohibits it from attempting to influence legislation.  22 U.S.C. § 4604(n).  Instead, the Institute's role vis-à-vis Congress is consistent with a typical executive agency—its personnel "may testify or make other appropriate communication when formally requested to do so by a legislative body, a committee, or a member thereof."  *Id.*  This is the same support many executive agencies provide to Congress when it asks for agency expertise in formulating legislation.  For example, just two days ago, the Acting Commander of the United States Cyber Command testified before the Senate Committee on Armed Services, Subcommittee on Cybersecurity to provide information for the Senate's consideration in assessing the Defense Authorization Request for Fiscal Year 2026.  *See* Senate Hearing on U.S. Cyber Command Defense Authorization Request for FY2026 (Apr. 9, 2025), available at https://www.youtube.com/watch?v=pLVT6jRZkmE.  Mere testimony and the provision of information and expert advice to Congress did not make the Cyber Command, or the Lieutenant General acting as its commander, parts of the Legislative Branch.

Lastly, Plaintiffs rely, with emphasis, on the U.S. Government Manual's placement of the Institute in a category of "quasi-official agencies" as determinative of its place within the federal government. Pls. Mot. (ECF No. 22) at 22–23. But the U.S. Government Manual does not purport to be a legal document or a definitive expression of the Executive's view on the law. Rather, it is a handbook that provides salient information as to the identities of officials, summaries of agency missions, histories of agencies, and contact information for government components. U.S. Government Manual, About Us, available at: https://usgovernmentmanual.gov/About. As the Manual makes clear, its contents reflect information "submitted to [the Office of the Federal Register] by Federal agencies and organizations[.]" *Id.* The information in the Manual about the Institute was presumably submitted by the Institute's former leadership given the Institute's page on the Manual is outdated, reflecting Moose as the board's chairperson and Lisa Grande as its president, among other prior office holders. U.S. Government Manual, U.S. Institute of Peace, available at: https://perma.cc/DX7M-4XNH. The publishers of the Manual—the Office of the Federal Register, the National Archives and Records Administration, and the U.S. Government Publishing Office (not the Office of Legal Counsel, the Attorney General, or the President)— merely "review and edit the submissions to produce organized and concise descriptions of Federal agency programs and activities." U.S. Government Manual, About Us, available at: https://usgovernmentmanual.gov/About. Also, ultimately, the Manual makes no attempt to identify which of the three branches houses the Institute. Thus, the U.S. Government Manual adds little to assist the Court here in answering that question.

       3.    The Structure of the Institute's Board Reveals Itself to Be Answerable to the President.

Plaintiffs also argue that "Congress purposefully designed [the Institute] to be independent from the President" as a reason to locate the Institute outside of the Executive Branch. Pls. Mot.

(ECF No. 22) at 29.  But that design is not apparent from the Institute's organic statute at all.  To the contrary, the President, and his or her political party, expressly controls the Institute's board due to party affiliation requirements and the presence of cabinet secretaries as ex officio members.  *See* 22 U.S.C. § 4605(b), (c).  That Congress opted to give the Institute some flexibility in its operations—e.g., a choice of legal counsel, auditors, and employment provisions—is unremarkable and commonplace in Executive Branch agencies.  *See, e.g.*, 29 U.S.C. § 154(a) (affording National Labor Relations Board independent litigating authority from the Justice Department); 5 U.S.C. § 8336(c)(1) (affording law enforcement and other classes of employees different retirement terms).  Moreover, had Congress decided to place the Institute outside of the Executive Branch (which it did not), significant constitutional issues would be at play.  This is because placing executive functions outside of the Executive Branch is flatly prohibited by the Constitution.  As the Supreme Court ruled in *Buckley v. Valeo*, 424 U.S. 1, 138–42 (1976), Congress has no authority to create government entities answerable to it that exercise executive authorities.  Certainly, having a Legislative Branch component conduct diplomacy on whatever "track" would violate that rule.

