**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

UNITED STATES INSTITUTE OF PEACE, *et al.*,

        Plaintiffs,

v.

KENNETH JACKSON, *et al.*,

        Defendants.

Case No. 1:25-cv-00804-BAH

**PLAINTIFFS' CONSOLIDATED REPLY IN SUPPORT OF THEIR
MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO
DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................iii

INTRODUCTION ........................................................................................................... 1

I.      Congress has long created or assigned statutory mandates to
corporate entities that are neither legislative, nor judicial, nor part
of the Executive Branch. ......................................................................................... 3

II.     Congress did not place USIP within the Executive Branch. ........................................ 11

      A.      Independence from the President is fundamental to Congress's
design for USIP. ............................................................................................. 11

      B.      Congress made selected statutes applicable to the Institute that
would have applied automatically if the Institute were an
executive agency. .......................................................................................... 14

      C.      The statutory definition of a "federal entity" in the Inspector
General Act does not correspond to the constitutional scope of
entities within the Executive Branch, and in any event does not
apply to USIP. ............................................................................................... 17

      D.      The statutory definition of an executive agency for purposes of
Title 5 does not correspond to the constitutional scope of entities
within the Executive Branch, and in any event does not apply to
USIP. ............................................................................................................. 18

III.      The Institute's roles of supporting Congress and promoting
worldwide peace as a non-governmental actor are not exercises
of executive foreign affairs power. ....................................................................... 21

IV.      Even if the Institute were an executive agency, its politically
balanced, multimember board of experts would fall well within
the *Humphrey's*/*Wiener* exception to unfettered presidential
removal. ................................................................................................................ 29

V.      USIP and the official-capacity Plaintiffs properly bring this suit. ............................. 34

VI.      Defendants offer no argument or facts in defense of their causing
USIP to cease its activities in direct contravention of the USIP
Act. ...................................................................................................................... 36

VII.      The Court is not powerless to grant relief should it find
Defendants' actions unlawful. .............................................................................. 39

A.      Defendants' anti-reinstatement argument does not apply to any
        component of Plaintiffs' requested relief.......................................................... 39

B.      Even on its own terms, Defendants' anti-reinstatement argument
        does not apply to USIP Board members or its acting president. ..................... 40

C.      Apart from its inapplicability to this case, Defendant's anti-
        reinstatement argument is incorrect as a matter of law. ................................. 42

D.      Defendants' remaining arguments against injunctive relief fail...................... 43

CONCLUSION.................................................................................................................... 44

## <u>TABLE OF AUTHORITIES</u>

**CASES**

*Adams v. Christie's Inc.*,
  880 A.2d 774 (R.I. 2005) ................................................................................. 20

*AIDS Vaccine Advoc. Coal. v. United States Dep't of State*,
  2025 WL 752378 (D.D.C. Mar. 10, 2025) ........................................................ 24

*Arlington v. FCC*,
  569 U.S. 290 (2013) ........................................................................................... 31

*Armstrong v. Exceptional Child Ctr., Inc.*,
  575 U.S. 320 (2015) ........................................................................................... 42

*Bd. of Dir., Washington City Orphan Asylum v. Bd. of Trs., Washington City Orphan Asylum*,
  798 A.2d 1068 (D.C. 2002) ......................................................................... 36, 42

*Berry v. Reagan*,
  1983 WL 538 (D.D.C. Nov. 14, 1983) .............................................................. 41

*Buckley v. Valeo*,
  424 U.S. 1 (1976) .................................................................................... 4, 5, 32

*California v. Trump*,
  613 F. Supp. 3d 231 (D.D.C. 2020) ....................................................... 28, 39, 43

*Collins v. Yellen*,
  594 U.S. 220 (2021) ................................................................. 11, 30, 32, 33, 34

*Dellinger v. Bessent*,
  WL 887518 (D.C. Cir. Mar. 10, 2025) .............................................................. 44

*Dong v. Smithsonian Inst.*,
  125 F.3d 877 (D.C. Cir. 1997) ............................................................................ 7

*eBay Inc. v. MercExchange LLC*,
  547 U.S. 388 (2006) ........................................................................................... 43

*Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*,
  561 U.S. 477 (2010) ............................................................................................. 8

*Harris v. Bessent*,
  2025 U.S. App. LEXIS 7301
   2025 WL 980278 (D.C. Cir. Mar. 28, 2025) ................................................... 30

*Harris v. Bessent*,
  2025 WL 679303 (D.D.C. Mar. 4, 2025) .......................................... 29, 30, 35, 41

*Humphrey's Executor v. United States,*
  295 U.S. 602 (1935) ................................................ 2, 27, 29, 30, 31, 32, 33

*Inst. for Energy Rsch. v. FERC,*
  2024 WL 551651 (D.D.C. Feb. 12, 2024) ............................... 28, 39, 43

*Kalbfus v. Siddons,*
  42 App. D.C. 310 (D.C. Cir1914) ........................................... 35, 40

*Lebron v. Nat'l R.R. Passenger Corp.,*
  513 U.S. 374 (1995) ........................................................... 10, 11

*Marbury v. Madison,*
  5 U.S. 137 (1803) ......................................................... 37, 42, 43

*New York v. EPA,*
  413 F.3d 3 (D.C. Cir. 2005) ........................................................ 28

*PHH Corp. v. CFPB,*
  881 F.3d 75 (D.C. Cir. 2018) ...................................................... 33

*San Francisco Arts & Athletics, Inc. v. U.S. Olympic Comm.,*
  483 U.S. 522 (1987) .......................................................... 6, 10, 26

*Schneider v. Kissinger,* 412 F.3d 190 (D.C. Cir. 2005) ........................... 29

*Seila Law v. CFPB,*
  591 U.S. 197 (2020) ........................................................ 9, 21, 29, 31

*Severino v. Biden,*
  71 F.4th 1038 (D.C. Cir. 2023) .................................................. 43

*St. John v. Johnson,*
  608 F. App'x 6 (D.C. Cir. 2015) ................................................. 29

*St. John v. Napolitano,*
  20 F. Supp. 3d 74 (D.D.C. 2013) .......................................... 28, 39, 43

*Swan v. Clinton,*
  100 F. 3d. 980 (D.C. Cir. 1996) ................................................. 43

*Trump v. Wilcox,*
  2025 WL 1101716 (S. Ct. Apr. 2025) ......................................... 29, 41

*United States v. Curtiss-Wright Exp. Corp.,*
  299 U.S. 304 (1936) ............................................................... 24

*United States v. Williams,*
  504 U.S. 36 (1992) .................................................................. 4

*Wannall v. Honeywell, Inc.*,
 775 F.3d 425 (D.C. Cir. 2014) ........................................................ 28

*White v. Berry*
 171 U.S. 366 (1898) ........................................................................ 42

*Wiener v. United States*,
 357 U.S. 349 (1958) .................................................................. 30, 34

*Wilcox v. Trump*,
 2025 WL 720914 (D.D.C. Mar. 6, 2025) ............................. 3, 8, 29, 30

*Zivotofsky ex rel. Zivotofsky v. Kerry*,
 576 U.S. 1 (2015) ...................................................................... 24, 25

**STATUTES**

16 U.S.C. § 410 ..................................................................................... 21

20 U.S.C. § 130 ..................................................................................... 16

20 U.S.C. § 41 ......................................................................................... 7

20 U.S.C. § 42 ......................................................................................... 8

20 U.S.C. § 43 ......................................................................................... 8

22 U.S.C. § 4601 ..................................................................... 4, 12, 13, 27, 28

22 U.S.C. § 4603 ............................................................................... 4, 15

22 U.S.C. § 4604 ......................................................... 11, 23, 25, 29, 35, 38, 40

22 U.S.C. § 4605 ........................................................ 3, 14, 15, 33, 35, 39, 40

22 U.S.C. § 4603 ................................................................... 11, 15, 18, 21

22 U.S.C. § 4606 ................................................................... 12, 16, 17

26 U.S.C. § 170 ..................................................................................... 21

26 U.S.C. § 501 ..................................................................................... 21

28 U.S.C. § 1361 ................................................................................... 43

31 U.S.C. § 703 ....................................................................................... 8

36 U.S.C. § 151102 ................................................................................. 7

36 U.S.C. § 220501 ................................................................................. 6

36 U.S.C. § 22102 ................................................................................................ 26

36 U.S.C. § 300101 ................................................................................................ 5

36 U.S.C. § 300102 ................................................................................ 6, 26, 34

36 U.S.C. § 90102 ................................................................................................ 7

36 U.S.C. § 90103 ................................................................................................ 7

36 U.S.C. § 90111 ................................................................................................ 7

36 U.S.C. § 511 ................................................................................................ 16

36 U.S.C. § 501 ................................................................................................ 16

40 U.S.C. § 581 ................................................................................................ 16

5 U.S.C. § 104 ................................................................................................ 19

5 U.S.C. § 104 ................................................................................................ 18

5 U.S.C. § 105 ................................................................................................ 18, 19

5 U.S.C. § 415 ................................................................................................ 17

5 U.S.C. § 5102 ................................................................................................ 20

50 U.S.C. § 3035 ................................................................................................ 18

50 U.S.C. § 3036 ................................................................................................ 18

Act of Apr. 10, 1816, § 8,
    3 Stat. 269 ................................................................................................ 9

Pub. L. No. 87-569, 17 Stat. 265, 268 (Aug. 6, 1962) ................................... 38

D.C. Code § 29 ................................................................................................ 14, 20

**OTHER AUTHORITIES**
Bureau of Legislative Affairs. U.S. Dep't of State, Bureau of Legis. Affs.,
    https://perma.cc/ZQX4-BPVR (last visited Apr. 17, 2025) ..................... 25

Carter Center. Council on Foreign Relations, Soft Power: Democracy-Promotion and U.S.
    NGOs, (Mar. 17, 2006),
    https://perma.cc/MZ58-V5ZF (last visited Apr. 18, 2025) ..................... 28

CFR Education, Foreign Policy, What is Soft Power? (Updated May 16, 2023),
    https://perma.cc/8CK3-YKTK ................................................................. 27

Department of Justice Guide to the Freedom of Information Act, Procedural Requirements,
https://www.justice.gov/oip/page/file/1199421/dl?inline (last visited Apr. 16, 2025)............ 16

Our Federal Charter, American Red Cross,
https://perma.cc/78H2-DRH7 (last visited Apr. 18, 2025) ......................................................... 6

**RULES**

Fed. R. Civ. P. 25 ................................................................................................................... 39

Fed. R. Civ. P. 56 ..................................................................................................................... 3

**REGULATIONS**

1 C.F.R. § 601.3 ...................................................................................................................... 19

26 C.F.R. § 1.501 .................................................................................................................... 21

*"There are other independent non-profits like USIP where we have a DOGE team assigned . . . because we want to assign a DOGE team to every institute or agency that has congressional monies appropriated to it."*

--Defendant Nate Cavanaugh, during an April 15, 2025 telephone call with representatives of the Vera Institute of Justice, explaining his justification for attempting to assign a DOGE team to Vera. Pls.' Opp. Ex. 7.

## <u>INTRODUCTION</u>

The record before the Court on cross motions for summary judgment shows that Nate Cavanaugh was right about one thing—the United States Institute of Peace is an independent nonprofit, not a part of the Executive Branch. To be sure, USIP has more ties to the federal government than the Vera Institute, which DOGE treated as within its purview based on the belief that it had received federal grant funding. Perry Stein, *DOGE sought to assign a team to an independent nonprofit group*, Washington Post (Apr. 15, 2025), http://washingtonpost.com/national-security/2025/04/15/doge-musk-nonprofit-vera-institute/.

But Congress was careful to specify the particular ways in which federal laws affecting government entities would and would not apply to USIP, while maintaining the Institute's identity as an independent nonprofit corporation under District of Columbia law. The real question before this Court is not whether Congress intended to keep USIP independent from the Executive Branch so that it could carry out its mission of promoting peace as a nonpartisan research institution—that intent is abundantly clear—but whether the Constitution prohibited Congress from doing so. The Defendants have failed to demonstrate that Congress lacked the power to create an independent nonprofit that has no regulatory or enforcement function and whose Board members are not subject to at-will removal by the President.

