# Plaintiff Opp. Ex. 1



BIENNIAL REPORT

*of*

# The United States
# Institute of Peace

1  9  8  7

BIENNIAL REPORT

*of*

# The United States Institute of Peace (U.S. Institute of Peace)

C239
7.5

LIBRARY OF CONGRESS
SEP
EXCHANGE & GIFT DIVISION



**Board of Directors**
John Norton Moore, *Chairman*
Ambassador Kenneth L. Adelman
Dr. Dennis L. Bark
Lieutenant General Bradley C. Hosmer, USAF
Ambassador William R. Kintner
Dr. Evron M. Kirkpatrick
Morris I. Leibman, Esq.
Reverend Sidney Lovett
Pastor Richard John Neuhaus
Ambassador Richard Schifter
Dr. W. Scott Thompson
W. Bruce Weinrod, Esq.
The Honorable Casper W. Weinberger
Dr. Allen Weinstein
Robert F. Turner, *President (nonvoting)*

The Biennial Report of the United States Institute of Peace was prepared and transmitted to the President and the Congress of the United States Pursuant to Section 1712 of the United States Institute of Peace Act (Public Law 98-525, as amended).

SUBMITTED TO THE CONGRESS AND THE PRESIDENT OF THE UNITED STATES OF AMERICA

BY JOHN NORTON MOORE—CHAIRMAN OF THE BOARD OF DIRECTORS—AUGUST 1987

JX 1908
4kg155a

On April 14, 1986—the date on which the United States Institute of Peace first opened its doors—former United States Senator Jennings Randolph sent a letter to Chairman of the Board John Norton Moore. Senator Randolph was first elected to Congress in 1932, the year that Franklin Delano Roosevelt was elected the thirty-second President of the United States. Senator Randolph's letter includes a moving quotation from the President's speech concerning the responsibility and necessity for the American public to work toward lasting peace. President Roosevelt intended to deliver that speech on April 13, 1945, but passed away unexpectedly the day before.

*JENNINGS RANDOLPH*

April 14
1986

Dear Chairman Moore —

Former President Franklin Roosevelt died in Warm Springs, Georgia on April 12, 1945.

He was to have given a speech in St. Louis, Missouri on April 13, had his health permitted. I have read the remarks our great president had prepared.

I quote from them that you and the Peace

---

*"Today we move against the terrible scourge of*

*war -- as we go forward toward the greatest con-*

*tribution that any generation of human beings*

*can make in this world -- the contribution of*

*lasting peace.  I ask you to keep up your faith."*

---

*JENNINGS RANDOLPH*

Institute Directors may understand the desire of his concern that the peoples of the world if we live - learn to like together in a world in whose time and distance are no more."

I continue to quote his underlined speech—

" We, as Americans, do not choose to deny our responsibility, nor do we intend to abandon our determination that, within the lives of our

---

*JENNINGS RANDOLPH*

Children and our children's children, there will not be a third World War.

"We seek peace enduring peace. More than that - an end to this brutal, inhuman, and thoroughly impractical method of settling the differences between governments.

"The work, my friends, is peace. More than an end to this war - an end to the beginnings of all wars. Yes, an end, forever, to this impractical, unrealistic settlement of the differences between governments by the

---

*JENNINGS RANDOLPH*

mass killing of Peoples.

" "Today we move against the terrible scourge - as we go forward toward the greatest contribution that any generation of human beings can make in this world - the contribution of lasting peace. I ask you to keep up your faith."

President Roosevelt - in his own hand added,

" The only limit to our realization of tomorrow will be our doubts of today. Let us move forward with

---

*JENNINGS RANDOLPH*

strong and active faith.

You, the Peace Institute Directors, will I am certain, "move forward with strong and active faith."

I add my belief that at long last, we have the instrument, through you, the directors, to make Roosevelt's hope come true.

Truly, Jennings Randolph



*Chairman John Norton Moore (left) presents former Senator Jennings Randolph with a certificate of appreciation at the Board's inaugural meeting.*

# Preface

"Peace is our passion," Thomas Jefferson wrote in 1803.[1] This crisp phrase captures the spirit of the United States Institute of Peace.

Mankind faces no problem more pressing than the achievement of peace. Each World War has been on an order of magnitude more catastrophic than the last; and, in this age of thermonuclear weapons, another such conflict simply must not be permitted to happen. In addition, we must find ways to end violence at the regional and nation state levels that, since World War II, has been a critical problem of world order.

Historically, Americans have taken the lead in working for international peace. We played major roles in the Hague Peace Conferences of 1899 and 1907. Secretary of State William Jennings Bryan introduced fact-finding and "cooling-off" treaties as a means of war avoidance. President Woodrow Wilson conceived the League of Nations. Secretary of State Frank B. Kellogg led the world in 1928 to the momentous Pact of Paris that, at least in legal terms, prohibited the use of aggressive war as an instrument of foreign policy. President Franklin Delano Roosevelt spearheaded the Allied effort to establish the United Nations. President Harry S Truman offered the Baruch Plan in an attempt to harness nuclear energy exclusively for peaceful purposes. President John F. Kennedy created the Peace Corps and the Arms Control and Disarmament Agency, unique national institutions for promoting peace. President Ronald Reagan established the National Endowment for Democracy to share with others the great benefits of a democratic heritage. The United States Institute of Peace comes from this profound tradition that seeks to control violence and achieve a just peace based on human freedom and dignity.

The story that follows makes it plain that the Institute's early steps owe their success to many people, from current supporters in the United States and abroad to the many individuals from the past whose work we build upon today. Any organization's first year of operation is, of necessity, a formative period, requiring substantial attention to organizational and administrative detail in addition to careful program development. Most importantly, the beginning is the appropriate time to establish the highest standards in all that a new institution does—intellectually and ethically as well as in the imagination, realism, and vigor with which it undertakes its mission. We believe that our record in these matters is strong. The Institute can now build from a very sound foundation to realize the aspiration of its architects that it become, in fact as well as promise, a permanent actor for peace among the nations and peoples of the world.

To echo Senator Spark Matsunaga's prefatory words to the study recommending that the Congress and the President create a national peace institution: "This report contains good news."[2] For over 200 years, visionary American statesmen worked for the creation of a national institution that would focus American intellect and experience on peace among nations. Their goal is now a reality, and I am fully confident that, when we look back from the perspective of the twenty-first century, the United States Institute of Peace will be an important and respected force in achieving a more peaceful world.

*John Norton Moore*

John Norton Moore
Chairman of the Board

# Contents

**Guiding Principles 1**
Tradition 1
Independence 1
Integrity 2

**The Beginning 5**

**Programs: An Overview 15**

**Jennings Randolph Program
for International Peace 17**

**Grants Program 19**

**Institute Projects 21**
Institutionalized Programming 21
  National Peace Essay Contest 21
  Report on the State of World Peace 21
  Newsletter 22
  Seminars on Negotiation Training and
    the Teaching of Negotiation Theory 22
  Internships 22

Longer-Term Projects 23
  Intellectual Map of the
    International Peace Field 23
  Television Series on the History
    of U.S.-Soviet Relations 23
  Curriculum Development for High School
    Teaching of International Peace and
    Conflict Management 25
  Library Classification System 25

Shorter-Term Projects 25
  Strengthening the United Nations Charter
    and International Law to Deter Low-Intensity
    Covert Forms of International Aggression 25
  Study of Political Systems and
    International Conflict 25

**Funding 27**
Resource Levels: Fiscal Years 1985 & 1986 27

Resource Levels: Fiscal Years 1987 & 1988 27

Endowment of the United States
Institute of Peace 27

Financial Management of the Institute
and the Endowment 28

**Looking Ahead 29**
Funding 29

The President of the United States
Institute of Peace 29

The Institute's Headquarters 30

The Institute's Public Visibility 30

A Closing Word 31

**Endnotes 33**

**Appendices**
A—Board of Directors 39
B—Institute Officers and Staff 45
C—Jennings Randolph Distinguished Fellows 49
D—Brief Descriptions of Grant Awards 51
E—Participants in First Four Intellectual
    Map Colloquia 59
F—Incorporation Documents of the Endowment
    of the United States Institutes of Peace 61
G—Audit of Institute Accounts for Fiscal Year 1986
    by Arthur Young & Company 69
H—The United States Institute of Peace Act 83

# *Guiding Principles*

*E*arly in its first months of activity, the Board of Directors of the United States Institute of Peace established three guiding principles for the Institute: tradition, independence, and integrity. These principles are not only central to an understanding of the Institute's progress, they also provide a useful thematic index for evaluating the accomplishments of the start-up period and for setting the Institute's future course. This report, therefore, turns to them first.[3]

### Tradition

When one examines Congress' vision of the Institute, it is immediately apparent that the purposes and means set forth in the legislative charter draw their fundamental strength from the American tradition. Building upon the conclusions of the Matsunaga Commission,[4] Congress found that an Institute embodying "the heritage, ideals, and concerns of the American people for peace"[5] would strengthen and symbolize "the fruitful relation between the world of learning and the world of public affairs . . . [and be an] efficient and immediate means for the Nation to enlarge its capacity to promote the peaceful resolution of international conflicts."[6] Congress further found that establishing this Institute would be "an appropriate investment by the people of this Nation to advance the history, science, art, and practice of international peace and the resolution of conflicts among nations without the use of violence."[7] In summarizing its purpose for creating the Institute, Congress declared:

It is the purpose of this title to establish an independent, nonprofit, national institute to serve the people and the Government through the widest possible range of education and training, basic and applied research opportunities, and peace information services on the means to promote international peace and the resolution of conflicts among the nations and peoples of the world without recourse to violence.[8]

It should be observed that, while the Institute as a whole is unique, its tools—research, education and training, and information services—are analogous to those found in other federally-supported programs. For example, there are similarities between the Institute's Jennings Randolph Program for International Peace and the Smithsonian Institution's Woodrow Wilson International Center for Scholars; and the Institute's Grants Program draws upon the experience of the National Endowment for the Humanities, the National Science Foundation, and other federal grantmaking entities. Among the Institute's own projects are a periodic report on the state of world peace, which will be patterned in some respects after the State Department's annual Country Reports on Human Rights Practices; educational television programming with ancillary instructional materials; a national essay contest for high school students; and a number of studies, including an intellectual map of the peace field and an examination of low-intensity armed aggression.

### Independence

Congress created the Institute as "an independent nonprofit corporation."[9] Making that independence a reality has been one of the most important accomplishments of the Institute's first year of activity. It is a central legacy of the Institute's first Board of Directors.

Congress vested the Institute with a measure of intellectual freedom comparable in many respects to that enjoyed by institutions of higher education and, having protected the Institute as an educational entity divorced from the political pressures of the day, wisely provided that the Institute should refrain from policymaking and dispute intervention. In exchange for this intellectual freedom and federal funding, Congress stipulated that the Institute focus exclusively on the development and extension of knowledge and skills important to

international peace and the resolution of international conflict without the use of violence.

Challenges to the Institute's independence could originate from two sources: first, from the politically ascendant forces of the day, and second, from any of the competing constituent interest groups whose activities fall within the Institute's wide mandate. Among the specific measures aimed at assuring independence for this national institution are:

• As a nonprofit corporation, the Institute has authority to govern itself within the limits of the enabling Act.[10]

• Congress authorized the Board to create a legal entity in the District of Columbia to facilitate the Institute's work, a step the Board took when it established the Endowment of the United States Institute of Peace as a nonprofit corporation.[11]

• Being an independent establishment of the federal government and not an agency of the Congress or the Executive Branch, the Institute's activities enjoy some insulation from governmental pressures.[12]

• With the advice and consent of the Senate, the President appoints the Institute's Directors, thus ensuring democratic accountability.[13]

• With members of the Board of Directors selected from both within and outside of federal government service, the Institute can draw upon the knowledge and experience of the public and private sectors.

• As an entity with the broadest functional mandate to pursue its central goal, the Institute can include a wide variety of intellectual approaches and practical experience.

• As a nonpartisan entity, the Institute conducts its affairs solely on the merits of the fundamental issues that comprise its compass.

Congress insisted that the Institute be independent of control by any particular discipline, methodology, belief, cause, region, or group. Most importantly, this stipulation requires that the Board be vigilant in ensuring that no privilege or special preference is granted to any particular viewpoint or activity. The Institute's standards are tied not to ideology or widely held perceptions of the moment, but instead, to what will work to secure peace with freedom and justice. The Institute would

not be true to its charter were it to follow an ideological agenda or to close its doors to diversity and an honest, intelligent inquiry into new and potentially useful knowledge.

## Integrity

Regardless of the kind of institution one sets out to build, no ingredient is more essential to its success than integrity. Among the elements that constitute institutional integrity are a commitment to intellectual excellence, fiscal honesty, and administrative fairness. That is the measure against which the Institute gauges all its decisions and activities. Beginning with the Board's inaugural meeting in February 1986, integrity has been a constant and explicit standard for hiring staff, committing funds, creating operational systems, and designing programs. The Institute's record demonstrates:

***Respect for intellectual excellence.*** The cumulative decisions made in the three major program areas—fellowships, grants, and "in-house" projects—have put into practice the promise made at the Board's first meeting that the Institute would pursue excellence in a climate of interdisciplinary and intellectual freedom. The Board was emphatic from the outset that the Institute embrace a full range of disciplines and fields of study and that, over time, an expansive array of perspectives gleaned from the social sciences, the humanities, the arts, and the sciences be explored and evaluated. Thus, for example, in statements at meetings, program materials, and communications with college and university presidents, the Board has invited historians, political scientists, legal scholars, economists, sociologists, anthropologists, linguists, psychologists, geographers, theologians, ethicists, literary critics, biologists, and physicists, along with specialists in conflict resolution, arms control, diplomacy, management, medical science, pedagogy, international institutions, and communications to participate in addressing the centrally important issues before the Institute.

This list is not exclusive but illustrative of the range of perspectives and experience toward which the Institute reaches. The first evidence of this scope and outreach comes

### *Institute Board Member Receives 1986 UN Peace Medal*

United States Institute of Peace Board member Dr. Allen Weinstein, who also serves as President of the Washington-based Center for Democracy, and is University Professor of History at Boston University, was awarded the 1986 United Nations Peace Medal on United Nations Day, October 24, 1986. The medal is given in recognition of an individual's contribution to international understanding and cooperation.

The Director of the UN's Washington Information Centre, Phyllis Kaminsky, presented the award on behalf of the Secretary General, in a ceremony commemorating the celebration of 1986 as the United Nations' International Year of Peace. She emphasized Dr. Weinstein's role in organizing the bipartisan U.S. election lawyers' group which reported on preparations for the February 7, 1986, Philippine presidential elections; and his successful efforts in 1984 to bring together leaders of the government and insurgents in El Salvador for their first public encounter, a televised debate seen throughout the United States and Latin America. In addition, she noted both his role in 1984 in reviving the famous *Pacem in Terris* conferences on global peace and arms control while serving as President of the Hutchins Center for the Study of Democratic Institutions and his current work as Chairman of the Education and Training Committee of the United States Institute of Peace.

from the fellowships and grants that have been awarded to date. The initial group of Jennings Randolph Distinguished Fellows is extraordinarily accomplished and dedicated to the propositions for which the United States Institute of Peace was established. Furthermore, each grant has met rigorous standards of professional competence and intellectual relevance with respect to the Institute's overall mandate. In addition, the Institute's own projects reflect a diversity, depth, and balance indicative of the range of accomplishments the world should expect from the Institute as a representative of the American peoples' commitment to peace among nations.

***Service by Directors as trustees of the public purse.*** The Board has held meetings nearly two days every month for

the past year-and-a-half in order to launch the Institute with the necessary vigor and care. All Board meetings have been open to and attended by interested members of the public, with portions being closed only when it was necessary to protect personal privacy and similar values. To help implement its stewardship responsibilities for taxpayer dollars, the Institute retained the accounting firm of Arthur Young & Company as auditor; made use of the services of the General Services Administration (GSA) during the start-up months of Fiscal Year (FY) 1986; obtained administrative support from the Office of Administration (OA) of the Executive Office of the President in FY 1987; and met the financial needs of the Endowment of the United States Institute of Peace[14] with the services of the National Bank of Washington.

***Evenhandedness and nonpartisanship in administration and programming.*** Congress chartered the Institute to become a major resource in developing human capacities to build a world in which conflicts among nations are managed without violence. To ensure nonpartisanship, it prohibited the use of political tests or qualifications in selecting personnel and making program decisions.[15] The Institute has adopted a broad interpretation of the term "political" to embrace not only party allegiance but also an individual's philosophy and opinions on public issues. In application, this means that the political views of employees and Fellows are not considered in selection or other personnel decisions; rather, choices are made on the basis of a review of an individual's talent, merit, and ability to carry out the Institute's work. It also has meant that grant awards are evaluated in terms of a project's utility in fulfilling the Institute's mandate, budgetary leanness, and the applicant's intellectual competence and professional accomplishments.[16]

## —— *The Beginning* ——

*T*wo key dates mark the beginning of the United States Institute of Peace. The first is February 25, 1986, when, at 9:00 a.m. in a hearing room in the Dirksen Senate Office Building, the Institute's Board of Directors convened its inaugural two-day meeting before a standing-room-only audience. The second date is April 14, 1986, the day the initial staff of three opened the Institute's office at 730 Jackson Place. Those two events—the formal creation of the Institute through the installation of its Board and the opening of the first office—set in motion the progress of the year-and-a-half reviewed in this report.

At the Board's first meeting on February 25 and 26, the process of establishing the Institute's identity began. Over the course of this meeting, the Directors and the corporation's Congressional sponsors reviewed their legislative charge, commenced an ongoing dialogue over long-range goals, and discussed several program initiatives which might be appropriate for the Institute in its formative months. An important conclusion was that the Institute's future would be critically influenced by the Board's ability to establish from the outset a solid administrative base. In practical terms, that meant care in staff selection, frequent Board meetings, and a deliberate pace in program implementation.

Among the actions taken at that meeting, the Board—

• read a cable of congratulations on the establishment of the Institute from United Nations (UN) Secretary General Perez de Cuellar to Secretary of State Shultz;
• presented a letter of appreciation to former United States Senator Jennings Randolph for his fifty years of vigorous leadership in creating a national peace institution. As its first formal action, the Board invited Senator Randolph to act as Senior Advisor to the Board. The Senator willingly accepted, and it was agreed that he would serve in that capacity without compensation;

• thanked Mrs. Milton C. Mapes, Jr., for her support and the tireless efforts of her late husband in directing the public campaign that lobbied Congress to establish the Institute;
• discussed the Institute's direction with key Congressional sponsors, including:

Senator Spark Matsunaga, who had advocated the idea of a national peace institution since his election to the House of Representatives in 1962 and who chaired the federal study commission that examined the concept and recommended federal action, providing both the institutional design and policy reasoning for the Institute's enabling legislation;

Senator Mark O. Hatfield, former Chairman and now Ranking Minority Member of the Senate Committee on Appropriations, who, as a principal sponsor of national peace institution legislation, provided Senate floor leadership for the amendment to the Defense Authorization Act of 1985 that became the United States Institute of Peace Act;

Senator Claiborne Pell, former Ranking Minority Member and now Chairman of the Senate Committee on Foreign Relations, who, as an early advocate of a national educational institution devoted to the peaceful management of conflicts among nations, advanced many of the steps that culminated in the Institute's creation;

Representative Dan Glickman who, as a member of the Matsunaga Commission and the principal House sponsor of legislation to create a national institution devoted to international peace, has served as an important guide for and tutor to the Institute.

*S*enator Spark Matsunaga and Representative Dan Glickman, both long term advocates of legislation to establish a national peace institution, joined other legislators in expressing their encouragement for the new Institute.





*Senator Mark O. Hatfield, then Chairman of the Senate Committee on Appropriations, introduced the amendment which became the United States Institute of Peace Act and shared his views with the Institute's Board at its first meeting.*

*S*enator Claiborne Pell, Ranking Minority Member of the Senate Committee on Foreign Relations, expressed his strong support for the Institute.



• reviewed conceptual and programmatic questions relating to the conflict resolution field with Dr. James Laue, vice chairman of the Matsunaga Commission;
• was briefed on the work of the State Department's Foreign Service Institute by its Director, Ambassador Stephen Low;
• organized the Board into six committees—three substantive (Research and Studies, Education and Training, and Information Services) and three operational (Personnel, Organization and Administration, and Institutional Planning);

• heard from GSA on administrative details involved in setting up the Institute;
• heard from the Office of Management and Budget (OMB) on questions of funding—a presentation that precipitated the first discussion with the Executive Branch over the practical meaning of the Institute's independence; and
• hired Robert F. Turner as the Institute's first President and Charles Duryea Smith as Attorney Adviser.[17]

## Board of Directors

### ---Non-Governmental Members---

**Chairman John Norton Moore**
Walter L. Brown Professor of Law, University of Virginia School of Law

**Dr. Dennis L. Bark**
Senior Fellow, Hoover Institution on War, Revolution and Peace, Stanford University

**Dr. William R. Kintner**
Former United States Ambassador to Thailand and Professor of Political Science, University of Pennsylvania

**Dr. Byron Kirkpatrick**
President, American Peace Society, and former Executive Director, American Political Science Association

**Morris I. Leibman, Esq.**
Senior Partner, Sidley & Austin

**The Reverend Sidney Lovett**
former Senior Minister, First Church of Christ Congregational, West Hartford, Connecticut

**Pastor Richard John Neuhaus**
Director, Center on Religion and Society

**Dr. W. Scott Thompson**
Professor of International Politics, The Fletcher School of Law and Diplomacy, Tufts University

**W. Bruce Weinrod, Esq.**
Director of Foreign Policy and Defense Studies, The Heritage Foundation

**Dr. Allen Weinstein**
Professor of History, Boston University and President, The Center for Democracy

### ---Ex officio Members---

**Ambassador Richard Schifter**
Assistant Secretary of State for Human Rights and Humanitarian Affairs

**The Honorable Caspar W. Weinberger**
Secretary of Defense

**Nonvoting Member**
Robert F. Turner
President, United States Institute of Peace

**Ambassador Kenneth L. Adelman**
Director, Arms Control and Disarmament Agency

**Lieutenant General Bradley C. Hosmer, USAF**
President, National Defense University

**Senior Advisor**
The Honorable Jennings Randolph
former United States Senator from West Virginia

---

## ---Committees of the Board of Directors---

| Education and Training | Organization and Administration |
|---|---|
| Weinstein, *Chairman* | Bark, *Chairman* |
| Adelman | Adelman |
| Bark | Hosmer |
| Hosmer | Kintner |
| Lovett | Neuhaus |
| Kintner | Weinrod |
| Weinrod | *Moore |
| Moore* | **Turner |
| Turner** | |

| Information Services | Personnel |
|---|---|
| Thompson, *Chairman* | Leibman, *Chairman* |
| Hosmer | Kirkpatrick |
| Kirkpatrick | Neuhaus |
| Leibman | Schifter |
| Neuhaus | Thompson |
| Schifter | Weinberger |
| Weinrod | Weinstein |
| Moore* | *Moore |
| Turner** | **Turner |

| Institutional Planning | Research and Studies |
|---|---|
| Kirkpatrick, *Chairman* | Weinrod, *Chairman* |
| Adelman | Kintner |
| Bark | Leibman |
| Lovett | Lovett |
| Weinberger | Schifter |
| Weinstein | Thompson |
| Moore* | Weinberger |
| Turner** | Weinstein |
| | *Moore |
| | **Turner |

*As Board Chairman, Prof. Moore is an ex officio member of all committees.
**As President of the Institute, Mr. Turner is a nonvoting, ex officio, member of all committees

In addition, the Directors took a number of important steps to initiate the Institute's work with strength and commitment. They met with President Ronald Reagan in the White House and Secretary George Shultz at the State Department. Chief Justice Warren Burger administered the oath of office to the nine initial private sector presidential appointees to the Board in a ceremony at the Supreme Court.[18] Thus, when the Board of Directors first met to give the Institute a corporate reality, it did so in concert with the three branches of the United States government.

