UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES INSTITUTE FOR PEACE,
et al.,

          Plaintiffs,

    v.

KENNETH JACKSON,
Assistant to the Administrator for
Management and Resources for USAID, et al.,

        Defendants.

Civil Action No. 25-0804 (BAH)

**DEFENDANTS' REPLY IN FURTHER SUPPORT OF
THEIR CROSS-MOTION FOR SUMMARY JUDGMENT**

**TABLE OF CONTENTS**

Table of Contents ................................................................................................................. i

    I.      The Institute is Part of the Executive Branch. ....................................................... 2

           A.     The Constitution Created Three Branches of Government, and the Exercise of Executive Authority Outside of the Executive Branch is Unconstitutional. ..................................................................................... 3

           B.     Congress Did Not Create the Institute as a Free-Floating Government Entity Existing Outside of the Government's Three Branches.................. 7

    II.     Plaintiffs Misunderstand the Law in Suggesting that the Institute's Board Can Enjoy For-Cause Removal Protections. ....................................................... 16

    III.    Plaintiffs Have No Authority to Bring Suit On Behalf of the Institute. ............... 19

    IV.    Plaintiffs Bring No Claim Regarding the Current Operation of the Institute, Nor Could They As They Have No Independent Standing to Do So. .................. 20

    V.     Plaintiffs' Remedial Arguments Have No Merit. .................................................. 22

Conclusion .................................................................................................................... 24

Defendants respectfully submit this reply in further support of their cross-motion for summary judgment (ECF No. 32, "Defs. Mot."). As explained below, Plaintiffs' opposition (ECF No. 34, "Pls. Opp'n") does nothing to save Plaintiffs' claims in this action, and the Court should enter summary judgment in Defendants' favor.

The Institute is part of the federal government. That is undisputed in this action. Where does it fall in the structure of the federal government? The United States demonstrated that the Institute is plainly part of the Executive Branch. The Institute exercises executive functions in furtherance of executive powers—namely in peacemaking and diplomacy. Its leadership is selected by the President. And its funding, aside from two highly constrained areas, comes from the taxpayers. It walks, swims, and quacks like an Executive Branch agency—because it is one. In their opposition, Plaintiffs claim that the Institute falls above, outside, or beyond the three branches of government, answering to no one that is politically accountable to the electorate. Plaintiffs' claim that the Institute is separate from any branch of the federal government fails on the text of the Constitution alone.

Because the Institute is part of the Executive Branch, its board is removable by the President. That is because the Institute does not fall into the narrow exception to at-will removal created by *Humphrey's Executor* and its progeny. That test does not turn on an agency having a multi-member board. It turns on the functions and powers exercised by the agency. And here, the Institute exercises no quasi-legislative or quasi-judicial functions or powers—the core rationale for creating an exception to at-will removal of Executive Branch officers.

Plaintiffs' remaining arguments—about how they continue to press suit on behalf of the Institute and in their official capacities, about unidentified claims regarding the current operation

of the Institute that are absent from their complaint, and about how the Court can fashion remedies contrary to controlling law—are unpersuasive and fail.

Ultimately, the President has authority to remove the Institute's board in his discretion. He appropriately exercised that discretion. That conclusion alone dooms all Plaintiffs' claims in this suit.

## I.    The Institute is Part of the Executive Branch.

As they did in their moving papers, Plaintiffs do not dispute that the Institute is part of the federal government. Pls. Mot. (ECF No. 22) at 16 n.9; Pls. Opp'n (ECF No. 34) at 9. This concession is fatal to Plaintiffs' claims. As the United States explained in its motion (ECF No. 32 at 13–14), the federal government consists of three, and only three, branches defined by Articles I, II, and III of the Constitution. The Institute is plainly not part of the Judicial or Legislative Branches; thus, it must fall within the Executive Branch, a conclusion buttressed by the Institute's functions, powers, and structure of its board. *Id.* at 13–20.

In their opposition, Plaintiffs resist this conclusion by contending that not all government entities fall into one of the three branches of government. Pls. Opp'n (ECF No. 34) at 4. Plaintiffs' argument flies in the face of the Constitution's plain text. That is, while Plaintiffs' coin the United States' arguments as an "executive-by-default" theory, Pls. Opp'n (ECF No. 34) at 4, it is the Constitution that created only three branches and vested the President and his Executive Branch with the Nation's executive power. *See Buckley v. Valeo*, 424 U.S. 1, 138–39 (1976) ("Our inquiry of necessity touches upon the fundamental principles of the Government established by the Framers of the Constitution, and all litigants and all of the courts which have addressed themselves to the matter start on common ground in the recognition of the intent of the Framers that the powers of the three great branches of the National Government be largely separate from one another."); *cf. Springer v. Gov't of Philippine Islands*, 277 U.S. 189, 202–03 (1928) ("Putting aside for the

moment the question whether the duties devolved upon these members are vested by the Organic Act in the Governor General, it is clear that they are not legislative in character, and still more clear that they are not judicial.  The fact that they do not fall within the authority of either of these two constitutes logical ground for concluding that they do fall within that of the remaining one of the three among which the powers of government are divided.").

But even were it possible to create a federal entity outside of the three branches, Congress did not do so with the Institute.  And Plaintiffs' attempts to liken the Institute to other entities does nothing to change the nature of its status as an Executive Branch component.

