UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES INSTITUTE OF PEACE, *et al.*,

    Plaintiffs,

v.

KENNETH JACKSON, *et al.*,

    Defendants.

Case No. 1:25-cv-00804-BAH

**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION
FOR A STAY PENDING APPEAL**

On May 19, this Court issued a thorough 102-page opinion disposing of cross-motions for summary judgment. On an undisputed factual record, the Court entered final judgment for Plaintiffs, allowing the individual Plaintiffs to resume control of the United States Institute of Peace ("USIP"). Indeed, on May 21, after providing notice to and working cooperatively with Defendants' counsel, Plaintiffs accessed and assumed control of USIP's headquarters building. Declaration of George E. Moose in support of Pl. Opp. to Defs. Stay Mot. ¶¶ 6-7 ("Moose Decl.") (attached as Exhibit 1).

After having seized control of USIP in March 2025 by enlisting police and federal agents, Defendants now seek to regain control of USIP, this time through the "extraordinary remedy" of a "stay pending appeal." *KalshiEX LLC v. CFTC*, 119 F.4th 58, 63 (D.C. Cir. 2024). Defs.' Mot. Stay Pending Appeal ("Mot."), ECF 42. But Defendants have not met their burden of justifying this "'intrusion into the ordinary processes of administration and judicial review.'" *M.M.V. v. Barr*, 459 F. Supp. 3d 1, 4 (D.D.C. 2020) (quoting *Nken v. Holder*, 556 U.S. 418, 427 (2009)). Defendants have made no cognizable showing that they will be irreparably harmed, while their appeal proceeds, if control of USIP remains with its duly appointed leadership, as is the case currently. And Defendants are very likely to lose on appeal because their claim that the removal restrictions in 22 U.S.C. § 4605(f) are unconstitutional is contrary to binding precedent, meaning that the removal of USIP's board and all that followed was unlawful.

Four factors guide the Court's discretion whether to take this extraordinary step, and nothing in the Supreme Court's stay order entered yesterday in *Trump v. Wilcox*, 605 U.S. __, No 24A966 (May 22, 2025) ("*Trump v. Wilcox* Order"),[1] suggests a contrary result. The first two factors—"whether the stay applicant has made a *strong* showing that [it] is likely to succeed on

---

[1] On May 22, Defendants submitted the decision as supplemental authority. ECF 44.

the merits" and "whether the applicant will be irreparably injured absent a stay"—are the "most critical." *M.M.V.*, 459 F. Supp. 3d at 4 (quoting *Nken*, 556 U.S. at 427) (emphasis added). The remaining two factors are "whether issuance of the stay will substantially injure the other parties interested in the proceeding" and "where the public interest lies." *Id.* (quoting *Nken*, 556 U.S. at 427). Here, all four factors clearly weigh against entering a stay.

***Likelihood of success on the merits.*** Defendants' merits argument in their motion for a stay is merely a rehash of arguments the Court thoroughly considered and rejected in its Memorandum Opinion. Where "a stay motion merely reiterates" arguments already advanced "and the Court has not been presented with anything new to consider," the likelihood of success factor weighs against a stay. *Id.* at 5. Moreover, a mere "chance" of success is not enough; the likelihood of success must be "substantial." *Id.* (quoting *Washington Metro. Area Transit Comm'n v. Holiday Tours, Inc.*, 559 F.2d 841, 843 (D.C. Cir. 1977)).

Defendants do not come close to meeting this "stringent standard." *Id.* As the Court's Memorandum Opinion explained, Defendants' merits positions depend upon an expansion of governing Supreme Court precedent, which holds that for-cause removal restrictions implicate the President's powers under Article II only if the restrictions purport to govern (i) an Executive Branch entity where (ii) persons within that entity exercise substantial executive power. *See* Memorandum Opinion ("Mem. Op.") at 28–30, 83–84, ECF 40. *See also Trump v. Wilcox* Order at 1 ("The stay [pending appellate review in that case] reflects our judgment that the Government is likely to show that both the NLRB and MSPB exercise considerable executive power.").