Ultimately, the process to select the leadership of the Institute is the same as that of typical Executive Branch agencies—nomination by the President and confirmation on advice and consent of the Senate.  That is the process commanded by the Constitution for "ambassadors, other public ministers and consuls, judges of the Supreme Court, and all other officers of the United States[.]" U.S. Const. art. II, § 2, cl. 2 (cleaned up).  While the use of the process for officials firmly in other branches of the federal government does not make them Executive Branch officers,[3] where there

---

[3]    For example, as Plaintiffs point out, the Comptroller General, Librarian of Congress, and the Director of the Government Publishing Office are nominated by the President and appointed with advice and consent of the Senate.  Pls. Mot. (ECF No. 22) at 17–18 n.10.

is any doubt, the use of the Constitutional appointment procedure is yet another indication that the government component those officers control falls under Article II.

### C. The Institute's Status as an Executive Branch Agency Is Confirmed By Federal Statutes and the Historic Way It Has Been Treated Under the Law.

While Defendants agree that the functions and structure of the Institute are dispositive of the branch of the federal government in which the Institute resides, statutory definitions further confirm the Institute's status here. As the United States demonstrated in responding to Plaintiff's request for an emergency All Writs Act order, under Title 5, the Institute is an "executive agency."

The United States believes that the Institute is best described for purposes of Title 5 as a "wholly owned corporation" of the United States, 5 U.S.C. § 103(1), which in turn makes it an "executive agency," 5 U.S.C. § 105. This is because the Institute's organic statute identifies it to be a corporation established by the United States. 22 U.S.C. §§ 4603(a), (b). Its organic statute also makes clear it is owned by the United States—the United States created it, *id.*, the United States controls its board, *id.* § 4605, the Institute is prohibited from issuing any other shares, *id.* § 4603(b), the Institute is prohibited from receiving non-governmental sums to fund it operations, *id.* § 4604(h)(3), and the United States retains title to the Institute's assets upon its dissolution, *id.* § 4610. These characteristics tick-off the classic indicia of ownership. *Cf. Student Loan Mktg. Ass'n v. Riley*, 104 F.3d 397, 410 (D.C. Cir. 1997) (Wald, J., concurring) (identifying indicia of ownership of loans to include control, financial benefits, and dissolution rights).

In response, Plaintiffs contend that D.C. nonprofit corporations do not have "owners." Pls. Mot. (ECF No. 22) at 23 n.19. Plaintiffs miss the point. The ultimate legal interest holders of a nonprofit corporation are referred to as "members" or "incorporators" as the entity operates in a non-profit fashion such that no excess revenues are distributed to shareholders as in a for-profit corporation. *See* D.C. Code §§ 29-402.01, 29-104.50, 29-404.40(a). Plaintiffs' suggestion that

the United States is not the legal interest holder of the Institute (in common parlance, an "owner") is simply a game of semantics.

Additionally, Plaintiffs confusingly argue that the Institute is not a "government corporation" because its organic statute does not use those magic words,[4] describing the Institute instead as an "independent nonprofit corporation."  Mot. (ECF No. 22) at 23 n.19.  This makes little sense.  Plaintiffs concede the Institute is part of the federal government, *see supra*, and the Institute was founded as a "nonprofit corporation[,]" 22 U.S.C. § 4603(b).   The simple melding of those terms makes the Institute a government corporation.

Were the Institute it not a government corporation for purposes of Title VII it plainly is an "independent establishment" under that Title, 5 U.S.C. § 104(a), which again means it is an "executive agency."  As noted above, the Institute is an "establishment" under its organic statute, 22 U.S.C. § 4603(a), exercises executive authorities, *supra*, and its organic statute provides it is "independent" of other agencies, 22 U.S.C. § 4603(b).  Once again, a simple joining of terms and review of its activities confirms that if the Institute is not a wholly owned government corporation, it qualifies as "independent establishment" under Title 5.

Plaintiffs attempt to dodge the supportive weight of Title 5's definitions as being "ad hoc definitions, each for the purpose of its own title[.]"  Pls. Mot. (ECF No. 22) at 18.  That may be true as far as it goes.  *Cf. Crim v. Comm'r*, 66 F.4th 999, 1001 (D.C. Cir. 2023) ("the Supreme Court has cautioned that congressional pronouncements are not dispositive of the status of a

---

[4]      Similarly, Plaintiffs half-heartedly argue that magic words are required to place an entity inside the Executive Branch.  *See* Pls. Mot. (ECF No. 22) at 19–20.  But controlling precedents make clear that the functions and structure of the agency control the analysis, not any magic words.  *Buckley*, 424 U.S. at 138–42 (analyzing Federal Election Committee's functions to determine whether it was exercising executive power).  Otherwise, for example, the Central Intelligence Agency would cease to be part of the Executive Branch—its establishing statute says nothing about the branch in which it is located.  50 U.S.C. § 3035(a) ("There is a Central Intelligence Agency.").