In substantial part, USIP serves as a research aid to Congress. Defendants do not contend that this work must be subject to presidential control, nor could they. The Institute also works as a non-governmental neutral facilitator of conflict resolution dialogues and trainings around the

world. On this score, Defendants do not even try to rebut Plaintiffs' factual showing that the work of the Institute is the same as the work of a range of non-governmental organizations ("NGOs") and that *the Institute does not represent the United States in foreign relations.* Instead, Defendants offer the unsupported theory that any entity Congress creates that is not a court or an arm of Congress itself must be part of the Executive Branch and its leadership must be subject to at-will removal by the President. But this theory runs aground on the long history of Congress furthering national interests by creating and chartering corporations that are outside the Executive Branch. Moreover, Defendants have failed to show that the USIP Board's removal protections would be unconstitutional under *Humphrey's Executor v. United States*, 295 U.S. 602 (1935), even if USIP were—as Defendants mistakenly contend—an agency within the Executive Branch.

The stakes in this matter, and other similar cases, are high. If the Court were to agree with the President's contention that he can remove USIP's board for any reason or no reason notwithstanding the USIP Act's provisions to the contrary, it would put an end to removal protections for federal agency boards from the FTC, to the NLRB, and even to the Federal Reserve. More than that, the acceptance of Defendants' theory would mean that Congress would lose the ability to legislate independence for the full range of entities it has created or chartered since the earliest Congresses established the Sinking Fund Commission in 1790 and the First Bank of the United States in 1791. The limits constraining presidential control of entities created by Congress, and perhaps even NGOs that receive federal funding, would vanish. To illustrate this point: by statute, the American National Red Cross is a federally chartered instrumentality of the United States, carries out U.S. treaty obligations, and acts as an independent interlocutor with foreign groups. Under Defendants' position, the President must control the leadership of the Red Cross. And according to Defendant Cavanaugh in his colloquy with the Vera Institute, it seems that the

ambitions of DOGE include a measure of control even over wholly private nonprofits merely because they receive some government funds.

Fortunately, this Court need not accept the assertion that an independent nonprofit's links to and funding from the government mean that presidential control must extend into civil society. To rule for Plaintiffs, the Court need only accept the validity of the USIP Act and its removal provisions; the Defendants do not dispute that their actions violated the statute. 22 U.S.C. § 4605(f). That makes the removal of the Board members unlawful, and with it the *ex officio* Board members' removal of USIP's acting president. The actions of the purported "acting presidents" appointed by the rump USIP board are nullities and must be set aside. The Constitution, the USIP Act, and the unrebutted material facts Plaintiffs have presented compel the conclusion that Plaintiffs are entitled to summary judgment and to declaratory and injunctive relief. Fed R. Civ. P. 56(a).[1]

## I. Congress has long created or assigned statutory mandates to corporate entities that are neither legislative, nor judicial, nor part of the Executive Branch.

A long, unbroken history of Congress establishing non-executive corporate entities to further national interests disproves Defendants' reductionist thesis that if a congressionally created and funded nonprofit like USIP is not a court, and (at least in substantial part) is not an arm of Congress, it must by default be part of the Executive Branch. *See Wilcox v. Trump*, No. CV 25-334 (BAH), 2025 WL 720914, at *6 (D.D.C. Mar. 6, 2025) (collecting Supreme Court authorities

---

[1] Abbreviations and defined terms herein have the meanings set forth in Plaintiffs' Opening Brief. For the Court's convenience, Plaintiffs have consolidated in one document (i) their Statement of Undisputed Material Facts ("SUMF"); (ii) Defendants' Responses thereto ("Defs.' Resp. to SUMF"); (iii) Plaintiffs' Reply in Support of the SUMF ("Pls.' Reply to SUMF"); (iv) Defendants' Statement of Additional Material Facts ("DSOF"); (v) Plaintiffs' Responses to the DSOF ("Pls.' Resp. to DSOF"); and (vi) Plaintiffs' Additional Undisputed Facts in Response to Defendant's Cross-Motion ("PAUF").

holding that "historical practice" carries "significant weight" in separation of powers cases and that courts should "hesitate to upset the compromises and working arrangements that the elected branches of Government themselves have reached" (citations omitted and cleaned up)); Opp. at 10, 13–14.

Defendants' rigid categorical approach is inconsistent with the design of the Constitution. As a baseline, not every facet of government must slot neatly into one of the three branches. *See United States v. Williams*, 504 U.S. 36, 47 (1992) (the institution of the grand jury "has not been textually assigned . . . to any of the branches described in the first three Articles . . . . In fact the whole theory of its function is that it belongs to no branch of the institutional Government . . . ."); *Buckley v. Valeo*, 424 U.S. 1, 138–39, (1976) ("Congress may undoubtedly under the Necessary and Proper Clause create 'offices' in the generic sense and provide such method of appointment to those 'offices' as it chooses"; holders of these offices need not be "Officers of the United States" under the Appointments Clause if they perform functions in aid of Congress or operate in an area "removed from the administration and enforcement of the public law").

Defendants' executive-by-default theory thus fails to account for the history of Congress creating scores of corporations and other entities that are not part of any branch of government— a history into which USIP neatly fits. When it crafted the USIP Act, Congress wished to further a public-interest mission: to "strengthen[] and symboliz[e] the fruitful relation between the world of learning and the world of public affairs" and to "advance the history, science, art, and practice of international peace and the resolution of conflicts among nations without the use of violence." 22 U.S.C. §§ 4601(a)(8)–(9). To effectuate these goals, Congress found it necessary to create a new entity, USIP, as a charitable "independent nonprofit corporation." 22 U.S.C. § 4603(b). Consistent with this form, Congress designed USIP to perform activities in applied research, peace studies,

and international engagement that are similar to those of non-governmental organizations ("NGOs") like the Carter Center and the Center for Strategic and International Studies ("CSIS"). SUMF ¶¶ 61, 65, 67, ECF 20; Br. of 128 Employees of USIP Purportedly Terminated on March 28, 2025 as *Amici Curiae* at 7, ECF 30 (quoting remarks in which President George W. Bush twice referred to USIP as an exemplar of a "non-governmental organization[]").

As President Bush recognized, when USIP acts in its international peace dialogue and research capacities, it does not act as a part of the government at all, much less as a part of the Executive Branch. SUMF ¶¶ 63, 65 (all parties understand USIP to be independent from, and not to represent, the United States government when it conducts its international engagement and think tank activities).[2] To be sure, USIP is somewhat different from other institutions in applied peace studies, like the Carter Center, that were not established by Congress. But that does not make the Institute part of the Executive Branch. Congress has long created and chartered nonprofit corporate entities to serve public purposes. These entities may have governmental character in some respects, but not in others—they are in that sense quasi-official, just as the official U.S. Government Manual describes USIP. SUMF ¶ 72. But as numerous examples show, they cannot be shoehorned into the Executive Branch.

In 1900 and 1905, Congress chartered the American National Red Cross. The Red Cross is a "[f]ederally chartered instrumentality of the United States and a body corporate and politic in the District of Columbia." 36 U.S.C. § 300101(a). Congress assigned it to perform a role in service of the national interest, including in the fields of foreign affairs and even diplomacy. Thus,

---

[2] Defendants do not dispute that insofar as USIP acts as a research aid to Congress, it is not part of the Executive Branch. Defs.' Resp. to SUMF ¶ 60. Congress is constitutionally free to assign this role to an entity not helmed by executive Officers of the United States. *Buckley* 424 U.S. at 138–39.

Congress tasked the Red Cross with discharging United States government obligations under federal treaties, 36 U.S.C. § 300102(1)–(2); serving as "a medium of communication" in relief efforts "between the people of the United States and the Armed Forces of the United States and . . . act[ing] in those matters between similar national societies of governments of other countries through the International Committee of the Red Cross and the Government, the people, and the Armed Forces of the United States," *id.* § 300102(3); and "carry[ing] out a system of national and international relief in time of peace," *id.* § 300102 (4). The Red Cross may "request appropriations for certain programs" when private donations are not sufficient. Our Federal Charter, American Red Cross, https://perma.cc/78H2-DRH7 (last visited Apr. 18, 2025). But no one considers the Red Cross to be part of the Executive Branch. *See id.* ("[d]espite" a "close relationship with the federal government, the American Red Cross is not a federal agency").

Similarly, Congress "established" the U.S. Olympic Committee ("USOC") and tasked it with representing the United States on the world stage of athletic competition. *San Francisco Arts & Athletics, Inc. v. U.S. Olympic Comm.*, 483 U.S. 522, 542–43 & 543 nn. 23–25 (1987) (quoting previous version of statute that said USOC is a "private corporation established under Federal law"). Congress created USOC as a corporation to "serve a national interest"; authorized it to receive federal funding; and imposed requirements that it remain nonpolitical and report to Congress on its operations, expenditures, and grants. *Id.* at 543 n.23, n.24, 25 (citing statute as previously numbered); *see* 36 U.S.C. § 220501, *et seq.* Yet USOC is not part of the Executive Branch; the Supreme Court has held that USOC was not even a "governmental actor" to whom the equal protection component of the Fifth Amendment applied. *U.S. Olympic Comm.* at 542–47. Like USIP's NGO functions in conflict resolution, USOC's work involves "activities that have always been performed by private entities." *Id.* at 544–45 (reasoning that "[t]he fact that Congress

granted it a corporate charter does not render the USOC a Government agent"; "[t]he fact that a private entity performs a function which serves the public does not make its acts governmental action"; and "the intent on the part of Congress to help the USOC obtain funding does not change the analysis" (citation omitted and cleaned up)); SUMF ¶¶ 61, 65, 67. In its opinion holding that the USOC was not a governmental actor, the Supreme Court cautioned against the breadth of any holding that the myriad corporate entities created by Congress are governmental for all constitutional purposes. *U.S. Olympic Comm.*, 483 U.S. at 543 n.23.

The full set of non-executive corporations that Congress has created, chartered, and/or funded to further public purposes is too numerous to list here, but some other examples include the Help America Vote Foundation, which receives appropriations to promote youth participation in elections and whose Board includes presidential appointees, 36 U.S.C. §§ 90102, 90103 , 90111, and the National Education Association of the United States, which Congress chartered to "promote the cause of education in the United States," 36 U.S.C. § 151102. An older example is Congress's 1846 incorporation of the Smithsonian Institution, which Congress bestows with "extensive federal funding." *Dong v. Smithsonian Inst.*, 125 F.3d 877, 880 (D.C. Cir. 1997). Congress created The Smithsonian as an "establishment," 20 U.S.C. § 41 ("Incorporation of institution"), and the Smithsonian is neither an arm of Congress nor a court. By Defendants' flawed logic, therefore, it must by default be part of the Executive Branch. Yet Defendants acknowledge, as they must, that the Smithsonian "exercises no executive power." *See* Opp. at 23. More importantly, in *Dong*, the Court of Appeals held that the Smithsonian is not an entity within the Executive Branch. *See* 125 F.3d at 879 (holding it plain that the Smithsonian is not an "establishment in the executive branch" as that term is used in the context of the Privacy Act). Defendants' rigid constitutional framework collapses on its own terms because it would place

entities, like the Smithsonian and USIP, that do not exercise any executive power within the Executive Branch.

Moreover, if Defendants were right that the Smithsonian must be part of the Executive Branch by default, the structure of the Smithsonian Board of Regents would create an impossible case of constitutional gridlock. Defendants presumably would contend that the President is constitutionally entitled to remove all members of the Smithsonian Board of Regents, as they would be executive officers subject to the "illimitable power of removal by the Chief Executive." Opp. at 24 (citation omitted). But the Regents include *ex officio* members that the President cannot remove from their positions—the President has no constitutional authority to fire the Chief Justice or the Vice President. 20 U.S.C. § 42(a). Moreover, a central premise of Defendants' argument that the USIP Act is unconstitutional is that there is a "traditional default rule" that "removal is incident to the power of appointment."[3] *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 509 (2010); *see* Opp. at 24. But other Regents of the Smithsonian (a mix of members of Congress and private citizens) are appointed not by the President but variously by the Speaker of the House, the President of the Senate, and joint resolution of Congress. 20 U.S.C. §§ 42(a), 43. If Defendants were correct that removal follows appointment, the President would lack the power to remove these Regents because he did not appoint them, but would at the same time possess constitutional authority to do so because the Smithsonian is part of the Executive Branch. Defendants' positions crumble under the weight of their own contradictions.