*T*he Institute's Board of Directors met with President Reagan during the second day of its first meeting. Pictured clockwise from upper left are: Pastor Richard John Neuhaus; W. Bruce Weinrod, Esq.; Dr. Allen Weinstein; Dr. Dennis L. Bark; Chairman John Norton Moore; President Ronald Reagan; Ambassador Kenneth L. Adelman; Reverend Sidney Lovett; Lt. Gen. Richard Lawrence, USA; Dr. Evron Kirkpatrick; Ambassador William R. Kintner.





*Secretary of State George Shultz meets with the Board of Directors during its first meeting. Pictured clockwise are: Secretary Shultz, Ch. Moore, Lt. Gen. Lawrence, Mr. Weinrod, Dr. Bark, Amb. Adelman, Rev. Lovett, Pres. Turner, Dr. Kirkpatrick, Dr. Thompson, and Amb. Kintner.*



*Chief Justice Warren Burger talks with Board members after administering the oath of office.*

The cumulative effect of these public and private activities has been both symbolic and practical in their importance to the formation of a major new federal institution. The personal and institutional expressions of support from the leaders of government reflect a significant consensus on the aspirations of Americans for a peaceful world and the hopes placed in the United States Institute of Peace. Certainly of equal if not greater importance has been the strong support of the American people, who were represented at the Board's first meeting by individuals from many states. The expression of international support embodied in a cable from the United Nations' Secretary General further emphasized that the Institute represents a vision of humanity and a shared conviction that such an organization can play an important role in building a new day of peace among the peoples and nations of the world.

```
•••••••••••••••••••••••
              UNCLASSIFIED                          S/S-0
        Department of State                        INCOMING

PAGE 01    2518002                    7916      5505990
                                                --28/1946Z
INFO  S-02  /002 44  BG
-------------------------------------------------------
ACTION SS-00

INFO  LOG-00  SSO-00  /AMAD-01  SSC-01  FAIM-01  /003 W
                          --326112  251831Z /38
R 2518452 FEB 86
FM NEW YORK NEW YORK
TO HIS EXCELLENCY THE SECRETARY OF STATE        8606327

UNCLAS

FOLLOWING RECEIVED FROM JAVIER PEREZ DE CUELLAR

X-000538A056 02/28/86
ICS IFLUNNA NYR
1424 UG DLY , NEWYORK (UNNY) 24 2335Z
PMS HIS EXCELLENCY
MR. GEORGE R. SHULTZ
SECRETARY OF STATE, DEPARTMENT OF STATE
WASHINGTON DC 00000
1158-02                          24TH FEBRUARY 1986
DEAR MR. SECRETARY,
    I WOULD LIKE TO EXTEND TO YOU MY BEST WISHES ON THE OCCASION OF
THE FIRST MEETING OF THE UNITED STATES INSTITUTE OF PEACE. THE
ESTABLISHMENT BY THE UNITED STATES GOVERNMENT OF A PERMANENT
INSTITUTION WHICH WILL SERVE TO PROMOTE PEACEFUL ECONOMIC,
POLITICAL, SOCIAL, AND CULTURAL RELATIONS THROUGH RESEARCH,
EDUCATION, TRAINING, AND INFORMATION EXCHANGE, IS A HIGHLY IMPORTANT
EVENT.
    I HAVE NOTED THAT  IN CREATING THIS NEW INSTITUTE, THE UNITED
STATES CONGRESS STATED THAT 'A LIVING INSTITUTION EMBODYING THE
HERITAGE, IDEALS, AND CONCERNS OF THE AMERICAN PEOPLE FOR PEACE
WOULD BE A SIGNIFICANT RESPONSE TO THE DEEP PUBLIC NEED FOR THE
NATION TO DEVELOP FULLY A RANGE OF EFFECTIVE OPTIONS, IN ADDITION TO
ARMED CAPACITY, THAT CAN LEASH INTERNATIONAL VIOLENCE AND MANAGE
INTERNATIONAL CONFLICT.' THIS IS A MOST ADMIRABLE OBJECTIVE, IN
KEEPING WITH THE PRINCIPLES OF THE UNITED NATIONS CHARTER.
    THE UNITED NATIONS WAS CREATED TO SAVE SUCCEEDING GENERATIONS
FROM THE SCOURGE OF WAR. IN ADDRESSING LAST YEAR'S 40TH ANNIVERSARY
SESSION OF THE GENERAL ASSEMBLY, PRESIDENT REAGAN NOTED  THAT THIS
VISION REMAINS REAL TODAY. A UNITED STATES INSTITUTE, INTENDED TO
ENCOURAGE STUDY OF THE REQUIREMENTS OF PEACE AND THE MEANS OF
CONFLICT RESOLUTION, CAN FURTHER THE REALIZATION OF THIS VISION
HOPE THAT MUCH ATTENTION WILL BE GIVEN TO THE ROLE OF THE UNITED
NATIONS IN THE PRESERVATION OF PEACE AND THE WAYS IN WHICH ITS
CAPACITY AS A CONSTRUCTIVE AND NECESSARY FORCE IN INTERNATIONAL
AFFAIRS CAN BE STRENGTHENED.
    IT IS ESPECIALLY APPROPRIATE THAT THE UNITED STATES INSTITUTE
OF PEACE IS BEGINNING ITS WORK IN 1986 WHICH HAS BEEN PROCLAIMED BY
THE UNITED NATIONS AS THE INTERNATIONAL YEAR OF PEACE. THE YEAR IS
INTENDED TO PROVIDE A VALUABLE OPPORTUNITY AND STIMULUS FOR THE
STUDY AND EXPLORATION OF WAYS TO REDUCE THE LIKELIHOOD OF WAR. ITS
THEME IS TO SAFEGUARD PEACE AND THE FUTURE OF HUMANITY, THUS, THE
PURPOSES OF THE YEAR AND OF THE UNITED STATES INSTITUTE OF PEACE ARE
VERY SIMILAR. THE INSTITUTE WILL FORTUNATELY BE ABLE TO CARRY ITS
STUDIES FORWARD FAR BEYOND THE PRESENT YEAR, AS IS CERTAINLY
ESSENTIAL. UNDERSTANDING THE REQUIREMENTS OF A PEACEFUL WORLD IS A
CONTINUING TASK IN WHICH INSTITUTES AND SCHOLARS FROM THE WORLD OVER
SHOULD BE JOINED.
    I WOULD BE GRATEFUL, MR. SECRETARY , IF YOU WOULD CONVEY TO THE
BOARD OF DIRECTORS OF THE UNITED STATES INSTITUTE OF PEACE AND ALL
ASSOCIATED WITH IT, MY BEST WISHES FOR SUCCESS IN PURSUIT OF ITS
OBJECTIVES
    UAVIER PEREZ DE CUELLARI

EOT
```

ALERT COPY                    UNCLASSIFIED

On April 14, 1986, the initial staff opened the Institute's offices at 730 Jackson Place, a townhouse located on Lafayette Park, which the White House made available as transitional quarters. As an indication of the speed with which work began, by the time the move was made to Jackson Place—only six weeks after the first Board meeting—the Board had held its second meeting on April 8 and 9 and, having set a pattern of two-day monthly meetings, was preparing for a third. Within days of the office's opening, testimony on FY 1987 funding was prepared and submitted to both the Senate and House Appropriations Subcommittees on Labor, Health and Human Services, and Education, and to OMB. The Institute's Chairman and President appeared before the House and Senate subcommittees on April 22 and 23, respectively. GSA continued to provide substantial administrative support, and interviews for additional staff were a regular occurrence[19] The Institute was underway.

### United States Institute of Peace Organizational Chart



## ———— *Programs: An Overview* ————

*I*n addition to constructing a strong administrative foundation, the Institute was anxious to move promptly into its designated program areas. Congress had authorized work to be undertaken in three broad categories: research and studies, education and training, and information services.[20] In its own committee design, then, the Board reflected the congressional intent that the Institute undertake an expansive variety of activities. Of equal importance, the Board's organizational decisions ensured constant attention to breadth in the three principal program areas which Congress authorized the Institute to develop: fellowships, grants, and the Institute's own projects. It is particularly significant, therefore, to observe that during the months of activity covered by this report, the Institute exercised this wide range of programmatic authority. For example:

• Among the activities of the initial group of eight Jennings Randolph Distinguished Fellows are: research on the protection of human rights in situations of violent conflict; a study of the role of the Atlantic Alliance in maintaining the peace in Europe; the development of teaching materials on the UN, and public presentations by all Fellows on their areas of expertise, ranging from the operations of international institutions to nation-building in the Sudan.

• Grantees' studies include: nongovernmental ("track two") diplomatic activity; nonofficial peace movements in the Soviet Union and Eastern Europe; the peaceful reintegration of Filipino rebels into society; the relationship between narcotics trafficking, political instability, and terrorism in Latin America; the implications of ethnic and religious relationships for peace among nations; Soviet military, economic, and political strategy in the Third World; negotiating techniques and strategies in international conflicts; the religious basis of pacifism; nonviolent sanctions as a means of confronting political violence; the role of international law in the formation of foreign policy; and peace, human rights, and security issues in the South Pacific. In addition, they are participating in the debate over international peace within the religious community, developing curricula for college programs, and surveying the peace studies field.

• The Board decided to undertake an Institute study of ways to strengthen the UN Charter's prohibition against the use of force as applied to low-intensity or covert warfare. The Institute will conduct annually a nationwide high school essay contest. Through the vehicle of a pilot program on U.S.-Soviet summitry, the Institute is testing the feasibility of developing an educational television series on the history of U.S.-Soviet relations. And, through a series of public colloquia leading to a working conference and a major national report, the Institute is developing an intellectual map of theories in the field of international peace.

The next section of this report describes the Institute's principal program components: the Jennings Randolph Program for International Peace, the Grants Program, and Institute Projects.

# Jennings Randolph Program
## For International Peace

*T*he Jennings Randolph Program for International Peace honors former Senator Jennings Randolph, who since 1943 has worked to develop educational institutions that could assist in bringing about a more peaceful world. As his final session in Congress drew to a close in the Fall of 1984, he and his colleagues succeeded in establishing the United States Institute of Peace. With the leadership of Senator Mark O. Hatfield, Congress determined that naming a program within the Institute—one patterned in many ways after the Smithsonian Institution's Woodrow Wilson International Center for Scholars—would reflect the Nation's deep appreciation for Senator Randolph. The Board began developing that program as an early, high priority. In structuring the Jennings Randolph Program for International Peace, the Institute is fortunate in being able to draw upon two national resources: the experience of the Woodrow Wilson Center and the counsel of Senator Randolph himself, who serves as the Board's Senior Advisor.

The Jennings Randolph Program assists the work of scholars and leaders in peace, from both the United States and abroad.[21] It provides support for scholarship and other appropriate forms of communication on issues of international peace and the management of international conflict. An appointment to the program cannot exceed two years. During the program's early stages, some Fellows will be in-residence at the Institute and others out-of-residence. In addition, some will be involved on a full-time basis and others part-time. From the outset, whether in- or out-of-residence, full-or part-time, Fellows will be important participants in representing the Institute in the United States and abroad.

The Jennings Randolph Distinguished Fellowship is the senior level of the program's three categories. On February 27, 1987, the Institute announced the appointment of eight Distinguished Fellows.[22] This first group includes former ambassadors; professors of international law, theology, and political science; and a former Under Secretary General of the UN and Member of Congress. Of the initial group of Distinguished Fellows, five are from the United States, two are from Europe, and one is from Africa. Most will devote their time to research and writing. Their topics include: promoting human rights in situations of armed conflict, problems of low-intensity warfare, prospects for peace in the Sudan, aggression and self-defense under the UN Charter, the role of the Western Alliance in promoting international peace, peacekeeping operations, possible relationships between peace and development, and the work of international organizations in promoting peace. In addition, each Fellow will participate at least once a year in public programs of the Institute.

The other two components of the Jennings Randolph Program for International Peace address professionals and graduate students. One, to be called United States Institute of Peace Fellows, will provide an opportunity for persons at the early or middle stages of their careers to undertake specific projects of research, education, or other forms of communication in the field of international peace and conflict management. The other, to be called United States Institute of Peace Scholars, will support graduate students working on doctoral dissertations. The anticipation is that it will encourage students and their advisors to examine their prospective work closely to see whether it can provide, in ways Congress intended, an important contribution to international peace. Details on competitions for the Jennings Randolph Program will be announced in the Fall of 1987.

## ——— Jennings Randolph Distinguished Fellows ———

Francis Deng, former Ambassador to the United States and Minister of State for Foreign Affairs of Sudan; book tentatively titled, *Myths and Realities: Crisis of Identity and the Prospects for Peace and Unity in the Sudan*.

Rosalyn Higgins, Professor of International Law at the University of London; study on "The Next Generation of U.N. Studies: A Programme for Teaching and Research," and preparatory work on the fifth volume of her series, *U.N. Peacekeeping: Documents and Commentary*.

David Little, Professor of Religious Studies at the University of Virginia; book tentatively titled, *In Pursuit of a Just Peace: Legal and Moral Dilemmas of Promoting Human Rights in Situations of Armed Conflict*.

Myles McDougal, Sterling Professor Emeritus at Yale Law School; two-volume book on *The Global Constitutive Process of Authoritative Decision*.

Bradford Morse, former Under Secretary General of the United Nations; research on the impact of development and other economic issues on international peace, and the role of international organizations in fostering peace among nations.

Eugene Rostow, former Under Secretary of State for Political Affairs; book tentatively titled, *Aggression and Self-Defense*.

Paul Seabury, Professor of Political Science at the University of California at Berkeley; book on *Proxies in Low Intensity Warfare*.

Max van der Stoel, former Foreign Minister of the Netherlands and the country's Permanent Representative to the United Nations; study of the cooperation between the U.S. and Western Europe and its effect upon the promotion of international peace.



*Board members meet with Jennings Randolph Distinguished Fellow Ambassador Max van der Stoel. From left to right, Dr. W. Scott Thompson, Ambassador van der Stoel, and Lt. Gen. Bradley C. Hosmer, USAF.*

——— 18 ———

## ——— Grants Program ———

*A* number of provisions in the United States Institute of Peace Act refer to "grants."[25] The Grants Program relates directly to the Institute's extension and outreach authority. It is the first and most prominent vehicle chosen by the Board to introduce the Institute in its early stages around the country and, in particular, into scholarly and professional communities. The program promotes scholarship, education, training, and the dissemination of information on international peace and conflict management by providing financial support to nonprofit organizations (including private colleges and universities), official public institutions (including public schools, colleges and universities, libraries, and federal, state, and local government agencies), and individuals, whether or not they are associated with nonprofit or official public institutions. In its Grants Program, the Institute has worked to attract a diverse range of disciplines, viewpoints, and talents. Standards are high and, even though there is a sharply limited funding capacity, the Board has time and again demonstrated by word and action that the Institute is committed to supporting diverse project activity.

Outreach to date in the Grants Program has been directed primarily to academics, professionals, and educators. Although the Board selected certain topics for priority consideration,[24] applications have been solicited and welcomed from any eligible organization or individual seeking assistance in pursuing work that falls within the Institute's mandate. Having determined that grants may be awarded to foreign nationals,[25] the Institute will soon begin the process of publicizing the Grants Program, as well as the Institute's other activities, outside the United States. Within the coming months, systematized outreach abroad will take place with the assistance of the Department of State.

During the first months of the Grants Program, from its announcement in July 1986 through mid-February 1987, more than 5,500 sets of application materials were mailed to colleges, universities, and other interested parties. A second mailing to college and university presidents in the United States was completed in early summer. By mid-August 1987, over 10,000 sets of materials had been distributed. Inquiries have arrived from all fifty states and the District of Columbia, U.S. territories, and a number of foreign countries. In addition, announcements of the Institute's grants activities are regularly sent to over 150 professional and scholarly periodicals and award announcements are provided to appropriate local and national media as well as to the recipient's congressional delegation.

By mid-August 1987, the Institute had received 330 completed applications from applicants in 37 states, the District of Columbia, Puerto Rico, and 11 foreign countries. More than $24,000,000 in funding was requested. During those months, the Institute awarded 50 grants totaling $1,377,297.[26] Approximately 75 percent of the grant funds were provided to nonprofit organizations and official public institutions and 25 percent to individual scholars. We estimate that total applications and demand for the period July 31, 1986, to September 30, 1987, will approach 375 and $30,000,000, respectively. It is further projected that approximately 60 grants will have been awarded totaling some $1.7 million.[27]

As part of its public outreach efforts, the Board decided to enter into actual grant-making at the earliest possible date. The decision was made that much good could be done immediately. Because of the extraordinary reach of the Institute's mandate, in lieu of undertaking specific topical competitions, the Board outlined nine priority areas of inquiry while simultaneously emphasizing its interest in all relevant subjects and approaches. Grants have been made in each priority topic area and nearly half have involved other areas, as well.

In launching the Grants Program, the Institute has devised an application process that is efficient and is accessible to scholars, educators, trainers, and other professionals in fields related to international peace and conflict management as well as to interested

——— 19 ———



*Board members meet to review grant applications. Clockwise from left front; Morris I. Leibman, Esq.; Ambassador William R. Kintner; Lt. Gen. Bradley C. Hosmer, USAF; Dr. W. Scott Thompson; (transcriber); Chairman John Norton Moore; Dr. Dennis L. Bark; (Dr. Kenneth Jenson—Director of Grants Program); Dr. Allen Weinstein; Dr. Evron Kirkpatrick.*

groups and individuals. The "Interim Procedures for Grant Applications," which accompanies each application form, gives clear program and application guidelines and was published in interim form in the *Federal Register* with a request for comments or other responses.[28] The Institute's staff encourages all proposals that fall within the general mandate of the United States Institute of Peace Act and works with each applicant to ensure the most competent and complete exposition of the proposed work. In addition, the Board has sought to create a fair and prompt review and action process. The program's application forms, grant-making instruments, and procedures are closely modeled on those of other federal grantmaking agencies, particularly the National Endowment for the Humanities.

The process used to date requires full Board action on every application submitted to the Institute.[29] Because the Board considers applications at frequent intervals,

each monthly meeting for the past year has devoted a portion of time to a review of funding proposals.[30] As a collateral benefit, this deliberative process has proved to be a useful learning device for the Board itself, most particularly when the ideas put forward are unique or highly original. Thus, the combination of mindful preparation by staff members working closely with applicants and a Board with considerable experience in the Institute's subject matter has led to a careful and sophisticated grant review process. The rising volume of applications alone, however, is likely to require changes in the intense commitment of time which the Directors have been able to devote to their grantmaking responsibilities. As the Institute continues to define the scope of the Grants Program and to identify areas warranting special concentration, the Board may seek to formalize mechanisms whereby outside expert advice is integrated into the review process.

## Institute Projects

$C$ongress authorized the Institute to develop an internal programmatic capacity. Under this mandate, the Institute has begun three types of projects. First, there are the more permanent or institutionalized programs, which include an annual national high school essay contest, a periodic report on the state of world peace, an information-sharing newsletter, negotiator training, and, possibly, internships. Second, there are longer-term projects that are expected to extend over a number of years. They include the preparation of an intellectual map of the peace field, an educational television series on the history of U.S.-Soviet relations, the development of high school curricula, and an examination of how library classification could make international peace information more accessible. Third, there are shorter-term projects which can be accomplished in less than two years. The two currently being developed are a study of ways to strengthen the UN Charter prohibition against the use of force in settings of low-intensity or covert violence and a study of possible relationships between domestic political systems and international aggression.

Each Institute project is under the guidance of a Board committee. Thus, the Education and Training Committee is responsible for the essay contest, the public television series, high school curriculum development, negotiator training, and the internship concept. The Research and Studies Committee oversees the studies on strengthening the UN Charter and on the relationships between domestic political systems and international aggression as well as the preparation of a periodic report on world peace. The Information Services Committee directs the intellectual map, library classification, and information-sharing newsletter projects.

### Institutionalized Programming

*National Peace Essay Contest.* Each year the Institute will conduct an essay contest for high school students across the country,

in U.S. territories, and in overseas dependents schools. Final contest procedures and rules for the 1987–1988 school year will be announced in October. To be eligible, an essay must first appear in an approved student publication. Appropriate recognition and prizes will be given to state, territorial, and national winners and to student publications sponsoring winning entries. The question this year asks students to address fundamental issues raised by the relationship between human rights and international peace. As a stimulus to their analysis, the question directs attention to a relevant portion of the Helsinki Accords. In developing the contest, the Institute has been assisted by the U.S. Department of Education, the Commission on the Bicentennial of the Constitution, the National Association of Secondary School Principals, and a number of other private educational associations.

*Report on the State of World Peace.* The Board decided to undertake a complex but exceedingly important task: a presentation of critical information on the state of peace worldwide to the American public and to the international community. A number of very valuable studies exist, both governmental and nongovernmental, in areas such as human rights and global ecology. As preliminarily discussed, the Institute's report would be a periodically updated survey seeking to identify trends, causes, and consequences of armed international conflict on a region-by-region or country-by-country basis. In addition, efforts will be made to standardize methods of statistical reporting on the state of world peace, to address questions of adherence to the Article 2 nonaggression principles of the UN Charter, and to identify peacemaking activities related to various conflicts. Substantial planning remains to be done, and the Board is determined that this report be scientifically and academically sound.

## ——National Peace Essay Contest Topic——

In an essay that does not exceed 1,500 words, consider the meaning and significance of the following statement from the Helsinki Accords, in which the signatories pledged to observe universal standards of human rights, fundamental freedoms, and self determination.

*The participating States recognize the unusual significance of human rights and fundamental freedoms, respect for which is an essential factor for the peace, justice and well-being necessary to ensure the development of friendly relations and cooperation among themselves as among all States....The participating States reaffirm the universal significance of respect for and effective exercise of equal rights and self-determination of peoples for the development of friendly relations among themselves as among all States.*

---

*Newsletter.* Until its administrative capacity and program development had matured, the Institute's public relations activities remained relatively and intentionally low-key. The Institute is now prepared to expand those efforts to increase its public profile in the nation and abroad. An information-sharing newsletter is one means of accomplishing this. Produced bimonthly, the newsletter initially will provide people with information on the Institute's programs and from the international peace field in general. As the investments of the Institute's first year begin to bear fruit, the newsletter will be the forerunner of an active publication program. The first newsletter will be ready this Fall.

*Seminars on Negotiator Training and the Teaching of Negotiation Theory.* The training of negotiators and the teaching of international negotiation theory is planned to begin in FY 1988. This work will, over time, become a hallmark of the Institute. As with all such activities, the highest professional standards will be established and care is being taken that no single view obscures alternative approaches. The initial emphasis will be placed on training government negotiators at the international level.