A.    **The Constitution Created Three Branches of Government, and the Exercise of Executive Authority Outside of the Executive Branch is Unconstitutional.**

A component of the federal government must fall into one of three branches, the Legislative, the Executive, or the Judicial Branch.  U.S. Const. art. I, II, III.  While rhetorically some have called independent agencies a "fourth branch" of the government, under the Constitution, there is no such thing.  *See id.*; *VHS Acquisition Subsidiary No. 7 v. Nat'l Lab. Rels. Bd.*, Civ. A. No. 24-2577 (TNM), 2024 WL 5056358, at *7 (D.D.C. Dec. 10, 2024), *appeal pending*, No. 25-5021 (D.C. Cir.) (collecting cases; citing *Fed. Mar. Comm'n v. S.C. State Ports Auth.*, 535 U.S. 743, 773 (Breyer, J., dissenting) ("Although Members of this Court have referred to agencies as a 'fourth branch' of Government, the agencies, even 'independent' agencies, are more appropriately considered to be part of the Executive Branch.")); *Nat'l Horsemen's Benevolent & Protective Ass'n v. Black*, 53 F.4th 869, 872 (5th Cir. 2022) ("the Constitution vests federal power only in the three branches of the federal government").

Resisting this conclusion, Plaintiffs argue that the Institute somehow floats beyond the constitutional structure of the federal government.  Specifically, Plaintiffs argue that the United States' adherence to the Constitution's text is a "rigid categorical approach . . . inconsistent with

the design of the Constitution."  Pls. Opp'n (ECF No. 34) at 4.  Plaintiffs are wrong, and the authorities they cite in support of their atextual arguments are inapposite.

For example, Plaintiffs cite *United States v. Williams*, 504 U.S. 36, 47 (1992), where the Supreme Court acknowledged that grand juries fall outside the three-branch structure of the Constitution.  Pls. Opp'n (ECF No. 34) at 4.  But the Institute hardly possesses the common law antecedents of a grand jury.  *Id.* at 47 (grand juries are "rooted in long centuries of Anglo-American history" (cleaned up)).  As the Supreme Court noted, grand juries are unique as they are "mentioned in the Bill of Rights, but not in the body of the Constitution" and "the whole theory of its function is that it belongs to no branch of the institutional Government, serving as a kind of buffer or referee between the Government and the people."  *Id.* at 47 (citations omitted).  The unique status of being specifically mentioned in the Constitution, but not in "any of the branches described in the first three Articles," yields a grand jury being "a constitutional fixture in its own right."  *Id.*  The Institute shares none of these attributes.  It has no Constitutional footing.  Instead, it is a creation of congressional enactment.  As such, however a grand jury may fall structurally within the federal government, provides no support that the Institute falls outside of the Executive Branch.

Next, Plaintiffs cite *Buckley*, 424 U.S. at 138–39.  Pls. Opp'n (ECF No. 34) at 4.  But, directly refuting Plaintiffs premises, that case underscores the need for government components exercising executive authorities to be located in the Executive Branch.  There, the Court held that because the Federal Election Commission exercised executive functions, its then-structure violated the Constitution, because its officers were not selected through presidential nomination and Senate confirmation—the constitutional process for selecting "Officers of the United States."  *Id.* at 141–42 ("The Commission's enforcement power, exemplified by its discretionary power to seek

judicial relief, is authority that cannot possibly be regarded as merely in aid of the legislative function of Congress.  A lawsuit is the ultimate remedy for a breach of the law, and it is to the President, and not to the Congress, that the Constitution entrusts the responsibility to 'take Care that the Laws be faithfully executed.'").  In so doing, the Court held that Congress has no authority to create government entities, which exercise executive authorities, answerable to it.  *Id.*  Nothing about the Court's holding in *Buckley* suggests that a component of the federal government can exist outside the three-branch structure established by the Constitution.  To the contrary, *Buckley* emphasized that all to "have addressed themselves to the matter start on common ground in the recognition of the intent of the Framers that the powers of the three great branches of the National Government be largely separate from one another."  *Buckley*, 424 U.S. at 120.

  *Buckley*'s holdings are in line with long-standing Supreme Court precedents.  For example, in *Springer*, the Court conducted the exact analysis the United States did here to determine where a governmental component fell in a government's constitutional structure.  In *Springer*, the Court considered the validity of "Acts of the Philippine Legislature that authorized a committee of three—two legislators and one executive—to vote corporate stock owned by the Philippine Government" in certain state-created entities.  *Metro. Wash. Airports Auth. v. Citizens for Abatement of Aircraft Noise, Inc.*, 501 U.S. 252, 274 (1991) (discussing *Springer*, 277 U.S. at 198–99).  While the Court addressed the lawfulness of this scheme under the Organic Act of the Philippine Islands, the Court noted that the Organic Act "follow[ed] the rule established by the American Constitution" as to separation of powers, in that it too divided "the government into three separate departments—the legislative, executive, and judicial."  *Springer*, 277 U.S. at 201. In determining where the committee sat within the Philippine government, the Court analyzed the circumstance as follows:

> Here the members of the Legislature who constitute a majority of the 'board' and 'committee,' respectively, are not charged with the performance of any legislative functions or with the doing of anything which is in aid of the performance of any such functions by the Legislature. Putting aside for the moment the question whether the duties devolved upon these members are vested by the Organic Act in the Governor General, it is clear that they are not legislative in character, and still more clear that they are not judicial. The fact that they do not fall within the authority of either of these two constitutes logical ground for concluding that they do fall within that of the remaining one of the three among which the powers of government are divided.