This Court engaged in an exhaustive analysis of the relevant factors in its Memorandum Opinion and correctly determined, based on undisputed record facts, that USIP is not an entity within the Executive Branch, and its Board members do not exercise any significant or substantial

2

executive functions. *Id.* at 30, 51–77. It simply is not an entity that exercises *any* executive power let alone "*considerable* executive power" (emphasis added) as described in the Supreme Court's May 22 stay order in *Trump v. Wilcox*. Because Defendants have no chance of success on the merits under the law that currently governs this Court and the D.C. Circuit, a stay is not warranted. *See* Order Denying Stay Pending Appeal at 4, *Aviel v. Gor, et al.*, No. 25-cv-00778-LLA, ECF No. 34 (D.D.C. Apr. 10, 2025) (merits position that required "dramatic[] reinterpret[ation] of the constitution" and "ignor[ing]" a statute governing presidential appointment could not support a stay pending appeal).

    Defendants rely principally on a reprise of the "process-of-elimination reasoning" the Court carefully analyzed and rejected in its Memorandum Opinion. Mem. Op. at 40, 52, 57, 60 n.23. The authorities Defendants cite stand at most for two principles, neither of which helps them. *First*, Defendants cite cases holding that an entity that exercises executive power is part of the Executive Branch. Mot. at 2-3. As the Court has already (correctly) explained, the reasoning of *Springer v. Gov't of Philippine Islands*, 277 U.S. 189 (1928), did not depend on the Supreme Court's "deduction" that the committee at issue was exercising executive powers because it was not exercising legislative or judicial powers. Mem. Op. at 57. Rather, the *Springer* Court explained "why the committee's powers were executive in nature." *Id.* (citing *Metro. Washington Airports Auth. v. Citizens for Abatement of Aircraft Noise, Inc.*, 501 U.S. 252, 275 (1991)). Similarly, this Court explained that the D.C. Circuit in *Kuretski v. Comm'r of Internal Revenue Serv.*, 755 F.3d 929, 939–940, 943 (D.C. Cir. 2014), reasoned that the Tax Court was part of the Executive Branch because it "is in the business of interpreting and applying the internal revenue laws," and thus performs inherently executive functions. *Id.* at 60 n.23. This Court further explained that language in *Kuretski* suggesting that if an entity does not belong to the other two branches, it likely belongs

3

to the third "does not undercut . . . that *some* entities, particularly those removed from core governmental responsibilities . . . may not belong in any branch at all." *Id.* And the Court has likewise already explained why *Nat'l Horsemen's Benevolent & Protective Ass'n v. Black*, 53 F.4th 869, 873, (5th Cir. 2022), is inapposite. *Id.* at 58 n.22.

Defendants' cases primarily deal with agencies that exercise considerable executive *regulatory* powers and are therefore inapposite. *See VHS Acquisition Subsidiary No. 7 v. NLRB*, 759 F. Supp. 3d 88, 97 (D.D.C. 2024) (involving agency that "relies on 'policymaking by adjudication' to *regulate parties*" (emphasis added and citation omitted)); *Fed. Mar. Comm'n v. S.C. State Ports Auth.*, 535 U.S. 743, 773–74 (2002) (Breyer, J., dissenting) (involving agency that had the "authority to enforce" a federal statute in a variety of ways, including by making rules, issuing and revoking licenses, conducting investigations, and adjudicating complaints); *Commonwealth Edison Co. v. U.S. Nuclear Regul. Comm'n*, 830 F.2d 610, 619–20 (7th Cir. 1987) (in assessing how to classify the U.S. Nuclear Regulatory Commission under statutory definitions in the Debt Collection Act of 1982, rejecting an argument that the NRC, as an "independent agency," was "necessarily not an executive or legislative agency" for purposes of the statute).