governmental entity for purposes of separation of powers analysis under the Constitution" (cleaned up)).  But if the Court is looking to statutes to confirm the text, purpose, and history of the Institute as an Executive Branch component, Congress's definitions in Title 5, which contains general agency requirements and procedures, is a good source to examine.  *Cf. Jackson v. Modly*, 949 F.3d 763, 770 (D.C. Cir. 2020) (using Title 5 definition in context with other sources to determine whether Title VII's federal sector provisions applied to uniformed servicemembers).

### D.  Plaintiffs' Comparisons of the Institute to Other Government-Chartered Organizations or Government-Created Entities Miss the Mark.

Scattered throughout their brief, Plaintiffs attempt to equate the Institute to government entities that fall outside the Executive Branch.  Those other entities, however, are materially different from the Institute.

For example, Plaintiffs appear to argue that the Institute is similar to the Legal Services Corporation.  Pls. Mot. (ECF No. 22) at 23.  But Plaintiffs cite no case that has addressed the status of the Legal Services Corporation and whether its for-cause removal provisions are valid. Moreover, it is a well-settled practice for the government to carry-out executive functions by using corporations—i.e., the business form of the Institute and Legal Services Corporation provide little guidance on their respective roles in the federal government.  *See, e.g.*, *Fed. Crop Ins. Corp. v. Merrill*, 332 U.S. 380, 384 (1947) ("The Government may carry on its operations through conventional executive agencies or through corporate forms especially created for defined ends."); *Keifer & Keifer v. Reconstruction Fin. Corp.*, 306 U.S. 381, 389 (1939) ("For more than a hundred years corporations have been used as agencies for doing work of the government. Congress may create them as appropriate means of executing the powers of government, as, for instance, a railroad corporation for the purpose of promoting commerce among the states." (cleaned up)).  As

such, any similarities between the Institute and Legal Services Corporation, or their common nature as corporations, do nothing to advance Plaintiffs' arguments here.

Next Plaintiffs appear to suggest that the Institute is like the Smithsonian Institute.  Pls. Mot. (ECF No. 22) at 23–24.  But the Smithsonian's structure and functions are far different from the Institute.  For one, the Smithsonian's board is far different.  As the D.C. Circuit explained in *Dong v. Smithsonian Institute*, 125 F.3d 877, 879 (D.C. Cir. 1997), "nine of the seventeen members of its governing Board of Regents are appointed by joint resolution of Congress, and six of the remaining eight are members of Congress. . . The other two are the Vice President and the Chief Justice of the United States[.]"  *Id.* (citations omitted).  That is, unlike the Institute whose entire board membership is selected by the President, the Smithsonian has exactly one Executive Branch official on its board: the Vice President.  Moreover, the D.C. Circuit noted that the Smithsonian exercises no executive power, and if it did, the makeup of its board would likely be unconstitutional.  *Id.*  The Smithsonian's function and only express purpose— "the increase and diffusion of knowledge among men[,]" 20 U.S.C. § 41—are a far cry from those of the Institute— extending the United States' soft power to enhance its diplomacy and foreign relations.

In sum, the Institute has failed to identify any other government entity with which it shares similarities that has been found to exist outside the Executive Branch.

## III.    The Institute Exercises No Quasi-Judicial or Quasi-Legislative Functions, and Thus, Its Board Members Are Removal by the President in His Discretion.

Because the Institute is part of the Executive Branch and performs executive functions, the President may remove its board members at his will and outside the alternative procedures identified in the Institute's organic statute.

A.    *Myers*, *Seila Law*, and *Collins* Dictate the Result Here.

In *Myers v. United States*, 272 U.S. 52 (1926), as clarified by *Humphrey's Executor*, 295 U.S. at 627–28, the Supreme Court held that "all purely executive officers" are "subject to the exclusive and illimitable power of removal by the Chief Executive[.]"  *Humphrey's Executor*, 295 U.S. at 627–28.  This is because, as *Myers* explained, Article II of the Constitution "grants to the President the executive power of the government—i.e., the general administrative control of those executing the laws, including the power of appointment and removal of executive officers— a conclusion confirmed by his obligation to take care that the laws be faithfully executed . . . to hold otherwise would make it impossible for the President, in case of political or other difference with the Senate or Congress, to take care that the laws be faithfully executed."  *Myers*, 272 U.S. at 163–64 (cleaned up).