Another early example of Congress's ability to create independent quasi-official entities,

---

[3] As it has in other cases, Congress modified any "default rule" that removal generally follows appointment as to USIP by placing express limits on the President's ability to remove those he appointed. *See, e.g.*, *Wilcox*, 2025 WL 720914 at *6–8; 31 U.S.C. §§ 703(a)(1), (b), (e)(1) (the Comptroller General is appointed by the President and confirmed by the Senate, yet is removable only by joint resolution of Congress or impeachment).

immune from removal powers of the President, is the Second Bank of the United States, which Congress "established" in 1816. Act of Apr. 10, 1816, § 1, 3 Stat. 266. Although tasked with "regulating the Nation's money supply in ways anticipating what the Federal Reserve does today," the Bank's Board was not subject to at-will presidential removal: "Of the twenty-five directors who led the Bank, the President could appoint and remove only five." *See Seila Law v. CFPB*, 591 U.S. 197, 274 (2020) (Kagan, J., dissenting in part and concurring in the judgment in part) (citing Act of Apr. 10, 1816, § 8, 3 Stat. 269). President Andrew Jackson vehemently opposed the Bank, but Congress had structured it to prevent presidential control through removal of its Board, so President Jackson had to settle for firing a member of the Executive Branch (the Treasury Secretary) for keeping public funds at the Bank. *See id.*

This history illustrates why Defendants are simply wrong when they suggest that Plaintiffs have contended that a corporation can never be "part of the federal government," and wrong again when they suggest that Plaintiffs "concede" that USIP "is part of the federal government." Opp. at 13. Instead, Plaintiffs submit that Defendants' attempt to categorize USIP as part of the federal government in a general sense is both overly simplistic and beside the point. First, it is overly simplistic because while USIP is a creature of statute, its work is not governmental in character. USIP acts as an independent, neutral research institution and facilitator of dialogue in a fashion identical to other NGOs. SUMF ¶¶ 65, 67. At most, USIP is quasi-official, as the Government Manual plainly states. SUMF ¶ 72. In addition, a corporate entity can be treated as part of the government for some purposes but not for others. When analyzing whether the Olympic Committee was subject to the Fifth Amendment when taking steps to protect its intellectual property rights, the Supreme Court focused on whether the Committee performed "functions that have been traditionally the exclusive prerogative of the Federal Government." *U.S. Olympic*

*Comm.*, 483 U.S. at 544 (emphasis omitted and cleaned up) (answering the question in the negative). A few years later, the Supreme Court employed a different analysis, and barely cited *U.S. Olympic Committee*, in determining that Amtrak was subject to the First Amendment when deciding what advertisements could be displayed in New York's Penn Station. *Lebron v. Nat'l R.R. Passenger Corp.*, 513 U.S. 374, 394–99 (1995). The Supreme Court made clear that its decision did not render Amtrak a federal agency for all purposes. *See id.* at 394, 400.

Second, Defendants' attempted categorization is beside the point because the question presented in this case is not whether USIP might be characterized as "part of the federal government" for certain purposes. The question is whether USIP *exercises substantial executive power* such that it must be subject to presidential control through the ability of the President to remove its Board at will, notwithstanding the reasonable restrictions on removal that Congress imposed to insulate the Institute's nonpartisan peacebuilding work from being influenced (or shut down) solely based on the predilection of any particular President—removal provisions that Defendants never mention and contend are not even material to this case. Defs.' Resp. to SUMF ¶¶ 40–42.

In their Opposition (at 12–13), Defendants seek to make *Lebron* into something more than it was: a state action determination that Amtrak, a corporation chartered by Congress, was subject to constitutional obligations with respect to the protection of individual rights. Even if one were to assume under *Lebron* that USIP might be subject to the First Amendment or other individual rights provisions for certain of its functions, that would not answer the question whether USIP is part of the Executive Branch. Indeed, *Lebron*'s reasoning makes plain that the case has nothing to say about structural separation of powers or Article II issues. Far from equating the applicability of the First Amendment to at-will presidential removal authority, the Court explained that "any reduction

in the immediacy of accountability for Amtrak directors" occasioned by the fact that the Amtrak statute did not "explicit[ly]" make Amtrak's presidentially-appointed directors "removable by the President for cause" was "of minor consequence" to the First Amendment issue decided by the Court. 513 U.S. at 394, 400.

In *Collins v. Yellen*, 594 U.S. 220, 254 (2021), when confronted with the argument that the for-cause removal restriction on the single director of the Federal Housing Finance Agency ("FHFA") did not run afoul of Article II when the FHFA took "on the status of a private party" by acting as a conservator or receiver, the Supreme Court did not analyze whether the FHFA-as-conservator/receiver was performing a governmental function under *Lebron*. Instead, the Court asked whether the FHFA "exercise[d] executive power" when acting in that capacity. *Id.* at 254 & n.20 (concluding that the FHFA did wield executive power even as a conservator/receiver, because in that capacity it still enjoyed the "distinctive" executive powers of issuing regulations, orders, and subpoenas, unlike typical conservators/receivers). It is not surprising that Defendants' discussion of *Lebron* concludes only with an assertion that USIP "is part of the federal government," not an assertion that USIP is part of the Executive Branch. Opp. at 13.

## II.     Congress did not place USIP within the Executive Branch.

### A.      Independence from the President is fundamental to Congress's design for USIP.

Congress made the Institute an independent corporation with the powers of a D.C. nonprofit except for the power of dissolution, which Congress reserved for itself (not DOGE or anyone else working for the President). 22 U.S.C. §§ 4603(b); 4604(a). Defendants fail to account for the numerous other features of the Institute's legal and operational structure that further confirm that it is not an executive agency by congressional design and in its functions. Pls.' Opening Br. 4–5, 19–20. These include the Institute's budgetary independence from the Executive Branch, its

ownership of its building; its authority to raise private funds for specified purposes; its right to sue and be sued (without protection of sovereign immunity or the benefit of government counsel);[4] and its retention of private accountants (KPMG) for its annual audits. In addition, Congress made clear that USIP employees are not federal employees, 22 U.S.C. § 4606(f)(1), and the Office of Personnel Management agreed that USIP is not bound by federal pay scales.[5] USIP employees have not been permitted to participate in government retirement and health insurance plans since the late 1980s, and receive paychecks not from the Treasury but out of USIP's private bank account via a commercial payroll broker.[6] PAUF ¶¶ 5, 12–13. Individually and together, these features make the Institute very different from entities that are part of the Executive Branch.

And in a finding that Defendants fail to mention, Congress made clear that the Institute should stand apart from the policymaking branches and act as a resource to strengthen the work not just of the U.S. government, but also of "existing institutions providing programs in international affairs, diplomacy, conflict resolution, and peace studies," as well as "government, private enterprise, and voluntary associations." 22 U.S.C. § 4601(a)(5). The USIP biennial reports

---

[4] This is distinct from independent Executive Branch agencies like the NLRB, which, though they have separate litigating authority, are still represented by government lawyers working within the Executive Branch. Opp. at 19.

[5] *See* Pls.' Resp. to DSOF ¶¶ 13(g) and (h), Pls.' Opp. Ex. 4, Letter from OPM Assoc. Gen. Counsel to Dir. of Personnel, Executive Office of the President (Oct. 2, 1987) (concluding that "***the Institute is not an executive agency either under the definition in 5 U.S.C. 105 or in 5 U.S.C. Chapter 51***" and that the USIP Act ***"gives the president of the Institute specific authority to appoint, fix the compensation of, and remove employees without regard to Civil Service rules, and subject instead to the Institute's bylaws and the general policy established by its Board***) (emphasis added).

[6] In a 1988 memo to the USIP General Counsel, the Executive Office of the President confirmed that all new USIP staff appointed on or after October 1, 1988 were barred from obtaining "retirement, health benefits, and life insurance coverage" because of Section 108 of Pub. L. No. 100-238, which prohibited "benefits coverage for employees of a non-Government entity"—*i.e.*, USIP. Pls.' Opp. Ex. 5, Memo from Dir. of Personnel, Exec. Office of the President to USIP Gen. Counsel (Mar. 11, 1988)

submitted to Congress and the President in the years following the Institute's creation underscore

Congress's careful efforts to avoid partisan influence and ensure the Institute's independence. In

its 1987 report, the Institute noted:

> Congress created the Institute as "an independent nonprofit corporation." Making
> that independence a reality has been one of the most important accomplishments of
> the Institute's first year of activity. It is a central legacy of the Institute's first Board
> of Directors.
>
> Congress vested the Institute with a measure of intellectual freedom comparable in
> many respects to that enjoyed by institutions of higher education and, having
> protected the Institute as an educational entity divorced from the political pressures
> of the day, *wisely provided that the Institute should refrain from policymaking*
> and dispute intervention.

Pls.' Resp. to DSOF ¶ 8 (emphasis added); Pls.' Opp. Ex. 1. The Institute noted the risk to its

independence from "the politically ascendant forces of the day," and emphasized the structural

features in the USIP Act designed to safeguard its independence, including "[b]eing an

independent establishment of the federal government *and not an agency of the Congress or the

Executive Branch*." *Id.* (emphasis added). The Institute stressed that "Congress insisted that the

Institute be independent of control by any particular discipline, methodology, belief, cause, region

or group." *Id.*; *see also* PAUF ¶ 2; Pls.' Opp. Ex. 2 (citing 1989 Biennial Report noting that the

independence provided by Congress in the USIP Act "is an important element in building public

confidence in the work of the Institute and has been stressed from the first meeting of the Board

of Directors"); PAUF ¶ 3; Pls.' Opp. Ex. 3 (citing 1991 Biennial Report at 1, stating that "Congress

insulated the Institute from political pressures by granting it independent status as a federal

institute and nonprofit corporate form with a bipartisan governing Board . . . .").

Defendants attempt to argue that the Institute is not independent because the Institute Board

is "designed to be dominated by the political party of the President." Opp. at 3, 19. This is a

fundamental misreading of the USIP Act. No more than eight Board members, including the *ex*

*officio* members, can be members of the same party. 22 U.S.C. § 4605(c). That is a design to *prevent* partisan "dominat[ion]," not to mandate it. (In a two-party system, any board with an odd number of members will have a majority of one party or the other). And affiliation with the incumbent President's party is not, in any event, the same thing as subservience to a President's direction. Assuming the *ex officios* are members of the President's party (former Defense Secretaries William Cohen, Robert Gates, Chuck Hagel, and others might have a word to say about that assumption), at most five additional Board members can also be members of the President's party. Thus, under the USIP Act, the President can have, at most, a one-vote majority from his party—hardly domination. But of course, there is no guarantee that a majority of the Board members will be from the President's party at any given time. Board terms are staggered such that a President will not be replacing all of the Board at once. 22 U.S.C. § 4605(e). Consistent with § 4605(c), when a new President takes office, eight of the (b)(4) Board members could be from the party opposite to the President, and the President's party would lack a majority. Indeed, the legislative history of the USIP Act shows that Congress expressly intended to prevent partisanship from influencing the work of the Institute, *see* SUMF ¶¶ 4–5. Moreover, Congress's choice of a D.C. nonprofit form means that whatever their party affiliation, Board members must answer not to their party or the President, but rather to the interests of the Institute pursuant to their fiduciary duties under D.C. law. D.C. Code § 29-406.30. Finally, as much as Defendants may wish it were not the case, the (b)(4) Board members are not answerable to the President because Congress has provided that he may not unilaterally remove them at will. 22 U.S.C. § 4605(f).

### B. Congress made selected statutes applicable to the Institute that would have applied automatically if the Institute were an executive agency.