*Internships.* The Institute is examining the feasibility of establishing an internship program that could place, in governmental and nongovernmental positions, promising young scholars and professionals who have an interest in the peaceful resolution of international conflicts. While some participants might eventually apply their experiences directly to their employment, one of the program's great strengths would be the extension to others of knowledge gained concerning private and governmental international peacemaking activities. The Institute expects that special insights into organizing and managing this program will be gained from similar efforts, such as the American Political Science Association's Congressional Fellowship Program.

## Longer Term Projects

*Intellectual Map of the International Peace Field.* The first Institute-conducted project is a survey of historical and current national and international scholarship and research relating to the peaceful resolution of international conflict. On a preliminary basis, the field has been organized into ten categories:

- collective security and deterrence;
- negotiating theory and diplomacy;
- strategic management and arms control;
- international law;
- interstate organizations: the global and regional dimension;
- third party dispute settlement;
- transnationalism and functionalism;
- behavioral approaches: psychological and nonviolent theories;
- internal systems: domestic structures and peaceful behavior; and
- systemic theories: ideological and theoretical approaches.

Through the examination of the field's principal intellectual strands and the assessment of the strengths and limitations of each, the Institute will create a more refined understanding from which to identify priority emphases for present and future work in the field by the Institute and others. Accordingly, the Institute's Grants Program and its intellectual mapping project have proceeded on parallel and interrelated courses during their initial periods of activity. It is also hoped that the mapping process will allow the Institute to play a catalytic role by bringing together practitioners as well as leading scholars from differing intellectual perspectives to exchange views and improve communication and understanding across disciplines.

The intellectual map colloquium series[3] opened in a hearing room in the Russell Senate Office Building on December 5, 1986, with presentations by four distinguished scholars on various theories of international conflict management. At a second round on February 19-20, 1987, at Stanford University, the Institute heard from 13 experts reflecting a wide range of practical peacemaking experience and academic disciplines. Two professors of international affairs met with the Board at a third colloquium on March 5 in the Washington, D.C. headquarters of the National Trust for Historic Preservation. The fourth colloquium took place on July 9, 1987, in the auditorium of the Dirksen Senate Office Building. At that time, eight prominent international law scholars convened to discuss "The Role of International Law in Securing and Maintaining Peace Among Nations." Senator Claiborne Pell introduced the morning session, and Senator Spark Matsunaga opened the afternoon session. Additional colloquia are being planned to further examine the currently identified strands in international peacemaking. The series will continue into FY 1988. At the conclusion of the colloquia, a working conference will be convened to assess the examination to date and to review possible frameworks from which a progress report will be prepared. In comprehensiveness and conceptual design, the report should prove useful to scholars and other interested individuals and is expected to become a basic reference for the Institute's determination of its own program emphases. The inquiry will extend over a number of years as its elaboration and refinement continue through related Institute activities.

*Television Series on the History of U.S.-Soviet Relations.* Under the Board's direction, the Institute is preparing a pilot program for a proposed educational series on the history of U.S.-Soviet relations. It is expected that the pilot—which will examine U.S.-Soviet summitry—will establish the feasibility of the series. The basis of the pilot will be a conference, cosponsored by the Smithsonian Institution's Woodrow Wilson International Center for Scholars, that brings together top-level scholars and summit participants to explore previous U.S.-Soviet summitry. The goal is to produce programming for general audience viewing, useful in both formal and informal educational settings. A consultant is providing expert advice on a range of application possibilities in public broadcasting and other media. The successful production of an educational television presentation, with the conference as its core, will quickly increase public awareness of the Institute and its work.

*A*mong the prominent international legal scholars who met on July 9, 1987 for a day-long colloquium in the Dirksen Senate Office Building auditorium were, from far left: G. Keith Higbet (President, American Society of International Law), Professor Louis Henkin (Columbia Law School), Senator Claiborne Pell, Chairman John Norton Moore, Professor Myres McDougal (Yale Law School), Judge Steven Schwebel (International Court of Justice).





*Dr. Herbert York (Director, Institute on Global Conflict and Cooperation, University of California at San Diego), addresses the Board—on the role of arms control in promoting peaceful resolution of international disputes—at the colloquium on February 19-20, 1987 at Stanford University.*



*Professor Sidney Hook, eminent philosopher and Senior Research Fellow at Stanford's Hoover Institution on War, Revolution and Peace, speaks to the Board at the February 19-20, 1987 colloquium.*

**Curriculum Development for High School Teaching on International Peace and Conflict Management.** An important Board decision was to commit the Institute to a project on the development of high school curricula on international peace and conflict management. A number of underlying considerations influenced this decision. First is the fact that educational activities affecting the youth of America carry special trust and demand great care. Second is that questions of international peace are complex and require the application of the highest intellectual and educational standards. Third is that any materials or activities involving the United States Institute of Peace in educational efforts at the high school level or below must be balanced and not be politicized. Recognizing, therefore, the need for a high level of caution, the Board decided to seek guidance from a group of specialists in high school curriculum development and in the area of international peace and conflict management. The outcome of this work will apply not only to possible curriculum development projects that the Institute itself undertakes, but also to funding requests from various educators and other interested parties. Although the Institute has funded a small number of grants for research on high school teaching and curricula development, the Board's policy has been to defer such grant applications pending the articulation of detailed guidelines.

**Library Classification System.** In FY 1988, the Institute will initiate a study of the feasibility of establishing a library classification system for international peace and conflict management information. This effort will build upon the intellectual map project and will involve librarians, scholars, and information specialists. The significance of the Library of Congress classification system as a worldwide means for gaining access to information will be examined as will the importance of the computer revolution in harnessing and making available existing knowledge on the subject.

## Shorter Term Projects

**Strengthening the United Nations Charter and International Law to Deter Low-Intensity and Covert Forms of International Aggression.** Subsequent to the adoption of the UN Charter, a principal form of armed aggression between nations has emerged: "low-intensity conflict," including support for terrorism, coups d'état, indirect attack, protracted "wars of national liberation," and covert warfare in general. While the contemporary international system continues to witness full-scale overt hostilities between regular armies—for example, the ongoing Iran-Iraq war—a recurrent and growing threat to international peace and security is organized political violence shaded in ambiguity. This study will examine legal protections and remedies against indirect armed aggression as provided in the UN Charter and other fundamental instruments of international law.

**Study of Political Systems and International Conflict.** This study will explore whether and to what extent there exists a relationship between domestic political systems and aggressive international behavior. A component of this study will be an investigation of political systems that oppress fundamental human rights and the propensity of those systems to use force in international relations in violation of international norms. As one dimension of conflict avoidance, and consistent with the goal of strengthening international peace and stability, the study also will assess problems that democracies have in deterring aggressive attacks that violate those norms and will examine ways in which such attacks can be deterred.

—— *Funding* ——

## Resource Levels: Fiscal Years 1985 and 1986

In the United States Institute of Peace Act, Congress authorized appropriations in the amounts of $6,000,000 for FY 1985 and $10,000,000 for FY 1986, and provided that appropriated yet unspent funds from FY 1985 would carry over to FY 1986.[32] The FY 1985 continuing resolution made a partial-year appropriation of $4,000,000.[33] The Institute's Board of Directors was appointed in FY 1986, and because FY 1985 funds were available for the Institute's start-up, Congress provided no FY 1986 appropriation.[34]

During the initial start-up months in FY 1986, the Institute expended approximately $300,000. Being trustees of taxpayer monies, and being charged with creating an extraordinarily important new institution of American leadership and innovation, the Board was determined from the outset to apply the most rigorous fiscal integrity to its stewardship. For example, the Board did not rush to award grants, but instituted a process of outreach and review that would assure opportunity and encouragement to potential applicants while simultaneously guaranteeing that the highest standards of government and private grantmaking institutions were applied. Equally, staffing decisions have been made in a careful and deliberate fashion, commensurate with the significance of the Institute to the United States and to the world. Such caution has meant that initial financial obligations have moved at the slow and steady pace dictated by the requirements of responsible institution-building and program development. The Board is confident that this approach was what Congress intended when it created the Institute as an independent corporation.

## Resource Levels: Fiscal Years 1987 and 1988

For Fiscal Years 1987 and 1988, Congress again provided a two-year authoriza-

tion, repeating the initial figures of $6,000,000 and $10,000,000, respectively.[35] The President's Fiscal Year 1987 Budget requested a funding level of $1,250,000 for the Institute.[36] After it became apparent that the the Board could transfer into the Endowment some $3.7 million for Institute programs, Senate and House conferees meeting on FY 1987 continuing resolution provided an appropriation of $625,000, thereby providing approximately $4.3 million for current year operations.[37] For FY 1988, the Institute has asked Congress for the full authorized funding level of $10 million, the amount that twice has been authorized for the second year of operations. With an excellent administrative system in place and with programs across a range of activities already underway or poised to begin, the Board is confident in its judgment that the Institute has firmly established the mechanisms to ensure that funding at this level will be used effectively and responsibly.[38]

## Endowment of the United States Institute of Peace

The United States Institute of Peace Act authorizes the Board of Directors to:

> . . . establish, under the laws of the District of Columbia, a legal entity which is capable of receiving, holding, and investing public funds for purposes in furtherance of the Institute under this title. The Institute may designate such legal entity as the "Endowment of the United States Institute for [*sic*] Peace".[39]

The Act also authorizes the Board to transfer appropriated funds to the Endowment.[40]

At its meeting of August 14 and 15, 1986, the Board directed the Institute's President to establish the Endowment of the United States Institute of Peace and to arrange for any unobligated or unexpended appropriated funds to be transferred to the Endowment. In September 1986, the Endowment was created as a nonprofit District of Columbia corporation, having the same

Board and purposes as the Institute.[41] At the September meeting of the Institute's Board, the Directors met for the first time as the Endowment's Board and took the initial steps toward opening the Endowment's accounts. It directed the Institute's President to obligate for the Endowment $3.5 million from the Institute's FY 1985/1986 funding. He took that step in a letter dated September 10, 1986, requesting GSA's financial office to make the obligation and asking GSA to prepare to transfer to the Endowment any remaining unobligated or unexpended FY 1985/1986 funds once the final accounting was completed.[42] Those fund transfers were effectuated, thereby making available financial resources for the Institute's programs during the current fiscal year.

### Financial Management of the Institute and the Endowment

In January 1986, shortly after the Senate confirmed the President's initial nominees to the Board of Directors, the Institute entered into an agreement with GSA for administrative support services on a reimbursable basis for FY 1986. For FY 1987, the Institute entered into an administrative support services agreement with OA.

Following discussions and meetings with officials of six area banks, the National Bank of Washington (NBW) was selected to serve as the Endowment's principal financial institution. An interest-bearing checking account was opened for the Endowment at the bank, which also agreed to provide assistance with the Endowment's initial investments. Funds from this account are used to pay for Institute programs. The Board has directed that, at least for the time being, Endowment investments be made only in Treasury bills or securities fully-guaranteed by the Federal Government.

The United States Institute of Peace Act requires an annual audit of Institute accounts with reports to Congress and the President.[43] After meetings with three of the "big eight" accounting firms, the Institute's President selected the firm of Arthur Young & Company to serve as auditor for FY 1986.[44] In addition to its auditing responsibilities, Arthur Young & Co. is providing

advice on financial management and accounting for the Institute and the Endowment. The Endowment also has secured the services of Athena Group, an information systems management firm, to provide expert advice on the technology of accounting and financial management for nonprofit corporations.

In addition, the Institute holds two accounts in the United States Treasury. During FY 1987,[45] OA is servicing the Institute by managing these two Treasury accounts; the first holds the FY 1987 annual appropriations of $625,000 and the second is a trust account.[46] During FY 1987, two kinds of expenditures will be made from the first Treasury account: (1) operating costs, such as personnel and office rental, both of which are most conveniently handled through the federal financial system, and (2) a transfer to the Endowment of no less than $156,250 to be used for grants.[47] The second account is a trust fund into which the Institute will deposit funds as needed from the Endowment.[48] OA is assisting the Institute in managing this trust account, which is being used to pay expenses for which the monies in the first account are inadequate.[49]

## *Looking Ahead*

### Funding

In March and April of this year, the Institute asked Congress for FY 1988 funding at the full authorized level of $10 million. Part of the testimony in which we urged that level of support bears repeating. As Chairman of the Board, I stated:

> In this request, we ask Congress to make what is, in my judgment, the single most important funding decision in the early years of the Institute's development. Your favorable action will ensure the Institute the means with which to implement a set of superb programs, as prescribed by the United States Institute of Peace Act. You also will establish a baseline for the Institute's future years. Our ability to do the work you have defined for us depends upon that measure of support.

> Speaking for the Directors of the United States Institute of Peace, we understand well the duty we owe our fellow taxpayers to be frugal in our handling of public funds. We also owe them our best efforts to find means other than war for managing international disputes. Measured in constant dollars, since the start of World War II the United States alone has spent more than $550,000,000,000 fighting wars.[50] This translates to an average annual cost of about $12 billion—or about $50 each year for every man, woman, and child in America today—and this does not include the costs associated with national defense when the nation has not been at war. The Institute's proposed FY 1988 budget of ten million dollars certainly is not insignificant, but at less than five cents per citizen per year it would seem to constitute a reasonable and justifiable investment in the search for a peaceful future.

> On the question of nongovernmental funding, at present the Institute is barred from receiving private gifts and contributions.[51] A number of people have offered financial assistance and gifts of property as expressions of support for the Institute. All have been informed that, by law, the Institute must decline such offers. While in particular cases the ban may have been unfortunately limiting, overall it has been a positive factor during the start-up period. It has precluded any pressure or need to engage in private fundraising and, thus, has allowed the Board and staff to focus en-

tirely on fundamental questions of programming and administrative structure. With resources limited to appropriated monies, the ban implicitly requires that Congress make its own assessment of the Institute's contribution to the public good and respond accordingly through public funding. Once the Institute is firmly on its feet with baseline funding set, it may be appropriate for Congress to reexamine the question of private gifts and contributions within appropriate guidelines as followed by other federally-supported entities.

### The President of the United States Institute of Peace

Robert F. Turner has served as the Institute's first President with skill and devotion for much longer than the initial year which he had anticipated. His leadership has been a major force in shaping the Institute and, in particular, in applying the Board's fundamental principles of tradition, independence, and integrity. His legacy is reflected in this report. After his successor takes office, he will return to the University of Virginia.

At its meeting on July 10, 1987, the Board unanimously selected Ambassador Samuel W. Lewis to be the new President of the Institute.[52] A *cum laude* graduate of Yale University and the recipient of a Masters Degree in International Relations from Johns Hopkins University, Ambassador Lewis is a man of remarkable intellectual capacity, industry, and skill. He possesses a rare breadth of first-hand diplomatic experience in peace processes and brings to the position of President of the Institute a wealth of extraordinary diplomatic, political, and managerial experience. In his last assignment before retiring from the Foreign Service in 1985, he was for more than eight years United States Ambassador to Israel, first appointed by President Carter in 1977 and reaffirmed by President Reagan in 1981. He played a prominent role in the Arab-

Israeli negotiations during both administrations, including the 1978 Camp David Accords. In 1982, he played a key role in delicate U.S. diplomatic efforts to prevent Israel's invasion of Lebanon, to put an end to the hostilities once they began, and to negotiate the eventual Israeli withdrawal. His diplomatic career spans more than three decades and embraces service on four continents—including lengthy assignments in Italy, Brazil, Afghanistan, and Israel. He has been Deputy Director of the State Department's Policy Planning Staff, with responsibilities for the Middle East, Africa, and Latin America. In 1975, President Ford appointed him as Assistant Secretary of State for International Organization Affairs, where he supervised the United States Missions to the United Nations and other international organizations. In other assignments, he served in Brazil with the U.S. Agency for International Development and at the White House as the senior staff member for Latin America on the National Security Council. Ambassador Lewis is the recipient of numerous awards, including the William A. Jump Award for Outstanding Service to the Federal Government in Public Administration, the Wilber J. Carr Award for Extraordinary Service, and two Distinguished Honor Awards from the Department of State. After retiring from the Foreign Service, he was named Diplomat-in-Residence at The Johns Hopkins University Foreign Policy Institute. Currently a guest scholar at the Brookings Institution in Washington, D.C., Ambassador Lewis will assume the presidency of the Institute on November 1, 1987.

## The Institute's Headquarters

The Institute plans to move from the Jackson Place townhouse into larger quarters in Washington, D.C. in November 1987. While the present location in many respects cannot be surpassed, the townhouse does not offer the space required to administer the Jennings Randolph Program for International Peace and to house Fellows, to continue a high quality and adequately staffed Grants Program, and to operate the other Institute projects and activities. We hope that the new headquarters will increase the interplay of the three program components, allowing each to strengthen the others. It should be easily accessible to interested members of the public and government officials, so that the Institute will, over time, become a familiar site for meetings, seminars, training programs, and other work on the fundamental questions of international peace and conflict management as set forth in the Institute's charter.

## The Institute's Public Visibility

Developing a strong public presence is a priority, and one should expect over the coming months to see a far more prominent Institute profile throughout the United States and overseas. Already, results of the Institute's Grants Program are being broadcast widely. For example, three months ago *The Washington Post* published an article about ethnic conflicts, which was based on a program cosponsored by the Institute and the State Department's Foreign Service Institute.[53] An informational newsletter is being prepared for wide distribution beginning in the Fall. The television pilot on U.S.-Soviet summitry is developing well and is expected to be ready for viewing toward the end of the year. The intellectual map colloquia are continuing with increased publicity. These examples are offered to illustrate the point that the Institute is intent upon projecting itself and its work to a wider audience. They are part of the implementation of the Congressional requirement that wide public dissemination of the work of the Institute is crucial if the Institute is to become "a living institution embodying the heritage, ideals and concerns of the American people for peace."[54]

## A Closing Word

The Institute needs and requests the support and guidance of Members of Congress and the Executive Branch, and equally important, the many individuals from around the country and the world who share the goals for which the Institute was founded. The aspirations for our endeavor are high, as befits the cause of peace among nations. It has been a great honor for every member of the Board to assist in making this historic idea into a reality. We have sought to build the structure with integrity, independence, and tradition; and the signs of a productive future for the Institute are strong. The next report of the Institute's Chairman will, I am confident, provide even greater evidence of the soundness of the decision to establish the United States Institute of Peace.

## —— *Endnotes* ——

1. Thomas Jefferson, THE WRITINGS OF THOMAS JEFFERSON (letter to Sir John Sinclair, June 30, 1803, emphasis in original), Vol. X, Library Edition, eds. Andrew A. Lipscomb and Albert Ellery Bergh (Washington, D.C.: The Jefferson Memorial Association, 1904), p. 397. ("Peace is our passion, and the wrongs might drive us from it. We prefer trying ever other just principles, right and safety, before we would recur to war.")

2. Spark M. Matsunaga, *Preface* to TO ESTABLISH THE UNITED STATES ACADEMY OF PEACE. REPORT OF THE COMMISSION ON PROPOSALS FOR THE NATIONAL ACADEMY OF PEACE AND CONFLICT RESOLUTION (Washington, D.C.: Government Printing Office, 1981) p. xi. (Hereinafter, MATSUNAGA COMMISSION REPORT). Commissioners were appointed in 1979 by President Jimmy Carter, Senate President Pro Tempore Strom Thurmond, and Speaker of the House Thomas P. O'Neill, Jr. The nine-member Commission was chaired by Senator Spark Matsunaga. Other members of the Commission were: Dr. James H. Laue (Vice Chairman), Representative John M. Ashbrook, Arthur H. Barnes, Dr. Elise Boulding, former Representative John R. Dellenback, John P. Dunfey, Representative Dan Glickman, and William F. Lincoln. In the Summer of 1981, the Commission submitted its report to President Ronald Reagan, Senator Thurmond, and Speaker O'Neill. Seminal essays on peace research, peace theories, peacekeeping, migration and social justice, a history of the Institute, excerpts from the MATSUNAGA COMMISSION REPORT, and the United States Institute of Peace Act are presented in THE HUNDRED PERCENT CHALLENGE: BUILDING A NATIONAL INSTITUTE OF PEACE, ed. Charles Duryea Smith (Cabin John, MD: Seven Locks Press, 1985).

3. This report is the first of a series of biennial reports that the Institute is required to submit to the Congress and the President. Congress established the Institute in the United States Institute of Peace Act, Title XVII of the Defense Authorization Act, 1985, Public Law 98–525 (Oct. 19, 1984), 98 Stat. 2492 at 2649, codified at 22 U.S.C. 4601. See Appendix H for the text of the Act (as amended). All subsequent references to the Act will be indicated by the Public Law section numbers. In regard to the biennial report, section 1712 provides: "Beginning two years after the date of enactment of this title, and at intervals of two years thereafter, the Chairman of the Board shall prepare and transmit to the Congress and the President a report detailing the progress the Institute has made in carrying out the purposes of this title during the preceding two-year period. The President shall prepare and transmit to the Congress within a reasonable time after the receipt of such report the written comments and recommendations of the appropriate agencies of the United States with respect to the contents of such report and their recommendations with respect to any legislation which may be required concerning the Institute. After receipt of such report by the Congress, the Committee on Foreign Affairs and the Committee on Education and Labor of the House of Representatives and the

Committee on Foreign Relations and the Committee on Labor and Human Resources of the Senate shall hold hearings to review the findings and recommendations of such report and the written comments received by the President."

4. The Commission found "that this Nation's constitutional, democratic, free enterprise, and immigrant heritage gives Americans a special capacity to promote the building of peace in the world as well as the Nation." MATSUNAGA COMMISSION REPORT, p. 55.

5. Section 1702(a)(1) states: "The Congress finds and declares that—(1) a living institution embodying the heritage, ideals, and concerns of the American people for peace would be a significant response to the deep public need for the Nation to develop fully a range of effective options, in addition to armed capacity, that can lessen international violence and manage international conflict."

6. Section 1702(a)(8).

7. Section 1702(a)(9).

8. Section 1702(b).

9. Section 1704(b) (emphasis added).

10. In section 1706(a), Congress provided that "[t]he powers of the Institute shall be vested in a Board of Directors unless otherwise specified in this title." Specific grants of corporate decision-making power in the Board are found in the authority to establish an endowment (section 1704(c): "As determined by the Board, the Institute may establish [an endowment]") and to develop an extraordinary range of programs (section 1705(b): "The Institute, acting through the Board, may—[a comprehensive list of ten authorized activities follows]"). When Congress incorporated by reference the nonprofit corporation laws of the District of Columbia in the United States Institute of Peace Act, it extended to the Institute the same authority used to operate a private, nonprofit corporation. Section 1705(a) provides: "The Institute may exercise the powers conferred upon a nonprofit corporation by the District of Columbia Nonprofit Corporation Act consistent with this title, except for section 5(o) of the District of Columbia Nonprofit Corporation Act (D.C. Code, sec. 29-1005(o))."

11. Congress provided, in section 1704(c), that: "As determined by the Board, the Institute may establish, under the laws of the District of Columbia, a legal entity which is capable of receiving, holding, and investing public funds for purposes in furtherance of the Institute under this title. The Institute may designate such legal entity as the 'Endowment of the United States Institute for [sic] Peace.'" Congress further provided for the transfer of funds from the Institute to the Endowment in section 1710(b): "The Board of Directors may transfer to the legal entity authorized to be established under section 1704(c) any funds not obligated or expended from appropriations to the Institute for a fiscal year, and such funds shall remain available for obligation or expenditure for the purposes of such legal entity without regard to fiscal year limitations. Any use by such legal entity of ap-

propriated funds shall be reported to each House of the Congress and to the President of the United States." The Board created the Endowment as a nonprofit corporation in the District of Columbia. For discussion of the Endowment, see text at "Funding . . . Endowment of the United States Institute of Peace," and for the Endowment's Articles of Incorporation, see Appendix F.