*Id.* at 202–03. The Court then invalidated the committee's structure based on its assigning executive functions to legislators. *Id.* at 203. Nowhere did the Court suggest that a governmental entity could reside outside the three branches. And the Supreme Court's consistent separation-of-powers holdings since *Springer* have underscored the same. *See, e.g.*, *Citizens for Abatement*, 501 U.S. at 275–76 (board of review to supervise operation of regional airports consisting of congressional members was an unconstitutional exercise of executive authority by legislators; rejecting argument that board was "the kind of practical accommodation between the Legislature and the Executive that should be permitted in a 'workable government'"); *INS v. Chadha*, 462 U.S. 919, 951 (1983) ("The Constitution sought to divide the delegated powers of the new federal government into three defined categories, legislative, executive and judicial, to assure, as nearly as possible, that each Branch of government would confine itself to its assigned responsibility."); *Bowsher v. Synar*, 478 U.S. 714, 721 (1986) ("The declared purpose of separating and dividing the powers of government, of course, was to diffuse power the better to secure liberty." (cleaned up)).

At bottom, the Institute, being part of the federal government, must fall into one of the three branches to be constitutionally permissible. It exercises no legislative or judicial functions and, thus, like the committee in *Springer*, falls into the Executive Branch.

**B.    Congress Did Not Create the Institute as a Free-Floating Government Entity Existing Outside of the Government's Three Branches.**

Even were it possible to have a federal entity placed outside the three branches, nothing in the Institute's organic statute suggests that Congress intended to break that new ground here. Plaintiffs' arguments to the contrary are unsupportable and misplaced.

1.    The Institute Was Not Designed to Be Independent from the President.

Plaintiffs argue that "[i]ndependence from the President is fundamental to Congress's design for" the Institute. Pls. Opp'n (ECF No. 34) at 11–14. Nothing in the statute's text indicates that. While the statute describes the Institute to be "independent" of other government components (e.g., the Departments of State and Defense), nothing in its text states it is to be free from political influence or exercise non-executive functions. To the contrary, as the United States explained in its motion, the "Institute is led by a board selected by the President with the advice and consent of the Senate and whose constituency is guaranteed to always track the political party of the President." Defs. Mot. (ECF No. 32) at 1; *see id.* at 13–20; 22 U.S.C. § 4605(c).

Plaintiffs' response largely relies on prior statements by Institute board members and officials. Pls. Opp'n (ECF No. 34) at 11–13. But the statements cited by Plaintiffs in this portion of their opposition do not purport to speak authoritatively to the legal status of the Institute within the federal government. Moreover, it is hardly surprising that the Institute's past board members and officials wished to act independently without the President's supervision—the former board members bringing this suit seek the same. The Executive Branch's contrary position on the Institute's position in the federal government has been equally consistent, rebutting the notion of a historical agreement on the Institute's position. *See* Statement on Signing the Department of Defense Authorization Act, 1985 (Oct. 19, 1984), available at: https://www.reaganlibrary.gov/archives/speech/statement-signing-department-defense-authorization-act-1985 ("I have been

advised by the Attorney General that section 1706(f), relating to the President's power to remove members of the Board of Directors of the Institute, is neither intended to, nor has the effect of, restricting the President's constitutional power to remove those officers."). Plaintiffs' citation to self-serving remarks from themselves or their predecessors in office regarding the Institute's "independence," do nothing to place the Institute outside of the federal government's constitutional structure. *See Collins v. Yellen*, 594 U.S. 220, 249 (2021) ("the term 'independent' does not necessarily connote independence from Presidential control").

> 2. Plaintiffs' Contention that the Institute Does Not Exercise Executive Functions or Powers Is Unsupportable.

Plaintiffs argue that the Institute does not exercise executive functions or powers. Principally, Plaintiffs remarkably contend that brokering and fostering peace in foreign nations is not "substantial executive power." Pls. Opp'n (ECF No. 34) at 21–28. But Plaintiffs cite nothing for this proposition. In fact, they do not even attempt to distinguish the myriad authorities cited by the United States in its motion, which firmly establish that diplomacy and peacemaking are core executive functions. Defs. Mot. (ECF No. 32) at 14–16. Instead, Plaintiffs rely on self-serving declarations—sixteen they tout, though many have nothing to do with this issue, *see, e.g.*, Falk Decl. (ECF No. 20-6); Swig Decl. (ECF No. 20-5); Jones Decl. (ECF No. 20-4); Blotzer Decl. (ECF No. 20-3)—that, at most, offer layman characterizations of the Institute's work as being non-executive in nature. Pls. Opp'n (ECF No. 34) at 22. But the issue of whether the Institute has been afforded power to undertake executive functions does not turn on micro-focused characterizations of the Institute's work.

Instead, whether the Institute serves an executive function or is vested executive power turns not just on how it operates, but also on its congressional design. As the Supreme Court noted in *Citizens for Abatement*, "[i]f the power is executive, the Constitution does not permit an agent

of Congress to exercise it."  501 U.S. at 276; *see also Bowsher v. Synar*, 478 U.S. 714, 730 (1986)
("The Framers recognized that, in the long term, structural protections against abuse of power were
critical to preserving liberty.").  And clearly, international engagement by a part of the federal
government is an executive act—not a legislative or judicial one.  *See* Defs. Mot. (ECF No. 32) at
14–18.

Plaintiffs call this view "sweeping."  Pls. Opp'n (ECF No. 34) at 23.  They are correct.
The Constitution places broad power in the chief executive to engage in foreign relations, negotiate
with foreign sovereigns, and conduct foreign affairs.  *Am. Ins. Ass'n v. Garamendi*, 539 U.S. 396,
414 (2003) ("the historical gloss on the 'executive Power' vested in Article II of the Constitution
has recognized the President's 'vast share of responsibility for the conduct of our foreign
relations.'" (quoting *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 610–611 (1952)
(Frankfurter, J., concurring))).  As such, non-legislative parts of the federal government that have
authorities in these areas plainly serve an executive function.