Defendants insist that USIP exercises executive powers of a different sort because some of its work involves peacebuilding activities abroad (Mot. at 6-7), but they do not offer any refutation of the Court's holding that undisputed record facts show that USIP does not represent *the United States government* in those activities. Notably, Defendants do not even contend (let alone explain why) USIP's research, training, and conflict resolution activities constitute an exercise of *substantial* executive power—the standard required by *Seila Law* (let alone the "considerable" executive power standard referenced in the *Trump v. Wilcox* Order). It is undisputed that USIP does not make or implement foreign policy for the United States. Rather, USIP's international

4

conflict resolution work furthers its own independently determined, "nongovernmental" research and educational mission. Mem. Op. at 65-74, 69 n.27 (emphasis omitted).

*Second*, Defendants' other cited cases stand for the proposition that the separation of powers means that one branch (e.g., Congress) cannot aggrandize to itself the powers of another branch (e.g., the Executive Branch). *See Springer*, 277 U.S. at 203 (holding that a committee controlled by Philippines legislators could not carry out the executive function of voting government stock held in government corporations because nothing in the Organic Act of the Philippine Islands suggests "that the Legislature in acting in respect of the proprietary rights of the government may disregard the limitation that it must exercise legislative and not executive functions"); *Ameron, Inc. v. U.S. Army Corps of Eng'rs*, 787 F.2d 875, 891–96 (3d Cir. 1986) (Becker, J., concurring in part) (opining that "administrative agencies" must be within the Executive Branch or, as in the case of the Government Accountability Office (then named the General Accounting Office) ("GAO"), in the Legislative Branch, and concluding that the GAO was within the Legislative Branch even though it exercised some executive powers because there was no "direct congressional involvement" in "the domain of the executive"), *on reh'g*, 809 F.2d 979 (3d Cir. 1986). The legislation creating USIP is not a case of Congress assigning any executive powers to itself or a body it controls. Indeed, the decisions cited by Defendants cut against their insistence on the "mathematical precision" of "divid[ing] the branches into watertight compartments." Mem. Op. at 57 n.21 (quoting *Springer*, 277 U.S. at 211) (Holmes, J., dissenting)). Take *Ameron*: On rehearing following the Supreme Court's holding in *Bowsher v. Synar*, 478 U.S. 714 (1986), that the GAO is part of the Legislative Branch, Judge Becker, this time writing for the panel, held that the power of the GAO at issue in that case—the power to stay execution of challenged government contracts pending the GAO's non-binding recommendation on the

5

resolution of a bid protest—was nevertheless constitutional because this power was not "of a kind which Article II of the Constitution grants exclusively to the President and his subordinates" and presented at most "minimal" potential to disrupt Executive Branch procurement functions. *Ameron, Inc. v. U.S. Army Corps of Eng'rs*, 809 F.2d 979, 991, 994–99 (3d Cir. 1986).

At bottom, Defendants' cases do not undermine Congress's ability to create by statute (with the President's signature) a nonprofit research institution that is not part of any of the three branches. In fact, *Springer* suggested that Congress can do, and from time to time had done, just that. The Supreme Court noted that the Smithsonian Institution was "created for governmental purposes" yet subject to the control of a hybrid board including members of Congress; and that there were other examples of "nonstock corporations of like character." 277 U.S. at 204. The U.S. Holocaust Memorial Museum is a more modern example of an entity created by Congress to perform a governmental function that cannot be squared with presidential control of board members chosen by Congress. Defendants' stay motion does not engage with the fact that from the earliest days of the Republic, Congress has established both for-profit and nonprofit corporations to carry out some governmental functions, starting with the first Bank of the United States. *See* Mem. Op. at 53-56 (discussing entities, like the grand jury and Smithsonian, that do not fit neatly into one of the three branches); *see also Trump v. Wilcox* Order at 2 ("The Federal Reserve is a uniquely structured, quasi-private entity that follows in the distinct historical tradition of the First and Second Banks of the United States."). No court has ever held that every corporation or other "quasi-private entity" charged with performing some governmental function is part of the Executive Branch by default and subject to presidential control by at-will removal even when Congress has dictated otherwise.