Since *Myers* and *Humphrey's Executor*, the Supreme Court has maintained that purely executive officers are removable by the President at will and that constraints on this authority are unconstitutional.  In *Seila Law LLC v. Consumer Financial Protection Bureau*, 591 U.S. 197, 213 (2020), the Court applied *Myers* and voided the for-cause removal protections of the Director of the Consumer Financial Protection Bureau, which it found exercised "quintessentially executive power[.]"  Similarly, in *Collins v. Yellen*, 594 U.S. 220, 253 (2021), the Court struck down for-cause removal protections for the Director of the Federal Housing Finance Agency, finding it too exercised executive functions.  In so doing, the Court stressed that the test for whether for-cause removal provisions are constitutional does not turn on the degree of executive power exercised: "Courts are not well-suited to weigh the relative importance of the regulatory and enforcement authority of disparate agencies, and we do not think that the constitutionality of removal restrictions hinges on such an inquiry."  *Id.*

Against this backdrop, the result here is compelled. The Institute exercises executive power, performing executive functions. Its board members are thus subject to removal under the President's exercise of his Article II prerogatives. *Seila Law*, 591 U.S. at 228 ("the President's removal power is the rule, not the exception").

    **B.**    ***Humphrey's Executor* and *Wiener* Are Inapposite.**

*Humphrey's Executor* created an exception to the developed rule that members of the Executive Branch are removable at will by the President; and the government acknowledges that *Humphrey's Executor* remains controlling on this Court. But the exception in *Humphrey's Executor* is not operative here.

In the wake of *Myers*, the *Humphrey's Executor* Court compared and contrasted the structure and functions of the then-existing Federal Trade Commission ("FTC") (the agency in *Humphrey's Executor*) against those of the Postal Service (the agency in *Myers*). *Humphrey's Executor*, 295 U.S. at 627–32. It distinguished the holding of *Myers* by finding that the FTC, "[t]o the extent that it exercises any executive function, as distinguished from executive power in the constitutional sense, [ ] does so in the discharge and effectuation of its quasi legislative or quasi judicial powers, or as an agency of the legislative or judicial departments of the government." *Id.* at 628. Accordingly, the Court held: "[t]he power of removal here claimed for the President falls within this principle, since its coercive influence threatens the independence of a commission, which is not only wholly disconnected from the executive department, but which, as already fully appears, was created by Congress as a means of carrying into operation legislative and judicial powers, and as an agency of the legislative and judicial departments." *Id.* at 630.

Removal restrictions were next considered by the Court in *Wiener v. United States*, 357 U.S. 349, 356 (1958). There, the restrictions were evaluated again in the context of non-executive functions. That is, in *Wiener*, the Court confronted the President's removal of a member

of the War Claims Commission, an adjudicatory body. Adopting the holding of *Humphrey's Executor*— that Article II does not require the President to have at will removal over officers exercising quasi-legislative or quasi-judicial powers—the Court found the removal to be improper:

> Judging the matter in all the nakedness in which it is presented, namely, the claim that the President could remove a member of an adjudicatory body like the War Claims Commission merely because he wanted his own appointees on such a Commission, we are compelled to conclude that no such power is given to the President directly by the Constitution, and none is impliedly conferred upon him by statute simply because Congress said nothing about it. The philosophy of Humphrey's Executor, in its explicit language as well as its implications, precludes such a claim.

*Wiener*, 357 U.S. at 356.

Fast forward a few decades and in *Seila Law*, the Court confirmed the narrowness of the exception to at-will removal recognized in *Humphrey's Executor* and *Weiner*. The Court in *Seila Law* specifically noted: "the contours of the *Humphrey's Executor* exception depend upon the characteristics of the agency before the Court. Rightly or wrongly, the Court viewed the FTC (as it existed in 1935) as exercising 'no part of the executive power.'" 591 U.S. at 216.

Here, the Institute does not act in a quasi-legislative or quasi-judicial capacity. The Institute carries out an executive purpose through executive functions. Its board members are, thus, removable in the President's discretion under Article II.