Defendants assemble a list of selected provisions of the USIP Act to support their contention that USIP is *governmental* in nature. Notably, ***every single item on the list except for***

*one misstates or mischaracterizes the cited section of the USIP Act*. *See* Pls.' Resp. to DSOF ¶ 13. For example, Defendants are wrong in contending that USIP compensation is set by federal statute. GSA pay schedules are only a guide to the compensation of USIP employees. *See* Pls.' Resp. to DSOF ¶ 13; Pls.' Opp. Ex. 4. Defendants are also incorrect in claiming that the Institute "is required to publish notices of board meetings in the Federal Register." Opp. at 4. In fact, the USIP Act requires all Board meetings to "be preceded by reasonable public notice. Notice in the Federal Register shall be deemed to be reasonable public notice for purposes of the preceding sentence." 22 U.S.C. § 4605(h)(3). In other words, notice in the Federal Register is one permissible method of notifying the public, but not a required method. Ironically, the rump *ex officio* Board did not comply with these public notice provisions before purporting to fire Ambassador Moose and taking steps to transfer USIP's assets.

One more example: Defendants incorrectly state that USIP may "use the name and seal of the United States," Opp. at 4, 10. In fact, 22 U.S.C. § 4603(e)(2) authorizes the Institute to use the terms "United States," "U.S.," or "any other reference to the United States Government or Nation" in the *Institute's* title or "corporate seal, emblem, badge, or other mark of recognition." The USIP Act does not grant permission to use the official seal of the United States—permission that executive branch agencies enjoy automatically—and the Institute has never done so.[7]

Defendants' list is not just unreliable; it also misses the forest for the trees in two ways. *See* Opp. at 3–4, 10–11; Pls.' Resp. to DSOF ¶ 13. First, Defendants do not explain why the provisions they cite place USIP in the *Executive Branch*, or even contend that they do. For instance,

---

[7] Moreover, Defendants fail to note an important limitation: unlike federal agencies, USIP's authority to use those terms is conditional upon Congress renewing appropriations for USIP each year. 22 U.S.C. § 4603(e)(2). By contrast, USIP's continued existence and status as a corporation does not depend on an annual appropriation or any other conditions. *Id.* §§ 4603(a), (b).

receiving appropriations has nothing to do with executive status, Opp. at 10; entities across all three branches and beyond receive appropriations from Congress. *See supra* (discussing the Red Cross); Pls.' Opening Br. at 28 (discussing the Congressional Hunger Center).

Second, Defendants fail to engage with Plaintiffs' showing that Congress's selective applications of particular federal statutes to the Institute and its employees—such as the application of FOIA—actually show that USIP is not part of the Executive Branch, because those and many other federal laws would apply automatically to the Institute if it were. Pls.' Opening Br. at 21 & nn. 17 & 18.[8] For example, having special authority to obtain services from GSA (subject to reimbursement for those services) cuts against USIP having executive status. 22 U.S.C. § 4604(o). The Inaugural Committee (headed by the president-elect, not the incumbent President and clearly not a part of the Executive Branch) can also receive services from GSA, as can Howard University. 36 U.S.C. § 501(1); *id.* § 511 (the Inaugural Committee also receives appropriations); 40 U.S.C. § 581(e); 20 U.S.C. § 130. The inclusion of these special, piecemeal applications of federal laws to USIP is especially striking against other provisions that place USIP outside the Executive Branch and even treat it, for many purposes, as outside the government. *E.g.*, 22 U.S.C. § 4606(f)(1).

---

[8] Thus, Defendants fail to respond to Plaintiffs' showing (at Opening Br. 21 n.17) that Congress explicitly applied FOIA to the Institute *because* it did not otherwise fit within FOIA's definition of "agency," which includes an "establishment in the executive branch of the Government." Indeed, the Department of Justice places USIP outside of the Executive Branch in its Guide to FOIA. The DOJ Guide states: "Agencies within the Executive Branch of the federal government, independent regulatory agencies, and some components within the Executive Office of the President are subject to the FOIA. Other organizations, such as Amtrak, have been made subject to the FOIA by statute." And it cites the USIP Act as an example of a statute for such an "other organization." *Department of Justice Guide to the Freedom of Information Act*, Procedural Requirements at 5 & n.29 (posted Aug. 20, 2021), https://www.justice.gov/oip/page/file/1199421/dl?inline (last visited Apr. 18, 2025).

Similarly, Defendants do not address NARA's legal conclusion that the Federal Records Act does not apply to the Institute. *See* Pls.' Opening Br. 22.

C.   **The statutory definition of a "federal entity" in the Inspector General Act does not correspond to the constitutional scope of entities within the Executive Branch, and in any event does not apply to USIP.**

In a similar vein, Defendants point to USIP's inclusion on lists of "federal entities" submitted from 1994 to 2014 pursuant to the Inspector General Act. Opp. at 11–12. Again, whether USIP is "federal" under the IG Act (or any other statute or list of entities that are "federal" in nature) does not answer the first constitutional question here: whether the Institute is part of the *Executive Branch*. *See* Pls.' Opening Br. at 18. Moreover, the lists published pursuant to this statute do not explain why USIP was included as an entity subject to the IG Act beginning in 1994 (and ending apparently eleven years ago, in 2014); indeed, USIP's inclusion is inconsistent with the provision of the USIP Act that requires that it be audited by a private accounting firm, not an Inspector General. Tellingly, USIP has never been audited by nor subject to the review of any Inspector General—and Defendants make no claim that it should have been or factual showing that it has been.

Defendants spend all of one footnote (Opp. at 21 n.4) trying to sidestep Plaintiffs' extensive recitation of statutes where Congress has—unlike in the USIP Act—unambiguously created an entity as an *Executive Branch* establishment or located an entity within an existing Executive Branch department or agency. *See* Pls.' Opening Br. at 19–20 and nn. 14–16. Defendants point to the Central Intelligence Agency as a counterexample, but the Defendants' reference to the CIA in fact confirms Plaintiffs' point. First, Congress titled the CIA an "Agency"—a textual indicator that Congress placed the CIA in the Executive Branch. Second, the very statute to which Defendants point, 50 U.S.C. § 3035, states that the function of the CIA "is to assist the Director of the Central Intelligence Agency in carrying out the responsibilities specified in section 3036(c) of this title." In turn, § 3036 provides that the CIA Director should coordinate overseas intelligence gathering to support the national security of the United States, that the CIA Director reports to the Director

of National Intelligence, and that the CIA "shall" coordinate directly with foreign governments on

intelligence matters. 50 U.S.C. § 3036. All of which is to say that Congress *did* explicitly locate

the CIA squarely within the Executive Branch and that it did assign it core executive functions.

That is constitutionally different from how Congress chose to structure USIP and the activities

Congress authorized the Institute to perform.

### D. The statutory definition of an executive agency for purposes of Title 5 does not correspond to the constitutional scope of entities within the Executive Branch, and in any event does not apply to USIP.

Defendants' repeated assertion that USIP is an "establishment of the United States"

(whatever that means) does not answer the first constitutional question at issue here, whether USIP

is part of the Executive Branch (again, the question is not whether USIP may for some purposes

be part of the government writ large). Opp. at 3, 10. Similarly, even Defendants appear to recognize

that they cannot use the Title 5 definition of "executive Agency" as a constitutional line, because

that definition excludes some Executive Branch entities while including at least one Legislative

Branch entity. Pls.' Opening Br. at 18 & n.12; *see* Opp. at 21–22 & n.19.

Undeterred by the irrelevance of Title 5, Defendants insist that the Institute is an

"independent establishment" within the meaning of 5 U.S.C. §§ 104 and 105, and thus an

Executive agency for purposes of Title 5. Opp. at 21. But Defendants' sole citation for their

"establishment" argument, 22 U.S.C. § 4603(a), does not support it. Opp. at 3, 21. All that section

does is make clear that Congress established the Institute. If everything established by Congress

were an "Executive agency," the rest of the Title 5 definitions would be surplusage. 5 U.S.C.

§§ 104–105 (defining Executive agency to mean "an Executive department, a Government

corporation, and an independent establishment," and then sub-defining those terms). As Plaintiffs

demonstrated in their opening brief, and Defendants fail to rebut, the "independent establishment"

component of the Title 5 "Executive agency" definition instead allows Congress to extend Title 5

coverage to entities that might not naturally fit under any of the other components of that definition. And when Congress wants an entity to be considered an "independent establishment" within the meaning of 5 U.S.C. § 104, it says so expressly via clear terms of art. *See* Pls.' Opening Br. at 19 n.14. Congress did not use these terms to create Title 5 coverage for USIP, as underscored by the fact that most of Title 5 obviously does not apply to USIP and that Congress felt the need to make certain discrete components of Title 5 applicable by incorporating them into the USIP Act.

Defendants cobble together ambiguous terms, but do not cite any source concluding that USIP is an Executive agency under 5 U.S.C. § 105. And in the Code of Federal Regulations, USIP is *not* defined as such an entity: USIP is a "Non-Federal Agency" for purposes of the National Capital Planning Commission's implementation of the National Environmental Policy Act ("NEPA"). *See* 1 C.F.R. § 601.3. The regulation defines "Federal Agency" as "the executive agencies of the Federal government as defined in 5 U.S.C. § 105." *Id.* In other words, this NEPA regulation classifies USIP as outside the definition the Defendants seek to apply. The Office of Personnel Management takes the same view, as does the National Archives and Records Administration. *See* Pls.' Resp. to DSOF ¶¶ 13(g) and (h), Pls.' Opp. Ex. 4; PAUF ¶ 4, Letter from OPM Assoc. Gen. Counsel to Dir. of Personnel, Executive Office of the President (Oct. 2, 1987) (concluding that "the Institute is not an executive agency either under the definition in 5 U.S.C. 105 or in 5 U.S.C. Chapter 51"); SUMF ¶ 72; Pls.' Opening Br. at 22–23.

Similarly flawed is the Defendants' contention that they "believe[] that the Institute is best described" as a "wholly owned corporation" of the United States. Opp. at 20. In 1987, the OPM determined that USIP is not an "agency" within the meaning of 5 U.S.C. § 5102. PAUF ¶ 4. This definition includes both wholly owned government corporations and "Executive agenc[ies]," so

OPM correctly concluded that USIP is neither. 5 U.S.C. § 5102 (a)(1)(A); PAUF ¶ 4 (citing statutory note explaining that the definition applies to "wholly owned corporations").

Moreover, as a non-member nonprofit, USIP has no owner.[9] Defendants' assertion that the United States is the owner or residual legal interest holder of USIP because its assets would revert to the government upon dissolution (Opp. at 3–4, 20) is simply wrong as a matter of law.[10] Federal law requires any tax-exempt nonprofit corporation that is dissolving to distribute its remaining assets only to another tax-exempt organization as described in section 501(c)(3), or to the federal government, or to a state or local government. 26 C.F.R. § 1.501 (c)(3)–1(4). By Defendants' logic, the government (federal or state) would "own" every single extant tax-exempt nonprofit.

Congress's choice of charitable-status designation under the Internal Revenue Code— USIP is "an organization described in section 170(c)(2)(B) of Title 26," 22 U.S.C. § 4603(b)— further confirms that the United States does not "own" USIP. Section 170 of Title 26 articulates

---

[9] Defendants mistakenly cite provisions of the D.C. Code applicable to member nonprofits (Opp. at 20), but Congress did not structure USIP as member nonprofit. USIP does not have any members; the United States is not a member of USIP. D.C. Code §§ 29-401.02 (24), 401.50 (defining "member" and requiring member-governed corporations to identify themselves as such). Even member nonprofits do not have owners. *See Adams v. Christie's Inc.*, 880 A.2d 774, 781 n.4 (R.I. 2005) (noting that "one key distinction between nonprofit corporations and for-profit corporations is that in a nonprofit corporation shareholders/members do not have a proprietary interest in the corporation as they do in a for-profit corporation"). Defendants also erroneously equate a member nonprofit's members with the person who incorporates the nonprofit, and proceed erroneously to assert without supporting citation that a nonprofit's incorporator is its "ultimate legal interest holder[]." Opp. at 20. Incorporators hold no interest, and they play no legal role after incorporation other than convening an initial meeting to elect the Board. D.C. Code § 29–402.05(b).