12. Congress authorized the Institute to approach it directly for funding. In distinction from Executive Branch agencies, but like a number of federally-funded entities including the Smithsonian Institution, prior clearance of funding requests by the Office of Management and Budget (OMB) is not necessary for the Institute. Section 1705(g) provides: "Nothing in this title may be construed as limiting the authority of the Office of Management and Budget to review and submit comments on the Institute's budget request at the time it is transmitted to Congress." Thus, in addition to addressing the question of funding for the Institute in its preparation of the President's budget, OMB may present its views again when the Institute itself asks Congress for funding, but OMB may not preclude the Institute from communicating its own funding requests directly to Congress. At the first Board meeting on February 25–26, 1986, the Directors averted an OMB effort to set the Institute's personnel ceiling. Since then, the Institute and OMB officials have engaged in professional and cordial dialogue and correspondence on the subject of the Institute's independence. The issue arose again in the context of the Institute's testimony before Senate and House Appropriations subcommittees in April 1986, only a week after the Institute had moved into offices at 730 Jackson Place. The question of the Institute clearing its testimony through OMB was repeated as the Institute prepared to present its request to Congress for Fiscal Year (FY) 1988 funding at the full authorized level of $13.33 million. At each juncture, the Institute has proceeded pursuant to its independent authority, keeping OMB informed of its decisions, but not seeking OMB approval.

13. Section 1705(b). The Institute's Directors are appointed in two ways. By law, four are *ex officio*. They are the Secretaries of Defense and of State or their Senate-confirmed designees; the Director of the Arms Control and Disarmament Agency or his Senate-confirmed designee; and the President of the National Defense University (NDU) or, at his designation, the university's Vice President. Eleven Directors are appointed from outside of federal service by the President, subject to the advice and consent of the Senate. Thus, whether *ex officio* or selected by the President, each Director has been appointed to office by the President with Senate approval. In addition, the Institute's President is a nonvoting member of the Board. Section 1707(a). The President's authority to dismiss any of his eleven appointees is limited. He may act only for cause [section 1706(f)(1): "for conviction of a felony, malfeasance in office, persistent neglect of duties, or inability to discharge duties"]; at the request of a majority of the Board [section 1706(f)(2): "upon the recommendation of eight voting members of the Board"]; or at the request of four committees of Congress [section 1706(f)(3): "upon the recommendation of a majority of the members of the Committee on Foreign Affairs and the Committee on Education and Labor of the House of Representatives and a majority of the members of the Committee on Foreign Relations

and the Committee on Labor and Human Resources of the Senate"]. Because the four *ex officio* members serve by virtue of their office, their leaving office would automatically remove them from the Board. When Lieutenant General Richard Lawrence, USA, retired from active service, NDU Vice President Ambassador Bruce Laingen became NDU's acting President and joined the Institute's Board. Ambassador Laingen later returned to the State Department and Lieutenant General Bradley Hosmer, USAF, assumed the NDU presidency and the seat on the Board. Secretary of Defense Caspar Weinberger designated Assistant Secretary of Defense Richard Perle to serve on the Board. When Secretary Perle resigned from the Department of Defense, he automatically left the Board and the position reverted to Secretary Weinberger.

14. The Endowment of the United States Institute of Peace is a nonprofit corporation established by the Board in the District of Columbia to facilitate the Institute's work as authorized by Congress. The Endowment is discussed below in the section on "Funding," and documentation is presented in Appendix F.

15. Section 1709(b): "No political test or political qualification may be used in selecting, appointing, promoting, or taking any other personnel action with respect to any officer, employee, agent, or recipient of Institute funds or services or in selecting or monitoring any grantee, contractor, person, or entity receiving financial assistance under this title."

16. The contracting procedure provides an example of the Board's standards of fairness and careful financial management. Because of the Institute's independence, it is not an Executive Branch agency. Nevertheless, because administrative assistance has been obtained from the General Services Administration (GSA) and the Office of Administration of the Executive Office of the President (OA), federal standards have been applied to all Institute agreements. In administering the Endowment, federal standards are the reference point for all contractual activities. Again, this decision to look to the spirit of federal rules carries forward the key principle of integrity in all aspects of the Institute's work.

17. An attorney and author of several books, Mr. Turner's background includes five years as senior foreign affairs assistant to a member of the Senate Foreign Relations Committee and service as Principal Deputy Assistant Secretary of State. At Mr. Turner's request, the term of his appointment as President was limited to one year or until his successor could be appointed. He assumed office on March 15, 1986, and at the Board meeting of February 12–13, 1987, his appointment was extended for up to six additional months to provide additional time for the Board to complete its national search for his successor. At its July 10, 1987 meeting, the Board again continued President Turner's appointment in order to facilitate a smooth transition for his successor, Ambassador Samuel W. Lewis. Mr. Smith, now the Institute's General Counsel, served as Special Assistant to Senator Spark Matsunaga, Chairman of the federal commission studying the concept of a national institution devoted to peace and conflict resolution, and drafted the Commission's report which included recommended legislation. He subsequently developed the only commercially published book on the Institute. See note 2. He also served on the legal staff of the federal study commission that addressed United States immigration and

refugee policy, and was acting director and research director of the federal study commission that examined and reached recommendations concerning the treatment and experiences of Japanese Americans and Aleuts in the United States during World War II. Within two months of the Board's inaugural meeting, Olympia Dimick joined the staff as Special Assistant to the President, on detail from the Department of State.

18. The Board members who took the oath of office from the Chief Justice were Chairman John Norton Moore; Dr. Dennis L. Bark; Dr. William R. Kintner; Dr. Evron M. Kirkpatrick; Rev. Sidney Lovett; Pastor Richard John Neuhaus; Dr. W. Scott Thompson; W. Bruce Weinrod, Esq.; and Dr. Allen Weinstein. Morris I. Leibman, Esq., was appointed to the Board later, and on July 22, 1986, was sworn into office by Supreme Court Justice John Paul Stevens. Biographical sketches of the Institute's Board are presented in Appendix A.

19. See Appendix B for biographical sketches of the Institute's officers and staff.

20. See description of the Board's inaugural meeting, in the text at "The Beginning."

21. Section 1705(b)(1) provides: "The Institute, acting through the Board, may—(1) establish a Jennings Randolph Program for International Peace and appoint, for periods up to two years, scholars and leaders in peace from the United States and abroad to pursue scholarly inquiry and other appropriate forms of communication on international peace and conflict resolution and, as appropriate, provide stipends, grants, fellowships, and other support to the leaders and scholars." The Institute carefully examined the possible application of the Act's prohibition in section 1705(g)(2) against contractual relationships with foreign nationals and concluded that it did not extend to fellowships, stipends, grants, and other forms of support under the Jennings Randolph Program or the Grants Program. Because of this legal conclusion, the Institute was able to include three foreign nationals among the initial group of eight Jennings Randolph Distinguished Fellows.

22. Biographies of the Jennings Randolph Distinguished Fellows and brief descriptions of their work are provided in Appendix C.

23. Section 1705(b)(1) lists grants as one form of support in the Jennings Randolph Program for International Peace. Section 1705(c) provides: "The Institute may undertake extension and outreach activities . . . by making grants and entering into contracts . . . [but] [n]o grant may be made to an institution unless it is a nonprofit or official public institution, and at least one-fourth of the Institute's annual appropriations shall be paid to such nonprofit and official public institutions." The provision continues by listing in encompassing terms the purposes for which grants or contracts may be made. Section 1705(g) allows the Institute to obtain grants and contracts from specified federal departments and agencies but bars grants from and contracts with foreign or private organizations or persons.

24. As set forth in the "Interim Procedures for Grant Applications," they are:

• Research on the relationship between adherence to international human rights standards and international peace.

• Research on perceptions of peace across political systems and ideologies, including the comparative status of peace movements and their impact under dif-

ferent political systems, and a comparative assessment and survey of the teaching of peace.

• Research on negotiations, including lessons from negotiations between the United States and the Soviet Union, lessons from negotiations between democratic and nondemocratic systems, and general lessons in the art of negotiation.

• Research on relationships between domestic political systems and the aggressive use of force.

• Research on strengthening the non-use-of-force provisions of the United Nations Charter, including the effectiveness of the UN and other international institutions in dealing with low intensity and covert forms of aggression.

• Research on the mediation of political change.

• Developing curricula and materials for the study of international peace and conflict resolution from high school through post-graduate programs.

• Developing curricula and materials for [international] negotiation, mediation, and conciliation theory, teaching, and training.

• Assisting media programming, including research and the development of materials particularly for television and radio, that will bring information about issues of international peace and conflict resolution to the broader public.

25. See note 21.

26. Grant awards are described in Appendix D.

27. In mentioning these figures, it is very important to note that the most critical factor in assessing the significance of demand when placed against resources is, of course, the quality of proposals. Using current grant application data, the Institute will have met less than five percent of the total dollar amount requested by grant applicants.

28. 51 Fed. Reg. 25,784–25,786 (July 16, 1986).

29. The Board has been particularly attentive to questions of ethics in its management of the Grants Program. In addition to using government-wide rules of ethics and such standards as those used in the legal profession, the Board has applied the provision in the Act concerning conflict-of-interest situations. Section 1706(g) provides: "No member of the Board may participate in any decision, action, or recommendation with respect to any matter which directly and financially benefits the member or pertains specifically to any public body or any private or nonprofit firm or organization with which the member is then formally associated or has been formally associated within a period of two years, except that this subsection shall not be construed to prohibit an *ex officio* member of the Board from participation in actions of the Board which pertain specifically to the public body of which that member is an officer." Board members are alert to situations calling for recusal because of an actual conflict-of-interest or an appearance of such. Because each Director knows beforehand which applications will be discussed, he is able to recuse himself from any discussion or voting on such applications. In addition, the Chairman, President, General Counsel (who serves as the Institute's Ethics Officer), and Director of the Grants Program have a shared responsibility to identify any conflict-of-interest question and to bring it to the attention of the Director involved. Moreover, they raise and review any potential disqualification ques-tion which might cause the Institute to decline to consider a particular application because of the possibility

that individual recusal might not adequately resolve the conflict-of-interest issue.

50. In brief, the procedure is as follows: The Director of the Grants Program assigns each application to one or more of the following Board committees: Research and Studies, Education and Training, and Information Services. At this early point, potential ethical concerns are identified and reviewed, and, as each appropriate point in the process, they are noted again. Each committee member receives a copy of the full application, and the committee chairman delegates to each committee member specific responsibility for reporting on individual proposals to the committee and the full Board. In instances where outside review can provide special insight, it is sought. All Board members receive a copy of each basic application (in eight-page form), and any member may ask for a full copy of any application. To date, all committee meetings have taken place during full Board meetings, thus allowing non-committee members to participate in discussion but not to vote at the committee level. Quorums are required in all instances, and recorded votes are kept. Committee recommendations proceed to the full Board as follows: if there is a unanimous rejection, it is reported and, unless a Board member wishes there to be a discussion or a vote, the committee decision is adopted by the full Board; any other committee action, whether a split vote or unanimous approval, goes to the full Board for deliberation and vote.

51. See Appendix E for the list of participants in the first four colloquia.

52. Section 1710(a) provides: "For the purpose of carrying out this title . . . there are authorized to be appropriated $6,000,000 for FY 1985 and $10,000,000 for FY 1986. Monies appropriated for FY 1985 shall remain available through FY 1986."

53. See 130 CONG. REC. S. 12713 (daily ed. Oct. 2, 1984) (Sens. Hatfield, Matsunaga, and Proxmire), concerning the decision to provide only partial funding for the Institute's first year of operation because it was expected to be active for only part of the year.

54. Although not providing an appropriation for FY 1986 since no funds had been expended from the FY 1985 appropriation, Appropriations Committees in both Houses expressed continued support for the Institute. HOUSE REP. 99-298, 99th Cong., 1st Sess. 147 (Sept. 26, 1985) ("This bill includes no further funding for the Institute in 1986. The $4,000,000 appropriated in 1985 will by law carry over into 1986. No funds have yet been obligated as the President has not yet appointed the Board of Directors of the Institute. The Committee fully expects that a Board of Directors will be appointed in the near future and the funds fully obligated.") See also, SENATE REP. No. 99-151, 99th Cong. 1st Sess., 200 (Oct. 4, 1985) ("[T]he Committee believes that additional funding for the Institute is unnecessary at this time. It is the Committee's intent, however, that the Institute will be fully supported with whatever funds are necessary to carry out its powers and duties. The Committee will consider additional funding for the Institute as may be necessary in the near future.").

55. The Higher Education Amendments 1986, Pub. L. No. 99-498, section 1601, provide: "(a) AUTHORIZATIONS OF APPROPRIATIONS.—(1) The first sentence of section 1710(a) of the United States Institute of Peace Act (22 U.S.C. 4609(a)) is amended—(A) by striking out 'fiscal year 1985' and inserting in lieu

thereof 'fiscal year 1987,' and (B) by striking out 'fiscal year 1986' and inserting in lieu thereof 'fiscal year 1988'. (2) The amendments made by paragraph (1) shall take effect on October 1, 1986. (b) AVAILABILITY OF FUNDS.—The second sentence of section 1710(a) of such Act (22 U.S.C. 4609(a)) is amended to read as follows: 'Amounts appropriated under this section are authorized to remain available to the Institute until expended.'"

56. See APPENDIX TO THE BUDGET FOR FISCAL YEAR 1987, p. 1-Z136. This budget was prepared before the Institute's Board was sworn into office. The FY 1987 funding of $1.25 million was intended to supplement prior year carry-over funds, which OMB estimated would be $2 million, thereby giving the Institute an operating budget of $3,250,000 for FY 1987. In fact, the Institute obligated or expended approximately $300,000 during FY 1986 primarily for operational activities. Most program expenditures did not come on line until FY 1987. For example, the Grants Program began in July 1986 with the first mailing of procedures and application forms, but grant outlays were not made until FY 1987. Thus, rather than the $2 million carry-over estimated by OMB, the Institute actually had some $3.7 million of prior year funds available for use in FY 1987.

57. The fact that $3.7 million remained available for obligation from prior year funds through the mechanism of the Endowment of the United States Institute of Peace was, we understand, a determining consideration when Senate and House conferees settled upon $625,000 for the Institute's FY 1987 appropriation. The FY 1987 Labor-HHS appropriations bill (H.R. 5233; H. REP. 99-960, 99th Cong., 2d Sess. (Oct. 2, 1986)), which was incorporated in the continuing resolution (Pub L. 99-500, Oct. 18, 1986; Pub. L. 99-591, Oct. 30, 1986), provides: "For necessary expenses of the United States Institute of Peace as authorized in the United States Institute of Peace Act, $625,000."

58. In testimony before the Senate and House Appropriations Subcommittees, it was emphasized that the effective budgetary amount upon which Congress should examine next year's funding level is $4.3 million, and that the additional $625,000 provided in FY 1987 should not be mistaken as an accurate funding baseline. It was further emphasized that FY 1987 was the first full year of operations for the Institute.

59. Section 1704(c).

60. Section 1710(b) provides: "The Board of Directors may transfer to the legal entity authorized to be established under section 1704(c) [the Endowment] any funds not obligated or expended from appropriations to the Institute for the fiscal year, and such funds shall remain available for obligation or expenditure for the purposes of such legal entity without regard to fiscal year limitations. Any use by such legal entity of appropriated funds shall be reported to each House of Congress and to the President of the United States."

61. The Endowment's Articles of Incorporation are reproduced in Appendix E.

62. In a letter dated September 15, 1986, GSA, the Institute's FY 1986 service agency, reported the obligation of $3.5 million and concurred with the Institute's ". . . position that based upon section 1710(b) of the United States Institute of Peace Act, that any remaining unobligated 1986 fiscal year funds may be moved after the end of the 1986 fiscal year" in addition to the $3,500,000 that the Institute obligated for

transfer to the Endowment, an amount of approximately $200,000 became available for transfer to the Endowment once the FY 1986 books were reconciled and closed. Because of a technical error, the President's FY 1988 Budget reported those funds as lapsed, but the joint efforts of the Institute, GSA, and OA have recaptured the funds, and these have been transferred to the Endowment.

63. Sections 1709 (g) and (h) set forth accounting and reporting requirements for the Institute.

64. The audit is reproduced in Appendix G. Arthur Young & Company is continuing to provide auditing services for FY 1987.

65. During FY 1986, the Institute worked closely with GSA. With the service agreement change from GSA to OA in FY 1987, the Institute's prior year accounts were transferred from GSA to OA. Therefore, OA is able to assist the Institute in matters concerning the use of both the FY 1985/1986 appropriation and the FY 1987 appropriation. The service agreement with OA includes assistance from the Financial Management Division.

66. Section 1705(g)(1) provides (emphasis added): "Except as provided in paragraphs (2) and (3) [barring foreign and private grants, contracts, gifts, and contributions], the Institute may obtain grants and contracts, including contracts for classified research for the Department of State, the Department of Defense, the Arms Control and Disarmament Agency, and the intelligence community, and receive gifts and contributions from government at all levels."

67. Section 1705(c) provides (emphasis added): "No grant may be made to an institution unless it is a nonprofit or official public institution, and at least one-fourth of the Institute's annual appropriations shall be paid to such nonprofit and official public institutions." The twenty-five percent requirement means that, of $625,000 appropriated in FY 1987, at least $156,250 must be set aside for institutional grants, and no more than $468,750 may be used for operating costs. The Institute's Board has determined that the Grants Program will be managed out of the Endowment account. Therefore, the Institute will restrict the necessary amount from the FY 1987 appropriations account in the Treasury to the Endowment's account at the National Bank of Washington.

68. The need for a second Institute Treasury account arose from the following considerations:

• The FY 1987 appropriation of $625,000 would be insufficient to pay for the Institute's operating costs during FY 1987.

• As Congress intended, a portion of the $3.7 million obligated by the Institute for the Endowment from the Institute's FY 1985/1986 appropriations would have to be used to cover the difference.

• The Institute's strong preference was to continue to receive the excellent services it had contracted from OA. The Institute would benefit from OA's experience and competence. OA's strong administrative preference was that the funds for Institute activities for which OA is responsible should be in a Treasury account.

• Because the FY 1987 funds are on a annual appropriation, the Treasury account for these funds could not be supplemented by funds from another source, including the Endowment, a nonprofit District of Columbia corporation whose purpose is to further the work

of the Institute. See Appendix F for the Endowment's Articles of Incorporation.

• Endowment funds would be comprised of the $3.7 million from the Institute's FY 1985/1986 appropriation obligated and transferred to the Endowment by the Institute. The Endowment would deposit this Institute's $3.7 million check in the National Bank of Washington. Once in the Endowment's account, the funds would become "no year" monies which could be applied to any current Institute costs.

69. The question—which arose when Congress appropriated $625,000 essentially as a supplement to the $3.7 million that remained unspent and unobligated from FY 1985/1986 funds—became how to make a portion of the prior year monies available for the Institute's costs. To be usable, the prior year funds had to be transferred to the Endowment. How, then, could they be brought back into an Institute account for OA to administer? To resolve this dilemma in a way that ensured clear reports to Institute and Endowment activities and that would maintain the Institute's relationship with OA, the Institute undertook a number of meetings and discussions with officials from OA, the Department of the Treasury, and OMB, as well as with congressional staff. The decision reached was to establish a trust account for the Institute in the Treasury into which the Institute could deposit funds given it by the Endowment. Four basic conclusions about the Institute and the Endowment provided the foundation for this determination. (1) Congress has authorized the establishment of Treasury accounts for the Institute. (2) The Endowment's purposes and functions include providing support for Institute operations. See section 1704(c) and the Endowment's Articles of Incorporation. (3) Section 1705(g)(1) permits the Institute to "receive gifts and contributions from government at all levels." (4) Since a purpose of section 1705(g) is to have Institute funding to public funds and since Endowment funds are "public" by definition, section 1709(c), and derive from appropriations, those funds are a gift which could be accepted by the Institute.

70. Figures used in calculations are from STATISTICAL ABSTRACT OF THE UNITED STATES 1986, p. 558 (table number 557).

71. Section 1705(g)(3): "Notwithstanding any other provision of this title, the Institute and the legal entity described in section 1704(c) [the Endowment] may not obtain any grant or contract or receive any gift or contribution from any private agency, organization, corporation or other legal entity, institution, or individual." In addition, Congress and the President have full oversight authority. Sections 1708(d), (g) & (h) and 1712.

72. The national search for the successor to the Institute's first President, Robert F. Turner, began in the Fall of 1986. In December, a letter soliciting nominations and applications was sent to university and college presidents across the U.S. as well as to the heads of major foundations and other organizations. Advertisements were placed in The New York Times and The Chronicle of Higher Education, and notices were sent to over 100 major journals whose readership would be interested in the Institute. The Board received nominations for and applications from over 270 candidates. Personnel Committee members reviewed resumes and other information on every nominee and applicant, and

all other members of the Board were provided with brief information on each applicant and nominee; additional information on any applicant or nominee was provided to any Board member upon request. Through a consultative process that included full Board discussions in executive session at three meetings, the list of candidates was carefully reduced to a manageable number. Interviews were conducted with finalists, and at its July 10, 1987 meeting, the Board selected Ambassador Samuel W. Lewis to succeed Mr. Turner.

53.  Don Podesta, "Ethnic, Religious Rivalry at Root of Many Violent Conflicts in World," *The Washington Post*, 26 May 1987, p. A1.

54.  Section 1702(a)(1).

---

# APPENDIX A

## —— *Board of Directors* ——

*T*he United States Institute of Peace Act vests the powers of the corporation in a fifteen-member Board of Directors. Eleven members of the Board are drawn from outside of Federal government service and are appointed by the President, with the advice and consent of the Senate. They may serve no more than two successive terms. Four members of the Board serve *ex officio*. They are: the Secretaries of State and Defense and the Director of the Arms Control and Disarmament Agency (these officers may designate another representative from their department or agency who has been confirmed by the Senate); and the President of the National Defense University, or, if he so designates, the Vice President. The President of the United States Institute of Peace is a nonvoting member of the Board. No more than eight of the fifteen voting members may be of the same political party. In addition to its statutory composition, the Board, at its first meeting, appointed a Senior Advisor to serve in a nonvoting capacity.

### Non-Governmental Members

**Chairman John Norton Moore** was appointed by President Reagan to be the first Chairman of the Board of Directors. He is the Walter L. Brown Professor of Law at the University of Virginia School of Law. Professor Moore has been Counselor on International Law to the Department of State; a United States Ambassador to the Third United Nations Conference on the Law of the Sea; Deputy Special Representative of the President to the Law of the Sea Conference; Chairman of the National Security Council Interagency Task Force on the Law of the Sea; and Special Counsel for the United States, arguing two cases before the International Court of Justice. He has also been a member of the National Advisory Committee on Oceans and Atmosphere; a member of the United States Delegation to the Conference on Security and Cooperation in Europe; Chairman of the American

Bar Association's Standing Committee on Law and National Security; Co-Chairman of the University of Virginia Council on Legal Education Opportunity program; a member of the Board of Editors of the *American Journal of International Law*; a member of the Council on Foreign Relations and the American Law Institute; and a Fellow of the Woodrow Wilson International Center for Scholars. He is the author or editor of numerous books on international conflict management, including *Law and the Indo-China War, Law and Civil War in the Modern World*, and *The Arab-Israeli Conflict (vols. I – IV)*.