Plaintiffs resort to slippery slope arguments in response.  They argue that if all functions
of international engagement of the sort exercised by the Institute are executive in nature, the
Nation's executive functions would sweep in "the Red Cross, the Olympic Committee, and every
congressional delegation or state-level trade mission abroad."  Pls. Opp'n (ECF No. 34) at 23–24.
Not so.  As explained below, chartered corporations, such as the Red Cross and U.S. Olympic
Committee, are not part of the federal government; they merely have congressional recognition.
*See infra*.  Consequently, these entities are not exercising any governmental power, executive or
otherwise.

As to congressional delegations: members of Congress can engage internationally, but they
do so in furtherance of their legislative powers and duties—not executive ones.  For example, no

Senator may settle claims of American nationals against foreign governments, acknowledge the legitimacy of a state or government and its territorial bounds, or compel the President to contradict an earlier recognition determination in the issuance of passports. *See Am. Ins. Ass'n v. Garamendi*, 539 U.S. 396, 415 (2003); *Zivotofsky ex rel. Zivotofsky v. Kerry*, 576 U.S. 1, 32 (2015).  That said, as Plaintiffs note, Congress "holds express authority to regulate public and private dealings with other nations in its war and foreign commerce powers[.]"  *Am. Ins. Ass'n*, 539 U.S. at 414. Congressional delegations to foreign countries fall within this exercise of their legislative powers.

Also, contrary to Plaintiffs' assertions, *see* Pls. Opp'n (ECF No. 34) at 24–25, the Executive Branch sharing foreign relations powers with the Legislative Branch does nothing to move the Institute outside the Executive Branch.  Plaintiffs do not seriously contend that the Institute is part of the Legislative Branch.  Nor could they, as the Institute's organic statute forbids it from influencing legislation.  22 U.S.C. § 4604(n).  Instead, it is a governmental entity that executes a law passed by Congress to, among other things, make grants,[1] promote international peace, and promote the resolution of conflicts without recourse to violence.  22 U.S.C. §§ 4606(b), 4601(b).

Lastly, Plaintiffs argue that because the Institute engages in peacemaking and diplomacy without consultation with the Departments of State and Defense, it somehow does not serve an executive function.  Pls. Opp'n (ECF No. 34) at 22–23.  Plaintiffs have it backwards.  Undoubtedly, the Institute is independent from other Executive Branch components (including the Departments of State and Defense)—its organic statute says as much.  *Id.* § 4603(a).  But its independent work "to serve the people and the Government . . . to promote international peace and the resolution of

---

[1]    Plaintiffs are incorrect that Defendants somehow waived an argument that the Institute has an executive function because it makes grants.  Pls. Opp'n (ECF No. 34) at 28 n.19.  Defendants adequately developed that argument in their motion.  *See* Defs. Mot. (ECF No. 32) at 3, 17.

conflicts among the nations and peoples of the world without recourse to violence," *id.* § 4601(b), does not make its functions and powers any less executive in nature. To the contrary, by independently wielding authorities "to serve the people and the Government" in areas of foreign relations, the Institute has substantial executive prerogatives, which undoubtedly fall under the President's constitutional authorities. *See* Defs. Mot. (ECF No. 32) at 15–16 (collecting authorities, including, *United States v. Curtiss-Wright Exp. Corp.*, 299 U.S. 304, 319 (1936) (noting that external relations include the powers to "wage war, to conclude peace, to make treaties, to maintain diplomatic relations with other sovereignties")).

3.    The Institute's Exclusion from Certain Statutory Obligations Does Not Place It Outside the Three Branches of Government.

Plaintiffs also argue that the Institute falls outside of the three branches because Congress opted to exclude the Institute from certain statutes governing Executive Branch agencies. *See* Pls. Opp'n (ECF No. 34) at 16. Not so. Congress regularly exempts certain governmental components from general laws without disturbing their place within the Executive Branch. For example, as the United States noted in its motion, Congress affords certain agencies independent litigating authority and creates different retirement benefits for certain Executive Branch employees. Defs. Mot. (ECF No. 32) at 19. [2] Plaintiffs cite no caselaw and fail to explain how the Institute's exclusion from certain statutory obligations, but its inclusion in others, supports a finding that it is

---

[2]    In a footnote, Plaintiffs suggest that "Defendants do not dispute that insofar as [the Institute] acts as a research aid to Congress, it is not part of the Executive Branch." Pls. Opp'n (ECF No. 34) at 5 n.2 (citing Defs. Stmt. (ECF No. 32-1) ¶ 60). Plaintiffs' suggestion is false. Defendants instead stated: "the Institute's response to congressional inquiries does nothing to take it out of the Executive Branch of the federal government and the Institute's congressional interactions are ancillary to its statutory purposes, which are plainly executive functions." Defs. Stmt. (ECF No. 32-1) ¶ 60 (citing 22 U.S.C. § 4601).

part of another branch of the government or that it somehow floats outside the government's constitutional structure.

>      4.    Plaintiffs Misunderstand the Government's Arguments When Hairsplitting the United States' Characterizations of the Governmental Hallmarks of the <u>Institute.</u>

While continuing to concede that the Institute is part of the federal government,[3] Plaintiffs nitpick the United States' descriptions of the Institute's attributes that confirm as much. Pls. Opp'n (ECF No. 34) at 14–15 (referencing Defs. Mot. (ECF No. 32) at 10–11). Plaintiffs also bizarrely argue that, the fact Congress expressly subjected the Institute to certain organizational laws (e.g., the Freedom of Information Act, the Federal Tort Claims Act), supports their views that the Institute sits outside the three branches of the federal government. Pls. Opp'n (ECF No. 34) at 15–16. Similarly, Plaintiffs question why the Institute was identified as a "federal entity" under the Inspector General Act in every available annual notice. Pls. Opp'n (ECF No. 34) at 17. The point of Plaintiffs' quibbling on these points is unclear.