Even setting these points entirely to the side, neither the pending stay motion nor the *Trump v. Wilcox* Order offers any reason for this Court to re-think its alternative holding that even if USIP were part of the Executive Branch, the removal restrictions would be constitutional under *Humphrey's Executor v. United States*, 295 U.S. 602 (1935), because they apply to a multi-member, partisan-balanced board of experts who do not wield substantial executive power. Mem. Op. at 76–88. For this reason alone, Defendants are unlikely to succeed on the merits.

Finally, Defendants rely on three dissenting opinions to suggest they are likely to succeed on appeal because the Court's "equitable relief" clashes with the exercise of "core executive power" and exceeds the scope of the Court's equitable authority. Mot. at 7 (citation omitted). The Court rejected Defendants' arguments on these points in its Memorandum Opinion, not least because USIP is not part of the Executive Branch. Mem. Op. at 97–99. Each of the opinions Defendants cite involved officials with regulatory and/or enforcement powers that USIP does not have. Two of the cited dissents involved the *Dellinger* litigation, in which the at-issue TRO arguably ran directly against the President. *See Dellinger v. Bessent*, No. 25-5028, 2025 WL 559669, at *10, 13, 13 n.2 (D.C. Cir. Feb. 15, 2025) (Katsas, J. dissenting). Here, the Court simply ordered Defendants not to interfere with the lawful leadership of USIP, relief that runs only against "subordinate defendants." Mem. Op. at 99. Moreover, even if the Court's remedy were not available under equitable principles, in a case decided after the merger of law and equity, it would be available at law through a writ of mandamus. *Id.* at 98 n.43.

Because a failure to demonstrate a likelihood of success on the merits is "an arguably fatal flaw for a stay application," the Court's analysis can end here. *See M.M.V.*, 459 F. Supp. 3d at 4 (quoting *Citizens for Responsibility & Ethics in Washington ("CREW") v. FEC*, 904 F.3d 1014, 1019 (D.C. Cir. 2018) (per curiam)).

***Irreparable harm, substantial injury to Plaintiffs resulting from a stay, and public interest.*** The irreparable harm factor "requires more than the mere 'possibility of irreparable injury.'" *Id.* (quoting *Nken*, 556 U.S. at 434). The "harm must be both certain and great, and actual and not theoretical." *Id.* (cleaned up) (quoting *CREW*, 904 F.3d at 1019). Where, as here, "there is a low likelihood of success on the merits, a movant must show a proportionally greater irreparable injury." *Id.* (citing *Cuomo v. U.S. Nuclear Regulatory Comm'n*, 772 F.2d 972, 978 (D.C. Cir. 1985). Even when (unlike here) "the question on the merits is close and difficult," a failure to demonstrate irreparable harm "is fatal" to a stay request. *KalshiEX*, 119 F.4th at 63–64.

Here, the Court's Order has restored the status quo ante—an independent USIP—that existed for decades before Defendants' unlawful actions. "The status quo is the last *uncontested* status which preceded the pending controversy." *District 50, United Mine Workers of Am. v. Int'l Union, United Mine Workers of Am.*, 412 F.2d 165, 168 (D.C. Cir. 1969) (internal quotation and citation omitted). The ten-week "status quo" that Defendants complain this Court "disrupt[ed]" (Mot. at 7) was contested by Plaintiffs from the very beginning. Indeed, the Defendants have failed to provide any evidence that, during those weeks, Defendants performed any of the functions Congress assigned to USIP (and instead, took impermissible steps to cease all USIP operations and functions, even those that Congress has mandated that it perform). *See* Mem. Op. at 22; Moose Decl. ¶ 13.

Rather, Defendants ask the Court to *restore* the ordering of USIP that this Court found unlawful and invalid—what Defendants misleadingly call the "existing" status quo. Mot. at 5, 8. But the actual, current "status quo" is different. After the Court issued its decision, consistent with the Court's order, Plaintiffs moved promptly to exercise their authority and fulfill their obligations as USIP's leadership—just as they had at all times before March 14. On the morning of May 20,

8

Plaintiffs' counsel wrote to defense counsel asking for Defendants' cooperation in facilitating an orderly transfer of responsibilities and control to Plaintiffs. On May 21, Defendants' counsel responded and helped facilitate Plaintiffs' access to the USIP building and systems—including assuming responsibility for the security and maintenance of the USIP headquarters, Moose Decl. ¶¶ 6-7—all before moving for a stay.