### C. Plaintiffs' Other Grounds for Permitting For-Cause Removal of Institute Board Members Fail.

Plaintiffs attempt to highlight other aspects of the Institute in a quest to enforce the for-cause removal provisions of its organic statute as the sole means of removing Institute board members.

*First*, Plaintiffs argue that the executive power exercised by the Institute is not "substantial." Pls. Mot. (ECF No. 22) at 31–32. But the Court in *Collins*, 594 U.S. at 252, rejected this as being a factor relevant to the analysis. "[T]he nature and breadth of an agency's authority

- 26 -

is not dispositive in determining whether Congress may limit the President's power to remove its head." *Id.* at 252.  Plaintiffs fail to grapple with this holding at all.

*Second*, Plaintiffs claim that the Court's holding in *Weiner* "permits removal protections for multimember, impartial bodies in the fields of foreign and military affairs."  Pls. Mot. (ECF No. 22) at 33.  But again, the Court in *Weiner* concluded there were no executive powers at play.  Instead, the Court concluded the War Commission fell into the *Humphrey's Executor* exception because it was "an adjudicatory body[.]" 357 U.S. at 356.  The Court did not examine the subject matter of that body or use it in rendering its decision.

*Third*, Plaintiffs argue that the removal restrictions on Institute board members under its organic statute are more modest than those in *Humphrey's Executor*.  Pls. Mot. (ECF No. 22) at 33–35.  In *Collins*, the Court confronted this very argument and rejected it.  There, the terminated official argued that the tenure provisions at issue only offered "modest" protections. 594 U.S. at 255.  The Court found that did not matter.  *Id.* at 255–56.  Instead, the Court emphasized that under Article II, "[t]he President must be able to remove not just officers who disobey his commands but also those he finds negligent and inefficient, those who exercise their discretion in a way that is not intelligent or wise, those who have different views of policy, those who come from a competing political party who is dead set against the President's agenda, and those in whom he has simply lost confidence[.]" *Id.* at 256 (cleaned up).

In sum, none of Plaintiffs' justifications for an exception to the rule of presidential at-will removal carry the day.

## IV.    Plaintiffs' Other Claims Rise and Fall With Their Removal Claims.

While the heart of this dispute concerns the removal of the former board members, Plaintiffs bring a series of other claims.  None have merit.

*First*, if the board members were properly removed, Moose's removal was similarly lawful (Count III).  Am. Compl. (ECF No. 12) ¶¶ 86–92.  Indeed, Plaintiffs' claim that Moose's removal was ultra vires rests solely on their incorrect conclusion that the former board members were removed improperly.  *Id.* ¶ 87.  Butbecause the former board members were properly removed, the action of the three remaining board members to remove Moose was not ultra vires.  That is because the president of the Institute serves "at the pleasure of the Board."  22 U.S.C. § 4606(a); *see also Changji Esquel Textile Co. v. Raimondo*, 40 F.4th 716, 725 (D.C. Cir. 2022) ("For an agency to act ultra vires, it must transgress 'clear and mandatory' limits that Congress has imposed on its authority.").

*Second*, and similarly, if the board members were properly removed, the ex officio members' appointments of Jackson and later Cavanaugh were proper (Count IV).  Am. Compl. (ECF No. 12) ¶¶ 93–99.  Again, the Institute's organic statute allows the board to appoint a president, and the president and other Institute officers serve at the pleasure of the board.  22 U.S.C. § 4606(a).  To the extent Plaintiffs challenge the ex officio board members' actions on the grounds that they were taken outside of a properly constituted board meeting, that challenge also fails.  While the Institute's organic statute has certain requirements for board meetings (e.g., a requirement to meet semiannually and to provide notice of the meetings in the Federal Register), none of those requirements or any other statutory provision dictate that the board must appoint or dismiss an Institute president only at one of those meetings.  *See* 22 U.S.C. § 4605(h).  The statute, rather, makes clear that the president serves "at the pleasure of the Board," meaning the board can dismiss the Institute's president at any time.  22 U.S.C. § 4606(a).  Ultimately, any procedural claim lurking in Plaintiffs' ultra vires counts lacks merit.