[10] Defendants' assertion that the "United States controls [USIP's] board" (Opp. at 20, citing § 4605) because the President and Senate have a role in the appointment of Board members is wrong for the same reasons stated above—the (b)(4) Board members comprise a supermajority of the Board; they can be removed by the President acting alone only for cause as defined in the USIP Act, and they do not answer to the President but rather owe their fiduciary obligations to the Institute under D.C. law.

rules for charitable giving, with subsection (c) defining four categories of "charitable contribution" based on the recipient or use of that contribution. Subsection (c)(2)—applicable to the Institute— addresses contributions to tax-exempt 501(c)(3) nonprofit organizations. By contrast, subsection 170(c)(1) addresses contributions to "a State, a possession of the United States, or any political subdivision of any of the foregoing, or the United States or the District of Columbia" for "exclusively public purposes." *See*, *e.g.*, 16 U.S.C. § 410yy-8(b)(2) (defining a real property gift to the Keweenaw National Historical Park Advisory Commission as "a gift to the United States" for "the purposes of section 170(c) of title 26"). If Congress intended for the Institute to be owned by the "United States," it would have described it as an entity covered by 26 U.S.C. § 170(c)(1), or even by 26 U.S.C. § 501(c)(1) (addressing tax exemptions for certain "corporation[s] organized under Act of Congress which [are] an instrumentality of the United States," including a list of four "Government corporations" in § 501(l)). Instead, Congress structured the Institute using the statutory provision for *non-governmental* charitable organizations.

III.   **The Institute's roles of supporting Congress and promoting worldwide peace as a non-governmental actor are not exercises of executive foreign affairs power.**

Neither USIP's statutory structure (as a matter of law) nor the actual record before this Court of what USIP does in practice (as a matter of fact) reflects the exercise of any executive power, much less "substantial executive power." *Seila Law v. CFPB*, 591 U.S. 197, 218 (2020). It has been clear from USIP's earliest reports to Congress and the President that the Institute does not make or execute the foreign policy of the United States. In 1987, the Institute stated that Congress "wisely provided that the Institute should refrain from policymaking and dispute intervention"—that is, executive functions within the province of the Executive Branch—and that because it is "not an agency of the Congress or the Executive Branch," the Institute's activities "enjoy some insulation from governmental pressures." *See* PAUF ¶ 1; Pls.' Opp. ¶ 1. The 1989

biennial report underscored that USIP "must not interfere with the conduct of foreign relations, which is the responsibility of Government agencies such as the Department of State." PAUF ¶ 2. And because it maintained its independence and avoided engagement in governmental policymaking, "the Institute can decide to undertake projects at the request or with the support of Governmental agencies, *if the projects are in accord with Institute priorities*." *Id.* The 1991 report stated: "As intended by its enabling legislation, the institute functions as a nonideological educational resource for policymakers and officials and *does not intervene directly in formulation or conduct of US foreign policy*." PAUF ¶ 3.

Defendants do not rebut with any contrary evidence Plaintiffs' factual showing that the Institute does not engage in the formulation or execution of United States foreign policy, including 16 declarations from USIP employees explaining why USIP is not executive in either form or function.[11] Pls.' Opening Br. at 5–8 and SUMF ¶¶ 60–68. Plaintiffs' showing was buttressed by an *amicus* brief from 128 USIP employees detailing how sharply the characteristics of their employment and work diverge from those of executive employees engaging in statecraft on behalf of the United States, ECF 30, and an *amicus* brief from 113 former Executive Branch and military officials describing the clear lines separating USIP's independent voice from official US diplomatic and policymaking departments and agencies, ECF 31.

At the April 16, 2025 TRO hearing in *Pippenger, et al. v. U.S. DOGE Service, et al.*, 1:25-cv-1090-BAH, this Court asked whether USIP, when it mediates conflicts around the world, does so in consultation with the Department of State or Department of Defense, and whether the USIP Act *mandates* such consultation. Without equivocation, the answers are no and no. Defendants have not contended otherwise, much less rebutted the extensive record facts demonstrating that

---

[11] Defendants are not permitted to attempt to remedy this failure by way of their forthcoming reply.

USIP acts independently when it works to resolve conflicts and that no component of the Executive Branch has any say in USIP's decisions about which foreign groups to interact with. SUMF ¶¶ 62–68 (USIP acts independently from the U.S. Government; its independent work may as a byproduct yield information of interest to the Executive Branch, which USIP in some cases voluntarily shares); SUMF Ex. 7, Decl. George E. Moose ¶¶ 9–12, ECF No. 20-7 ("When foreign governments or other organizations contact USIP to work together on projects, we do not obtain U.S. government approval when agreeing to undertake these activities. Again, if they align with USIP's mission and we have the capacity to engage with these groups, we may do so.").[12] Any USIP engagement with DOD or State comes on a voluntary basis as a partner or FOIA requester. For example, the Institute "*may* respond," but does not have to, to a "*request*" from "a department or agency of the United States Government to investigate, examine, study, and report on any issue within the Institute's competence." 22 U.S.C. § 4604(e) (emphasis added); 22 U.S.C. § 4604(b)(9) (The Institute "may" secure by way of a FOIA request information from government agencies).

Unable to dispute the facts, Defendants respond with a sweeping argument that any activity involving any sort of international engagement is necessarily executive in nature. Opp. at 1, 14, 23. Defendants quote the statement in *United States v. Curtiss-Wright Exp. Corp.*, 299 U.S. 304, 319 (1936), that "[t]he President is the sole organ of the nation in its external relations, and its sole representative with foreign nations." Opp. at 15. But the Court there was referring to negotiations with foreign governments conducted on behalf of the United States government, not to everything that involves working with foreign groups. Opp. at 1. An exclusively executive province this broad would sweep in the Red Cross, the Olympic Committee, and every congressional delegation or

---

[12] Consistent with their independent role, USIP staff are not subject to and do not comply with State Department Chief of Mission Authority guidance on where State Department representatives can and cannot operate. SUMF Ex. 8, Decl. Brian Harding ¶ 4, ECF No. 20-8.

state-level trade mission abroad. And the Supreme Court has "explicitly rejected" attempts to read the "sole organ" quotation for more than the President's role in recognizing foreign governments and conducting treaty negotiations. *See AIDS Vaccine Advoc. Coal. v. United States Dep't of State*, No. 25-00400 (AHA), No. 25-00402 (AHA), 2025 WL 752378, at *16 (D.D.C. Mar. 10, 2025); *Zivotofsky ex rel. Zivotofsky v. Kerry*, 576 U.S. 1, 19 (2015) (rejecting government "sole organ" argument that the President has "'exclusive authority to conduct diplomatic relations,' along with 'the bulk of foreign-affairs powers'" (citation omitted)); *id.* at 65 (Roberts, C.J., dissenting) ("The expansive language in *Curtiss-Wright* casting the President as the 'sole organ' of the Nation in foreign affairs certainly has attraction for members of the Executive Branch. The Solicitor General invokes the case no fewer than ten times in his brief. But our precedents have never accepted such a sweeping understanding of executive power." (citation omitted)). The President does not have "unbounded power" in foreign affairs or diplomacy. *Zivotofsky*, 576 U.S. at 20 (majority opinion).

Instead, Congress and the President both have constitutionally assigned foreign affairs roles. *Id.* at 16–17; 20–21. And in significant part, the Institute serves as a research adjunct for Congress in support of the Legislative Branch's work in that field. SUMF ¶ 60. Defendants' only answer to this point is to say that the USIP Act prohibits USIP "from attempting to influence legislation." Opp. at 17 (citing 22 U.S.C. § 4604(n)). Quite so, and this confirms that USIP engages with the Legislative Branch as a nonpartisan, non-policymaking expert resource, not as an outside party trying to lobby for legislation, something that the Executive Branch Departments do. For instance, the State Department maintains its own lobbying shop known as the Bureau of Legislative Affairs. U.S. Dep't of State, Bureau of Legis. Affs., https://perma.cc/ZQX4-BPVR (last visited Apr. 17, 2025). Nor, contrary to Defendants' suggestion, does the Institute engage with Congress solely by presenting formal testimony. Opp. at 17. Defendants fail to address or

rebut Plaintiffs' showing that USIP regularly provides informal briefings to members of Congress and convenes study groups upon congressional request.[13] SUMF ¶ 60.

As for the rest of USIP's work, the fact that the Institute participates in "international engagement" does not mean that Congress assigned to it an *executive* foreign affairs function. Opp. at 15. Defendants insist that "negotiating for peace" and "diplomacy" are "quintessential executive functions." *Id.* Maybe so, when the negotiating party is the United States.[14] But Defendants have not offered *any* facts to rebut Plaintiffs' showing that USIP does not represent the United States or even act as a part of the government when it engages internationally. USIP can only participate in Track 1.5 dialogues as a neutral convener because it is independent of the diplomatic and policymaking arms of the United States government.[15] SUMF ¶¶ 52–68. And of course, were USIP an arm of the Executive Branch, it could not participate in Track 2 dialogues at all—a fact that Defendants do not even try to address in their brief, and with respect to which they offer no contrary facts. Defs.' Resp. to SUMF ¶ 66.[16]

Defendants' reliance on the *Curtiss-Wright dictum* cannot mask the absence of any

---

[13] Defendants mischaracterize 22 U.S.C. § 4604(n) as setting forth the full scope of the Institute's engagement with Congress. Instead, that provision prohibits USIP from seeking to influence legislation (including legislation pending before state/local legislatures or the United Nations) *except* in the context of formally requested testimony regarding legislation by one of these bodies.

[14] Even then, Defendants' position is an overstatement—as the familiar example of a congressional delegation meeting with foreign leaders shows. *See Zivotofsky*, 576 U.S. at 19–20 (rejecting argument that "the President has 'exclusive authority to conduct diplomatic relations'" (citation omitted)).

[15] Defendants note that Track 1.5 diplomacy "is facilitated or mediated by a third party not representing a political organization or institution." Opp. at 15 (quoting SUMF Ex. 15, ECF 20-15). That is precisely so. USIP's role is to be that third party; it does not act as part of or a representative of the federal government at all. *See* SUMF Ex. 30.

[16] Defendants accuse Plaintiffs of ignoring the forest for the trees by focusing on USIP's "underlying work" of "research, report writing, training, and conflict resolution activities." Opp. at 16. But Defendants do not explain what other ends this work supposedly "under[lies]." Indeed, these activities are the forest—USIP does not do anything else.

authority suggesting that USIP's international engagement work is an exercise of executive (or even governmental) power; nor can it mask Defendants' lack of any factual support for their apparent misconception of what USIP does. And as Plaintiffs have shown, the mere fact that Congress created USIP to carry out a public-service mission does not transform its NGO-like work into an executive activity that the President must control, any more than the President must control the Red Cross's work of discharging treaty obligations or coordinating international relief efforts. 36 U.S.C. § 300102(1)–(4); *see also* 36 U.S.C. § 22102(2) (Congress chartered The American Society of International Law "to promote the establishment and maintenance of international relations on the basis of law and justice"). Similarly, the Olympic Committee plays a role in representing the United States vis a vis other nations, and can even make diplomatically fraught decisions that are not subject to "direct[]" presidential "control." *U.S. Olympic Comm.*, 483 U.S. at 545 n.27. Thus, when the USOC considered sending U.S. athletes to the 1980 Olympics in Moscow despite tensions between the United States and the Soviet Union, President Carter concluded that he was powerless to order the USOC not to do so. *Id.* (the Carter administration determined that it would have to either file suit or bar travel to the Soviet Union under the Emergency Powers Act to stop USOC from sending a team).