**Dr. Dennis L. Bark** is Senior Fellow of the Hoover Institution on War, Revolution and Peace at Stanford University. Dr. Bark received his undergraduate training at Stanford University and his Ph.D. in modern European History and Political Science *summa cum laude* from the Free University of Berlin. Recipient of a number of fellowships, he has been a member of the President's Commission on White House Fellowships and Chairman of United States Coast Guard Academy Advisory Committee. Dr. Bark is the author or editor of several books, including *Agreement on Berlin: A Study of the 1970 – 72 Quadripartite Negotiations* and *To Promote Peace: U.S. Foreign Policy in the Mid-1980s*.

**Dr. William R. Kintner** was United States Ambassador to Thailand between 1973 and 1975. A graduate of the United States Military Academy at West Point, Ambassador Kintner went on to receive his Ph.D. from Georgetown University. Following a distinguished Army career, which included service in the Korean conflict (for which he received the Legion of Merit with Oak Leaf Cluster and the Bronze Star with Oak Leaf Cluster), Ambassador Kintner in 1961 became a Professor of Political Science at the University of Pennsylvania. He has been President and Director of the Foreign Policy Research Institute, Editor of the quarterly journal *Orbis*, a Fellow of the Hudson Institute, a member of the Board of Foreign Scholarships, and a member of the

Board of Freedom House. He is the author or co-author of numerous books, including *Peace and the Strategic Conflict, Protracted Conflict, Building the Atlantic World,* and *The New Frontier of War.*

**Dr. Evron M. Kirkpatrick** served for more than 25 years as Executive Director of the American Political Science Association. He is President of the American Peace Society and has for many years been the Editor and Chairman of the editorial board of *World Affairs.* Dr. Kirkpatrick received his Ph.D. from Yale University, and immediately following World War II held several research positions with the Department of State. He was Chairman of the Social Science Division of the University of Minnesota, where he became a mentor to former Senator Hubert H. Humphrey, a long-time advocate of a national peace institution. Dr. Kirkpatrick taught for four years at Howard University and has taught at Georgetown University since 1959. He is a former member of the National Arbitration Association and of its Board of Arbitrators, and has served on the Council and the Executive Committee of the International Political Science Association. He is the author of numerous books and articles about American government and international affairs.

**Morris I. Leibman, Esq.,** is Partner in the law firm of Sidley & Austin. For many years, Mr. Leibman was Chairman of the American Bar Association's Standing Committee on Law and National Security. In 1981, he was awarded the Presidential Medal of Freedom. He received his Ph.B. and J.D. degrees from the University of Chicago. He was a founder and now serves on the Executive Board of the Georgetown University Center for Strategic and International Studies. He was the 1986 recipient of the Fellows of the American Bar Association's Annual Fifty-Year Award.

**Reverend Sidney Lovett** received his undergraduate education at Yale University and his Master of Divinity degree from Union Theological Seminary. Most recently, he was for a decade Senior Minister of the First Church of Christ Congregational in West Hartford, Connecticut. He has served on the boards of directors of many human

services agencies and theological schools and was a co-founder and Director of the Foodshare Commission of Greater Hartford. He has been a Director and President of the Allan Institute in Washington, D.C.

**Pastor Richard John Neuhaus** is the Director of the Center on Religion and Society in New York City. A Lutheran clergyman, for seventeen years he was Senior Pastor of a low-income Black and Hispanic parish in Brooklyn, New York. He has held leadership positions in numerous organizations concerned with civil rights, peace, international justice, and religious ecumenism. For eight years he was Senior Editor of *Worldview.* He currently is Editor of *The Religion and Society Report* and Editor-in-chief of *This World: A Journal of Religion and Public Life.* He is the author of ten books, including *The Naked Public Square: Religion and Democracy in America, Movement and Revolution, To Empower People,* and *The Catholic Moment.*

**Dr. W. Scott Thompson** is Professor of International Politics at the Fletcher School of Law and Diplomacy at Tufts University. A Rhodes Scholar and a graduate of Stanford and Oxford Universities, Dr. Thompson has been a White House Fellow, an Assistant to the Secretary of Defense, and an Associate Director of the United States Information Agency. He is the author or editor of numerous books and articles on foreign policy; is a founding member of the Board of the Committee on the Present Danger; is a member of the Council on Foreign Relations and the International Institute for Strategic Studies; and serves on the Board of the Institute for Strategic Trade.

**W. Bruce Weinrod, Esq.,** is Director of Foreign Policy and Defense Studies at the Heritage Foundation in Washington, D.C. He holds a J.D. from Georgetown University School of Law and has done graduate work in International Affairs at the University of Pennsylvania. He has served as Legislative Director to Senator John Heinz and on the White House writing and research staff. He is a U.S. Army veteran, was a Manager of International Corporate Affairs for Chase Manhattan Bank, has written extensively on U.S. foreign and defense policy issues, and is a member of the International Institute

for Strategic Studies. He is a Public Member of the U.S. Delegation to the 1987 Vienna Follow-Up Talks on the Helsinki Accords and a Board Member of the Foreign Student Service Council.

**Dr. Allen Weinstein** was awarded the United Nations Peace Medal in 1986 for his work in promoting a peaceful political transition in the Philippines and a peaceful resolution of the conflict in El Salvador. He is University Professor and Professor of History at Boston University and President of the Center for Democracy. He has been University Professor at Georgetown University and President of the Center for the Study of Democratic Institutions and was a member of the Editorial Board of the *The Washington Post* and Editor of *The Washington Quarterly* and *The Center Magazine.* He also served as acting President of the National Endowment for Democracy. A prize-winning historian, Dr. Weinstein is the author of many books, including *Freedom and Crisis: An American History, Perjury: The Hiss-Chambers Case,* and *Between the Wars: American Foreign Policy from Versailles to Pearl Harbor.*

### Ex Officio Members

#### Department of State

Secretary of State George Shultz designated **Ambassador Max M. Kampelman,** Head of the United States Delegation to the Conference on Security and Cooperation in Europe, to serve on the Institute's Board. Ambassador Kampelman received his J.D. from New York University and his Ph.D. in Political Science from the University of Minnesota. He has been a faculty member at the University of Minnesota, Howard University, and several other institutions of higher learning. Ambassador Kampelman is a former Chairman of the Board of Trustees of the Woodrow Wilson International Center for Scholars at the Smithsonian Institution. He was a Senior Advisor to the United States Delegation to the United Nations and served as Legislative Counsel to Senator Hubert H. Humphrey.

In June, 1986, **Ambassador Richard Schifter,** Assistant Secretary of State for Human Rights and Humanitarian Affairs, was named by Secretary Shultz to replace Am-

bassador Kampelman, whose return to the Geneva arms control negotiations precluded active participation in the Institute's work. Ambassador Schifter is the United States member of the United Nations Human Rights Commission. He graduated *summa cum laude* from the College of the City of New York and received his LL.B. from Yale Law School. He has served as Deputy United States Representative to the Security Council of the United Nations with the rank of Ambassador. For many years, he has participated in the educational affairs of his home state of Maryland on various boards and commissions, including service as Vice President and President of the Maryland State Board of Education, Chairman of the Governor's Commission for the Funding of the Education of Handicapped Children, and Chairman of the Maryland Values in Education Commission.

#### Department of Defense

Secretary of Defense Caspar W. Weinberger designated Assistant Secretary of Defense for International Security Policy **Richard Perle** to serve on the Board. Secretary Perle received his education at the London School of Economics, the University of Southern California, and Princeton University. For more than a decade, he was a senior staff member for Senator Henry M. Jackson and on the Permanent Subcommittee on Investigations and the Senate Armed Services Subcommittee on Arms Control. He is the author or coauthor of numerous articles on U.S. foreign policy and has received fellowship awards from Princeton University, the Ford Foundation, the Social Science Research Council, and the American Council of Learned Societies. In April 1987, he resigned from his position in the Defense Department, and thereby left the Institute's Board.

**The Honorable Caspar W. Weinberger,** Secretary of Defense, currently serves on the Institute's Board pursuant to the appointment provisions of the United States Institute of Peace Act. Secretary Weinberger's federal government service includes positions as Deputy Director and Director of the Office of Management and Budget, Chairman of the Federal Trade Commission, and Counselor to the President (1973). He is a graduate of Harvard

University and the Harvard Law School, and has practiced law in California and has been a member of the California legislature.

## Arms Control and Disarmament Agency

**Ambassador Kenneth L. Adelman** is the Director of the Arms Control and Disarmament Agency. He has been Deputy United Nations Permanent Representative to the United Nations (with the rank of Ambassador Extraordinary and Plenipotentiary) and Head of the United States delegation to the Second Special United Nations Session on Disarmament. He also has worked for the Agency for International Development, the Office of Economic Opportunity, and other federal government agencies. Dr. Adelman received his Ph.D. in Political Theory from Georgetown University. He has taught Shakespeare at Georgetown University and African Studies at The Catholic University of America.

## National Defense University

**Lieutenant General Richard D. Lawrence**, USA (ret.), was the first President of the National Defense University to serve on the Institute's Board. General Lawrence received his Ph.D. in Engineering from Ohio State University. He has been a Federal Executive Fellow at the Brookings Institution and completed the Executive Program for National and International Security at Harvard University. His distinguished military career includes service in Germany, Korea, Vietnam, and Saudi Arabia. He served with the Army Missile Command, was Chief of the Army Force Modernization Coordination Office, and was Commandant of the United States Army War College. He was also the Military Negotiator of the United States Delegation to the Egyptian-Israeli Peace Talks during the Carter Administration. His numerous military decorations include the Silver Star with Oak Leaf Cluster and the Legion of Merit with Oak Leaf Cluster.

On July 31, 1986, General Lawrence retired from the Army and from his position

as President of the National Defense University. Prior to his departure, he designated NDU Vice President, **Ambassador Bruce Laingen** to serve on the Board during his tenure as Acting President. Ambassador Laingen received his B.A. from St. Olaf College, graduating *cum laude*, and his M.A. in International Relations from the University of Minnesota. During his career with the Foreign Service, he served at numerous embassy posts throughout the world in various capacities, including Officer in Charge of Greek Affairs; Deputy Chief for the Mission to Afghanistan, Kabul; Acting Deputy Assistant Secretary of State for European Affairs; and Ambassador to Malta. He was Chargé d'affaires at the American Embassy, Teheran, during the period when Iranian militant students lay siege to the Embassy and held Americans hostage.

On September 18, 1986, **Lieutenant General Bradley C. Hosmer**, USAF, was confirmed by the Senate as the new President of the National Defense University, as Ambassador Laingen completed his NDU term and returned to the State Department. General Hosmer is a graduate of the United States Air Force Academy and earned his M.A. degree in International Relations from Oxford University as a Rhodes Scholar. He is also a graduate of the Naval War College, the National War College, and NDU. General Hosmer is a command pilot with over 4,000 flying hours as pilot and navigator, including more than 160 combat missions in Vietnam. His operational experience includes command of the 479th Tactical Training Wing, Holloman Air Force Base; the 374th Tactical Fighter Wing, Moody Air Force Base; and the 831st Air Division, George Air Force Base. He has served in a number of staff assignments, including Executive to the Chief of Staff, U.S. Air Force; Deputy Chief of Staff (Plans), Headquarters Pacific Air Forces; and Vice Director of the Joint Staff, Organization of the Joint Chiefs of Staff. Among General Hosmer's notable military decorations are the Defense Superior Service Medal, the Legion of Merit with oak leaf cluster, and the Distinguished Flying Cross. He is also a member of the Council on Foreign Relations.

## Senior Advisor

The first formal decision made by the Institute's Board of Directors was to invite **The Honorable Jennings Randolph** to be the Board's Senior Advisor. For four decades, Senator Randolph represented West Virginia in the United States Congress. He was first elected to the House of Representatives in 1932, where he served until 1947. He was elected to the Senate in 1958 and retired in 1985; his most recent committee memberships were on the Environment and Public Works, Labor and Human Resources, and Veterans' Affairs Committees. To this day, whether in or out of public office, Senator Randolph has been a vigorous proponent of a national institution dedicated to enhancing knowledge and skills in the management of international conflict and the search for peace among nations. In recognition of his vision and unflagging energy, his colleagues in the Congress authorized the Board to establish fellowships under the auspices of a Jennings Randolph Program for International Peace. The author of *Speaking That Wins*, Senator Randolph has been an airlines executive, journalist, and a professor of public speaking. In addition to following a busy schedule as a speaker, he serves as Chairman of the Council for the Advancement of Citizenship and is a trustee of the Claude Worthington Benedum Foundation.

APPENDIX B

## *Institute Officers and Staff*

*T*o meet increasingly complex administrative responsibilities and expanded program activities, the Institute's staff of fourteen is expected to double within the next year. Indicative of the quality of personal dedication exemplified by the current staff is their having surpassed by more than 200 percent their established quota of donation to the Combined Federal Campaign charity drive for Fiscal Year 1986. This level of individual donation was the highest of any federal entity in the greater Washington area. In recognition of this accomplishment, a plaque presented by President Ronald Reagan commends their "extraordinary support of voluntarism." Biographies follow:

### Officers

**Robert F. Turner** is the Institute's first President, appointed at the inaugural meeting of the Board of Directors in February 1986. In addition to being the senior staff member of the Institute, President Turner serves on the Board of Directors in a non-voting *ex officio*, capacity. Mr. Turner's undergraduate degree is from Indiana University; he received his J.D. from the University of Virginia School of Law; and he pursued postgraduate studies at Stanford University as well as the University of Virginia. He served two tours of duty in Vietnam as an Army officer, and for five years was the senior foreign affairs legislative assistant to a member of the Senate Foreign Relations Committee. In addition, he has served in the Executive Branch as Special Assistant to the Under Secretary of Defense for Policy, Counsel to the President's Intelligence Oversight Board, and Principal Deputy Assistant Secretary of State. He is the author or coauthor of seven books and monographs on law and foreign affairs and has worked in academic positions for several years. After his successor takes office, he will join the faculty of the University of Virginia.

**Ambassador Samuel W. Lewis** has been selected to become the Institute's second President; he will take office on November 1, 1987. A *cum laude* graduate of Yale University, with a Master's Degree in International Relations from The Johns Hopkins University, Ambassador Lewis was a Foreign Service Officer for over 30 years. In his last post, he served for over eight years as United States Ambassador to Israel, first appointed by President Carter and then reaffirmed by President Reagan. He has been a prominent actor in Arab-Israeli negotiations, including participation in the 1978 Camp David Conference which led to peace between Israel and Egypt, and in U.S. efforts to bring the Israeli invasion of Lebanon to a peaceful conclusion. He has also served as Assistant Secretary of State for International Organization Affairs, as Deputy Director of the Policy Planning Staff, as a senior staff member of National Security Council, as a member of the United States Agency for International Development mission to Brazil, and in lengthy assignments on the staffs of United States embassies in Italy and Afghanistan. Ambassador Lewis retired from the State Department in 1985.

**Charles Duryea Smith** is the Institute's General Counsel. Mr. Smith holds an A.B. degree from Oberlin College, an M.A. degree in English Literature from Washington University (St. Louis), and a J.D. from Boston University School of Law, and has done post-graduate work at Harvard Law School. He served as a Peace Corps Volunteer and has worked in the fields of criminal, constitutional, and immigration law. He was Special Assistant to Senator Spark Matsunaga (Chairman of the Commission on Proposals for the National Academy for Peace and Conflict Resolution) and drafted both the final report and the legislation that eventually became the United States Institute of Peace Act. He edited *The Hundred Percent Challenge: Building a National Institute of Peace.*

**Kenneth M. Jensen** is Director of the Institute's Grants Program. A graduate of the University of Colorado, Dr. Jensen has studied at the University of Wisconsin and Moscow State University (USSR) and holds a Ph.D. in History from the University of Colorado with a special emphasis in Russian Marxism and Soviet ideology. He came to the Institute of Peace from the Institute for Educational Affairs, where he directed grant programs in human rights and foreign policy, the media, and public policy. The editor of a number of publications on political thought and public policy, he is the author of *Beyond Marx and Mach* and is a veteran of a decade of college teaching.

## Administrative and Support Staff

**Bernice J. Carney** is the Institute's Administrative Officer. She brings to her position more than twenty-five years of experience with various agencies of the Federal government. For sixteen years, Ms Carney served on the staff of the President's Council on Environmental Quality, where she most recently held the position of Chief Administrative Officer.

**Christopher M. De Paola** is an intern at the Institute. He is in his senior year at George Washington University, where he is majoring in Political Science and minoring in International Law.

**Olympia S. Diniak** is Special Assistant to the President of the Institute. Mrs. Diniak holds a B.A. degree in English from the University of New Hampshire. She taught for three years at the high school level in New Hampshire and Maine. Mrs. Diniak joined the Institute staff from the Office of Legislative and Intergovernmental Affairs at the Department of State, where she received numerous sustained superior performance awards.

**Darleen S. Hall** is Staff Assistant, with responsibilities that include financial administration and co-ordination of general office operation. In addition, she serves as information co-ordinator for the Institute's grants and fellowship programs. Mrs. Hall received her B.S. and M.S degrees in Home Economics from Oklahoma State University.

Before joining the Institute's staff, she was Office Manager for the American Dairy Association and the Dairy Council of South Dakota.

**Wayne D. Myslik**, a summer student assistant, is a junior at The Johns Hopkins University, where he is majoring in international studies. For the coming year-and-a-half he will study in Paris and South Africa.

## Program Staff

**Kathleen Allison** is the Institute's Program Manager with responsibilities in public affairs and information services. Ms Allison holds a B.A. in Spanish and Education and an M.A. in International Relations from the University of South Carolina. Before coming to the Institute, she was on the staff of the American Bar Association's Standing Committee on Dispute Resolution.

**Lilly J. Goren**, Project Officer for the Institute's annual National Peace Essay Contest, is a recent graduate of Kenyon College, where she received the Henry J. Dalton Fellowship in American Studies and earned several awards for academic excellence. Ms Goren holds an A.B. in Political Science and English.

**Samuel C. O. Holt**, the Institute's media consultant, is a Rhodes Scholar and holds an A.B. in History from Princeton University, a B.Phil. in History from Oxford University, and an M.A. in History from Harvard University. He has had extensive experience in telecommunications programming, management, and educational applications. He is one of four founding staff members of the Public Broadcasting System and the only person to have headed programming at both PBS and National Public Radio.

**Michael S. Lund** is the Institute's Programs Manager, responsible for the Jennings Randolph Program for International Peace and the report on the state of world peace. He holds a B.A. in Philosophy from Augustana College, a B.D. from Yale Divinity School, and an M.A. and a Ph.D. in Political Science from the University of Chicago. Dr. Lund has been a Peace Corps Volunteer, a

university teacher of government and public policy, and a public policy analyst at The Urban Institute and several federal agencies. His principal emphases have been on political development in industrialized and developing nations and on the systematic evaluation of how political forces, values, and institutions shape public policies in the United States and other nations.

**Barry J. O'Connor** is the Program Officer for the Institute's Grants Program. Dr. O'Connor received his B.A. in History and Political Science from Eastern Washington University and his M.A. and Ph.D. in Government and International Studies from the University of Notre Dame. He is a former Peace Corps Volunteer in Morocco and has been an editor of *The International Human Rights Bibliography*.

**Richard N. Smith** is the Institute's Project Officer, responsible for developing an intellectual map of the international peace field. He received his B.A. and M.A. degrees in Political Science from the University of Pennsylvania. Prior to joining the Institute's staff, he worked in the fields of foreign policy and alternative dispute resolution.

APPENDIX C

## *Jennings Randolph*
## *Distinguished Fellows*

*T*he initial group of eight Jennings Randolph Distinguished Fellows, representing four countries, bring to their research and writing a wide range of experience in diplomacy, scholarship, and the management of international organizations.

**Ambassador Francis Deng** was the Sudan's Minister of State for Foreign Affairs and its Ambassador to the United States, Canada, and Scandinavia. Mr. Deng holds an LL.B. degree from the University of Khartoum and LL.M. and J.S.D. degrees from Yale Law School. Mr. Deng has taught at several law schools and written many articles in the fields of international law, and law and anthropology. He is the author of eleven books, including *Tradition and Modernization: A Challenge for Law Among the Dinka of the Sudan; Dynamics of Identification: A Basis for National Integration in the Sudan;* and *The Man Called Deng Majok.* Ambassador Deng will join the Institute for a two-year, part-time, in-residence fellowship to work on a book tentatively titled, *Myths and Realities: Crises of Identity and the Prospects for Peace and Unity in the Sudan.*

**Professor Rosalyn Higgins** is Professor of International Law at the University of London and has taught international law at the Universities of Kent, Stanford, and Yale. A past Vice President of the American Society of International Law, she is currently a member of the United Nations Human Rights Committee and is on the Board of Editors of the *American Journal of International Law* and the *British Yearbook of International Law.* The author of a number of books, Professor Higgins will be a part-time, out-of-residence Fellow for two years, working on a study entitled, *The Next Generation of UN Studies: A Programme for Teaching and Research* and conducting preparatory work on the fifth volume of her series, *UN Peacekeeping, 1946–1967:*

*Documents and Commentary.* The American Society of International Law awarded Professor Higgins the Certificate of Merit for Volumes I and II of that series.

**Professor David Little** was, for the past academic year, the Henry R. Luce Visiting Professor at Haverford College, while on leave from his position as Professor of Religious Studies at the University of Virginia. He was previously Professor of Christian Ethics at Yale Divinity School. He is the author or coauthor of numerous articles and books on history, religion, and social ethics, including: *Religion, Order, and Law: A Study in Pre-Revolutionary England; American Foreign Policy and Moral Rhetoric: The Example of Vietnam; Comparative Religious Ethics;* and *Leadership.* Professor Little will join the Institute for a full-time, in-residence period of one year to prepare a book tentatively titled, *In Pursuit of a Just Peace: Legal and Moral Dilemmas of Promoting Human Rights in Situations of Armed Conflict.*

**Professor Myres McDougal** is Sterling Professor Emeritus at Yale Law School. Professor McDougal, a Rhodes Scholar, received his education at the University of Mississippi, Yale Law School, and Oxford University. He is former President and Honorary President of the American Society of International Law, has been President of the Association of American Law Schools, and is the only American to receive both the Hudson Medal from the American Society of International Law and the Read Medal from the Canadian Council of International Law. Professor McDougal served on the U.S. delegation to the 1969 Vienna UN Conference on the Law of Treaties, and has been a member of the Permanent Court of Arbitration. Professor McDougal is the author or coauthor of many books on international law, including *International Law in Contemporary Perspective: The Public*

*Order of the World* and *Human Rights and World Public Order: The Basic Policies of an International Law of Human Dignity.* He will spend his two-year, part-time, out-of-residence fellowship completing a two-volume book on, *The Global Constitutive Process of Authoritative Decision.*

**The Honorable Bradford Morse** has practiced and taught law for more than a decade, was a member of the House of Representatives, where he served on the Foreign Affairs Committee, and was Chairman of Members of Congress for Peace through Law. In 1972, he resigned from Congress to succeed Dr. Ralph Bunche as Under Secretary General of the United Nations. In 1976, he was appointed Administrator of the UN Development Programme, the largest component of the UN, and also headed the UN Office for Emergency Operations in Africa. As a two-year, part-time, out-of-residence Distinguished Fellow, Secretary Morse will examine both the impact of development and other economic issues on international peace and the role of international organizations in fostering peace among nations.