The United States' lengthy list of the Institute's governmental attributes, the Institute being subjected to certain organizational laws, and the Institute being listed repeatedly in the Federal Register as a federal entity, confirms what the Institute has conceded in its papers—it is part of the federal government. Defs. Mot. (ECF No. 32) at 10–11. In its motion, after establishing the Institute is part of the federal government, the United States then demonstrated that the Institute falls within the Executive Branch—not the Judicial or Legislative Branches—due to its structure,

---

[3]     The concession in Plaintiffs' papers that the Institute is part of the federal government stands in contrast to statements made by Plaintiffs during the pendency of this action to the media, claiming the Institute is "private." Jackie Benson, US Institute of Peace says DOGE broke into its building, NBC4 (Mar 18, 2025), https://www.nbcwashington.com/news/president-trump-politics/us-institute-of-peace-doge-trump-administration/3869923/ (reporting "Moose vowed legal action, saying that 'what has happened here today is an illegal takeover by elements of the executive branch of a private nonprofit'").

powers, and functions. *Id.* at 13–23. But the latter demonstration did not depend on the former. And with Plaintiffs repeatedly conceding that the Institute is part of the federal government, Plaintiffs' spilled ink on these points in their opposition is irrelevant.

>        5.    Plaintiffs Are Wrong In Suggesting the United States Does Not Own the <u>Institute.</u>

As the United States demonstrated in its motion, the generic statutory definitions of executive agency further support a finding that the Institute is part of the Executive Branch, as it plainly falls into the definition of a "government-owned corporation" or "independent establishment." Defs. Mot. (ECF No. 32) at 20–22. In response, Plaintiffs largely make a series of unpersuasive slippery slope arguments and cite authorities that do not purport to weigh-in on the Institute's placement in the federal government.

For example, in responding to the United States' demonstration that the Institute easily falls into the definition of "independent establishment," Plaintiffs argue that "[i]f everything established by Congress were an 'Executive agency,' the rest of the Title 5 definitions would be surplusage." Pls. Opp'n (ECF No. 34) at 18. Plaintiffs misunderstand the law. The Institute's organic statute plainly makes it an establishment of the United States—it uses those exact words. 22 U.S.C. § 4603(a) (entitling provision, "Establishment," and stating "[t]here is hereby established the United States Institute of Peace"). The statute also makes the Institute independent of other governmental components. *Id.* § 4603(b). Where Congress creates a government entity with these attributes, it is plainly an "independent establishment," unless it falls into another sub-definition of executive agency. *See* 5 U.S.C. §§ 104(a), 105. This straightforward analysis does not mean that all congressional creations are independent establishments. Rather, it means that when Congress uses those specific terms, there can be no reasonable debate that a government entity falls into that statutory definition.

Similarly, in responding to the United States' demonstration that the Institute is best understood as a government-owned corporation, Plaintiffs argue "[b]y Defendants' logic, the government (federal or state) would 'own' every single extant tax-exempt nonprofit." Pls. Opp'n (ECF No. 34) at 20. Once again, Plaintiffs are confused. As the United States showed in its motion, the Institute is owned by the federal government, because the government has all hallmarks of ownership over the Institute—i.e., the United States created it; the United States controls its board; the Institute cannot issues shares to anyone else; the Institute is prohibited from receiving non-appropriated sums to fund its operations; and the United States retains title to the Institute's assets upon its dissolution. Defs. Mot. (ECF No. 32) at 20. In assembling their slippery slope, Plaintiffs ignore all indicia of ownership besides the last. They then argue that the mere fact that the Institute's assets revert to the United States upon dissolution, is insufficient to establish ownership. Pls. Opp'n (ECF No. 34) at 20. The United States never made that argument. Thus, by solely focusing on that indicium of ownership, Plaintiffs offer no response to the United States' demonstration of ownership as a whole.

Beyond confused slippery slope contentions, Plaintiffs argue that the Institute's tax treatment somehow reveals it is not owned by the United States. Pls. Opp'n (ECF No. 34) at 20. But the provision of the Internal Revenue Code governing the Institute, 26 U.S.C. § 170(c)(2)(B), does not speak to ownership at all. Instead, it generically applies to any "corporation, trust, or community chest, fund, or foundation" that meets its statutory requirements. *Id.* § 170(c)(2). Plaintiffs' remark that Congress could have deemed the Institute subject to another tax code provision exclusively used by governmental possessions, is hardly evidence that Congress intended that the Institute, in exercising executive powers, be outside the Executive Branch (and for that matter, outside the whole of the constitutional structure of the federal government).

6.    Plaintiffs' Comparisons of the Institute to Title 36 Charters, the
Smithsonian Institute, and the Second Bank of the United States Are
<u>Misplaced.</u>

In their opposition, Plaintiffs again attempt to move the Institute outside of the Executive

Branch by comparing it to dissimilar organizations—including, the Smithsonian, the Second Bank

of the United States, and corporations chartered under Title 36.  Pls. Opp'n (ECF No. 34) at 7–9.

The United States already explained that the Smithsonian is far different from the Institute here.

Defs. Mot. (ECF No. 32) at 23.  As to the Second Bank of the United States, no one besides

Plaintiffs here have suggested it fell outside of the Executive Branch—instead, Justice Kagan

recently pointed to it as an example of an Executive Branch component (or "agency") with

historical for-cause removal protections.  *See Seila L. LLC v. Consumer Fin. Prot. Bureau*,

591 U.S. 197, 274 (2020) (Kagan, J., concurring in part).

Corporations chartered under Title 36 are even further afield.  They are often not parts of

the federal government at all.  Take, for example, the Boy Scouts of America.  It has a Title 36

charter.  *See* 36 U.S.C. §§ 30901–30908.  But it is a private corporation, not part of the government.