Defendants' two sentences that purport to identify "harms" to Defendants are wholly inadequate to justify a stay. First, Defendants state—without any factual support—that the Court's order will "require the Executive Branch to undo months of work." Mot. at 7. It is not even clear what that means, because the order mainly requires Defendants not to impede *Plaintiffs* from performing their duties. As the current leadership of USIP, Plaintiffs are the ones bearing the burden of undoing the unlawful actions taken by Defendants during their brief period of control over USIP. Second, Defendants claim that absent a stay, the "government" will be required to "expend taxpayer funds." *Id.* at 8. Defendants offer no explanation or evidence for that assertion. Such vague, unsupported statements do not come close to meeting the irreparable harm standard required for a stay. In any event, the expenditure of taxpayer funds for the purposes for which Congress appropriated them cannot constitute irreparable injury to the government, let alone to these Defendants.

Nor have the Defendants presented any evidence or basis for concluding why, now that Plaintiffs are restored to possession of and responsibility for USIP's headquarters, Defendants should again be given control of the building. There is no evidence that Defendants (or GSA) have sought to use the USIP building, and Defendants' handover of the building on May 21 confirms that it is not the theirs to control. When he entered the building on May 21, pursuant to the Court's Order, Plaintiff Ambassador Moose confirmed his understanding that USIP's headquarters

building has sat essentially abandoned for weeks. Moose Decl. ¶ 8. There is evidence of rats and roaches in the building, along with other evidence of Defendants' failure to maintain the building, including problems with the vehicle barrier and cooling tower, water leaks, and damage to the garage door. *Id.* ¶¶ 10-11. And Defendants' understaffed security team allowed an exterior wall to be marred with graffiti. *Id.* ¶ 12. Stopping Defendants from letting the building languish in this way cannot cause irreparable harm.

Moreover, Defendants' assertion of a purely abstract harm to the President's "electoral mandate" as irreparable injury warranting a stay would be an extraordinary departure. Mot. at 7. To accept this position would mean that curbing the President in anything he desires to do constitutes irreparable injury regardless of the manner in which he seeks to do it, even when, as the Court found here, the President's actions violate a duly enacted, constitutional statute.[2] USIP's status as an independent nonprofit corporation makes particularly farfetched the idea that simply leaving in place duly appointed USIP board members who do not exercise "considerable executive power" constitutes irreparable harm to the current Administration.

The limits on the President's removal power with respect to the USIP Board are constitutional because they do not interfere with the President's Article II powers; enforcing those limits consistent with the Court's Order does not interfere with any presidential duty. Even were Defendants ultimately to prevail on appeal and resume their dismantling of USIP, the Court's order would amount to no more than a pause in those efforts. As the record shows, Defendants have had

---

[2] Defendants' request presents a house-of-mirrors inversion of the principle that a state may suffer irreparable harm when it is "enjoined by a court from effectuating statutes enacted by representatives of its people." *See New Motor Vehicle Bd. of Cal. v. Orrin W. Fox Co.*, 434 U.S. 1345, 1351 (1977) (Rehnquist, J., in chambers). Here, Defendants seek this Court's approval of actions taken in continuing violation of the USIP Act, rather than adherence to Congress's mandate.

no problem acting with lightning speed to dismantle USIP. *See* Mem. Op. at 16-21. Any "right-siz[ing]" of USIP that the President may lawfully carry out could proceed without hindrance should Defendants prevail on appeal. Mot. at 7–8. Defendants offer no reason for their bald request that the Court enter an order causing USIP to cease to function again and to allow that to happen *now*.