*Third*, because ex officio members did in fact appoint Jackson to be the Institute's president, there can be no trespass (Count VI).  Compl. (ECF No. 12) ¶¶ 103–14.  At its core, a trespass claim of any sort requires an unlawful entry onto land.  *Garay v. Liriano*, 943 F. Supp. 2d 1, 25 (D.D.C. 2013) (Boasberg, J.) ("if the entry on the property was authorized by law, then the claim for trespass cannot be successful" (quoting *Trull v. Smolka*, 411 F. App'x 651, 657 (4th Cir. 2011)).  Because Jackson had been appointed the Institute's president when he attempted to gain access to the Institute's former headquarters, and Jackson authorized those officials accompanying him to do the same, Plaintiffs' trespass claim fails as a matter of law.

*Fourth*, Plaintiffs bring an APA claim against the Institute's ex officio board members.  Am. Compl. (ECF No. 12) ¶¶ 100-02.  But Plaintiffs bring that claim against them in their official capacities at their "home" agencies—i.e., the State Department, Defense Department, and the National Defense University.  *See id.*  Plaintiffs do not sue those officials under the APA in their roles as members of the Institute's board—indeed, Plaintiffs contend the APA does not apply to the Institute.   Pls. Mot. (ECF No. 22) at 21.  The factual allegations in Plaintiffs' Amended Complaint make clear that the ex officio members of the Institute's board took their challenged actions in their roles with the Institute.  *Id.* ¶ 2 (describing the challenged actions as "the unlawful purported firing of the Institute's Acting President, Plaintiff Ambassador George Moose, by ex officio board members Marco Rubio, Pete Hegseth, and Vice Admiral Peter A. Garvin; and the unlawful attempt to install Defendant Kenneth Jackson as the acting President").  Accordingly, Plaintiffs have failed to identify any action taken by the ex officio members in their roles at their home agencies that could serve as the basis for an APA claim.

Moreover, even were the APA to apply, Plaintiffs have failed to plead, let alone establish, a plausible claim of arbitrary and capricious agency action.  While Moose may disagree with his

removal, the ex officio members carrying out a Presidential initiative to reduce the Institute to its statutory minimum and electing to install a board president that would assist with that initiative is hardly irrational or unreasonable.  *See* Exec. Order No. 14,217, 90 Fed. Reg. at 10577.  Moose made clear he wanted no part of that downsizing by barricading the Institute's former headquarters to thwart those implementing the Executive Order's objectives.  Pls. Mot. (ECF No. 22) at 11–12.

*Fifth, and lastly*, Plaintiffs' freestanding Declaratory Judgment Act claim fails as a matter of law.  Am. Compl. (ECF No. 12) ¶¶ 115–16.  Quite simply, "[t]he Declaratory Judgment Act, 28 U.S.C. § 2201, does not provide an independent cause of action."  *Jones v. U.S. Secret Serv.*, 701 F. Supp. 3d 4, 14 (D.D.C. 2023) (Chutkan, J.) (citing *Ali v. Rumsfeld*, 649 F.3d 762, 778 (D.C. Cir. 2011)).

## V.    Plaintiffs Are Not Entitled to Declaratory and Injunctive Relief.

Even were Plaintiffs successful in challenging their removals, their requested relief is improper.  Plaintiffs assert that the only appropriate relief is "an injunction restoring the unlawfully removed directors to their positions, reinstating Ambassador Moose as Acting President, and voiding the actions taken by the *ex officio* directors."  Pls. Mot. (ECF No. 22) at 39.  "[T]hese remedies have no historical basis and put the courts on a collision course with the President over his exercise of core executive power."  *Harris v. Bessent*, No. 25-5037, 2025 WL 1021435, at *2 (D.C. Cir. Apr. 7, 2025) (Rao, J. dissenting); *see also Dellinger v. Bessent*, No. 25-5028, 2025 WL 559669, at *12 (D.C. Cir. Feb. 15, 2025) (Katsas, J., dissenting) (noting the "extraordinary character" of an order "direct[ing] the President to recognize and work with an agency head whom he has already removed").