In this connection, Defendants' gauzy "soft power" contention demonstrates the indefensible breadth of their conception of executive power. For one thing, the congressional statement of purpose Defendants cite in support of this point does not refer to "soft power." Opp. at 14 (citing 22 U.S.C. § 4601).[17] More fundamentally, "soft power," an academic concept

---

[17] Notably, Defendants do not even attempt to define "soft power"; do not provide any evidentiary support establishing that USIP's activities constitute "soft power"; and do not explain how any USIP activities that supposedly reflect "soft power" are at all executive in nature or constitute the exercise of "substantial executive power" so as to take USIP outside the rule of *Humphrey's. See infra.*

referring to "a country's ability to influence others without resorting to coercive pressure," sweeps much broader than the work of formal relations with foreign states that the Constitution assigns to the President; indeed, it sweeps much broader than the government. "Soft power usually originates *outside government* in places like schools, religious institutions, and charitable groups." CFR Education, Foreign Policy, What is Soft Power? (Updated May 16, 2023), https://perma.cc/8CK3-YKTK (emphasis added). The contributors to a nation's soft power are nearly limitless, encompassing all sorts of private sector actors, including those in "music, sports, media, and major industries like Silicon Valley and Hollywood." *Id.* Civil society and NGO groups also play a key role. For example, contributors to the United States's soft power efforts to promote democracy include not only "government channels" such as USAID and the Bureau of Democracy, Human Rights, and Labor within the State Department, but also "independent organizations" that receive varying degrees of federal funding, such as the National Endowment for Democracy, the International Republican Institute,[18] and the Carter Center. Council on Foreign Relations, Soft Power: Democracy-Promotion and U.S. NGOs, (Mar. 17, 2006), https://perma.cc/MZ58-V5ZF (last visited Apr. 18, 2025). Even institutions that do not receive any government funding contribute to the soft power of the United States. *Id.*

Congress founded USIP to "strengthen[]" "private enterprise[] and voluntary associations" just as much as to strengthen "government." 22 U.S.C. § 4601(a)(5). Just like the National Endowment for Democracy or the Carter Center, any contribution USIP might make to how the world perceives and responds to the United States comes as a byproduct of its work as a neutral,

---

[18] The National Endowment for Democracy receives federal appropriations and then uses those funds to make grants to other groups, including the International Republican Institute and the National Democratic Institute for International Affairs, each of which is largely publicly funded but also accepts a small proportion of private donations. *Id.*

non-governmental facilitator of informal peace dialogues throughout the world, not from any role in the President's representation of the United States in dealings with foreign states. In short, because soft power by definition includes the contributions of private parties and NGOs, and in light of Congress's long history of promoting national interests through nonprofits outside the Executive Branch, Defendants' resort to characterizing USIP's activities as contributing to our nation's "soft power" only underscores that the Institute does not exercise any executive power— the issue that matters here.[19]

---

[19] The "foreign affairs" point is Defendants' only attempt to argue that the Institute carries out executive powers. Defendants do not offer any substantive response to Plaintiffs' explanation of why the Institute's grant-making functions do not involve executive power. Pls.' Opening Br. at 28–29 (private corporations and state government entities regularly distribute to other entities federal funds they have received; the Institute's grantmaking functions do not involve the administration of federal law). Defendants briefly assert, without explanation or citation to authority, that making grants is a "clear example[] of [an] executive function[]." Opp. at 17. But by failing to respond to Plaintiffs' argument on this score with any facts or developed argument, Defendants concede that the Institute's grantmaking work is not executive and have waived any argument to the contrary. They may not cure this waiver in reply. *Inst. for Energy Rsch. v. FERC*, No. Civ. No. 22-3420 (BAH), 2024 WL 551651, at *9 (D.D.C. Feb. 12, 2024) ("[I]f a party files an opposition to a motion and therein addresses only some of the movant's arguments, the court may treat the unaddressed arguments as conceded. Such a concession acts as waiver." (quoting *Wannall v. Honeywell, Inc.*, 775 F.3d 425, 428 (D.C. Cir. 2014)); *California v. Trump*, 613 F. Supp. 3d 231, 255 (D.D.C. 2020) (a "party waives arguments that it fails to raise in its opening brief" (citing *New York v. EPA*, 413 F.3d 3, 20 (D.C. Cir. 2005)); *St. John v. Napolitano*, 20 F. Supp. 3d 74, 103 n.16 (D.D.C. 2013) ("It is not enough merely to mention a possible argument in the most skeletal way, leaving the court to do the counsel's work, create the ossature for the argument, and put flesh on its bones . . . [A] litigant has an obligation to spell out its arguments squarely and distinctly or forever hold its peace.") (quoting *Schneider v. Kissinger*, 412 F.3d 190, 200 n. 1 (D.C. Cir. 2005)), *aff'd sub nom. St. John v. Johnson*, 608 F. App'x 6 (D.C. Cir. 2015)).

Moreover, even this short reference to grantmaking manages to mischaracterize the USIP statute. Defendants mistakenly assert that the Institute "is compelled to issue grants" under 22 U.S.C. § 4604(d), Opp. at 17, but the statute says only that the "Institute *may* undertake extension and outreach activities under this chapter by making grants and entering into contracts." 22 U.S.C. § 4604(d) (emphasis added).

IV.  **Even if the Institute were an executive agency, its politically balanced, multimember board of experts would fall well within the *Humphrey's/Wiener* exception to unfettered presidential removal.**

USIP is a multimember, partisan-balanced board of experts. With respect to that structure, as even Defendants concede, "*Humphrey's Executor* remains controlling on this Court." Opp. at 25. And under any reading of that precedent, the USIP Act's Board removal provisions are constitutional. Plaintiffs' position in this regard is buttressed by the Solicitor General's recent application to stay the judgments in the *Wilcox* and *Harris* cases.[20] The Solicitor General explained the government's position that the *Humphrey's* "exception to the President's removal power . . . "extends only to 'multimember expert agencies *that do not wield substantial executive power*." App. to Stay the Judgments of the U.S. Dist. Ct. for the Dist. of Columbia & Request for Admin. Stay at 3, *Trump v. Wilcox*, No. 24A, 2025 WL 1101716 (S. Ct. Apr. 2025) ("S.G. Stay App.") (quoting *Seila Law*, 591 U.S. at 218) (emphasis in original). In *Humphrey's*, the Supreme Court regarded the FTC as not exercising substantial (or indeed any) executive power because it was a "legislative" "aid" that made "investigations and reports thereon for the information of Congress" as well as a judicial aid that made recommendations to courts. *Id.* at *13 (quoting *Humphrey*'s, 295 U.S at 628). In seeking a stay in *Wilcox* and *Harris*, the Solicitor General reasoned that the NLRB and MSPB "do not simply make reports to Congress or recommendations to courts"; instead, they exercise substantial executive power because they implement and enforce "major" federal laws regulating "private-sector industrial relations" and "the federal workforce," respectively. *Id.* at 15, 17.

---

[20] Plaintiffs do not concede that the Solicitor General's narrow interpretation of *Humphrey's* is correct. But because Plaintiffs prevail even under this narrow interpretation, this Court should sustain their argument that the removal provisions in the USIP Act do not run afoul of any Article II prohibition.

The government's argument before this Court that "substantial[ity]" doesn't matter is inconsistent with the Solicitor General's position in the Supreme Court in *Wilcox* and *Harris* and misrepresents the reasoning of *Collins*. Opp. at 24 ("Courts are not well-suited to weigh the relative importance of the regulatory and enforcement authority of disparate agencies." (quoting *Collins*, 594 U.S. at 253)). In *Collins*, the Court disclaimed reliance on subtle distinctions between different degrees of enforcement and regulatory power. But USIP doesn't have or exercise *any* such power. It has no authority to bring an enforcement action against anyone, and it does not issue regulations or adjudicate claims. The question here is whether USIP's international research and engagement work amounts to an exercise of "substantial executive power" incompatible with the precedents of *Humphrey's* and *Wiener v. United States*, 357 U.S. 349, 356 (1958).[21]

Defendants assert that *Wiener* does not support application of the *Humphrey's* exception when foreign affairs powers are at issue because the Court in *Wiener* "concluded there were no executive powers at play." Opp. at 27. Not so. As the Supreme Court explained, the War Claims Commission started out from a proposal that would have placed some claims by Americans against Japan within the purview of the Federal Security Administrator, who was "indubitably an arm of the President"; the final statute assigned the handling of these and other types of claims to the Commission. *Wiener*, 357 U.S. at 353–56. Claims adjudication that would have involved executive power in the hands of the Federal Security Administrator did not magically become non-executive when assigned to the Commission. Defendants do not respond to Plaintiffs' argument that the

---

[21] Moreover, *Collins* presented a distinct situation in another critical way: it dealt with a single-director agency, rather than a multimember board. *Cf. Harris v. Bessent*, 2025 U.S. App. LEXIS 7301, *53, 2025 WL 980278, at *22 (D.C. Cir. Mar. 28, 2025) (Henderson, J. concurring in the grants of stay) (noting that because the *Collins* analysis flowed from the fact that the agency was led by a single director, "it is not clear that *Collins*' instruction not to weigh up the nature and breadth of an agency's authority extends to multimember boards").

settlement of claims against formerly belligerent states is an executive foreign affairs function, yet the Supreme Court nonetheless held unanimously that it was constitutional for Congress to legislate removal protections for those who carried out this task. Pls.' Opening Br. at 33.

In contrast to the agencies at issue in recent Supreme Court removal decisions like *Collins* and *Seila Law*, a significant part of USIP's work *is* simply investigating facts, conducting research, making reports to Congress, and facilitating congressional study groups. *Humphrey*'s, 295 U.S at 628; SUMF ¶ 60. To use the terminology of *Humphrey's*, these functions are quasi-legislative. To use the current Supreme Court's approach, making reports to and serving as an information resource for Congress, as distinct from administering a regulatory regime, is not an exercise of executive power (and certainly not a substantial one).[22] *See Seila Law*, 591 U.S. at 215, 218. Defendants invoke *Buckley v. Valeo*, 424 U.S. at 138–42 for the proposition that Congress cannot assign executive functions to an entity outside the Executive Branch. Opp. at 19. That is correct as far as it goes; *Buckley* held that Congress could not assign to the Federal Election Commission, which at the time was not helmed by individuals properly appointed as Officers of the United States, the functions of administering a campaign financing statute and enforcing it in court. 424 U.S. at 138–39. But Defendants omit the Supreme Court's important caveat that under *Buckley*,

---

[22] Defendants go to lengths to point out that *Humphrey*'s considered the FTC removal restrictions to be constitutional in part because the FTC played a quasi-legislative role and in part because it played a quasi-judicial one, and that USIP does not engage in adjudications. Opp. at 25–26. But the rule of *Humphrey*'s is not that removal restrictions are consistent with Article II only when an agency has both quasi-legislative *and* quasi-judicial functions. In fact, that USIP does not enforce federal law through adjudication makes it easier to conclude that it does not exercise substantial executive power, not harder. *See Arlington v. FCC*, 569 U.S. 290, 304 n.4 (2013). The Plaintiffs agree with Defendants' contention that the "Institute is far removed from the early-20th century Federal Trade Commission," Opp. at 6, but that is because USIP is even further removed from the substantial exercise of executive power than the FTC and similar bodies like the MSPB and NLRB.

"there can be no question" that Congress is free to assign to non-executive officers functions that are "essentially of an investigative and informative nature" in aid of Congress. *Id.* at 137.

Beyond its research work for Congress, USIP's remaining functions (applied peace research, conflict resolution, dialogue facilitation and training) are not governmental at all. SUMF ¶¶ 61–68; *cf. Collins*, 594 U.S. at 254 (rejecting argument that FHFA "does not wield executive power" when "acting as a conservator or receiver"—typically a private-sector capacity—only after emphasizing that the FHFA's statutory powers "differ critically" from those of private conservators or receivers in that the FHFA as conservator/receiver may issue regulations, orders, and subpoenas). An entity that in part assists Congress with its legislative responsibilities and in part acts, consistent with its nonprofit corporate form, as an NGO is not engaged in the exercise of substantial executive power. The officers of such an entity certainly are not "purely executive" and therefore removable at will. Opp. at 24. If, as the Solicitor General says, the binding rule of *Humphrey's* is that Congress may protect from removal expert board members of multimember bodies that do not wield substantial executive power, Congress's removal protections for the USIP Board members are plainly constitutional—all the more so if the binding rule of *Humphrey's* is broader than the Solicitor General has asserted.[23]

Finally, the President may remove USIP Board members not only for cause (malfeasance, neglect, inability to discharge duties), 22 U.S.C. § 4605(f)(1), but also *without* cause so long as eight other Board members, or designated congressional committees, so recommend. *Id.* §§ 4605(f)(2), (3). The President does not have this privilege with respect to the FTC, NLRB, or MSPB, and thus has more latitude to influence the USIP Board than he had with respect to the

---

[23] In his dissent in *PHH Corp. v. CFPB*, then-Judge Kavanaugh listed "independent agencies exercising substantial executive authority." 881 F.3d 75, 173 (D.C. Cir. 2018). USIP did not appear on the list.