**The Honorable Eugene Rostow** has been Dean of Yale Law School, Under Secretary of State for Political Affairs, and Director of the U.S. Arms Control and Disarmament Agency. Professor Rostow is Sterling Professor of Law and Public Affairs at Yale School and is on the Board of the American Arbitration Association. The author of many books, Professor Rostow will divide his fellowship into two phases: a three-month, part-time, out-of-residence period between August and October 1987, and a twenty-one-month, full-time, in-residence period beginning in July 1988. In both, he will work on a book tentatively titled *Aggression and Self-Defense.*

**Professor Paul Seabury** is Professor of Political Science at the University of California at Berkeley and the author of many articles on international relations and national defense. He has written nearly a dozen books on foreign policy issues, including: *The Rise and Decline of the Cold War; The Great Détente Disaster: OPEC and the Decline of American Foreign Policy;* and *America's Stake in the Pacific.* Professor Seabury will use his full-time, one-

year, in-residence fellowship to work on a book manuscript on *Proxies in Low Intensity Warfare.*

**Ambassador Max van der Stoel,** recipient of two law degrees from Leyden University, has held a variety of posts in the government of the Netherlands, including Foreign Minister; Permanent Representative to the United Nations; member of the Council of State; and member of both houses of Parliament, including service as Chairman of the Standing Committee for Foreign Affairs of the Lower House. He has been Chairman of the Board of both the Institute of Social Studies and the Netherlands Institute for Peace Problems. Ambassador van der Stoel also has been a member of the European Parliament, the UN Commission on Human Rights, and the North Atlantic Assembly. He will use his two-year, part-time, out-of-residence fellowship to study cooperation between the United States and Western Europe and its impact on the promotion of international peace.

## APPENDIX D
# —— *Brief Descriptions of* —— *Grant Awards*

The following grant awards have been made by the Board of Directors of the United States Institute of Peace. These awards bring to 50 the number of grants announced by the Institute since launching its Grants Program in July 1986. As of mid-August 1987, the Board had committed $1,377,297 to successful applicants.

**The Albert Einstein Institution,** Cambridge, Massachusetts (Dr. Gene Sharp, Project Director): A one-year grant in support of three projects on nonviolent sanctions in confronting political violence: (1) a comprehensive annotated bibliography of English-language book literature on nonviolent sanctions and related matters; (2) a book identifying major research tasks and policy analyses that need to be undertaken on the subject and a recommended research agenda for the next decade; and (3) a book gathering new knowledge and thought about the nature, practice, and policy potential of nonviolent sanctions based on five years of seminars on these topics at Harvard University. $50,000.

**Alexander R. Alexiev,** Senior Analyst, The RAND Corporation, Santa Monica, California: A one-year grant to permit Mr. Alexiev, who will take leave from The RAND Corporation, to research and write a book on Soviet efforts to employ religion and religion-based organizations in pursuing public peace campaigns. The study will focus on Soviet-based organizations and those abroad with Soviet ties. $29,400.

**The American Psychiatric Association,** Washington, D.C. (George Tarjan, M.D., Project Director): A one-year challenge grant in support of work with Egyptian, Israeli, and Jordanian educational institutions to research the way biases are reinforced in textbooks used in Arab and Israeli schools and to establish guidelines for steps to decrease or eliminate these sources of bias. $40,000 on condition that an additional $150,000 is raised.

**The American University,** Washington, D.C. (Abdul Aziz Said, Professor, School of International Service, Project Director): A one-year grant to permit the university to add a multi-course Peace and Conflict Resolution concentration to the Washington Semester undergraduate study and internship program and to provide for the development of a curriculum and peace information library in support of that concentration. $34,380.

**The Atlantic Council of the United States,** Washington, D.C. (Dr. John A. Baker, Director of Education, Project Director): A one-year challenge grant to assist the Atlantic Council in researching, developing, and testing two crisis management decision-making simulations focusing on the NATO alliance. The first of these simulations is for post-graduate Atlantic Council Fellows and college and university professors, and the second is for undergraduates. The Council will also undertake research and development on simulations for the secondary school level. $20,000 on the condition that an additional $15,000 is raised from other sources.

**Dr. Paul R. Bennett,** Harriman Institute for the Advanced Study of the Soviet Union, Columbia University: A one-year matching grant to permit the completion of a book on Soviet negotiating strategy and tactics in nuclear arms limitation talks. The book will examine Soviet negotiating behavior from 1969 to 1987, taking SALT I, SALT II, the INF talks, the START talks, and recent Geneva negotiations as case studies. It will provide a general analysis of Soviet national goals and decision making and Soviet negotiating strategy and tactics, and will conclude with implications for United States negotiators. Up to $24,000.

**The Brookings Institution,** Washington, D.C. (Harold H. Saunders, former Assistant Secretary of State for Near

Eastern and South Asian Affairs, Project Director): A nine-month grant to support the research and writing of a monograph on the contribution of nongovernmental diplomatic activity to the peaceful resolution of international disputes. $20,000.

**Center for International Affairs, Harvard University,** Cambridge, Massachusetts (Professor Herbert C. Kelman, Project Director): A two-year grant in support of two projects. The award will permit researchers under the direction of Professor Kelman to produce a systematic analysis of the results of research on the interactive problem-solving approach to international conflict conducted at the Center for International Affairs over the past five years. The grant will also allow Professor Kelman to prepare a book on the socio-psychological dimensions of international conflict and the application of the interactive problem solving method to the Middle East conflict. $40,000.

**Center for Peace Learning, George Fox College,** Newberg, Oregon (Dr. Lon Fendall and Mr. Ron Mock, Project Directors): A one-year grant to allow two faculty members to research and write a monograph on recent peaceful political transitions in the Philippines and Haiti. $15,000.

**Center for International Security and Strategic Studies,** Mississippi State University (Professor Janos Radvanyi, Project Director): A one-year grant to allow the Center (a) to add to the permanent curriculum of the university one multi-disciplinary and five departmental courses on international peace and conflict resolution and (b) to conduct a trial workshop on the teaching of peace and conflict resolution education for secondary schools. $58,980.

**Center for Social Policy in the Middle East, Brandeis University** (Susan G. Miller, Project Director): A one-year challenge grant to assist in the production of a one-hour public television documentary film on the Middle East Regional Cooperative Program, a major U.S. Agency for International Development-funded project involving Egyptian and Israeli scientists working in the areas of infectious disease, arid-land

agriculture, and oceanography. The film is intended for the PBS series NOVA, which is considering funding assistance at this time. $70,000 on condition that the remaining production funding is raised from other sources.

**The Center for Strategic and International Studies, Georgetown University,** Washington, D.C. (Drs. William J. Taylor and Amos A. Jordan, Project Directors): A one-year grant to assist in the production of three publications related to CSIS's Crisis Management Project. *Decision Making in Crisis* will report on the Center's 1986-87 crisis simulation series; *Dynamics of Crisis Management* and *Leaders in Crisis* will be the reports of the Center's 1986 and 1987 leaders' and scholars' workshops on crisis management. $28,000.

**Center for the Study of Foreign Affairs, Foreign Service Institute,** United States Department of State (Dr. Hans Binnendijk, Project Director): A one-year grant to support four symposia and resulting publications on various major instances of ethnic, religious, racial, and other sectarian strife as they bear on issues of international peace. $56,000.

**Dr. Nirmala Chandrahasan, Human Rights Program,** Harvard Law School, Cambridge, Massachusetts: A one-year grant to allow Dr. Chandrahasan, former Dean of the Faculty of Law, University of Colombo, Sri Lanka, to complete a comparative study of the extent to which human rights standards and international conventions on refugee law have been applied in the practice of states making determinations regarding refugee status and asylum. This work will take the handling of Tamil refugees as a case study. $5,000.

**Colgate University,** Hamilton, New York (Robert L. Rothstein, Harvey Picker Distinguished Professor of International Relations, Principal Investigator): A one-year grant to support the research and writing of a monograph by Professor Rothstein on the conceptual and practical problems of the transition of authoritarian regimes to democratic political entities, with special attention to the implications of this transition for international peace. Up to $5,000.

**College of Law, Syracuse University,** Syracuse, New York (Professor L. F. E. Goldie, Project Director): A one-year partial-support grant to permit ten U.S. legal scholars to produce papers on international humanitarian law as it applies to armed conflict at sea, both in declared war and covert or low-intensity circumstances. These papers will be delivered and critiqued at an international conference to be held at Pisa University in Italy. Upon reaching final form, the papers with their essays in a published volume. $20,829.

**College of William and Mary,** Williamsburg, Virginia (Armand J. Galfo, Heritage Professor of Education, Principal Investigator): A one-year travel and research-support grant to allow Professor Galfo to study the effect of peace studies on West German secondary school student perceptions of the NATO-Warsaw Pact confrontation. $5,700.

**Moshe Decter,** Washington, D.C., Independent Researcher-Writer, Former Director of Research, American Jewish Congress: A one-year grant in partial support of a book-length study on the connection between world peace and human rights as it concerns the Soviet-American relationship. Topics to be discussed include: (1) the relations of the two powers, as they are affected by human rights issues; (2) democratic movements in the USSR and reverberations in Western public opinion; (3) the state of human rights in the Soviet Union; (4) the relationship between détente and democratization; (5) the question of the optimal balance of outside influence and internal pressure for change inside the USSR; and (6) the relation between human rights and individual liberty and peace. $12,000.

**Development and Security Project, Fletcher School of Law and Diplomacy,** Tufts University (Dr. Robert L. West, Project Director): A one-year grant to permit a team led by Dr. West to produce a book-length study of the consequences for maintaining international peace and security of the increasing national defense efforts of developing countries. Focusing on selected Latin American and African case studies, the project will attempt (1) to determine a basis for describing how the politics of the budgetary process in such countries affects

the level of public resources devoted to development and national security and (2) to determine the relationship between arms build-ups and aggressive use of force in developing countries. $40,000.

**The Foreign Policy Research Institute,** Philadelphia, Pennsylvania (Vladimir Tismaneanu, Dr. Michael Radu, and Dr. Milan Hauner, Principal Investigators): A one-year grant in support of a book-length study of nonofficial peace movements in the Soviet Union and Eastern Europe and their relations with their respective governments. $58,704.

**Dr. Adam M. Garfinkle,** Philadelphia, Pennsylvania, Lecturer in Political Science, University of Pennsylvania: A one-year grant in partial support of a book-length study of the potential role of interpersonal contacts in mediating political change between disputants. Dr. Garfinkle will use current cooperative undertakings between Israeli and Jordanian citizens as material for a case study. $10,000.

**Allan Gerson, Esq.,** Chevy Chase, Maryland, Former Senior Advisor to the Attorney General of the United States on International Affairs and Special Counsel to the United States Permanent Representative to the United Nations: A one-year grant to assist in the completion of a book on revitalizing the role of international law in United States foreign policy. This book will focus on (a) the relationship between the goals of United States foreign policy and basic principles of international law, (b) bringing principles of constitutionalism to bear in the deliberations of the United Nations, and (c) integrating a revitalized international law into United States public diplomacy and foreign policy decision making. $35,000.

**Dr. Stephen Haseler,** Washington, D.C., Professor of Government, City of London Polytechnic, and Visiting Professor, Department of Sociology, University of Maryland, Baltimore County Campus (Dr. Stephen Haseler, Project Director; Drs. David Gress and David Carlton, Project Consultants): A one-year grant to allow Dr. Haseler to complete a book on the British peace movement as a case study in the political, cultural, and ideological assump-

tions underlying West European peace movements generally. Dr. Haseler will consult with Drs. David Gress and David Carlton, who will provide comparative perspectives on the West German and Italian peace movements. $32,000.

**The Hudson Institute,** Indianapolis, Indiana, and Washington, D.C. (Dr. Thomas Blau, Project Director): A one-year grant to permit a team of education and national security experts to conduct a survey and analysis of how the most widely disseminated peace and conflict resolution curricula and curricular materials are used in the secondary school classroom. The project will include an evaluation of curricula and curricular materials, observation and interviews in a representative selection of schools, and the production of a publishable report. $31,323.

**Institute for Contemporary Studies,** San Francisco, California (Dr. Robert B. Hawkins, Jr., Project Director): A one-year grant to support a series of public discussions and a national and an international conference on the conflict in South Africa, and to assist in the preparation of a multi-authored book on the variety of political arrangements that might be possible after apartheid and how the parties to the conflict can be induced to enter into negotiations. $32,000.

**Institute for Foreign Policy Analysis,** Cambridge, Massachusetts (Dr. Jacquelyn K. Davis, Project Director): A one-year grant to permit the research and writing of a book-length study of the intermediate-range nuclear force debate in the United Kingdom, the Federal Republic of Germany, and The Netherlands with special emphasis on the role of Western European peace movements in that debate. $12,000.

**Institute for Soviet and East European Studies, University of Miami,** Coral Gables, Florida (Professor Jiri Valenta, Project Director): A one-year grant to assist the production of a collection of essays, resulting from an international conference on military, political, economic, information, and other strategies employed by the Soviet Union in the Third World. $20,000.

**Institute of War and Peace Studies,** Columbia University, New York, New York (Dr. Rachel Ehrenfeld, Visiting Scholar, Project Director): A one-year grant to assist Dr. Ehrenfeld in researching and writing a substantial study of the relationships among narcotics trafficking, terrorism, and political instability in Latin America. $20,000.

**The James Madison Foundation,** Washington, D.C. (George S. Weigel, Jr., and Father John P. Langan, Woodstock Theological Seminary, Project Directors): A one-year grant for (a) a series of seminars (and resulting publications) for scholars and foreign policy practitioners and commentators reconsidering the basic religious and ethical questions regarding war and peace and (b) a survey of related curricula employed in U.S. theological seminaries. $91,400.

**Nish Jamgotch,** Professor of Political Science, University of North Carolina at Charlotte: A one-year grant to allow Professor Jamgotch and colleagues at the University of Georgia, Colorado College, University of Arkansas, University of Kansas, and The American University to prepare a book of essays on U.S.-Soviet cooperation in the areas of security communications, trade, space, medicine, environmental protection, agriculture and grain trade, and science and technology. $10,000.

**Edward Killham,** Retiring Director, Central African Affairs, United States Department of State: A one-year grant to begin after Mr. Killham's retirement from the Department of State to permit the research and writing of a book on the role of the Pan-Europeanism or European federalism in East-West relations since World War I, with special emphasis on renewed Soviet interest in this concept in recent years. $15,000.

**The Lehrman Institute,** New York, New York (Robert W. Tucker and Nicholas X. Rizopoulos, Project Directors): In recognition of the 25th anniversary of the United States Arms Control and Disarmament Agency, partial support for a series of symposia and publications held and produced in cooperation with ACDA and the Lynde and Harry Bradley Foundation on the following topics: (a) nuclear arms reductions

and the transition to non-nuclear defense, (b) resolving Third World conflicts, (c) advancing the cause of liberty, and (d) fulfilling arms control agreements. $25,500.

**William E. Morrisey,** Rumson, New Jersey, Associate Editor, *Interpretation*: A two-year research support grant to assist Mr. Morrisey in the completion of a book that examines the principal strands of pacifist thought, giving special attention to their fundamental religious and philosophical roots. $8,025.

**National Institute for Public Policy,** Fairfax, Virginia (Dr. Carnes Lord, Project Director): A one-year challenge grant to permit a team directed by Dr. Lord to research and write a book-length comparative study of the role and significance of themes of peace and nuclear war in Soviet public diplomacy. The study will compare Soviet contributions to recent arms control debates in West Germany and the United States. $23,256 on the condition that a similar sum is raised from other sources.

**New Hampshire Council on World Affairs,** Durham, New Hampshire (Dr. David L. Larson, Associate Professor of Political Science, University of New Hampshire, Project Director): A one-year grant to assist the New Hampshire Council on World Affairs in launching a multi-year project designed to train teachers in the New Hampshire secondary schools in the international affairs and peace fields. The project proposes (a) to develop teaching strategies in topic areas related to international relations and peace education, (b) to correlate the teaching of social studies and peace education, and (c) to develop specialized curricular materials related to the above. $5,000.

**Peace Education Program, Teachers College,** Columbia University, New York, New York (Dr. Betty Reardon, Project Director): A one-year partial support grant to assist the Peace Education Program to educate secondary school teachers in the relationship between human rights and international peace. The project will (a) prepare model human rights courses for inclusion in peace studies curricula for graduate schools of education, (b) prepare

human rights and peace program outlines and other curricular materials for in-service teacher education courses, and (c) provide curriculum guides for secondary school human rights and peace education. $40,000.

**Pepperdine University,** Malibu, California (Professor Dan Caldwell, Department of Political Science, Project Director): A one-year grant to allow Professor Caldwell to undertake a book-length study of the extensive public debate in the United States that led to the non-ratification of the SALT II Agreement. $10,000.

**Program on the Analysis and Resolution of Conflicts, Maxwell School of Citizenship and Public Affairs,** Syracuse University, Syracuse, New York (Professor Louis Kriesberg, Project Director): A one-year grant to support the research and writing of a collaborative book on de-escalating international conflicts between the U.S. and the U.S.S.R., with special attention to (a) the role of timing in negotiations, (b) negotiation approaches focused on peripheral issues in contrast to central ones, (c) the comparative merits of linking and decoupling issues, (d) bilateral versus multilateral negotiations, (e) the role of threats and benefits in prompting negotiations, and (f) the role of intermediaries in bringing about negotiations. $30,000.

**Research Institute on International Change, Comparative Defense Studies Program,** Columbia University, New York, New York (Dr. Stephanie Neuman, Project Director): A one-year grant to allow Dr. Neuman to create a computerized databank on Third World military arms production. This databank will be a continuously updated research tool containing information from publicly available sources on all levels of arms production and the impact of that production on the civilian sectors of Third World countries. $40,000.

**David Satter,** Paris, France, Former Moscow Correspondent, *Financial Times*: A one-year challenge grant to permit Mr. Satter to complete a book on governmental management of various sectors of public opinion in the Soviet Union. $20,000 on the condition of the receipt of other funding in the same amount.

**Dr. Jacques Semelin,** Visiting Scholar, Center for International Affairs, Harvard University: A one-year grant to permit Dr. Semelin, a noted French scholar and student of both communication and non-violence, to complete a book on the role the information revolution will play in building peace between East and West over the next twenty years. The study will focus on technology, programming, and the role of information in international relations. $30,000.

**Drs. Max Singer and Constantine Menges,** Washington, D.C. (Dr. Max Singer, Project Director): A one-year grant to allow Dr. Singer, a professional policy analyst with special expertise in the area of strategy, and Dr. Menges, former Special Assistant to the President for National Security Affairs, to produce a monograph analyzing basic intellectual approaches to working for peace in foreign policy. The grantees' intention is to present those approaches in all their complexity and show how they might be applied in a balanced fashion in studying and teaching foreign policy issues. $33,000.

**The University of Hawaii Institute for Peace,** Honolulu, Hawaii (Betty M. Jacob, Project Director): A one-year grant to support two programs sponsored by the University of Hawaii Institute for Peace: the Asian-Pacific Dialogue and the Human Rights Commission in the South Pacific project. The Asian-Pacific Dialogue is a continuing research seminar for scholars and experts from market, non-market, and mixed economies in the Asian-Pacific region studying international peace and security issues facing that region. Support under the grant for the Human Rights Commission in the South Pacific project will allow a University of Hawaii law professor to work with law students, lawyers, and others in the Pacific Islands which are affiliated with the United States to assist in the development at the nongovernmental level of a Human Rights Charter and Commission for the Pacific region. $30,000.

**University of Maryland,** College Park, Maryland (Dr. David R. Segal, Professor of Sociology and of Government and Politics, Project Director): A one-year partial support grant to assist Professor Segal in re-searching and writing a book on the experience of U.S. military participation in the Multinational Force and Observers in the Sinai subsequent to the Camp David Accords. This book will be for use in college and university courses that deal with the peacekeeping role of the military and for use by commanders in preparing U.S. military personnel for participation in peacekeeping missions. $10,000.

**University of Nebraska-Lincoln,** Lincoln, Nebraska (Ivan Volgyes, Professor of Political Science and Special Projects Officer, Institute of International Studies, Project Director): A one-year partial support grant to permit Professor Volgyes to research and write a book on the mediation of political change in Eastern Europe. The project will examine (a) the level of, and reasons for, violence in the settlement of political conflicts in Czechoslovakia, Hungary, and Poland, and (b) the role of mediating institutions, groups, and individuals in those instances where political violence was minimized or avoided. $39,900.

**University of the Philippines at Los Baños** (Luziminda B. Cornista and Sinesio M. Mariano, Project Director): A one-year grant to allow rural development faculty members Luziminda B. Cornista and Sinesio M. Mariano to study how "rebel-returnees" can be functionally integrated into the mainstream of Philippine national development and the implications of such reintegration of rebel-returnees in the general setting of Third World insurgencies for the prospects for peace. $25,000.

**University of Washington,** Seattle, Washington (George Modelski, Professor of Political Science, Project Director): A one-year partial support grant to assist Professor Modelski in researching and writing a book-length comparative study of the five global wars of modern history. Matters to be examined include the relationship between past conventional global wars and possible future nuclear wars and the effects of global war on subsequent world political, economic, and cultural systems. The project will focus on the Italian Wars (1494–1516), the Wars of the Grand Alliance (1689–1713), the Wars of the French Revolution, the First World War, and the Second World War. $20,000.

**The Woodrow Wilson International Center for Scholars,** Washington, D.C. (Dr. Prosser Gifford, Project Director): A one-year, publication-support grant to make available in the United States and the Sudan (in English and Arabic) the proceedings of a Wilson Center workshop held in March 1987, analyzing the major political, economic, social, cultural, religious, ethnic, and strategic aspects of armed conflict in the Sudan. $3,000.

**The World Without War Council,** Berkeley, California (Robert Pickus, Project Director): A one-year grant to permit researchers at the World Without War Council to survey the activities of nongovernmental organizations in the peace, security, and world affairs fields for the years 1983–1986. The survey will be carried out through questionnaires, interviews, and seminars; and the resulting report will provide a conceptual, organizational, and programmatic guide to the work of such organizations for the use of scholars, educators, citizens, and the nongovernmental organizations themselves. $57,200.

**Yale University,** New Haven, Connecticut (Professor Bruce Russett, Project Director): A one-year partial-support grant in support of Dr. Russett's preparation of several separately-publishable chapters of a book on the relationship of economic conditions and the state of public opinion in democratic countries and the aggressive use of force internationally. $7,700.