*See Boy Scouts of Am. v. Dale*, 530 U.S. 640, 644 (2000) ("The Boy Scouts is a private, not-for-

profit organization engaged in instilling its system of values in young people."); *see also* Ronald

C. Moe, Congressionally Chartered Corporate Organizations (Title 36 Corporations) What They

Are and How Congress Treats Them, 46 Fed. Law. 35, 36 (July 1999) ("Chartered corporations

listed in Title 36 are not agencies of the United States and the charter does not assign the corporate

bodies any governmental attributes.").  The same goes with the U.S. Olympic and Paralympic

Committee.  36 U.S.C. §§ 220501–220552.  As the Supreme Court has ruled: "The fact that

Congress granted it a corporate charter does not render the [U.S. Olympic Committee] a

Government agent. . . . They do not thereby lose their essentially private character."  *San Francisco

Arts & Athletics, Inc. v. U.S. Olympic Comm.*, 483 U.S. 522, 543–44 (1987).  Accordingly, any

comparison or analogies that Plaintiffs attempt to draw between the Institute and Title 36 charters is misplaced.

Once again, here it is undisputed that the Institute is part of the federal government. Pls. Mot. (ECF No. 22) at 16 n.9. True, the Institute is "an independent nonprofit corporation" under its organic statute. 22 U.S.C. § 4603(b). But that description does not mean Congress created a governmental entity floating outside the constitutional structure of our federal government. It simply means the Institute is independent from other government components, and its legal status is that of a non-profit corporation versus some other legal form.

## II.    Plaintiffs Misunderstand the Law in Suggesting that the Institute's Board Can Enjoy For-Cause Removal Protections.

As the United States demonstrated in its motion, because the Institute is part of the Executive Branch and performs executive functions, the President may remove its board members at his will and outside the alternative procedures identified in the Institute's organic statute. Defs. Mot. (ECF No. 32) at 23–25; *see* 22 U.S.C. § 4605(f)(1)–(3). Indeed, as the Supreme Court has held, "the President's removal power is the rule, not the exception." *Seila L.*, 591 U.S. at 228. In response, Plaintiffs argue that the Institute falls within the *Humphrey's Executor* exception to the general rule because it does not wield "substantial executive power." Pls. Opp'n (ECF No. 34) at 29–34. Plaintiffs are wrong.

As the United States discussed in their motion, the *Humphrey's Executor* exception only applies when an agency exercises no substantial executive power. *Seila L.*, 591 U.S. at 216. That is, while insubstantial or incidental exercises of executive authority will not, under *Humphrey's Executor*, force a court to invalidate for-cause removal protections of an otherwise quasi-judicial or quasi-legislative agency, an agency that predominately exercises executive functions plainly exercises substantial executive power. *See Humphrey's Executor v. United States*, 295 U.S. 602,

628 (1935) (As to the then-existing Federal Trade Commission, "[t]o the extent that it exercises any executive function, as distinguished from executive power in the constitutional sense, it does so in the discharge and effectuation of its quasi legislative or quasi judicial powers, or as an agency of the legislative or judicial departments of the government.").

Contrary to Plaintiffs' argument, the Government's argument here is on all fours with the Solicitor General's position in *Wilcox*. Pls. Opp'n (ECF No. 34) at 29–30. Indeed, it is Plaintiffs who misunderstand the Solicitor General's position. "Substantial" as used in *Seila Law* is not a relative comparison to "importance of the regulatory and enforcement authority of disparate agencies." *Collins*, 594 U.S. at 253 ("we do not think that the constitutionality of removal restrictions hinges on such an inquiry"). Instead, it connotes the assignment of executive functions that are not merely ancillary or incidental to otherwise judicial or legislative authorities. For example, the 1926 Federal Trade Commission's obligation to undertake investigations at the direction of the President, while executive in nature, was "so obviously collateral to the main design of the act as not to detract from the force of this general statement as to the character of that body." *Humphrey's Executor*, 295 U.S. at 628 n.1.

As detailed above and in the United States' motion, the Institute does not fall into this exception. The Institute is predominantly tasked with executive authorities: enhancing U.S. diplomacy and foreign policy efforts in an attempt to obviate the need for military action. 22 U.S.C. § 4601. Plaintiffs argue that these are not executive functions. But they clearly fall within the ambit of Article II executive powers. Thus, the Institute plainly wields substantial executive powers. Indeed, the question is not, as Plaintiffs phrase it, "whether [the Institute's] international research and engagement work amounts to an exercise of 'substantial executive power[.]'" Pls. Opp'n (ECF No. 34) at 30. Instead, it is whether Congress assigned beyond de

minimis executive functions and power to the Institute in its organic statute. As noted above, the

focus of the inquiry is not on the practical work performed by the agency, but its functions and

authorities assigned by Congress. And the functions and authorities assigned to the Institute,

which is indisputably part of the federal government, are clearly executive in nature.

Pivoting to likening the Institute to the Federal Trade Commission in *Humphrey's*

*Executor*,[4] Plaintiffs now argue that the Institute serves a quasi-legislative function. Pls. Opp'n

(ECF No. 34) at 31–32. This new proposition is absent from Plaintiffs' moving papers. *See* Pls.