On the other hand, restoring Defendants' unlawful and outdated "status quo" will cause serious harm to Plaintiffs. As this Court held, Plaintiffs have suffered irreparable harms from their purported removals and Defendants' slapdash efforts to dismantle USIP, including the individual Plaintiffs' loss of the ability to serve in a position of public importance; the corresponding disruptive loss to USIP of its expert leadership; USIP's loss of the independence necessary to perform its mandated work and resulting harm to its reputation; and USIP's loss of "significant human capital and expertise." Mem. Op. at 93–95. These harms have not dissipated in the few days since the Court entered its Order; the fact that Defendants do not seek a stay order that would permit them to (further) dissipate USIP's financial assets does not remedy the full sweep of these harms. *See* Mot. at 8.

Even worse, a stay would permit Defendants to resume their rogue efforts to dismantle USIP, causing Plaintiffs to continue to suffer the harms found by the Court and compounding them with each passing day. In fact, a stay might enable Defendants to "run out the clock" by fully and irreversibly dismantling USIP before the Court of Appeals has a chance to weigh the merits. For every day that the Defendants are permitted to control this entity, the job of putting it back together by rehiring employees and stemming the dissipation of USIP's goodwill and reputation for independence will become that much harder. *See* Order Denying Stay Pending Appeal at 4, *Aviel*, No. 25-cv-00778-LLA, ECF No. 34 ("Staying the effect of the court's order would permit

11

Defendants to finish dismantling the IAF, effectively preventing Ms. Aviel from ever reassuming her lawful position. Far from 'minimiz[ing] harm while an appellate court deliberates,' *United States v. Texas*, 144 S. Ct. 797, 798 (2024) (Barrett, J., concurring), granting Defendants' motion would exacerbate it and turn imminent harm into irremediable injury.").

Where the choices are between (1) permitting USIP to fulfill its statutory educational mission as it has since 1984, with nothing stopping Defendants from calling a halt in the event they prevail on appeal, and (2) granting the extraordinary relief of a stay—without any substantial showing of irreparable harm or likelihood of success on the merits—so that Defendants can resume actions that "call into question whether USIP will continue to operate in the future," Mem. Op. at 93 n.41, the equities weigh heavily in favor of the former.

Finally, the public interest weighs against a stay. This Court has held that the challenged removals of the Plaintiffs were contrary to the express terms of a law passed by Congress, signed into law by President Reagan, and reaffirmed on numerous occasions over the past 40 years. There can be no public interest in allowing the unlawful actions of the current Administration and their effects to persist. *See League of Women Voters of United States v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016). The public is far better served by maintaining the *current* status quo—a USIP led by its lawfully appointed leadership—so that it can resume the programmatic work Congress authorized, and has funded it to pursue each year since 1984. *See* 22 U.S.C. § 4601(a)(1), (b).

Because all relevant factors weigh against the entry of a stay pending appeal, Plaintiffs respectfully request that the Court deny Defendants' motion for a stay. The Court should also deny Defendants' request (Mot. at 9) for "a two-business-day administrative stay to allow Defendants to seek a stay from the D.C. Circuit." At the TRO stage, Defendants argued that an administrative stay is not a "tool available to district courts" and that this Court lacks authority to issue any

temporary relief absent a showing of likelihood of success on the merits and irreparable harm. ECF 9 at 5-7. As explained herein, Defendants have not come close to such a showing.

Dated: May 23, 2025

Respectfully submitted,

*/s/ Andrew N. Goldfarb*
Andrew N. Goldfarb (D.C. Bar No. 455751)
J. Benjamin Jernigan (D.C. Bar No. 9000865)
ZUCKERMAN SPAEDER LLP
2100 L Street, NW, Suite 400
Washington, DC 20037
Tel: (202) 778-1800

William J. Murphy (D.C. Bar No. 350371)
ZUCKERMAN SPAEDER LLP
100 East Pratt Street, Suite 2440
Baltimore, MD 21202-1031
Tel: (410) 332-0444

*Counsel for Plaintiffs*

**CERTIFICATE OF SERVICE**

I hereby certify that on May 23, 2025, I served a true and correct copy of the foregoing document via the Court's Electronic Filing System, which will electronically send notice to all counsel of record.

/s/ *Andrew N. Goldfarb*
Andrew N. Goldfarb