Such de jure reinstatement of a principal officer is beyond the equitable authority of the court to impose because it "impinges on the 'conclusive and preclusive' power through which the President controls the Executive Branch that he is responsible for supervising."  *Dellinger*,

2025 WL 559669, at *16 (quoting *Trump v. United States*, 603 U.S. 593, 608–09 (2024)).  As Judge Katsas in dissent explained, there would be no doubt of "grave and irreparable" injury if a district court had ordered reinstatement of a dismissed Secretary of State, and any differences between the Department of State and the Institute "g[o] to the extent—not the character—of the President's injury." *Id.*

The Supreme Court recognized long ago that a court "has no jurisdiction . . . to enjoin the President in the performance of his official duties." *Mississippi v. Johnson*, 71 U.S. (4 Wall.) 475, 501 (1867).  The appointment and removal of principal officers is specifically entrusted to the President, *see Swan v. Clinton*, 100 F.3d 973, 979 (D.C. Cir. 1996) (recognizing that "principal officers of the United States . . .  must be appointed, and removed, by the President"), and thus a court may not, by injunction, order the reinstatement of a principal officer the President has removed.  Accordingly, when principal officers have been removed from their posts, they generally have challenged that removal in suits for backpay.  *See Humphrey's Executor*, 295 U.S. at 618 (challenge sought "to recover a sum of money alleged to be due"); *Myers*, 272 U.S. at 106 (same); *Wiener*, 357 U.S. at 349-51 (same).  That rule reflects the obvious Article II problems that arise if a court attempts to reinstate—that is, reappoint—an executive officer removed by the President.  The President cannot be compelled to retain the services of an officer whom he has removed from office.

Moreover, a federal court may grant only those equitable remedies that were "traditionally accorded by courts of equity."  *Grupo Mexicano de Desarrollo, S.A. v. All. Bond Fund, Inc.*, 527 U.S. 308, 319 (1999).  Reinstatement of a public official is not such a remedy.  "It is . . . well settled that a court of equity has no jurisdiction over the appointment and removal of public officers." *In re Sawyer*, 124 U.S. 200, 212 (1888).  Thus, "the power of a court of equity to restrain

by injunction the removal of a [public] officer has been denied in many well-considered cases."

*Id.*; *see, e.g., Baker v. Carr*, 369 U.S. 186, 231 (1962) (decisions that "held that federal equity power could not be exercised to enjoin a state proceeding to remove a public officer" or that "withheld federal equity from staying removal of a federal officer" reflect "a traditional limit upon equity jurisdiction"); *White v. Berry*, 171 U.S. 366, 377 (1898) ("[A] court of equity will not, by injunction, restrain an executive officer from making a wrongful removal of a subordinate appointee, nor restrain the appointment of another."); *accord Bessent v. Dellinger*, 145 S. Ct. 515, 517 (2025) (Gorsuch, J., dissenting) (observing that "courts of equity at the time of the founding were apparently powerless" to stop the removal of executive officers).

Further, forgoing reinstatement would not harm plaintiffs. Although removal deprives each of his or her position and any attendant renumeration, the traditional remedy for such claims has been an award of backpay or front pay, not reinstatement. Backpay and front pay would not enable Plaintiffs to perform the duties of their former offices; but those duties are vested in the offices, and plaintiffs have neither a personal right to exercise the powers of an office after having been removed nor an injury resulting from the harms to the Institute of which they claim to have been improperly removed. When faced with a challenge to the removal of a principal officer, Courts have recognized that the equities favor the President. *See Dellinger v. Bessent*, No. 25-5052, 2025 WL 887518, at *3–4 (D.C. Cir. Mar. 10, 2025).

Lastly, if Plaintiffs are reinstated and the government prevails after appellate review, any actions the Institute takes with Plaintiffs as directors will need to be reconsidered by the future directors, which may interfere with the Institute's ability to address future actions and interfere with the GSA's ability to utilize the building. Plaintiffs' claimed equities cannot outweigh the

grave and unprecedented harm this injunction causes to the separation of powers and the President's authority to "take Care that the Laws be faithfully executed." U.S. Const. art. II, § 3.

## CONCLUSION

For these reasons, the Court should enter summary judgment in Defendants' favor on Plaintiffs' claims in this suit and deny Plaintiff's motion for summary judgment.

Dated: April 10, 2025
      Washington, DC

Respectfully submitted,

EDWARD R. MARTIN, JR., D.C. Bar #481866
United States Attorney


By:       */s/ Brian P. Hudak*
    BRIAN P. HUDAK
    Chief, Civil Division
    601 D Street, NW
    Washington, DC 20530
    (202) 252-2549

JOSEPH F. CARILLI, JR.
SAM ESCHER, D.C. Bar #1655538
Assistant United States Attorneys

*Attorneys for the United States of America*