FTC in *Humphrey's*. *A fortiori*, then, USIP's structure is constitutional. Pls.' Opening Br. at 33–35. Defendants respond with a non-sequitur reference to *Collins*. Opp. at 27. In *Collins*, the Supreme Court rejected the argument that the statute at issue provided for removal of the FHFA director "for cause," and therefore allowed for removal in a greater range of circumstances than under statutes that limit removal to malfeasance, neglect, and similar language. 594 U.S. at 229, 256–57. The Court reasoned that even though the statutory provisions at issue in *Collins* gave the President authority to remove the director for disobeying an order, in the context of a single-director regulatory enforcement agency,[24] Article II demanded that the President retain the ability to remove the director for additional reasons, including loss of confidence, differing policy views, and partisan differences.

More to the point, Plaintiffs do not argue that 22 U.S.C. § 4605(f)(1) gives the President greater latitude to remove USIP Board members than other statutes using malfeasance and neglect language. They instead argue that § 4605(f)(2) and (3) grant the President additional latitude, because those provisions allow for without-cause removal so long as it is recommended by a Board majority or congressional committees, both of which may well be under the control of the President's own party. Moreover, the President may remove the three *ex officio* members unilaterally and for any reason, another feature that gives him greater influence over USIP than over the FTC. *Cf. Collins*, 594 U.S. at 253 n.19 ("[T]he Sinking Fund Commission, which Congress created to purchase U.S. securities following the Revolutionary War, was run by a 5-member Commission, and three of those Commissioners were part of the President's Cabinet and therefore removable at will."). Defendants cannot point to any case holding that Article II would

---

[24] The Court expressly noted that removal restrictions on members of multimember boards were not before it. *Collins*, 594 U.S. at 256 n.2.

prohibit removals based on a structure that includes a range of removal options like those in § 4605(f). Indeed, Defendants offer no argument for why these additional removal options would not alleviate any lingering Article II concerns as to USIP even if it were otherwise part of the Executive Branch and outside the *Humphrey's/Wiener* exception for multimember Boards.

## V.    USIP and the official-capacity Plaintiffs properly bring this suit.

Defendants' arguments that undersigned counsel do not represent the Institute, that the Institute did not authorize suit on its behalf, and that the Board member plaintiffs may not sue in their official capacities are all circular. They assume Defendants' success on the merits of their constitutional challenge to the USIP Act removal provisions. Opp. at 7–9. The Court should not assume the unconstitutionality of an act of Congress limiting removal of Board members when aligning the parties "at the threshold." *Id.* at 7. Defendants do not dispute that the President's purported removals of the Board members were in contravention of the USIP Act removal provisions. Defs.' Resp. to SUMF ¶¶ 39–42.[25] And as Plaintiffs have shown, Defendants have not succeeded in establishing that these provisions are unconstitutional. Accordingly, the removals were *ultra vires* and void *ab initio*. Put another way, the Board member plaintiffs were "never in fact removed." *Harris v. Bessent*, Civ. No. 25-412 (RC), 2025 WL 679303, at *11 n.13 (D.D.C. Mar. 4, 2025); *Kalbfus v. Siddons*, 42 App. D.C. 310, 321 (D.C. Cir1914) ("In the present case the removal of the relator having been illegal and void, the office never became vacant, and the attempted appointment of his successor was a mere nullity.").

In turn, the resolution to terminate Ambassador Moose as acting president of USIP was signed only by the three *ex officio* members, and therefore was not operative. The purportedly

---

[25] Defendants (Opp. at 8) incorrectly portray the SUMF statement that the President "purported to remove" the Board members as an admission that the President in fact lawfully removed them.

removed (b)(4) Board members were still part of the Board even after the purported termination emails went out on March 14, 2025, so there remained thirteen lawfully appointed Board members (after one resigned on March 14). The three *ex officio* votes did not constitute a majority of the Board. The Board may only act, following public notice of a meeting, when there is a majority of the Board present to constitute a quorum (and then only when a majority of those present concur in the resolution), or by unanimous written consent of all Board members.[26] 22 U.S.C. § 4605(h)(2); SUMF Ex. 37 at 4–5, ECF No. 20-37 (USIP Bylaws Sections 3(a), 3(b), 6). Accordingly, the three *ex officio* members' "resolution" purporting to terminate Ambassador Moose was without effect, and he remains in his position as acting president of USIP. He authorized USIP to bring this suit. *See* 22 U.S.C. § 4604(k) (the Institute may bring suit).

Ambassador Moose and the Board member plaintiffs may challenge their purported ousters, as well as the harms to USIP that flowed from those *ultra vires* actions. it. *See Bd. of Dir., Washington City Orphan Asylum v. Bd. of Trs., Washington City Orphan Asylum*, 798 A.2d 1068, 1070, 1070–77 (D.C. 2002 (under principles of "federal standing jurisprudence," "purportedly ousted board" members of the Washington City Orphan Asylum, a nonprofit corporation Congress chartered in 1828, had standing to challenge their ouster and a threat "to end all funding to the operating unit of the organization"; the Directors asserted not only "the interest of the youth" their organization served but also "their own interest in serving in the capacity accorded them by the statute").

Defendants' argument to the contrary proceeds from non-binding *dicta* from a single judge in *In re Aiken County*: Defendants quote Part III of the D.C. Circuit's opinion, which was joined by then-Judge Kavanaugh alone." 725 F.3d 255, 261 & n.2 (D.C. Cir. 2013). Moreover, the point

---

[26] It is undisputed that there was no public notice before the purported resolutions were issued.

Defendants rely upon—that "the President (and subordinate executive agencies supervised and directed by the President) may decline to follow [a] statutory mandate or prohibition if the President concludes that it is unconstitutional"—was *dictum* even with respect to Judge Kavanaugh's opinion, which concluded that mandamus was available to compel the Nuclear Regulatory Commission to comply with statutes the Commission had "not asserted" were unconstitutional. *Id.* at 262; *see also id.* at 267 (Randolph, J., concurring) (expressing the view that the discussion in then-Judge Kavanaugh's solo Part III opinion was "unnecessary to decide this case").

Then-Judge Kavanaugh's statement also has no bearing on how a court decides a dispute over the constitutionality of a statute. He was opining about what the political branches could permissibly do, *subject to judicial resolution in a justiciable case*. *See id.* at 262 (Part III opinion of Kavanaugh, J.). Then-Judge Kavanaugh certainly did not suggest that Article III courts are bound to agree with the President's determination that a statute enacted by Congress is unconstitutional. This Court has before it a justiciable controversy between parties invoking a congressional enactment as the basis for the legal rights of the Institute itself and the officers and directors who have a recognized interest in the Institute and its work on the one hand, and representatives of the Executive Branch asserting the unconstitutionality of the enactment on the other. It should go without saying that in such a circumstance, it is this Court's role to "say what the law is." *Marbury v. Madison*, 5 U.S. 137, 177 (1803).

## VI.    Defendants offer no argument or facts in defense of their causing USIP to cease its activities in direct contravention of the USIP Act.

Contrary to Defendants' claim, not all of Plaintiffs' claims "rise and fall" on Plaintiffs' opposition to Defendants' constitutional challenge to the USIP Act's removal protections. *See* Opp. at 7, 27. Defendants do not address Plaintiffs' independent argument that even if the

President's removals of USIP's Board members were valid, Defendants may not give away all of the Institute's property, fire all its employees, and cancel its contracts, which together amount to cessation of the Institute's activities and steps to dissolve the entity. Since DOGE's February 24, 2025 statement to Ambassador Moose that DOGE would reduce USIP's "functions" to only having a board, a president, and submitting biannual reports to Congress, DOGE's shutdown efforts have only accelerated. Pls.' Opp. Ex. 8 ¶ 3. DOGE has worked to shut down all programmatic activity; one DOGE representative advised staff to assume that all overseas programs would wind down in early April. PAUF ¶ 6. All staff working on the Gandhi-King Academy program have been terminated. PAUF ¶ 7.

The vast majority of D.C. headquarters staff were terminated on March 28; as of this filing only four headquarters employees (not counting members of DOGE) had not received termination notices. The remaining four are not programmatic staff; they work in IT, human resources, and finance. Moreover, they understand that they will be terminated by the end of May. *Id.* The situation is no less dire for USIP's work abroad. Across USIP's former global presence, only four USIP employees or contractors remain after the rest have been terminated, and these remaining four are working only on closing down USIP's operations. They, too, believe they will be fired before May is out. PAUF ¶ 8. Nor is USIP's purported leadership doing any work in furtherance of USIP's statutory mission. It appears that purported acting president Defendant Cavanaugh does not carry out any tasks for USIP at all, and another individual DOGE assigned to be in charge of USIP, Justin Fox (whose precise position at USIP is unclear) works only on the efforts to close USIP down. PAUF ¶ 9; Pls.' Op. Ex. 8 ¶ 7. Ambassador Moose, who knows from experience what resources and staff levels are necessary to ensure USIP is carrying out the mission Congress set out for it, believes that the current staffing situation is insufficient for USIP to do so, or even to

37

carry out its statutory minimum functions as defined by DOGE. Pls.' Opp. Ex. 8 ¶ 8.

As Plaintiffs explained in their opening brief, the USIP Act bars Defendants from causing USIP to cease activities or dissolve, but this is just what they have done and continue to do. Pls.' Opening Br. 38–39 (citing 22 U.S.C. § 4604(a); Pub. L. No. 87-569, 76 Stat. 265, 268 (Aug. 6, 1962)). This statutory bar remains whether or not the removal of the Board members was lawful. It is not only an independently sufficient basis for success on Count V (Plaintiffs' Administrative Procedure Act claim against Defendants Rubio, Hegseth, and Garvin), but also an independently sufficient basis for success on Count I against all Defendants. Pls.' Opening Br. at 38. Congress expressly prohibited USIP from ceasing its corporate activities or dissolving; Congress would have to amend the USIP Act to permit any lawful cessation or dissolution. The President and his agents—the Defendants here—may not accomplish this by executive diktat alone.[27] Defendants do not so much as mention this independent argument in their brief. Accordingly, they have conceded it and waived any opposition. *Inst. for Energy Rsch.*, 2024 WL 551651, at *9; *Trump*, 613 F. Supp. 3d at 255; *St. John*, 20 F. Supp. 3d at 103 n.16.

With respect to Count V, Defendants offer no support for their contention that Defendants Hegseth, Rubio, and Garvin are not subject to the APA because they do not act in their capacities as heads of agencies when they sit on USIP's Board. Opp. at 29. But these Defendants are not acting as individuals appointed to the Board; the USIP Act identifies their positions as "Secretary

---

[27] Count I alleged that the President has a duty to take care that the laws be faithfully executed; that bicameralism and presentment are required before legislation can become law; and that Congressional enactments must be observed. Am. Compl. ¶¶ 73–76. Count I further incorporated the prior allegations, *id.* ¶ 71, which included descriptions of the Defendants' actions to terminate most employees, "paralyze the organization," and cut off funds, as well as their anticipated actions to cancel contracts, e.g., *id.* ¶¶ 60–65. Count I also alleges that Defendants' actions exceed executive authority, usurp the role of Congress, violate the separation of powers, and are *ultra vires. Id.* ¶ 77. Of course, in addition to covering the unlawful dissolution, Count I also covers the unlawful terminations in violation of the USIP Act and the void-*ab-initio* actions that followed.

of State," "Secretary of Defense," and "president of the National Defense University" as the *ex officio* holders of the seat. 22 U.S.C. § 4605(b)(1)–(3). They may designate someone else *within their agency* to serve. *Id.* If the President were to replace Defendant Hegseth with a new Secretary of Defense tomorrow, the new Secretary would automatically become a member of the USIP Board and a defendant in this lawsuit. *See* Fed. R. Civ. P. 25(d).