APPENDIX E

## *Participants in First Four Intellectual Map Colloquia*

*T*he first Institute project is an exploration of the "intellectual map of the field of international peace and conflict management." To that end, the Institute has initiated an ongoing colloquium series to survey the principal approaches and theoretical foundations of the international peace field. To date, those who have participated in the series are:

**Coit Blacker,** Senior Research Associate, Stanford University, Arms Control Program (February 19–20, 1987)*

**Adda Bozeman,** Professor Emeritus, Sarah Lawrence College (July 9, 1987)

**Innis Claude,** Professor of Government and Foreign Affairs, University of Virginia (December 5, 1986)

**Robert Conquest,** Senior Research Fellow, The Hoover Institution on War, Revolution and Peace (February 19–20, 1987)

**Anthony D'Amato,** Professor, Northwestern University Law School (July 9, 1987)

**Louis Henkin,** Professor, Columbia University School of Law (July 9, 1987)

**G. Keith Highet,** President, American Society of International Law (July 9, 1987)

**Sidney Hook,** Senior Research Fellow, The Hoover Institution on War, Revolution and Peace (February 19–20, 1987)

**Samuel P. Huntington,** Director, Harvard University Center for International Affairs (March 5, 1987)

**Monroe Leigh,** Partner, Steptoe & Johnson (July 9, 1987)

**Edward Luttwak,** Georgetown University Center for Strategic and International Studies (December 5, 1986)

**Myres McDougal,** Professor Emeritus, Yale University School of Law (July 9, 1987)

**Robert North,** Professor Emeritus, Stanford University (February 19–20, 1987)

**Robert Pickus,** President, World Without War Council (February 19–20, 1987)

**Craig Ritchie,** Board Member, Beyond War Foundation (February 19–20, 1987)

**Henry Rowen,** Professor, Stanford University Graduate School of Business (February 19–20, 1987)

**Robert Scalapino,** Director, Institute of East Asian Studies, University of California at Berkeley (February 19–20, 1987)

**Steven Schwebel,** Justice, International Court of Justice (July 9, 1987)

**Gene Sharp,** President, Albert Einstein Institute (December 5, 1986)

**Louis Sohn,** Professor, University of Georgia School of Law (December 5, 1986)

**John Stevenson,** Partner, Sullivan and Cromwell (July 9, 1987)

**Donald Treadgold,** Chairman, Russian and East European Studies Department, University of Washington (February 19–20, 1987)

**Gregory Treverton,** Kennedy School of Government, Harvard University (March 5, 1987)

**Carlos Warter,** President, World Health Foundation for Peace (February 19–20, 1987)

**Charles Wolf,** Senior Fellow, The RAND Corporation (February 19–20, 1987)

**Herbert York,** Director, Institute on Global Conflict and Cooperation, University of California at San Diego (February 19–20, 1987)

*Indicates date of colloquium.

APPENDIX F

ARTICLES OF INCORPORATION

of

ENDOWMENT OF THE UNITED STATES
INSTITUTE OF PEACE, INCORPORATED

To:      Department of Consumer and Regulatory Affairs
         Corporations Division
         614 H Street, N.W., Washington, D.C.   20001

         We, the undersigned natural persons of the age of
twenty-one years or more, acting as incorporators and desir-
ing to form a Non-profit Corporation under the DISTRICT OF
COLUMBIA NONPROFIT CORPORATION ACT (D.C. Code, 1981 edition,
Title 29, Chapter 5), adopt the following Articles of Incor-
poration:

FIRST:    The name of the Corporation is Endowment of the
          United States Institute of Peace, Incorporated.

SECOND:   The period of duration of the Corporation is
          perpetual.

THIRD:    The purpose for which the Corporation is organized
          is to receive, hold, invest, and expend public
          funds for exempt purposes in furtherance of the
          United States Institute of Peace as established
          under the United States Institute of Peace Act,
          Title XVII, Public Law 98-525, as it is now or may
          be amended.  Said Corporation is organized exclu-
          sively for charitable, educational and scientific
          purposes, including, for such purposes, the making
          of distributions to organizations that qualify as
          exempt organizations under Section 501(c)(3) of the
          Internal Revenue Code, or corresponding section of
          any future federal tax code.

FOURTH:   The Corporation shall have no members.

FIFTH:    The manner of appointment of the directors of
          the Corporation shall be provided in the bylaws.

SIXTH:    The address of the Corporation's initial registered
          office is 730 Jackson Place, N.W., and the name
          of the initial registered agent at such address is
          Charles Duryea Smith who resides at 4740 Connecticut
          Avenue, N.W., Washington, D.C. 20008.

SEVENTH:   The number of directors constituting the initial
Board of Directors is Fifteen (15), who shall serve
as the initial directors until their successors
be selected as provided in the bylaws. The names
and addresses of the initial directors are as
follows:

| NAME | ADDRESS |
|------|---------|
| Prof. John Norton Moore | University of Virginia, School of Law Charlottesville, VA  22901 |
| Dr. Dennis L. Bark | Hoover Institution on War, Revolution and Peace Stanford University Stanford, CA  94305 |
| Dr. William R. Kintner | University of Pennsylvania Philadelphia, PA  19104 |
| Dr. Evron M. Kirkpatrick | 4000 Albemarle St., N.W. Suite 310 Washington, D.C.  20016 |
| Morris I. Leibman, Esq. | Sidley & Austin One First National Plaza Chicago, IL  60603 |
| Rev. Sidney Lovett | P.O. Box 448 Holderness, NH  03245 |
| Pastor Richard John Neuhaus | Center on Religion and Society 152 Madison Avenue 24th Floor New York, NY  10016 |
| The Honorable Richard Schifter | Bureau of Human Rights and Humanitarian Affairs Department of State Room 7802 Washington, D.C. 20520 |
| Dr. W. Scott Thompson | Fletcher School of Law and Diplomacy Tufts University Medford, MA  02155 |
| Mr. W. Bruce Weinrod | The Heritage Foundation 214 Massachusetts Ave., N.E. Washington, D.C.  20002 |

-2-

| | |
|---|---|
| Dr. Allen Weinstein | 1155 15th Street, N.W. Suite 1010 Washington, D.C.  20005 |
| The Honorable Kenneth L. Adelman | U.S. Arms Control and Disarmament Agency 320 21st Street, N.W. Room 5930 Washington, D.C.  20451 |
| Ambassador Bruce Laingen | National Defense University Fort Leslie J. McNair Room 218, Building 59 4th and P Streets, S.W. Washington, D.C.  20319 |
| The Honorable Richard N. Perle | The Pentagon Room 4E848 Washington, D.C.  20301 |
| Mr. Robert F. Turner (Nonvoting) | United States Institute of Peace 730 Jackson Place, N.W. Washington, D.C. 20503 |

EIGHTH:   The names and addresses of the incorporators are
as follows:

| NAME | ADDRESS |
|------|---------|
| Mark D. Schneider | Sidley & Austin 1722 Eye Street, N.W. Washington, D.C.  20006 |
| Charles Duryea Smith | United States Institute of Peace 730 Jackson Place, N.W. Washington, D.C.  20503 |
| Dr. Kenneth M. Jensen | United States Institute of Peace 730 Jackson Place, N.W. Washington, D.C.  20503 |
| Ms. Bernice Carney | United States Institute of Peace 730 Jackson Place, N.W. Washington, D.C.  20503 |

-3-

NINTH:    No part of the net earnings of the Corporation
          shall inure to the benefit of, or be distributable
          to its directors, officers, or other private
          persons, except that the Corporation shall be
          authorized and empowered to pay reasonable compen-
          sation for services rendered and to make payments
          and distributions in furtherance of the purposes
          set forth in Article Third hereof.  No substantial
          part of the activities of the Corporation shall be
          the carrying on of propaganda, or otherwise attempt-
          ing to influence legislation, and the Corporation
          shall not participate in, or intervene in (including
          the publishing or distribution of statements) any
          political campaign on behalf of any candidate for
          public office.  Notwithstanding any other provision
          of these articles, the Corporation shall not,
          except to an insubstantial degree, engage in any
          activities or exercise any powers that are not in
          furtherance of the purposes of this Corporation.

TENTH:    Upon the dissolution of the Corporation, assets
          shall be distributed for one or more exempt pur-
          poses within the meaning of Section 501(c)(3)
          of the Internal Revenue Code, or corresponding
          section of any future federal tax code, or shall
          be distributed to the federal government pursuant
          to Section 1711 of the United States Institute of
          Peace Act, Title XVII, Public Law 98-525, as it is
          now or may be amended.

IN WITNESS WHEREOF, we have hereunto subscribed our
names this 16th day of September, 1986.

_Mark D. Schneider_
INCORPORATOR

_Charles Duryea Smith_
INCORPORATOR

_Dennis Shea_
INCORPORATOR

_Dennis Carney_
INCORPORATOR

The signatures above
sworn to and subscribed before me
this 16th day of September, 1986

_Linda Morgan Blanchard_
Notary Public
My Commission Expires:

_My Commission Expires April 14, 1991_

VERIFICATION

The undersigned, being duly sworn upon oath,
deposes and states that he is an Incorporator of the Endowment
of the United States Institute of Peace, and that the signature
on the attached Articles of Incorporation is genuine.

*Mark D. Schneider*
Mark D. Schneider

Sworn and subscribed to before me
this 16th day of September, 1986
*Linda Morgan Blanchard*
Notary Public
My Commission Expires:

The undersigned, being duly sworn upon oath,
deposes and states that he is an Incorporator of the Endowment
of the United States Institute of Peace, and that the signature
on the attached Articles of Incorporation is genuine.

*Charles Duryea Smith*
Charles Duryea Smith

Sworn and subscribed to before me
this 16th day of September, 1986
*Linda Morgan Blanchard*
Notary Public
My Commission Expires:

---

VERIFICATION

The undersigned, being duly sworn upon oath, deposes
and states that he is an Incorporator of the Endowment of the
United States Institute of Peace, and that the signature
on the attached Articles of Incorporation is genuine.

*Dr. Kenneth M. Jensen*
Dr. Kenneth M. Jensen

Sworn and subscribed to before me
this 16th day of September, 1986
*Linda Morgan Blanchard*
Notary Public
My Commission Expires:

The undersigned, being duly sworn upon oath, deposes and
states that she is an Incorporator of the Endowment of the
United States Institute of Peace, and that the signature on
the attached Articles of Incorporation is genuine.

*Bernice Carney*
Ms. Bernice Carney

Sworn and subscribed to before me
this 16th day of September, 1986
*Linda Morgan Blanchard*
Notary Public
My Commission Expires:

-7-

UNITED STATES INSTITUTE OF PEACE

FINANCIAL STATEMENTS
AND ADDITIONAL INFORMATION

THE PERIOD FEBRUARY 25, 1986 (DATE OF INCEPTION)
TO SEPTEMBER 30, 1986
with
REPORT OF CERTIFIED PUBLIC ACCOUNTANTS



CONTENTS

Report of certified public accountants

Financial statements

  Statement of financial position
  Statement of operations
  Statement of changes in financial position
  Statement of changes in fund balance
  Notes to financial statements

Additional information

  Schedule of contracts and grants requiring payments
    in excess of $5,000
  Schedule of payments of compensation, salaries or fees
    at a rate in excess of $5,000 per year

 A MEMBER OF ARTHUR YOUNG INTERNATIONAL

## Arthur Young

Board of Directors
United States Institute of Peace

We have examined the accompanying statement of financial position of
the United States Institute of Peace at September 30, 1986, and the
related statements of operations, changes in financial position and
changes in fund balance for the period February 25, 1986 (date of
inception) to September 30, 1986. Our examination was made in
accordance with generally accepted auditing standards and,
accordingly, included such tests of the accounting records and such
other auditing procedures as we considered necessary in the
circumstances.

In our opinion, the statements mentioned above present fairly the
financial position of the United States Institute of Peace at
September 30, 1986, and the results of operations and changes in
financial position for the period February 25, 1986 (date of
inception) to September 30, 1986, in conformity with generally
accepted accounting principles.

Our examination has been made primarily for the purpose of
expressing an opinion on the basic financial statements taken as a
whole. The accompanying schedules of contracts and grants requiring
payments in excess of $5,000 and payments of compensation, salaries,
or fees at a rate in excess of $5,000 per year, are presented for
purposes of additional analysis and are not a required part of the
basic financial statements. Such additional information has been
subjected to the auditing procedures applied in the examination of
the basic financial statements and, in our opinion, is fairly stated
in all material respects in relation to the basic financial
statements taken as a whole.

*Arthur Young & Company*

November 14, 1986

UNITED STATES INSTITUTE OF PEACE

STATEMENT OF FINANCIAL POSITION

September 30, 1986

## ASSETS

| | |
|---|---:|
| Funds on deposit with U.S. Treasury (Note 4) | $3,776,571 |
| Fixed assets, at cost | 55,262 |
| Accumulated depreciation | (3,272) |
| Net fixed assets | 51,990 |
| | $3,828,561 |

## LIABILITIES AND FUND BALANCE

| | |
|---|---:|
| Accounts payable: | |
| To the General Services Administration | $   25,000 |
| To the public | 14,368 |
| | 39,368 |
| Accrued payroll and benefits | 15,000 |
| Accrued annual leave (Note 5) | 8,760 |
| Total liabilities | 63,128 |
| Fund balance: | |
| Invested capital | 51,990 |
| Results of operations | (8,760) |
| Unexpended appropriations | 3,722,203 |
| Total fund balance | 3,765,433 |
| | $3,828,561 |

See accompanying notes.

UNITED STATES INSTITUTE OF PEACE

STATEMENT OF OPERATIONS

The period February 25, 1986 (date of inception)
to September 30, 1986

| | |
|---|---:|
| Financing sources: | |
| Expended operating appropriations | $222,535 |
| Transfer of invested capital for | |
| depreciation expense | 3,272 |
| | 225,807 |
| Operating costs: | |
| Salaries and employee benefits (Note 7) | 158,066 |
| Rent (Note 6) | 25,000 |
| General Services Administration | |
| servicing fees (Note 6) | 18,900 |
| Travel | 11,631 |
| Depreciation | 3,272 |
| Other | 17,698 |
| | 234,567 |
| Excess of operating costs over | |
| financing sources (Note 5) | $ (8,760) |

See accompanying notes.

UNITED STATES INSTITUTE OF PEACE

STATEMENT OF CHANGES IN FINANCIAL POSITION

The period February 25, 1986 (date of inception)
to September 30, 1986

| | |
|---|---:|
| Funds on deposit with U.S. Treasury, beginning of period | $    - |
| Funds were provided from: | |
| Appropriations | 4,000,000 |
| | 4,000,000 |
| Funds were used for: | |
| Operating costs | 234,567 |
| Less non-cash items: | |
| Depreciation expense | (3,272) |
| Accrued annual leave | (8,760) |
| | 222,535 |
| (Increase) in | |
| Accounts payable | (39,368) |
| Accrued payroll and benefits | (15,000) |
| Acquisition of fixed assets | 55,262 |
| | 223,429 |
| Funds on deposit with U.S. Treasury, end of period | $3,776,571 |

See accompanying notes.

— 74 —

UNITED STATES INSTITUTE OF PEACE

STATEMENT OF CHANGES IN FUND BALANCE

The period February 25, 1986 (date of inception)
to September 30, 1986

| | Invested capital | Results of operations | Unexpended appropriations | Total |
|---|---:|---:|---:|---:|
| Balance, beginning of period | $    - | $    - | $    - | $    - |
| Appropriations | - | - | 4,000,000 | 4,000,000 |
| Expended appropriations | - | - | (222,535) | (222,535) |
| Purchase of fixed assets | 55,262 | - | (55,262) | - |
| Transfer to financing sources for depreciation expense | (3,272) | - | - | (3,272) |
| Excess of operating costs over financing sources | - | (8,760) | - | (8,760) |
| Balance, end of period | $51,990 | $(8,760) | $3,722,203 | $3,765,433 |

See accompanying notes.

— 75 —

UNITED STATES INSTITUTE OF PEACE

NOTES TO FINANCIAL STATEMENTS

September 30, 1986

1.    Organization

The United States Institute of Peace (the Institute) is an independent, non-profit corporation established by Congress through the United States Institute of Peace Act (the Act), Title XVII of Public Law 98-525, dated October 19, 1984.  The Institute is headed by a Board of Directors appointed by the President with the advice and consent of the Senate.  The Institute commenced operations with the Board's inaugural meeting on February 25-26, 1986.  Headquartered in the District of Columbia, the Institute was established to promote the peaceful resolution of international conflicts.

The operations of the Institute began mid-way in fiscal 1986.  As such, the Institute's activities in this year principally involved establishing the framework within which to begin the program activities in 1987 in the areas of grants, fellowships and Institute-directed projects.

2.    Summary of significant accounting policies

Basis of presentation - Pursuant to the Act, the accompanying financial statements are presented on an accrual basis of accounting in accordance with generally accepted accounting principles.

Depreciation - Depreciation is computed using the straight-line method over estimated useful lives of five years for all fixed assets, which consist primarily of computer, photocopy and telephone equipment.

Unexpended appropriations - The balance of unexpended appropriations represents obligations incurred for which the related product is undelivered or service has not been

UNITED STATES INSTITUTE OF PEACE

NOTES TO FINANCIAL STATEMENTS

September 30, 1986

2.    Summary of significant accounting policies (continued)

performed at September 30, 1986, and funds obligated or otherwise available for transfer to the Endowment (see Note 3).

Federal income tax - The Institute is a non-profit organization under Section 170(c)(2)(B) of the Internal Revenue Code and, as such, is exempt from Federal income tax.

3.    The Endowment

In accordance with the provisions of the Act, the Board of Directors established the Endowment of the United States Institute of Peace (the Endowment) in the District of Columbia on September 16, 1986.  The Endowment is a non-profit corporation capable of receiving, holding, investing and expending public funds for purposes in furtherance of the Institute.  It has the same directors and officers as the Institute.

The Act provides that the Board of Directors may transfer to the Endowment any funds obligated for that purpose and any funds not otherwise obligated or expended for a fiscal year.  Such funds remain available to the Endowment without regard to any fiscal year limitations on the original appropriated funds.

In fiscal 1986, $3,500,000 of Institute funds were obligated for the purpose of initiating a transfer to the Endowment in fiscal 1987.

UNITED STATES INSTITUTE OF PEACE

NOTES TO FINANCIAL STATEMENTS

September 30, 1986

4.  Funds on deposit with U.S. Treasury

The balance of funds on deposit with U.S. Treasury is
available for use in liquidating valid obligations into which
the Institute entered prior to September 30, 1986, and for
transfer to the Endowment pursuant to the provisions in the
Act that address transfer to the Endowment of funds not
obligated or expended by the Institute.

The balance of funds on deposit with U.S. Treasury includes
approximately $200,000 which inadvertently was returned to
the U.S. Treasury instead of being held in the Institute's
account for transfer to the Endowment.  The Institute is
taking steps to have the funds returned to the Institute for
that transfer.

5.  Accrued annual leave

The accrued annual leave at September 30, 1986 represents
annual leave earned, but not taken, in which employees have a
vested interest.

The excess of operating costs over financing sources of
$8,760 for the period February 25, 1986 (date of inception)
to September 30, 1986, represents accrued annual leave.
Annual leave is funded when it is taken, not when it is
earned; and, as such, an increase in the accrued annual leave
balance is reflected as an excess of operating costs over
financing sources.

6.  Rent and administrative services

The General Services Administration (GSA) provides facilities
and furnishings to the Institute and, during fiscal 1986,
provided accounting services.  Under this arrangement,
expenses for rent and administrative services for the period
were $25,000 and $18,900, respectively.

7.  Pension plan

Three of the employees of the Institute are participants in
the Civil Service Retirement System (CSRS), a defined benefit
pension plan which is administered by the Office of Personnel
Management.  As required by law, employees contribute seven
percent of their salaries to the plan with an equal amount
contributed by the Institute.  The remaining employees are
covered under the Federal Insurance Contributions Act instead
of CSRS.  Total pension expense for the period was $7,439.

Effective January 1, 1987, all employees hired into Federal
service since January 1, 1984 will be covered by the Federal
Employees Retirement System (FERS), a three-tier system
consisting of Social Security, a basic benefit plan and a
savings plan.  Employees hired before January 1, 1984 may
elect to participate in FERS rather than CSRS, beginning July
1, 1987.

UNITED STATES INSTITUTE OF PEACE

SCHEDULE OF CONTRACTS AND GRANTS REQUIRING PAYMENTS
IN EXCESS OF $5,000

The period February 25, 1986 (date of inception)
to September 30, 1986

| | |
|---|---|
| Arthur Young & Company | 12,500 |
| AT&T | 9,000 |
| Clinton Computer | 28,000 |
| General Services Administration | |
| Rent | 25,000 |
| Servicing fees | 18,900 |
| Xerox | 14,000 |

---

UNITED STATES INSTITUTE OF PEACE

SCHEDULE OF PAYMENTS OF COMPENSATION, SALARIES OR FEES
AT A RATE IN EXCESS OF $5,000 PER YEAR

The period February 25, 1986 (date of inception)
to September 30, 1986

| | |
|---|---|
| Carney, Bernice | 9,200 |
| Hall, Darleen | 7,100 |
| Jensen, Kenneth | 14,200 |
| Moore, John | 12,100 |
| Smith, Charles | 32,000 |
| Turner, Robert | 40,300 |

APPENDIX H

# UNITED STATES INSTITUTE
# OF PEACE ACT

**Title XVII of the Department of Defense Authorization Act, 1985, Public Law 98–525
(Oct. 19, 1984), 98 Stat. 2492, 2649, codified at 22 U.S.C. 4601**

### SHORT TITLE

SEC. 1701. This title may be cited as the "United States Institute of Peace Act".

### DECLARATION OF FINDINGS AND PURPOSES

SEC. 1702. (a) The Congress finds and declares that—

(1) a living institution embodying the heritage, ideals, and concerns of the American people for peace would be a significant response to the deep public need for the Nation to develop fully a range of effective options, in addition to armed capacity, that can leash international violence and manage international conflict;

(2) people throughout the world are fearful of nuclear war, are divided by war and threats of war, are experiencing social and cultural hostilities from rapid international change and real and perceived conflicts over interests, and are diverted from peace by the lack of problem-solving skills for dealing with such conflicts;

(3) many potentially destructive conflicts among nations and peoples have been resolved constructively and with cost efficiency at the international, national, and community levels through proper use of such techniques as negotiation, conciliation, mediation, and arbitration;

(4) there is a national need to examine the disciplines in the social, behavioral, and physical sciences and the arts and humanities with regard to the history, nature, elements, and future of peace processes, and to bring together and develop new and tested techniques to promote peaceful economic, political, social, and cultural relations in the world;

(5) existing institutions providing programs in international affairs, diplomacy, conflict resolution, and peace studies are essential to further development of techniques to promote peaceful resolution of international conflict, and the peacemaking activities of people in such institutions, government, private enterprise, and voluntary associations can be strengthened by a national institution devoted to international peace research, education and training, and information services;

(6) there is a need for Federal leadership to expand and support the existing international peace and conflict resolution efforts of the Nation and to develop new comprehensive peace education and training programs, basic and applied research projects, and programs providing peace information;

(7) the Commission on Proposals for the National Academy of Peace and Conflict Resolution, created by the Education Amendments of 1978, recommended establishing an academy as a highly desirable investment to further the Nation's interest in promoting international peace;

(8) an institute strengthening and symbolizing the fruitful relation between the world of learning and the world of public affairs, would be the most efficient and immediate means for the Nation to enlarge its capacity to promote the peaceful resolution of international conflicts; and

(9) the establishment of such an institute is an appropriate investment by the people of this Nation to advance the history, science, art, and practice of international peace and the resolution of conflicts among nations without the use of violence.

(b) It is the purpose of this title to establish an independent, nonprofit, national institute to serve the people and the Government through the widest possible range of education and training, basic and applied research opportunities, and peace information services on the means to promote international peace and the resolution of conflicts among the nations and peoples of the world without recourse to violence.