Mot. (ECF No. 22) at 29–36 (discussion of *Humphrey's Executor* with no argument that the

Institute is quasi-legislative in nature). That is for a good reason—the Institute's primary role is

not to support congressional lawmaking. Indeed, as Plaintiffs explained it in their motion:

> Under the USIP Act, the principal activities of the Institute are to establish a
> fellowship program for domestic and global peace scholars; establish a scholarship
> program for high school and college students; establish a multidisciplinary research
> program on peace and conflict; develop programs to make peace education,
> research, and training "useful" to government, private enterprise, and voluntary
> associations"; support post-graduate peace research; conduct trainings "for
> practitioners, policymakers, policy implementers, and citizens and noncitizens" in
> the field of international peace and conflict resolution; and publish analyses and
> information gleaned from fieldwork to the public and the government.

Pls. Mot. (ECF No. 22) at 5–6. And nothing about the Institute's organic statute assigns it

legislative functions or support authorities. To the contrary, the Institute is prohibited from

attempting to undertake or influence congressional action except as formally requested by a

"legislative body, a committee, or a member thereof." 22 U.S.C. § 4604(n).

Lastly, Plaintiffs argue that somehow the allowance of the board to recommend the

removal of one of its members clears up any constitutional issues with its for-cause removal

---

[4]    Plaintiffs do so yet oddly concede the Institute is "far removed from the early-20th century
Federal Trade Commission[.]" Pls. Opp'n (ECF No. 34) at 31 n.22.

provisions.  Pls. Opp'n (ECF No. 34) at 32–34.  Not so.  Requiring the President to obtain the consent of eight board members hardly makes those board members removable at the will of the President.  *See Seila L.*, 591 U.S. at 213–15.  The other removal provision in the Institute's organic statute—allowing for presidential removal upon the concurrence of certain members of Congress—poses even more constitutional issues, *see Citizens for Abatement*, 501 U.S. at 275–76, and plainly does not make board members at will in the President's discretion, which is the constitutional obligation rooted in the vesting clause.

## III.    Plaintiffs Have No Authority to Bring Suit On Behalf of the Institute.

The individual plaintiffs have been terminated from the Institute.  Am. Compl. (ECF No. 12) ¶ 85 ("Accordingly, President Trump's actions to remove the members of the Institute's Board are unlawful and without legal effect.").  Those individual plaintiffs claim that termination was improper.  *Id.*  Those individual plaintiffs have filed this suit seeking injunctive and declaratory relief to reinstate them.  *Id.* at 26–28.  This is how our legal system works—individuals allegedly harmed by another file suit seeking a judicial resolution of their alleged injuries.  *See generally Curran v. Higgiston*, 18 F. Supp. 969, 970 (D. Mass. 1937) ("The generally accepted method of testing the right of a federal official to hold office is to sue at law in the Court of Claims for salary.  Such a remedy is plain, adequate, and complete." (citing *Myers v. United States*, 272 U.S. 52 (1926), and *Humphrey's Executor*, 295 U.S. at 602)).

What the official capacity plaintiffs and those purporting to represent the Institute do instead is pretend that the terminations have not occurred and that they can continue to exercise Institute authorities despite their terminations.  That is not how our legal system works.  The official capacity plaintiffs and those purporting to represent the Institute cannot continue to invoke governmental authorities.  *Cf.* Restatement (Second) of Agency § 450 cmt. a (1958) ("a principal always has the power to terminate the agency, and the agent is under a duty not to continue to act

as such after his authority is terminated"). Under a contrary logic, the official capacity plaintiffs and those purporting to represent the Institute could continue to cut checks for the Institute, enter into binding contracts for the Institute, and retain outside counsel with Institute funds. That is not the law, and those actions would undoubtedly be unlawful. *Glob. NAPs, Inc. v. Verizon New England, Inc.*, 389 F. Supp. 3d 144, 146 (D. Mass. 2019) ("Once discharged, however, the receiver's duties and authority cease, and he may no longer act in an official capacity."). No less, pressing a lawsuit in the name of the Institute and in official capacities as the Institute's board after termination falls outside of any authority.

Plaintiffs offer little to the contrary other than reiterating their disputes with their terminations[5] and claiming that their terminations were void. Indeed, Plaintiffs in their individual capacities can obviously seek to void their terminations (although the law does not afford Plaintiffs that remedy here). But until a court rules that those terminations are void, they remain in effect. *Id.*

## IV.    Plaintiffs Bring No Claim Regarding the Current Operation of the Institute, Nor Could They As They Have No Independent Standing to Do So.

Plaintiffs next argue that the United States does "not address Plaintiffs' independent argument that even if the President's removals of [the Institute's] Board members were valid, Defendants may not give away all of the Institute's property, fire all its employees, and cancel its contracts, which together amount to cessation of the Institute's activities and steps to dissolve the entity." Pls. Opp'n (ECF No. 34) at 36–38. But Plaintiffs' operative complaint contains no such claim, and Plaintiffs have no standing to bring it if they were properly removed.

---

[5]    Plaintiffs are wrong in suggesting a board meeting was necessary to remove Moose from his position. The Institute's organic statute contains no such obligation, and the Institute's bylaws expressly permit board action without a meeting. *See* Institute Bylaws art. V, § 6 (ECF No. 34-5 at 93).