**VII.    The Court is not powerless to grant relief should it find Defendants' actions unlawful.**

**A.    Defendants' anti-reinstatement argument does not apply to any component of Plaintiffs' requested relief.**

Defendants' argument that the Court cannot order that USIP's ousted board members and acting president should be reinstated because "de jure reinstatement of a principal officer is beyond the equitable authority of the court" (Opp. at 30), is inapplicable to the directors and president of a D.C. nonprofit corporation. Moreover, the argument rests on drawing an obsolete line between equitable and legal relief when in fact both are available here. It is also worth noting at the outset that even if the Court could not order the directors reinstated (the supposed "principal officers" in Defendants view, Opp. at 30), it could still invalidate the consequences of their unlawful ouster: the replacement of Ambassador Moose as acting president (who would under Defendants' theory be an *inferior* officer) and the dismantling of USIP by transferring its headquarters, destroying its data, and sacking its staff. Pls.' Proposed Order Granting Summary Judgment at 1–2, ECF 20-38 ("Proposed Order"). That would redress the injuries to USIP and the individual Plaintiffs at least in part, and would not implicate in any way the purported equitable barrier Defendants interpose. Thus, for example, Court may enter an order enjoining Defendants from further trespass against Institute property and an order enjoining them from further accessing Institute systems or purporting to act in the name of the Institute. *Id.* Moreover, the Court can remedy the de facto dissolution of USIP effected by the Defendants' cessation of its core activities—a power Congress

withheld from USIP and kept for itself.[28] 22 U.S.C. § 4604(a). Plaintiffs do not "only" seek an injunction allowing them to serve in their rightful positions. Opp. at 30.

Moreover, even Plaintiffs' removal-related requests for injunctive relief do not require the Court to reinstate the Board member Plaintiffs (and Ambassador Moose) because these Plaintiffs were never validly removed from their positions. *See Kalbfus*, 42 App. D.C. at 321; Proposed Order at 2 (requesting an order that the Board members "shall continue to serve" and "may be removed only in conformity with" the USIP Act and an order that Ambassador Moose "may not be removed or in any way be treated as having been removed, or otherwise be obstructed from his ability to carry out his respective duties").

### B.    Even on its own terms, Defendants' anti-reinstatement argument does not apply to USIP Board members or its acting president.

Defendants' argument is inapplicable to USIP because its directors are directors of a D.C. non-profit corporation, not executive principal officers. The government has conceded that presidential appointment and Senate confirmation does not a principal officer—or an officer of any degree—make. *See* Opp. at 19 & n.3, Pls.' Opening Br. at 17 n.10. If the Court agrees that USIP is not an Executive Branch agency and exercises no executive power, then there is simply

---

[28] Defendants' argument that the Court may not enter a reinstatement injunction also does not apply to Plaintiffs' seven distinct requests for declaratory (rather than injunctive) relief, remedies Defendants do not address. Proposed Order at 1–2. The requested declaratory relief includes orders that the purported removals of the Board member Plaintiffs and Ambassador Moose were null and void. *Id.* at 1. It also includes Plaintiffs' requests for declarations that the subsequent actions of Defendants Jackson, Cavanaugh, Hegseth, Rubio, and Garvin were null and void because they were not authorized by a majority vote of a quorum of the lawful Board members or unanimous consent of the full lawful Board (or by an Institute president appointed by that group). 22 U.S.C. § 4605(h)(2); SUMF Ex. 37 at 4–5, ECF No. 20-37 (USIP Bylaws Sections 3(a), 3(b), (6). The Court need not reinstate anyone to issue these orders encompassing declaratory relief. Contrary to Defendants' brief, Plaintiffs invoke the Declaratory Judgment Act as a basis for relief on their *ultra vires* and other claims, not, as Defendants contend (Opp. at 30), an "independent cause of action" or a "freestanding . . . claim."

no basis for constraining the Court's authority to undo the illegal removals and the actions flowing from them. Even if the Court disagrees with that conclusion, the Plaintiff board members are part of a multimember board that does not exercise substantial executive power such that Congress may constitutionally protect them from at-will presidential removal.[29] In the government's *Harris* and *Wilcox* Supreme Court stay application, the Solicitor General acknowledges that a court in this district reinstated removed members of the U.S. Commission on Civil Rights "because that court believed that the commission functioned as a 'legislative agency' whose 'only purpose' was 'to find facts which [could] subsequently be used as a basis for legislative or executive action'—not to exercise any executive power in its own right." S.G. Stay App. at *23 (quoting *Berry v. Reagan*, Civ. No. 83-3182, 1983 WL 538, at *2 (D.D.C. Nov. 14, 1983)). As in *Berry*, once the Court reaches the remedies stage on the removal claims in this case, the President's Article II interests— on which Defendants' anti-reinstatement argument rests—will no longer be applicable.

For similar reasons, Defendants miss the mark when they say that "[r]einstatement of a public official" is not a remedy that was "traditionally accorded by courts of equity." Opp. at 31 (citation omitted).[30] As the undisputed summary judgment record makes plain, the duly appointed USIP Board members and Ambassador Moose are not public officials; they are directors and the acting president of a District of Columbia nonprofit. Defendants are federal officials. Accordingly, the government's cases regarding reinstatement of executive and even public officials are the wrong place to look for a historical pedigree. The right places to look are the longstanding equitable powers of federal courts to grant injunctive relief "with respect to violations of federal

---

[29] If one branch, Congress, may enact removal restrictions consistently with Article II, it follows that another branch, the judiciary, may enforce those restrictions consistently with Article II.

[30] As discussed *infra,* Defendants' argument also happens to be flatly inconsistent with the analysis of Chief Justice Marshall for a unanimous Supreme Court in *Marbury*, 5 U.S. at 166.

law by federal officials," *e.g.*, *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 326–27 (2015), as well as the doctrine permitting purportedly ousted board members of a congressionally chartered nonprofit to seek injunctive relief. *Bd. of Dir., Washington City Orphan Asylum*, 798 A.2d at 1070–77. Plaintiffs' requested relief is in the heartland of the Court's equitable authority.

### C.    Apart from its inapplicability to this case, Defendant's anti-reinstatement argument is incorrect as a matter of law.

Defendants' anti-reinstatement argument is also wrong because it rests on pre-merger authority about the unavailability of equitable relief when legal relief is available. Reinstatement would be available even if USIP Board members and officers were public officials. One of the most straightforward legal remedies for the unlawful removal of a public official is mandamus. Indeed, *White v. Berry*, Defendants' main authority for its no-equitable-remedy-proposition, points to mandamus as available legal relief. 171 U.S. 366, 377 (1898). And Congress expressly conferred authority on district courts "to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff." 28 U.S.C. § 1361. That statute addressed the fallout from *Marbury v. Madison*, where the Supreme Court established judicial review by holding that Congress lacked the power to add to the Supreme Court's original jurisdiction, preventing the Court from issuing mandamus to give Marbury his unlawfully withheld judicial commission, although Chief Justice Marshall deemed it "a plain case for mandamus." 5 U.S. at 173. Here, the Board members' right is clear and indisputable because the statute clearly bars their removal. And the constitutional question is just as clear under existing law.

*Swan v. Clinton* did not hold that a court could not remedy an unlawful removal. In that case, the Court was concerned with avoiding an injunction issued directly to the President, but there is no need to do that in this case. *See* 100 F.3d 973, 989 (Silberman, J., concurring). To the contrary, *Swan* is one of numerous modern post-merger cases that recognize that courts do have

such authority. *See* 100 F.3d at 980 (D.C. Cir. 1996) (majority op.); *Severino v. Biden*, 71 F.4th 1038, 1042–43 (D.C. Cir. 2023).

**D.      Defendants' remaining arguments against injunctive relief fail.**

Defendants offer little in the way of an attempt to rebut Plaintiffs' showing that the traditional factors all weigh in favor of injunctive relief. *See, e.g.*, *eBay Inc. v. MercExchange LLC*, 547 U.S. 388, 391 (2006) (the factors are irreparable harm, lack of adequate remedies at law, balance of hardships, and whether an injunction would disserve the public interest). They do not even address Plaintiffs' showing that they have suffered various forms of irreparable harm for which legal remedies are not adequate, Pls.' Opening Br. at 39–44. Defendants have conceded and waived any argument on these points. *Inst. for Energy Rsch.*, 2024 WL 551651, at *9; *Trump*, 613 F. Supp. 3d at 255; *St. John*, 20 F. Supp. 3d at 103 n.16. Defendants briefly allude to the balance of hardships and public interest, but their reasoning again presumes their success on the merits of their argument that the Board members are principal executive officers who must be subject to presidential control. *See* Opp. at 32 (citing the per curiam motions panel opinion in *Dellinger v. Bessent*, No. 25-5052, 2025 WL 887518, at *3–4 (D.C. Cir. Mar. 10, 2025)). Thus, Defendants argue that restoring Plaintiffs to their lawful positions will harm the President's interest in enforcing the separation of powers and prevent the President from taking care that the laws be faithfully executed. Opp. at 32–22. But of course, Defendants have not pointed to any laws that USIP is responsible for executing, or to any functions it performs that invade the province of the Executive Branch.

Defendants also complain of harm if, hypothetically, the Court were to reinstate the Plaintiffs only for the government to prevail on appeal. Defendants speculate that this sequence of events might require future directors to "reconsider" actions Plaintiffs take in the meantime and "interfere with the GSA's ability to utilize" USIP's building. Opp. at 32. But this argument too

presumes the validity of Defendants' claims that the removal provisions are unconstitutional. If the Court reaches the stage of balancing the hardships on Plaintiffs' request for injunctive relief regarding their removal, Plaintiffs will have prevailed on the merits and the Defendants' actions in transferring the privately owned USIP building to GSA for no consideration, along with seizing the funds of the USIP Endowment, will have been determined to be unlawful. There is no hardship in requiring federal officials to abide by the laws they are duty-bound faithfully to execute.

Defendants final point on the balance of hardships, that "forgoing reinstatement would not harm plaintiffs" because they may be able to recover lost "remuneration," ignores that Plaintiffs do not argue that their loss of pay is a basis for injunctive relief. Opp. at 32. Defendants do not respond to Plaintiffs' showing that the Board member Plaintiffs and Ambassador Moose have suffered harms in their individual and official capacities, including that they have been deprived of their lawful right to serve in a position of high importance; that they have been prevented from carrying out their fiduciary obligations to thwart Defendants' actions to divest USIP of its property and employees and to harm its reputation; and that they have been deprived of any ability to fulfill their fiduciary obligations as stewards of the Institute's financial wellbeing and its ability to perform the important mission assigned to it by Congress. Pls.' Opening Br. at 39–45.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court grant their motion for summary judgment, order the declaratory and injunctive relief they request, and deny Defendants' cross-motion for summary judgment.

Dated: April 18, 2025                          Respectfully submitted,

                                               /s/ Andrew N. Goldfarb
                                               Andrew N. Goldfarb (D.C. Bar No. 455751)
                                               J. Benjamin Jernigan (D.C. Bar No. 9000865)
                                               ZUCKERMAN SPAEDER LLP
                                               2100 L Street, NW, Suite 400

Washington, D.C. 20037
Tel: (202) 778-1800

William J. Murphy (D.C. Bar No. 350371)
ZUCKERMAN SPAEDER LLP
100 East Pratt Street, Suite 2440
Baltimore, MD 21202-1031
Tel: (410) 332-0444

*Counsel for Plaintiffs*

## **REQUEST FOR HEARING**

Pursuant to Local Civil Rule 7(f), Plaintiffs request an oral hearing on their motion for summary judgment and Defendants' cross-motion for summary judgment.

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on April 18th, 2025, I served a true and correct copy of the foregoing document via the Court's Electronic Filing System, which will electronically send notice to all counsel of record.

/s/ *Andrew N. Goldfarb*

Andrew N. Goldfarb