### DEFINITIONS

Sec. 1703. As used in this title, the term—
(1) "Institute" means the United States Institute of Peace established by this title; and
(2) "Board" means the Board of Directors of the Institute.

### ESTABLISHMENT OF THE INSTITUTE

Sec. 1704. (a) There is hereby established the United States Institute of Peace.

(b) The Institute is an independent nonprofit corporation and an organization described in section 170(c)(2)(B) of the Internal Revenue Code of 1954. The Institute does not have the power to issue any shares of stock or to declare or pay any dividends.

(c) As determined by the Board, the Institute may establish, under the laws of the District of Columbia, a legal entity which is capable of receiving, holding, and investing public funds for purposes in furtherance of the Institute under this title. The Institute may designate such legal entity as the "Endowment of the United States Institute for Peace".

(d) The Institute is liable for the acts of its directors, officers, employees, and agents when acting within the scope of their authority.

(e)(1) The Institute has the sole and exclusive right to use and to allow or refuse others the use of the terms "United States Institute of Peace", "Jennings Randolph Program for International Peace", and "Endowment of the United States Institute of Peace" and the use of any official United States Institute of Peace emblem, badge, seal, and other mark of recognition or any colorable simulation thereof. No powers or privileges hereby granted shall interfere or conflict with established or vested rights secured as of September 1, 1981.

(2) Not withstanding any other provision of this title, the Institute may use "United States" or "U.S." or any other reference to the United States Government or Nation in its title or in its corporate seal, emblem, badge, or other mark of recognition or colorable simulation thereof in any fiscal year only if there is an authorization of appropriations for the Institute for such fiscal year provided by law.

### POWERS AND DUTIES

Sec. 1705. (a) The Institute may exercise the powers conferred upon a nonprofit corporation by the District of Columbia Nonprofit Corporation Act consistent with this title, except for section 5(o) of the District of Columbia Nonprofit Corporation Act (D.C. Code, sec. 29–1005(o)).

(b) The Institute, acting through the Board, may—
(1) establish a Jennings Randolph Program for International Peace and appoint, for periods up to two years, scholars and leaders in peace from the United States and abroad to pursue scholarly inquiry and other appropriate forms of communication on international peace and conflict resolution and, as appropriate, provide stipends, grants, fellowships, and other support to the leaders and scholars;
(2) enter into formal and informal relationships with other institutions, public and private, for purposes not inconsistent with this title;
(3) conduct research and make studies, particularly of an interdisciplinary or of a multidisciplinary nature, into the causes of war and other international conflicts and the elements

—— 84 ——

of peace among the nations and peoples of the world, including peace theories, methods, techniques, programs, and systems, and into the experiences of the United States and other nations in resolving conflicts with justice and dignity and without violence as they pertain to the advancement of international peace and conflict resolution, placing particular emphasis on realistic approaches to past successes and failures in the quest for peace and arms control and utilizing to the maximum extent possible United States Government documents and classified materials from the Department of State, the Department of Defense, the Arms Control and Disarmament Agency, and the intelligence community;
(4) develop programs to make international peace and conflict resolution research, education, and training more available and useful to persons in government, private enterprise, and voluntary associations, including the creation of handbooks and other practical materials;
(5) provide, promote, and support peace education and research programs at graduate and postgraduate levels;
(6) conduct training, symposia, and continuing education programs for practitioners, policymakers, policy implementers, and citizens and noncitizens directed to developing their skills in international peace and conflict resolution;
(7) develop, for publication or other public communication, and disseminate, the carefully selected products of the Institute;
(8) establish a clearinghouse and other means for disseminating information, including classified information that is properly safeguarded, from the field of peace learning to the public and to government personnel with appropriate security clearances;
(9) recommend to the Congress the establishment of a United States Medal of Peace to be awarded under such procedures as the Congress may determine, except that no person associated with the Institute may receive the United States Medal of Peace; and
(10) secure directly, upon request of the president of the Institute to the head of any Federal department or agency and in accordance with section 552 of title 5, United States Code (relating to freedom of information), information necessary to enable the Institute to carry out the purposes of this title if such release of the information would not unduly interfere with the proper functioning of a department or agency, including classified information if the Institute staff and members of the Board who have access to such classified information obtain appropriate security clearances from the Department of Defense and the Department of State.

(c) The Institute may undertake extension and outreach activities under this title by making grants and entering into contracts with institutions of postsecondary, community, secondary, and elementary education (including combinations of such institutions), with public and private educational, training, or research institutions (including the American Federation of Labor—the Congress of Industrial Organizations) and libraries, and with public departments and agencies (including State and territorial departments of education and of commerce). No grant may be made to an institution unless it is a nonprofit or official public institution, and at least one-fourth of the Institute's annual appropriations shall be paid to such nonprofit and official public institutions. A grant or contract may be made to—
(1) initiate, strengthen, and support basic and applied research on international peace and conflict resolution;
(2) promote and advance the study of international peace and conflict resolution by educational, training, and research institutions, departments, and agencies;
(3) educate the Nation about and educate and train individuals in peace and conflict resolution theories, methods, techniques, programs, and systems;
(4) assist the Institute in its publication, clearinghouse, and other information services programs;
(5) assist the Institute in the study of conflict resolution between free trade unions and Communist-dominated organizations in the context of the global struggle for the protection of human rights; and
(6) promote the other purposes of this title.

(d) The Institute may respond to the request of a department or agency of the United States Government to investigate, examine, study, and report on any issue within the Institute's competence, including the study of past negotiating histories and the use of classified materials.

—— 85 ——

(e) The Institute may enter into contracts for the proper operation of the Institute.

(f) The Institute may fix the duties of its officers, employees, and agents, and establish such advisory committees, councils, or other bodies, as the efficient administration of the business and purposes of the Institute may require.

(g)(1) Except as provided in paragraphs (2) and (3), the Institute may obtain grants and contracts, including contracts for classified research for the Department of State, the Department of Defense, the Arms Control and Disarmament Agency, and the intelligence community, and receive gifts and contributions from government at all levels.

(2) The Institute may not accept any gift, contribution, or grant from, or enter into any contract with, a foreign government, any agency or instrumentality of such government, any international organization, or any foreign national, except that the Institute may accept the payment of tuition by foreign nationals for instruction provided by the Institute. For purposes of this paragraph, the term—

(A) "foreign national" means—

(i) a natural person who is a citizen of a foreign country or who owes permanent allegiance to a foreign country; and

(ii) a corporation or other legal entity in which natural persons who are nationals of a foreign country own, directly or indirectly, more than 50 percent of the outstanding capital stock or other beneficial interest in such legal entity; and

(B) "person" means a natural person, partnership, association, other unincorporated body, or corporation.

(3) Notwithstanding any other provision of this title, the Institute and the legal entity described in section 1704(c) may not obtain any grant or contract or receive any gift or contribution from any private agency, organization, corporation or other legal entity, institution, or individual.

(h) The Institute may charge and collect subscription fees and develop, for publication or other public communication, and disseminate, periodicals and other materials.

(i) The Institute may charge and collect fees and other participation costs from persons and institutions participating in the Institute's direct activities authorized in subsection (b).

(j) The Institute may sue and be sued, complain, and defend in any court of competent jurisdiction.

(k) The Institute may adopt, alter, use and display a corporate seal, emblem, badge, and other mark of recognition and colorable simulations thereof.

(l) The Institute may do any and all lawful acts and things necessary or desirable to carry out the objectives and purposes of this title.

(m) The Institute shall not itself undertake to influence the passage or defeat of any legislation by the Congress of the United States or by any State or local legislative bodies, or by the United Nations, except that personnel of the Institute may testify or make other appropriate communication when formally requested to do so by a legislative body, a committee, or a member thereof.

(n) The Institute may obtain administrative support services from the Administrator of General Services on a reimbursable basis.

### BOARD OF DIRECTORS

Sec. 1706. (a) The powers of the Institute shall be vested in a Board of Directors unless otherwise specified in this title.

(b) The Board shall consist of fifteen voting members as follows:

(1) The Secretary of State (or if the Secretary so designates, another officer of the Department of State who was appointed with the advice and consent of the Senate).

(2) The Secretary of Defense (or if the Secretary so designates, another officer of the Department of Defense who was appointed with the advice and consent of the Senate).

(3) The Director of the Arms Control and Disarmament Agency (or if the Director so designates, another officer of that Agency who was appointed with the advice and consent of the Senate).

(4) The president of the National Defense University (or if the president so designates, the vice president of the National Defense University).

(5) Eleven individuals appointed by the President, by and with the advice and consent of the Senate.

(c) Not more than eight voting members of the Board (including members described in paragraphs (1) through (4) of subsection (b)) may be members of the same political party.

(d)(1) Each individual appointed to the Board under subsection (b)(5) shall have appropriate practical or academic experience in peace and conflict resolution efforts of the United States.

(2) Officers and employees of the United States Government may not be appointed to the Board under subsection (b)(5).

(e)(1) Members of the Board appointed under subsection (b)(5) shall be appointed to four year terms, except that—

(A) the term of six of the members initially appointed shall be two years, as designated by the President at the time of their nomination;

(B) a member may continue to serve until his or her successor is appointed; and

(C) a member appointed to replace a member whose term has not expired shall be appointed to serve the remainder of that term.

(2) The terms of the members of the Board initially appointed under subsection (b)(5) shall begin on January 20, 1985, and subsequent terms shall begin upon the expiration of the preceding term, regardless of when a member is appointed to fill that term.

(3) The President may not nominate an individual for appointment to the Board under subsection (b)(5) prior to January 20, 1985, but shall submit the names of eleven nominees for initial Board membership under subsection (b)(5) not later than ninety days after that date. If the Senate rejects such a nomination or if such a nomination is withdrawn, the President shall submit the name of a new nominee within fifteen days.

(4) An individual appointed as a member of the Board under subsection (b)(5) may not be appointed to more than two terms on the Board.

(f) A member of the Board appointed under subsection (b)(5) may be removed by the President—

(1) in consultation with the Board, for conviction of a felony malfeasance in office, persistent neglect of duties, or inability to discharge duties;

(2) upon the recommendation of eight voting members of the Board; or

(3) upon the recommendation of a majority of the members of the Committee on Foreign Affairs and the Committee on Education and Labor of the House of Representatives and a majority of the members of the Committee on Foreign Relations and the Committee on Labor and Human Resources of the Senate.

A recommendation made in accordance with paragraph (2) may be made only pursuant to action taken at a meeting of the Board, which may be closed pursuant to the procedures of subsection (h)(3). Only members who are present may vote. A record of the vote shall be maintained. The President shall be informed immediately by the Board of the recommendation.

(g) No member of the Board may participate in any decision, action, or recommendation with respect to any matter which directly and financially benefits the member or pertains specifically to any public body or any private or nonprofit firm or organization with which the member is then formally associated or has been formally associated within a period of two years, except that this subsection shall not be construed to prohibit an ex officio member of the Board from participation in actions of the Board which pertain specifically to the public body of which that member is an officer.

(h) Meetings of the Board shall be conducted as follows:

(1) The President shall stipulate by name the nominee who shall be the first Chairman of the Board. The first Chairman shall serve for a term of three years. Thereafter, the Board shall elect a Chairman every three years from among the directors appointed by the President under subsection (b)(5) and may elect a Vice Chairman if so provided by the Institute's bylaws.

(2) The Board shall meet at least semiannually, at any time pursuant to the call of the Chairman or as requested in writing to the Chairman by at least five members of the Board. A majority of the members of the Board shall constitute a quorum for any Board meeting.

(3) All meetings of the Board shall be open to public observation and shall be preceded by reasonable public notice. Notice in the Federal Register shall be deemed to be reasonable public notice for purposes of the preceding sentence. In exceptional circumstances, the Board may close portions of a meeting, upon a majority vote of its members present and with the vote taken in public session, which are likely to disclose information likely to affect adversely any ongoing peace proceeding or activity or to disclose information or matters exempted from public disclosure pursuant to section 552b of title 5, United States Code.

(i) A director appointed by the President under subsection (b)(5) shall be entitled to receive the daily equivalent of the annual rate of basic pay in effect for grade GS-18 of the General Schedule under section 5332 of title 5, United States Code, for each day during which the director is engaged in the performance of duties as a member of the Board.

(j) While away from his home or regular place of business in the performance of duties for the Institute, a director shall be allowed travel expenses, including a per diem in lieu of subsistence, not to exceed the expenses allowed persons employed intermittently in Government service under section 5703(b) of title 5, United States Code.

### OFFICERS AND EMPLOYEES

SEC. 1707. (a) The Board shall appoint the president of the Institute and such other officers as the Board determines to be necessary. The president of the Institute shall be a nonvoting ex officio member of the Board. All officers shall serve at the pleasure of the Board. The president shall be appointed for an explicit term of years. Notwithstanding any other provision of law limiting the payment of compensation, the president and other officers appointed by the Board shall be compensated at rates determined by the Board, but no greater than that payable for level I of the Executive Schedule under chapter 53 of title 5, United States Code.

(b) Subject to the provisions of section 1705(a)(3), the Board shall authorize the president and any other officials or employees it designates to receive and disburse public moneys, obtain and make grants, enter into contracts, establish and collect fees, and undertake all other activities necessary for the efficient and proper functioning of the Institute.

(c) The president, subject to Institute's bylaws and general policies established by the Board, may appoint, fix the compensation of, and remove such employees of the Institute as the president determines necessary to carry out the purposes of the Institute. In determining employee rates of compensation, the president shall be governed by the provisions of title 5, United States Code, relating to classification and General Schedule pay rates.

(d)(1) The president may request the assignment of any Federal officer or employee to the Institute by an appropriate department or agency, or congressional official or Member of Congress and may enter into an agreement for such assignment, if the affected officer or employee agrees to such assignment and such assignment causes no prejudice to the salary, benefits, status, or advancement within the department, agency, or congressional staff of such officer or employee.

(2) The Secretary of State, the Secretary of Defense, the Director of the Arms Control and Disarmament Agency, and the Director of Central Intelligence each may assign officers and employees of their respective department or agency, on a rotating basis to be determined by the Board, to the Institute if the affected officer or employee agrees to such assignment and such assignment causes no prejudice to the salary, benefits, status, or advancement within the respective department or agency of such officer or employee.

(e) No officer or full-time employee of the Institute may receive any salary or other compensation for services from any source other than the Institute during the officer's or employee's period of employment by the Institute, except as authorized by the Board.

(f)(1) Officers and employees of the Institute shall not be considered officers and employees of the Federal Government except for purposes of the provisions of title 28, United States Code, which relate to Federal tort claims liability, and the provisions of title 5, United States Code, which relate to compensation and benefits, including the following provisions: chapter 51 (relating to classification); subchapters I and III of chapter 53 (relating to pay rates); subchapter I of chapter 81 (relating to compensation for work injuries); chapter 83 (relating to civil service retirement);

chapter 87 (relating to life insurance); and chapter 89 (relating to health insurance). The Institute shall make contributions at the same rates applicable to agencies of the Federal Government under the provisions of title 5 referred to in this section.

(2) No Federal funds shall be used to pay for private fringe benefit programs. The Institute shall not make long- term commitments to employees that are inconsistent with rules and regulations applicable to Federal employees.

(g) No part of the financial resources, income, or assets of the Institute or of any legal entity created by the Institute shall inure to any agent, employee, officer, or director or be distributable to any such person during the life of the corporation or upon dissolution or final liquidation. Nothing in this section may be construed to prevent the payment of reasonable compensation for services or expenses to the director, officers, employees, and agents of the Institute in amounts approved in accordance with the provisions of this title.

(h) The Institute shall not make loans to its directors, officers, employees, or agents, or to any legal entity created by the Institute. A director, officer, employee, or agent who votes for or assents to the making of a loan or who participates in the making of a loan shall be jointly and severally liable to the Institute for the amount of the loan until repayment thereof.

### PROCEDURES AND RECORDS

SEC. 1708. (a) The Institute shall monitor and evaluate and provide for independent evaluation if necessary of programs supported in whole or in part under this title to ensure that the provisions of this title and the bylaws, rules, regulations, and guidelines promulgated pursuant to this title are adhered to.

(b) The Institute shall prescribe procedures to ensure that grants, contracts, and financial support under this title are not suspended unless the grantee, contractor, or person or entity receiving financial support has been given reasonable notice and opportunity to show cause why the action should not be taken.

(c) In selecting persons to participate in Institute activities, the Institute may consider a person's practical experience or equivalency in peace study and activity as well as other formal requirements.

(d) The Institute shall keep correct and complete books and records of account, including separate and distinct accounts of receipts and disbursements of Federal funds. The Institute's annual financial report shall identify the use of such funding and shall present a clear description of the full financial situation of the Institute.

(e) The Institute shall keep minutes of the proceedings of its Board and of any committees having authority under the Board.

(f) The Institute shall keep a record of the names and addresses of its Board members; copies of this title, of any other Acts relating to the Institute, and of all Institute bylaws, rules, regulations, and guidelines; required minutes of proceedings; a record of all applications and proposals and issued or received contracts and grants; and financial records of the Institute. All items required by this subsection may be inspected by any Board member or the member's agent or attorney for any proper purpose at any reasonable time.

(g) The accounts of the Institute shall be audited annually in accordance with generally accepted auditing standards by independent certified public accountants or independent licensed public accountants, certified or licensed by a regulatory authority of a State or other political subdivision of the United States on or before December 31, 1970. The audit shall be conducted at the place or places where the accounts of the Institute are normally kept. All books, accounts, financial records, files, and other papers, things, and property belonging to or in use by the Institute and necessary to facilitate the audit shall be made available to the person or persons conducting the audit, and full facilities for verifying transactions with the balances or securities held by depositories, fiscal agents, and custodians shall be afforded to such person or persons.

(h) The Institute shall provide a report of the audit to the President and to each House of Congress no later than six months following the close of the fiscal year for which the audit is made. The report shall set forth the scope of the audit and include such statements, together with

the independent auditor's opinion of those statements, as are necessary to present fairly the Institute's assets and liabilities, surplus or deficit, with reasonable detail, including a statement of the Institute's income and expenses during the year, including a schedule of all contracts and grants requiring payments in excess of $5,000 and any payments of compensation, salaries, or fees at a rate in excess of $5,000 per year. The report shall be produced in sufficient copies for the public.

(i) The Institute and its directors, officers, employees, and agents shall be subject to the provisions of section 552 of title 5, United States Code (relating to freedom of information).

## INDEPENDENCE AND LIMITATIONS

SEC. 1709. (a) Nothing in this title may be construed as limiting the authority of the Office of Management and Budget to review and submit comments on the Institute's budget request at the time it is transmitted to the Congress.

(b) No political test or political qualification may be used in selecting, appointing, promoting, or taking any other personnel action with respect to any officer, employee, agent, or recipient of Institute funds or services or in selecting or monitoring any grantee, contractor, person, or entity receiving financial assistance under this title.

## FUNDING

SEC. 1710. (a) For the purpose of carrying out this title (except for paragraph (9) of section 1705(b)), there are authorized to be appropriated $6,000,000 for the fiscal year 1985 and $10,000,000 for the fiscal year 1986. Monies appropriated for the fiscal year 1985 shall remain available to the Institute through the fiscal year 1986.

(b) The Board of Directors may transfer to the legal entity authorized to be established under section 1704(c) any funds not obligated or expended from appropriations to the Institute for a fiscal year, and such funds shall remain available for obligation or expenditure for the purposes of such legal entity without regard to fiscal year limitations. Any use by such legal entity of appropriated funds shall be reported to each House of Congress and to the President of the United States.

(c) Any authority provided by this title to enter into contracts shall be effective for a fiscal year only to such extent or in such amounts as are provided in appropriation Acts.

## DISSOLUTION OR LIQUIDATION

SEC. 1711. Upon dissolution or final liquidation of the Institute or of any legal entity created pursuant to this title, all income and assets of the Institute or other legal entity shall revert to the United States Treasury.

## REPORTING REQUIREMENT AND REQUIREMENT TO HOLD HEARINGS

SEC. 1712. Beginning two years after the date of enactment of this title, and at intervals of two years thereafter, the Chairman of the Board shall prepare and transmit to the Congress and the President a report detailing the progress the Institute has made in carrying out the purposes of this title during the preceding two-year period. The President shall prepare and transmit to the Congress within a reasonable time after the receipt of such report the written comments and recommendations of the appropriate agencies of the United States with respect to the contents of such report and their recommendations with respect to any legislation which may be required concerning the Institute. After receipt of such report by the Congress, the Committee on Foreign

Affairs and the Committee on Education and Labor of the House of Representatives and the Committee on Foreign Relations and the Committee on Labor and Human Resources of the Senate shall hold hearings to review the findings and recommendations of such report and the written comments received from the President.

The United States Institute of Peace Act has been amended twice:

• The Higher Education Technical Amendments Act of 1986, Pub. L. No. 99-498 (Oct. 17, 1986), 100 Stat. 1612, to be codified at 20 U.S.C. 4609 note, provided:

"SEC. 1601. (3) AUTHORIZATIONS OF APPROPRIATIONS.—

(1) The first sentence of section 1710(a) of the United States Institute of Peace Act (22 U.S.C. 4609(a)) is amended—

(A) by striking out 'fiscal year 1985' and inserting in lieu thereof 'fiscal year 1987'; and

(B) by striking out 'fiscal year 1986' and inserting in lieu thereof 'fiscal year 1988'

(2) The amendments made by paragraph (1) shall take effect on October 1, 1986.

(b) AVAILABILITY OF FUNDS.—The second sentence of section 1710(a) of such Act (22 U.S.C. 4609(a)) is amended to read as follows: 'Amounts appropriated under this section are authorized to remain available to the Institute until expended.'"

• The Higher Education Technical Amendments Act of 1987 (133 Cong. Rec. S6768, S6776, daily ed., May 19, 1987) provided:

"SEC. 25. UNITED STATES INSTITUTE OF PEACE.

Section 1705 of the United States Institute of Peace Act is amended by inserting after (5) the following: 'establish a Jeannette Rankin Research Program on Peace to' ..."

☉ US Government Printing Office 1987-191-061:29180



*T*he Institute's seal incorporates five principal components: the Institute's name, a dove, an oak tree, a world map grid, and the colors of the United States flag. The words ''United States Institute of Peace'' occupy the scroll of the seal, identifying the organization. In the seal's major field are three symbolic renderings. The dove, which was personally designed by President George Washington as the weather vane for his home at Mount Vernon, symbolizes the traditional American commitment to the cause of peace. Behind the dove is an oak tree. Known first as the ''Peace Tree'' and subsequently as the ''Charter Oak,'' the tree grew from an acorn buried with tomahawks almost one thousand years ago in what is presently the state of Connecticut. For centuries, the Suckiauke Indians used the tree as the site for peace councils. In 1687, colonists seeking freedom from Britain hid their charter of liberty—which King Charles II had given to Governor John Winthrop—in the hollow tree to safeguard it from seizure by agents of King James II. The tree's history thus combines the complementary values of peace and freedom. The background grid represents a world map symbolizing the international scope of the Institute's mandate.

C 321 88



"*Peace is our passion.*"
—THOMAS JEFFERSON, LETTER TO SIR JOHN SINCLAIR (1803)



United States Institute of Peace    730 Jackson Place, NW, Washington, DC  20503    (202) 789-5700