In making this argument, Plaintiffs point to Count I of their Amended Complaint.  *Id.* at 38 n.27.  That Count makes no reference whatsoever to the operations of the Institute after Plaintiffs were removed.  Am. Compl. (ECF No. 12) ¶¶ 71–77.  Instead, the count asserts an ultra vires claim against "All Defendants" for their actions "to exert control over" the Institute.  *Id.* ¶ 77.  Within the count, there is no contention that Defendants have otherwise exceeded their authorities beyond "exerting control" over the Institute and relatedly exceeding the congressional scheme for removing board members.  *See id.*  This reading is confirmed by Plaintiffs' prayer for relief—it only seeks injunctions and declarations to correct what Plaintiffs believe were their improper removals, not the operation of the Institute to reduce it to its statutory minimums.  *Id.* at 27–28.  Plaintiffs cannot reinterpret their complaint through motions practice and play "gotcha," seeking waiver because the United States did not respond to claims totally absent or vaguely presented in their pleading.  *See, e.g.*, *Pappas v. District of Columbia*, 513 F. Supp. 3d 64, 81 n.5 (D.D.C. 2021) (Contreras, J.) ("[A plaintiff] cannot amend his or her complaint by the briefs in opposition to a motion to dismiss."); *Kingman Park Civic Ass'n v. Gray*, 27 F. Supp. 3d 142, 160 (D.D.C. 2014) (Kollar-Kotelly, J.) (collecting authorities; "It is well settled law that a plaintiff cannot amend his or her complaint by the briefs in opposition to a motion to dismiss.").

That said, even had Plaintiffs reasonably spelled out a claim challenging the operations of the Institute after their removals, Plaintiffs have no standing to bring such a claim.  That is, if Plaintiffs were properly removed, they have no continuing relationship with the Institute and have suffered no legally recognized injury from its continued operations.  *Cf. Stirrup v. Dep't of Def.*, No. 23-5094, 2024 WL 2873780, at *3 (D.C. Cir. June 7, 2024) ("[T]he terminated appellants do not contend that they are likely to again serve on the Air Force Board. As a result, a permanent injunction preventing all future presidents from removing the appellants during the term of a

hypothetical future appointment would not affect them in any non-speculative way."). As such, even had Plaintiffs made claims regarding the continuing operation of the Institute (which they did not), those claims plainly would rise and fall with their removal claims.

## V.     Plaintiffs' Remedial Arguments Have No Merit.

Lastly, Plaintiffs suggest that contrary to controlling law, they can be reinstated to positions that require presidential nomination and Senate confirmation. Pls. Opp'n (ECF No. 34) at 39–44; *see* 22 U.S.C. § 4605(b)(4). Plaintiffs are wrong. As demonstrated in the United States' motion, the law is clear—reinstatement of presidential appointees is improper as it "impinges on the 'conclusive and preclusive' power through which the President controls the Executive Branch that he is responsible for supervising." *Dellinger v. Bessent*, No. 25-5028, 2025 WL 559669, at *12 (D.C. Cir. Feb. 15, 2025) (Katsas, J., dissenting) (quoting *Trump v. United States*, 603 U.S. 593, 608–09 (2024)).

Plaintiffs argue that the Institute's legal form, that of a non-profit corporation, changes the analysis. Not so. The Institute is part of the federal government (again, a conclusion Plaintiffs do not contest), and its board members are thus public officials. Plaintiffs only citation in support of their distinction is the decades-old, unreported district court opinion in *Berry v. Reagan*, Civ. A. No. 83-3182, 1983 WL 538, at *4 (D.D.C. Nov. 14, 1983). But the court's decision in *Berry*— which found, in considering a preliminary injunction, that commissioners on the Commission on Civil Rights may likely have life tenure despite no statutory for-cause removal provisions, the Commission being within the Executive Branch, and a tenure provision that had the commissioners serve "during the pleasure of the President"—has almost certainly been rendered outdated in light of the Supreme Court's more recent rulings in *Seila Law*, *Collins*, and others. The *Berry* decision also did not grapple with any of the authorities cited by the United States, which cabin the Judiciary's authority to compel reinstatement of presidentially appointed officials. *See id.* And

the decision in no way supports the distinction that Plaintiffs draw here from the Institute's legal form.

Plaintiffs' resort to *Marbury v. Madison*, 5 U.S. (1 Cranch) 137 (1803), fares no better. *Marbury* concerned the delivery of a judicial commission signed by the President and entrusted to the Secretary of State to be delivered to a judicial appointee. *See id.* It did not concern the removal of any official or any non-judicial official, like the circumstance presented here. That distinction is critical, because Plaintiffs here ask this Court to unwind a presidential decision to remove them from office, not to compel an Officer of the United States to take a non-discretionary action. While Plaintiffs suggest that the Court need not issue an injunction to the President to reinstate the former board members, they fail to explain how that is so. The former board members were removed by the President; thus, the only way to reinstate them is to direct the chief executive to recognize their reinstatement. Otherwise, any reinstatement order would be ineffectual. Presumably this is why they named the President as a defendant in this case.

Plaintiffs otherwise fail to meaningfully address the myriad legal precedents, which prevent the Court from issuing the remedy of reinstatement here, cited by the United States in its motion. The individual plaintiffs can sue for money damages if they were wrongfully terminated. Whether that suit would be successful is outside of the issues presented in this case. The Court, however, cannot compel the President to reinstate presidential appointees he has terminated.

*    *    *

## CONCLUSION

For these reasons, and those in the United States' motion, the Court should enter summary judgment in Defendants' favor on Plaintiffs' claims in this suit.

Dated:  April 25, 2025
       Washington, DC

Respectfully submitted,

EDWARD R. MARTIN, JR., D.C. Bar #481866
United States Attorney


By:  _____ */s/ Brian P. Hudak*_____
    BRIAN P. HUDAK
    Chief, Civil Division
    601 D Street, NW
    Washington, DC 20530
    (202) 252-2549

JOSEPH F. CARILLI, JR.
SAM ESCHER, D.C. Bar #1655538
Assistant United States Attorneys

*Attorneys for the United States of America*